# EXHIBIT 1

# Transcript created by Epiq

Event:            CIVIL JURISDICTION
                  (COMMERCIAL COURT)
                  2021, NO 387

                  IN THE MATTER OF THE AGREEMENT AND PLAN OF
                  MERGER BY AND AMONG ATHENE HOLDING LTD,
                  APOLLO GLOBAL MANAGEMENT INC, TANGO HOLDINGS
                  INC, BLUE MERGER SUB LTD, AND GREEN MERGER SUB
                  INC, DATED AS OF 8 MARCH 2021

                  AND IN THE MATTER OF A PROPOSED STATUTORY
                  MERGER AGREEMENT AMONG ATHENE HOLDING LTD,
                  TANGO HOLDINGS INC, AND BLUE MERGER SUB LTD.

                  AND IN THE MATTER OF SECTION 106 OF THE
                  COMPANIES ACT 1981

                  BETWEEN:

                        (1) STONEHILL INSTITUTIONAL  PARTNERS LP
                           (2) STONEHILL MASTER FUND LTD
                            (3) APS HOLDING CORPORATION
                          (4) DIAMOND FAMILY INVESTMENTS, LLC
                        (5) INVICTUS SPECIAL SITUATIONS MASTER I, LP
                                                                Plaintiffs

                                    AND

                           ATHENE HOLDING LTD
                                                     Defendant

Date:             02 November 2022

Speakers:         Chief Justice Narinder Hargun
                  Mark Chudleigh
                  Kevin Taylor

Digital transcript of Epiq Europe Ltd
Lower Ground | 18-22 Furnival Street | London | EC4A 1JS
Phone: +44 (020) 7404 1400
Web : www.epiqglobal.com/en-gb/ | Email: ukclient@epiqglobal.co.uk




**CHIEF JUSTICE HARGUN:** Yes, good morning, Mr Taylor.  Can you hear me all right?

**MR TAYLOR:**  Yes, my Lord, I can.  Can you hear me?

**CHIEF JUSTICE HARGUN:**  Yes, thank you.

**MR TAYLOR:**  Thank you.

**CHIEF JUSTICE HARGUN:**  Yes, good morning, Mr Chudleigh.

**MR CHUDLEIGH:**  Good morning, my Lord.  My Lord, I appear in this matter on behalf of the five Plaintiffs, and my learned friend, Mr Taylor and Mr Howard, appear on behalf of the defendant.

My Lord, this is the first Hearing of my client's originating summons for a fair value appraisal of their shares in the defendant, pursuant to Section 106(6) of the Companies Act.

**CHIEF JUSTICE HARGUN:**  Yes.

**MR CHUDLEIGH:**  My Lord, I am hoping you have before you, one Hearing Bundle, one Joint Authorities Bundle and copies of the parties' submissions.

**CHIEF JUSTICE HARGUN:**  I have in fact more than that.  I have a Hearing Bundle; I have your Authorities bundle and I have the other side's Authorities bundle.

**MR CHUDLEIGH:**  My Lord, as is often the case I suspect we will not be looking at many Authorities, but I think our Authorities Bundle does include more of the defendant's Authorities.  So, if necessary, we can make do with that bundle.

**CHIEF JUSTICE HARGUN:**  Yes.

**MR CHUDLEIGH:**  My Lord, and I am also hoping that you have received very recently a draft non-disclosure agreement.

**CHIEF JUSTICE HARGUN:**  Yes, I have.

**MR CHUDLEIGH:**  Thank you, my Lord.  My Lord, we have a day or so to start, but it is inconceivable that we will need anything close to that.  It would be unlikely that we will certainly go past lunch and could conclude even earlier than that, my Lord, because there has been a significant narrowing of issues, including in the last 48 hours, so I think we can contain things to a relatively short space of time.

My Lord, what I was proposing to do, was firstly just to highlight what remaining issues are.  I was then proposing to take your Lordship through selected passages in the proxy to provide your Lordship with an understanding of the transaction in question.  To take your Lordship to some passages which are relevant to my client's position in terms of both the initial disclosures and the expert evidence.

When I have done that, I was proposing to take your Lordship through the draft Directions Order just to highlight the directions that the parties have agreed upon and proposed to your Lordship.

**CHIEF JUSTICE HARGUN:**  Yes.

**MR CHUDLEIGH:**  At the same time as doing that I will address the essentially two remaining matters in issue.

**CHIEF JUSTICE HARGUN:**  Yes, that sounds fine.

**MR CHUDLEIGH:**  My Lord, before I turn to the issues, I just firstly would like to acknowledge the cooperation received from my learned friends at Walkers, certainly with the guidance from your Lordship's Judgment in the Jardine case; have managed to agree on most matters.

Secondly, my Lord, I would just note that this is a Directions Hearing and I have in mind the remarks of Justice Parker in the eHi Car Services case.  In fact there is an Authority in the bundle but that relates to the substantive Directions Hearing.  Subsequent to that there was a debate over who should pay the costs of the Directions Hearing.  In your lordship's judgment in Cost Judgment in Jardine you cited that Mr Justice Parker's comments with approval.  To the effect that one purpose of these hearings is to further the overriding objective, and for the parties and the Court an opportunity to take stock as we take matters forward.

Obviously, my Lord, it is for you to approve the proposed Directions which include a direction in relation to expert evidence, which is obviously a matter which the parties cannot agree between them and need the Court to specifically approve.

My Lord, in terms of the remaining matters in dispute; I think that if I could ask your Lordship to turn to the Plaintiff's Skeleton Submissions at paragraph 27.

**CHIEF JUSTICE HARGUN:**  Yes.

**MR CHUDLEIGH:**  As that sets out the parties' respective positions in terms of the initial disclosure that is due from the Company.  I would just ask your Lordship, if you could

take up your pen in relation to the Plaintiff's formulation and starting three lines from the bottom there is a comma and it states, "Such documents to include."

We have proposed to our learned friends on the other side to delete those words.  That does not of course amount to acceptance as to whether Lazard and Houlihan Lokey acts as agents for the Company, but we say it is not an issue that needs to be determined at this stage, and I will come back to that issue, my Lord.

Essentially, my Lord, the differences between the parties are, perhaps as you might expect, the Plaintiffs are seeking a broader formulation and the company is seeking a narrow formulation.

My Lord, just to step back, I should point out that the disclosure contemplated here is disclosure of documents in relation to work done by the Financial Advisors to the Company in relation to the merger.

I do not need to take your Lordship to the Jardine ruling, but in that case the advisors were a company known as Evercore.  Your Lordship made an order to the effect that Evercore's documents, or at least a subset of Evercore documents, should be produced as an initial matter.

My Lord, we are seeking essentially, we say, that all documents in relation to the role of Lazard and Houlihan Lokey should be disclosed.  My learned friends seek to narrow that and limit it to documents provided to, or received from, the advisors.  I will take your Lordship to the proxy in which it is apparent there is likely to be a significant number of documents, a significant number of relevant documents, that fall outside of the provided to or received from restriction.

My Lord, the second way in which the defendant seeks to narrow the initial disclosure is to limit it to documents in connection with the valuation of the company.  I accept that at first sight or first hearing, you may think that seems like a perfectly rational restriction, and there may be a definitional issue at play here between myself and my learned friends.

As I will illustrate by reference to the proxy, in this case, it is clear from the work that the financial advisors did that they looked at the value of the company.  I would agree that that is the central issue.

The financial advisors also looked at documents and information in relation to Apollo and indeed had direct

contact with Apollo's management in relation to their fairness

(Inaudible)

**CHIEF JUSTICE HARGUN:**  Can I ask you a question?  Have you
been given the shares which were given to all the other
shareholders?

**MR CHUDLEIGH:**  We have, my Lord.

**CHIEF JUSTICE HARGUN:**  So you are looking for the difference,
are you, between what this Court values and what you have
already received?

**MR CHUDLEIGH:**  Yes, my Lord.  I mean as this is a stock
transaction there is an issue.  It may, at the end of the day,
be a very simple issue to resolve, but neither side has
progressed with their experts, and so until the experts are
fully engaged it will not be possible to achieve any
resolution on it.

    As the consideration paid to the Plaintiffs was in the
form of shares in Apollo, which obviously traded stock and
fluctuate.  Indeed they fluctuate at market price which may
not be the same thing as value.  It is possible that one
argument , it is obviously a matter for the experts to opine
on, is that you would take the value of those Apollo shares on

the day they were received, their trading value; that is one argument.  My lord, it is not really appropriate for the parties --

**CHIEF JUSTICE HARGUN:**  Ordinarily you would just simply be concerned with what is the fair value of the shares; that is the only statutory enquiry the Court is concerned with.  If the Court says that the shares are worth $100 a share and you receive $95, you would be entitled to receive the difference. The only complication here is that you received shares.

**MR CHUDLEIGH:**  Yes, my Lord.  I mean this is a very theoretical argument, I think it is perhaps unlikely to arise in practice but let us just say that the Court was to appraise the value of the shares in the company at $100.  The market value of the Apollo shares received was $95, such that you would think that $5 would be due to the Plaintiffs.

There is an issue, and I stress an issue that I would expect to be resolved between the parties with the assistance of experts, that they may say, "Well, no.  What you received in Apollo is the intrinsic value, or some other value", or is it the market price on the day that they are received?  If so, would it be possible to crystalise that value, for example, by selling them?  I understand that there may be trading issues that affects that within a matter of days.  I do not want to

overstate the issue, be it as I say, I am hopeful it will be resolved, but it does need to be addressed, my Lord.

Again, this may be a definitional issue in relation to the valuation of the company shares. As you Lordship will see from the work done by the financial advisors they looked, as you would expect, very closely at Apollo. They would have obviously considered the potential synergies that arise out of the merger and the resulting value that can be attained as a result of those synergies.

Perhaps my learned friends can clarify this, what I want to avoid both in relation to the disclosure of the valuation, is a suggestion that we should not be allowed to have access to the Apollo documents insofar as they are within the possession, custody or control of the defendant. The exercise that the valuation experts will embark on will, just as (Inaudible) looked at Apollo that our experts will look at Apollo and the relevance of Apollo in terms of the value of the Company shares.

**CHIEF JUSTICE HARGUN:**  I mean as you have rightly identified that this is just an initial disclosure so that the parties can get going. It will be for the experts to decide as to what they think is relevant material for them to determine the

fair value of your client's shares within the statutory
definition, right?

I would have thought that the relevant time to have those
disputes, the sort of dispute you are thinking of as to the
relevance of the Apollo shares, the value of the Apollo shares
and the relevance of the documentation relating to Apollo, may
or may not be relevant.  I can see arguments on both sides.

I would have thought that the relevant time to have that
argument would be after the respective experts have seen the
initial material and then taken a view as to how they are
going to determine what is the fair value of your client's
shares.  If they think that somehow the value of Apollo's
shares has a bearing the value of your client's shares, then
we can have that argument at that time, I would have thought.
This is a bit early, is it not?

MR CHUDLEIGH:  I mean, yes, my Lord.  Of course it will always
be open to the parties to come back to the court and seek to
refine the scope once they have the benefit of input from
their experts.

My Lord, we have done just that in relation to the
valuation dates, whether anything turns on it or not is not
the matter, but because of the nature of the transaction there

is some uncertainty as to the precise valuation date that the experts are to conduct their valuation in relation to.

**CHIEF JUSTICE HARGUN:**  Presumably it is a date prior to the merger, is it?

**MR CHUDLEIGH:**  It could be, my Lord.  It could be the date of the proxy; it could be the date of when the merger was completed.  There is reference in the proxy to this, to the fact that it is something of a moving target because the shares of both companies were traded on public exchanges.

What my learned friends and I concluded was that the best approach was to leave that issue for now; obviously we tried to, with the assistance of experts, to reach agreement on that.  If we cannot, then we will need to come back to the Court and ask the Court to assist us.  The same would apply generally in relation to the scope of --

**CHIEF JUSTICE HARGUN:**  Absolutely, what you have agreed is just an initial order.  As the paragraph 2 says it is "initial disclosure".  This is just to have your experts with sufficient material to start working on it, and after that they will take a view as to what other material they need, and they can make requests.  If the parties can't agree, come back to us.

**MR CHUDLEIGH:**  My Lord, I accept that.  Although if the defendants are proceeding on the basis that the Apollo documents are not relevant; whereas what is going to happen is we are only going to receive the subset of the documents, our expert may well conclude that he or she is unable to prepare an opinion without those documents.  We are then going to have to come back to the Court, which obviously will involve significant delay in order for us to obtain this document.

My Lord, I do think that that issue, or the importance of those core documents, will become apparent from the --

**CHIEF JUSTICE HARGUN:**  Leaving aside the question of the documents which have not been exchanged and the question of whether they are agents or not, what they are offering is any and all documents which have been exchanged between the company and its financial advisors.  You will get all the documents which the company has received sent to the financial advisor and has received back from the financial advisors.  That would be a large part of the universe.  I accept there may be other documents but to start off with.

If the Financial Advisors thought that the valuation of Apollo had an impact upon the valuation of the company, presumably that would be highlighted in the correspondence, or

the documentation sent by the financial advisors to the
Company which would be disclosed to you.

**MR CHUDLEIGH:**  My Lord, it is in fact highlighted in the proxy
itself and in the opinion letters.  Can I take your lordship
to the proxy document, and it is a 600 plus page document we
have reduced it perhaps by half in the bundle.  The extracts
start at tab 9.

**CHIEF JUSTICE HARGUN:**  Yes.

**MR CHUDLEIGH:**  My Lord, the first document in fact is a sort
of a cover to the proxy if you like and is a joint letter to
the shareholders of the two companies.

On the first page, page 87 of the bundle on the fourth
paragraph, it just sets out in summary the essential terms of
the proposed terms on what the respective shareholders are to
vote.  In terms of the Athene or AHL shareholders this would
involve the HA.  This is the fourth line down, capital A,

"A-H-L common shares will be converted automatically the
right to receive 1.149 duly authorised value issued etc
common stock in hold co."

Hold co was a sort of temporary name for the company that has now assumed the name Apollo Global Management, which is the parent company of the two key operating subsidiaries, Athene and Apollo.  The Apollo shareholders as a result of the merger would receive one hold co share for each Apollo share.

My Lord, over the page at page 88, just the first paragraph.  This is the issue which may or may not be relevant to the valuation date and indeed to the issue as to what consideration was received.  There is an acknowledgement that the market value of the consideration will fluctuate, and obviously they can only give details of the closing price as it stood as of the date of this letter.

**CHIEF JUSTICE HARGUN:**  I understand it will fluctuate. Presumably it was agreed at the time of the date when it would be fixed; you take a valuation to a particular time, what was the time?

**MR CHUDLEIGH:**  My Lord, upon closing, so obviously the shareholders would vote on the --

**CHIEF JUSTICE HARGUN:**  When do you say is the closing?

**MR CHUDLEIGH:**  The closing, my Lord, it might have been 4 January this year.

**CHIEF JUSTICE HARGUN:**  Yes.

**MR CHUDLEIGH:**  My Lord, there is then a summary which in itself is very lengthy document, but I want to take your lordship to the part dealing with the opinions of the financial advisors, which is at page 137.

My lord, as is often the case, the company put together a special committee of its Board members who were free of conflicts to consider the fairness of the proposed terms of the merger.  You can see, my Lord, that the special committee retained Lazard and Houlihan Lokey to act as financial advisors to the AHL special committee.  They requested that Lazard and Houlihan Lokey value the fairness from a financial point of view towards the AHL common shares of the exchange ratio provided for the AHL merger.  It was the exchange ratio that is referred to in the joint letter to shareholders at the front of this document.

**CHIEF JUSTICE HARGUN:**  So in broad terms Athene was valued at more than Apollo, therefore Apollo shareholders got one share in the holding company.  Athene got 1 … ?

**MR CHUDLEIGH:**  Yes, certainly the shares were valued higher, but I could not say how many shares were issues, for example.

In fact I believe that Apollo is the more valuable of the two entities

**CHIEF JUSTICE HARGUN:**  Well, they have got less shares, the shareholders.

**MR CHUDLEIGH:**  Well, I think, my Lord --

**CHIEF JUSTICE HARGUN:**  Maybe I am missing --

**MR CHUDLEIGH:**  I think that would depend on whether the number of issued shares are more.

**CHIEF JUSTICE HARGUN:**  Yes, of course, okay.

**MR CHUDLEIGH:**  Then my Lord, still on page 137:

> "Each of Lazard Houlihan and Lokey rendered to the
> special committee its respective written as of March
> 7th."

I will take your Lordship to those.  If I could skip forward to page 168, at the bottom there is a heading, "Background of the mergers".

**CHIEF JUSTICE HARGUN:**  Yes.

**MR CHUDLEIGH:**  I am not going to take Lordship to selected passages here, but I do think it is helpful to see; the process that is a culmination of several years of discussions between the companies.  As you can see from the sentence on page 168, that indeed Apollo was involved with Athene from its very inception.  Athene began operations in 2009 with Apollo when the burdens of financial prices in resolving capital demands, then it exits from retirement market.

If we turn over the page to 169, I am in what would be the fourth paragraph, it starts, "Throughout the many years", and you can see reference to the relationship between Apollo and Athene throughout the many years of Apollo's relationship with Athene.

"Apollo's ongoing strategic review included the evaluation of various transaction structures that could further enhanced the strategic alignment between Apollo and Athene ranging from Apollo increasing its ownership in Athene, to pursuing a complete business combination. In July 2018 Apollo invited a highly reputed financial advisor to present a comprehensive analysis on a potential Apollo and Athene merger."

Then in the next paragraph you see on numerous occasions throughout 2018 and 2019 the executive committee of the Apollo Board, engaged in comprehensive discussions regarding the possibility of further enhancing Apollo's strategic relationship with Athene.

My Lord, there was in fact, a transaction agreement which I will come on to.  You see in the last paragraph of page 169 Houlihan Lokey and Lazard first emerge onto the scene in September 2019.  Obviously, that is over two years prior to the consummation of the merger.

"Apollo propose the Athene potential transaction that was resolved in a share exchange and conversion of Athene's mortar(?) class share structure into a single class of being common shares.  The Athene Board of directors formed a special committee to review, evaluate and negotiate those transactions.  The special committee was advised by representatives of Latham, Houlihan, Lokey and Lazard."

My Lord, then over the page at 170, and I will take you fairly quickly through this and look at the more recent history.  The first paragraph we can see that Lazard was advising the special committee on a number of matters which are listed, all in contemplation obviously of a merger with

Apollo.  There are several references in there obviously to analysis of both Athene and Apollo.

Then in the second paragraph on this page there is a reference to a 2019 transactional agreement as a result of which Athene owned approximately 7 per cent of the equity of the Apollo operating group.

So there was a sort of crossholding shares here.  The Apollo operating group is a subsidiary, but Apollo was a shareholder of the Athene and Athene in turn was a shareholder of at least some Apollo entity.

Then my Lord, just move to the last paragraph.

"Following the closing of transactions contemplated by the 2019 transaction agreement, in a favourable market response the further alignment during the course of the remainder of 2020, early 2021, the management teams of Apollo and Athene separately evaluated on a periodic basis their respective investment in the other party. They explored the legal, regulatory and tax implications of a variety of strategic transactions including a potential combination."

My Lord, over the page, to page 172, just perhaps to note, this is a letter from the CEO of Apollo to the Board of Directors of Athene.  This is the sort of formal marriage invitation, if you like, that kicked off the process that led to the eventual merger.  I do not propose to take you to the contents of that letter, just to note the point in time we are 4 March 2021.

There is then a very impressive summary of what happened in terms of the negotiations, and presumably part of the object here is to demonstrate that there were arm's length negotiations intended to achieve the best price for shareholders.

My lord, on page 174, on the fourth paragraph --

**CHIEF JUSTICE HARGUN:**  What was agreed was option number 3 at page 173, "Stock for stock merger"?

**MR CHUDLEIGH:** Yes, my Lord.

**CHIEF JUSTICE HARGUN:**  Presumably stock for stock merger, you would have to have a clear understanding of the value of both entities?

**MR CHUDLEIGH:**  That is right, my Lord.  It is apparent that that exercise was undertaken by both companies with the assistance of their advisors.

**CHIEF JUSTICE HARGUN:**  So presumably you will get that in the initial communication which you will receive from the company's financial advisors to the company, assuming they recommended that the particular ratio was the appropriate ratio.  They would presumably say how they have come to it, and that would presumably include their view of the worth of Apollo.

**MR CHUDLEIGH:**  That is right, my Lord.  That is my expectation, and my learned friends can confirm this.  My concern is that the paragraph 2, certainly in our version of paragraph 2 we wish to make that clear, to draft it so there can be no doubt that we would receive those documents. Whereas my learned friend's definition refers to a, "A valuation of the company", ie the valuation of Athene.  I guess my concern is that that might be interpreted by the defendant to exclude anything in relation to Apollo.

**CHIEF JUSTICE HARGUN:**  You mean the qualification, "Valuation of Athene"?  Those words?

**MR CHUDLEIGH:**  As I said at the beginning it is going to be a definitional issue and I am sure my learned friend will clarify that, but that is just one of two issues that we have with their formulation.  One that it is not clear to us that it would include the Apollo information.  The other one is that as I will demonstrate momentarily, there were a large number of activities,  as a result of which documents were generated, that do not fall within the provided to or received from limitation.

**MR TAYLOR:** My Lord, I am loath to interrupt my friend.  How the defendants have interpreted what we are going to provide is everything they have given us and then everything we have given them; we think that is fairly clear from our language.

Here is the other thing, my Lord, you identified this: there is certain statutory language that we are all saddled with, if I can put it that way.  There are no tricks in this paragraph.  If we have provided information, we Athene, to the Financial Advisors to assist them in giving their fairness opinion, that will be disclosed.  Anything that they have given to us will also be disclosed.

**CHIEF JUSTICE HARGUN:**  Everything they have given to us?

**MR TAYLOR:**  Whereas you said at the outset --

**CHIEF JUSTICE HARGUN:**  Everything they have sent back to you would be disclosed?

**MR TAYLOR:**  That is correct, that is the intention.  The reason the language, "The fair value of the company's shares", is there is because that is was that the Statute says.

**CHIEF JUSTICE HARGUN:**  I understand.

**MR TAYLOR:**  My Lord, that is what you identified at the outset, so to the extent that there is any difficulty with that; I am sorry, and then I will stop.  As you indicated at the outset, "I cannot sit here and say, I know exactly what that will contain".  We have not started to look yet, but you are quite right in saying there will be a lot of material there.  I understand.  (Overspeaking)

**CHIEF JUSTICE HARGUN:**  Yes, no, I understand that.  The only reason why this is slightly odd and a bit more complicated than the normal run of the mill dissenting shareholders' actions for fair value is in the ordinary case the company says, "Your shares are worth $95", and the dissenting shareholders say, "We don't think that that is right.  We want to go to appraise fair value".  The court comes along and

says, "We think the shares are worth $100", and if they have already been paid $95, they get extra $5 per share.

Here the complication is that they did not receive money, they received shares and --

**MR TAYLOR:**  Well, the comparator is not as simple as it would be in the usual cash monetary compensation.

**CHIEF JUSTICE HARGUN:**  So, we are going to end up where there is potentially a situation where the Court is asked to value the fair value of his shares, which means the fair value of the plaintiff's shares at a certain date.

The only way the Court can come to it is they are worth X, $100 per share, let us say for the sake of argument.  Then the question would arise, "How much more money they are entitled to, if any", and that would depend upon the value of the ratio of shares they have received already.

**MR TAYLOR:**  I do not necessarily disagree, but I hasten to add that I am not a certified business valuer or similar.  In fact what my friend has said at the outset of his submissions about us trying to narrow things, is actually quite the opposite.

In this particular formulation of an initial tranche of disclosure where we all acknowledge, I believe, very clearly that the experts are the individuals who know this, and will say, "To properly to conduct the exercise that the statute requires, we need to do this.  In furtherance of that exercise we need these documents".  They're going to come back.

What we are loath to do is to add things outside the statute, which in fact in our view will narrow the analysis. This is what we have been trying to explain.

My Lord, the other thing in this context that is important, and then I promise I will stop talking for now, is you will see in the material that the plaintiffs in this case have utilised the available rules in the US to subpoena Apollo and get information directly from Apollo.  I pass no comment on that, I am not a US lawyer, presumably they are entitled to do that, but in those circumstances when we've --

**CHIEF JUSTICE HARGUN:**  There is a House of Lords' decision which says that they are entitled to do it.

**MR TAYLOR:**  We are entitled to do it whether or not subsequently, my Lord, you decide that everything is admissible remains with you, and that's something for down the road.

**CHIEF JUSTICE HARGUN:**  Yes.

**MR TAYLOR:**  The point is, my Lord, in this context, if they are going after Apollo directly for these things, surely what we're proposing to provide as a first tranche is reasonable. That is our --

**CHIEF JUSTICE HARGUN:**  As I understand it, you are saying that you are going to provide in the initial disclosure, everything which you sent to the financial advisors and everything which you received back.

**MR TAYLOR:**  That is correct, my Lord, thank you.  Thank you.

**CHIEF JUSTICE HARGUN:**  Good.

**MR CHUDLEIGH:**  My lord, just to pick up on a few points my learned friend has just said.  Firstly in relation to the US 1782 application against Apollo, that is being contested and I understand there is due to be an application to quash the resulting subpoenas, that is pending.  It remains an open question as to whether any documents would be obtained, and if so which documents.

My lord, in relation to the received from provided to them, and I think it is the first time I have taken your Lordship to the opinion letters.  It is apparent that information was received by the advisors, and indeed by the company, in forms that may not involve transmission of documents between the two.

**CHIEF JUSTICE HARGUN:**  The document would presumably extend to electronic communications.

**MR CHUDLEIGH:**  My Lord, yes.  Perhaps if I could take you to your selected highlight of the process if you like.  What happened was there were a lot of conference calls involving the representatives of Athene and Apollo; Houlihan, Lokey and Lazard would be on.  There are numerous references to them here.

It is clear from proxy that information was imparted during those conference calls.  Now that information on the defendants' formulation would not find its way to us and to our experts.  For example, if minutes were kept of these calls, those minutes may well contain information that is relevant to valuation but would fall between the cracks of my learned friend's formulation.

My Lord, on page 174 the chronology starts, which is what kicks off immediately the letter that is sent by the CEO of Apollo on 4 March.  In the fourth paragraph of page 174 you see during the morning that day the Athene Board of Directors participated in a telephonic meeting with representatives of Latham in attempts to discuss the proposal.  Including the potential engagement by such special committee of Houlihan and Lokey as independent financial advisors.

We know that those advisors were involved from 2019 in certain capacities, this is the point at which they were formally engaged to provide their opinions.  My lord, if you turn to page 175, at the top, you can see this relates to the relevance of the relationship:

"The Athene special committee reviewed the benefits of Apollo's relationship with Athene and the operational benefits that would be shared after a merger transaction against the three-year plan on the standalone basis.  And there is some opportunities of maintaining the status quo."

Then my lord, to the fourth paragraph which starts, "Later on March 4 2021".  You can see there is a discussion here involving Houlihan Lokey:

"Discussed with representatives of Lazard and Houlihan Lokey, each firm's respective independence and ability to act following discussion by the special committee, including a review of the relationship, in which Lazard and Houlihan Lokey were engaged."

My Lord, this perhaps is not the best example of a valuation related discussion but there are more to come.  But as you see that any minutes or any documents in relation -- or any of the company's documents in relation to that type of discussion will not fall within the provided to or received from restriction.

A lot starts happening on 4 March 2021, it is two paragraphs down:

"A financial due diligence call was held with representatives of Lazard and representatives of Apollo and its advisors."

So again, a potentially important call where information is provided during the course of the call by Apollo to Lazard, information which would not fall within the provided to obviously from.

The last paragraph on page 175, again we are in the late afternoon of that day now, the special committee held two separate telephonic meetings with representatives of Latham, Houlihan, Lokey and Lazard in attendance.  To discuss among other things, the benefits, and risks of the status quo versus various potential alternatives, including those referenced in the Apollo letter.  That is the letter a few pages earlier, as well as Apollo's proposed timing.

Clearly it would be relevant in relation to valuation to know what the company's view was on the benefits and risks of the status quo versus potential alternatives.  It is particularly relevant given that that was a discussion that took place with the involvement of both Houlihan, Lokey and Lazard.

My Lord, on page 176 in the third paragraph, we see the day still has not ended, a lot of billable hours incurred on this date no doubt.  During the evening of March 4 the special committee have another telephonic meeting with representatives of Latham, sorry, I think there's a reference there to Houlihan, Lokey.

Then you see in the next paragraph it looks like the last call of the day, and this call did involve Houlihan, Lokey and Lazard in attendance to discuss, among other things, a review

of the materials on Apollo related to the transaction
announced in 2019 that had previously been distributed by
Apollo's financial advisors.

Again notes of that discussion and indeed the materials
may or may not be part of the provided and received.  Again
there is a discussion of various alternatives et cetera.

My Lord, I am not going to flog this to death but on
page 177, in the fourth paragraph, we are now on 5 March and
there is a reference there to a call with Lazard in attendance
discussing financial analysis of both Apollo and Athene.

Then the next paragraph, another call involving Houlihan,
Lokey discussing preliminary and financial analysis, amongst
other things.

Over the page, 178 my Lord, first paragraph again --

CHIEF JUSTICE HARGUN:  Can I just stop you there?  Paragraph 2
is just dealing with initial disclosure, right?  Then
paragraph 3 is dealing with the parties' obligations.
Paragraph 3.2:

"All documents of whatever description, whether
electronic, hard copy or in other format, within the

plaintiff's possession, custody or power reflecting or
relating to any valuation."


Presumably the stuff you are talking about would be
covered by paragraph 3.2?


**MR CHUDLEIGH:**  No, my Lord, para 3.2 deals with my client's
disclosure obligations.


**CHIEF JUSTICE HARGUN:**  Yes, but I mean what about the
defendant's general obligation beyond this?  Beyond the
initial disclosure, is there a paragraph which deals with it?


**MR CHUDLEIGH:**  My Lord, we are not seeking any general
discovery at this juncture.  There is a provision for either
party to seek --


**CHIEF JUSTICE HARGUN:**  Further material, yes.


**MR CHUDLEIGH:**  -- specific discovery.  It is very important;
the initial disclosures obviously are the foundation upon
which the experts will build out their opinions.  If that
information is incomplete and there is a need to come back to
the court, that can take a considerable period of time for the
parties to --

**CHIEF JUSTICE HARGUN:**  The difficulty is that at the moment you do not know what you are going to get.  We are boxing in the dark.  It may well be after you receive it, you have received all the material.  I mean that is conjectural at the moment as to what you may be missing, which is critical.

**MR CHUDLEIGH:**  It is somewhat, but it is informed.  I will take you shortly to the opinion letters so we can see from that what essentially, in summary, what the financial advisors did.

One of the points that is taken against me is that in the Jardine case, the order did include that provided for receive.  In Jardine, and this is apparent from the Judgment, the financial advisors' opinion, their opinion, was not before the court and was not available to the plaintiffs in that case, at the time of the directions hearing.  They really were in the dark.

Here, because the opinions were exhibited to the proxy, we have the benefit of seeing what they did.  It is clear, I submit, that what they did in relation to forming their opinion involved doing more, or potentially creating documents that would not fall into the provided or received category.

I think your Lordship probably has the point that there were a number of telephone calls involving the financial advisor in relation to the proposed merger and its terms.

My Lord, again if we can flick through the pages, there are several references to them, but I will spare your Lordship any more of those.  Then if we look at, turn to page 181, there is just one reference there, my Lord, which is in the fourth paragraph there which is during the afternoon of 7 March 2021:

> "The Athene Board of Directors with only the disinterested Athene directors participating, held a telephonic meeting with representatives of Latham, Walkers and Lazard in attendance.  During which representatives of Lazard presented its financial analysis on the potential stock and stock combination of Athene and Apollo.  Following Lazard's presentation the Lazard representative left the meeting."

My Lord, we do not know whether that was done means of a PowerPoint type presentation that could be put up on a Zoom call.  If it was, whether that Power Point presentation was provided to Athene.

**CHIEF JUSTICE HARGUN:**  I mean you will know when you receive it, and if it is missing then you can take a view as to whether it is worth coming back to the court.

**MR CHUDLEIGH:**  Well, my Lord, that is going to involve us having to come back to the court.

**CHIEF JUSTICE HARGUN:**  At the moment you are asking me to go through document by document and ask Mr Taylor to confirm that he will be providing it.

**MR CHUDLEIGH:**  I am not, my Lord.  I am asking to craft an order that requires the defendant to disclose documents, and any documents in their possession, custody or power.  If it is the case, which we do not accept, that the financial advisors were not agents, and therefore their documents cannot be obtained on agency principles, there is a possession, custody or control filter which will take care of that issue.  If necessary, can have an argument about that another day.

What we're looking for is all documents in the company's possession, custody or control, essentially in relation to the work that Houlihan, Lokey and Lazard did, will be provided. Not just documents provided and received, which would be of a happenstance as to whether relevant documents fall within those categories or outside of them.

We certainly, would have to come back; indeed our expert may make that information request very quickly for those documents.  Then those either will be provided, or they will not be provided, and we will have to come back, and we are going to have delay.  All I am suggesting is that everything should be provided now.

My Lord, in terms of the burden on the defendants, it is actually easier to provide the broader discovery that we are seeking than the selective disclosure that they are seeking, which will require a careful analysis as to what is in and what is out.  Present the risk of documents falling between the cracks.

I am going to move on, if I could turn to page 215. There is a reference here to, just a reference, my Lord, to Lazard's fee which may or may not be an indication of the amount of work they did.  In connection with Lazard Services, Athene agreed to pay Lazard an aggregate fee of $25 million implying that they did quite a lot of work or their services are very valuable.  Likewise in relation to Houlihan Lokey at page 225, their fee was an aggregate of $12 million.

My lord, with that I would like to turn, and these are the last documents that I will take you to, the opinion

letters, which the first one from Lazard is at page 354.  The
first paragraph, is a description of what was a very
complicated process of getting to the merger, which I can skip
over and start at the second paragraph:

"The special committee requested our opinion as of the
date hereof, is fairness from a financial point of view
of the exchange ratio provided for in the transaction."

Undoubtedly, the value of the Athene shares would be, or
Athene as a company, would be part of that, but he goes
further and includes exchange ratio.

There, my Lord, they set out the nine things that they
did.  I am just going to point out a few of these.  The second
one: they reviewed certain publicly available historical
business and financial information relating to Athene and
Apollo.  We would like to know what that was exactly.  Whether
we will get it or not because the agency argument that has
been put out remains to be seen.  If it is to the extent that
is within possession, custody or power of the company, we
would like to have it.

Then paragraph 3, you can see that they reviewed various
data provided to them by Athene, including forecasts relating
to the business of Apollo.

**CHIEF JUSTICE HARGUN:**  That presumably you will receive under the paragraph, because it was sent to them.

**MR CHUDLEIGH:**  I assume so, my Lord, yes.  I highlight that just in the relevance of Apollo here.

Over the page, this is paragraph 4:

"Held discussions with members of the senior management of both Athene and Apollo with respect to the businesses and prospects of Athene and Apollo respectively and certain benefits that could be realised from the transaction."

What we do not know is whether Athene participated in the discussions with Apollo, what sort of discussion, what was discussed, was a note prepared?  If so, was that note shared with the company?  Clearly it could contain relevant information.

Again in the next paragraph, they are reviewing public information in relation to both Athene and Apollo.  In paragraph 7 they are reviewing historical prices of trading, information in relation to both Athene and Apollo.

**CHIEF JUSTICE HARGUN:**  Presumably, that is public information, is it?  Historical stock prices.

**MR CHUDLEIGH:**  It would be, my Lord, although we do not know precisely what they reviewed or indeed what they made of it, how they interpreted that.  To the extent that that information is within the possession, custody or control of the company, if Lazard's are trading memos analysing that and expressing conclusions, then that's something that we would like to see.

They may have sent it to the company in which case it falls within my friends' parameters.  They may not have; in which case we won't get it.

My Lord, similar points in relation to Houlihan Lokey, the opinion letters on page 357.  Again there are nine matters although they are different to the nine matters, or slight differences between the matters that Houlihan Lokey looked at and those that Lazard looked at.

Again you can see paragraph number 2 looking at public information in relation to both Athene and Apollo.  In paragraph 4 they reviewed financial information in relation to Apollo, although again that may well fall within the PCP of the company.

Then 5, you see they have spoken with certain members of the management of Athene and management of Apollo and certain of their own committee's representatives and advisors regarding respective business operations.  Obviously, we (Inaudible) about that.  The rest are similar matters to those at Lazard.

My Lord, it was clear that the financial advisors did things that would not necessarily translate into documents provided or received.  It is clear that the company itself was involved in discussions involving Lazard and Houlihan Lokey in relation to their fairness opinions that they have produced documents such as minutes et cetera that were not provided to or received.

It is clear that not only the historical relationship between Apollo and Athene and the synergies that would arise on the merger.  Ultimately the appropriate exchange ratios are matters that were highly relevant to Lazard and Houlihan Lokey and are likely to be similarly relevant to the work to be done by the valuation experts.

My Lord, that is all I wish to take you to in relation to the proxy.  I was proposing just to take you through the Directions Order.

**CHIEF JUSTICE HARGUN:**  Yes.

**MR CHUDLEIGH:**  There are obviously versions of it in the bundle.

**CHIEF JUSTICE HARGUN:**  I will mark up the one at tab 4 and maybe we can concentrate on that.

**MR CHUDLEIGH:**  That is the one I was proposing to take your lordship to.  I should say we did follow, as you will appreciate, what we have called the Jardine approach, if you like.  Obviously, that was helpful and there were certain issues that might become contentious, for example, whether we should have management meetings or not, which in Jardine the decision was taken that that was an issue that could be addressed further down the road when we got there, and we have taken the same approach here.

**CHIEF JUSTICE HARGUN:**  Yes.

**MR CHUDLEIGH:**  We are going to have to speak about it, and in fact we did have some arguments over that.  In the end it was just decided that the best thing to do was to pump that down the road for another day.

My Lord, just starting if I can on paragraph 1, and this just simply provides for the data room and also for the parade confidentiality and non-disclosure on the premium.

Just touch on that and perhaps your Lordship could tell me, given that it is now agreed, the extent to which your Lordship is interested in knowing the terms.  There is one provision in there which I should draw your Lordship's attention to because it may well involve the court becoming engaged in the event of a dispute.  Apart from that I was not proposing to take your Lordship --

**CHIEF JUSTICE HARGUN:**  I have looked at it very quickly. There is nothing which strikes me as particularly odd.

**MR CHUDLEIGH:**  My lord, it is in fairly conventional terms. We did have a dispute over how to deal with so called restricted access information which would be information considered to be particularly sensitive.  But we have managed to reach an accommodation on that.

**CHIEF JUSTICE HARGUN:**  Good.

**MR CHUDLEIGH:**  My lord, just as it potentially could engage the court, I would just draw your attention to paragraph 3.4 which is the Dispute Provision.  This would apply if the

receiving party disputes that the document should have this
heightened restricted access.  There is a procedure for first
trying to resolve it in discussions by the parties, but then
that has failed to refer the matter to the court for
determination.

**CHIEF JUSTICE HARGUN:**  Yes.

**MR CHUDLEIGH:**  That is the only point that I would draw your
Lordship's attention to there.

My lord, going back to the Draft Directions Order,
paragraph 2, obviously this is the issue around the scope of
the initial disclosures.  As I indicated, we have deleted the
words at the end of the comma:

"Such documents to include documents held as agents for
the company."

Just there I should note, the first we knew of these
engagement letters was when we received the defendant's
submissions.  Obviously, there are only quotes in there.

We have included authority in the bundle, the Ports case
which I do not propose to take you to because this is an issue
to be debated another day, if at all.  That case just simply

says, and perhaps it's stating the obvious, whether somebody
is or is not an agent is a matter of substance, not form, so
you cannot contract out being an agent.  I highlight that
because I would be concerned --

**CHIEF JUSTICE HARGUN:**  Is that right?  I mean I assumed that
they have said that we are not agents because they do not want
to assume the responsibilities of an agent and be sued in the
United States.  It would be odd if they could not do that.

**MR CHUDLEIGH:**  They may well, my Lord.  It may be a defensive
measure with these types of proceedings in mind.  I do not
know.

     I should add that the emphasis on the agency argument
which to be fair is one that I raised, is not the only way
that those documents could be the defence, PCP.  They could
have ownership deciding that just as a client has an ownership
interest in its lawyers' files, certain documents in their
files that --

**CHIEF JUSTICE HARGUN:**  You may have an argument, leaving aside
agency, that they are still under their power or control
because theoretically it is possible that there is no agency
relationship.  The contractual relationship is such that there
is either expressly or impliedly an obligation to provide

documentation.  That is not something to be debated today, I would have thought.

**MR CHUDLEIGH:**  I agree, my Lord.  We have not seen a full engagement letter and it is entirely possible that it contains an assistance provision or provisions with relation to documents.  My concern is that the --

**CHIEF JUSTICE HARGUN:**  In relation to this paragraph you raise two issues, one was you thought that their reference to the documentation relating to the valuation of Athene might exclude other documents received or sent in relation to Apollo.

Now in relation to that, Mr Taylor has said that is not their intent, so we can tick that one off.

**MR CHUDLEIGH:**  We can, my Lord.  So I think that really just leaves the --

**CHIEF JUSTICE HARGUN:**  The second point is --

**MR CHUDLEIGH:**  -- with the provided or received breach.

**CHIEF JUSTICE HARGUN:**  Yes, the limitation to sent or received, whether there are other category of documents which

relate to valuation, but now they are sent, not received. That is an issue, I will hear Mr Taylor about that.

**MR CHUDLEIGH:**  Yes, my Lord, just to round up my submissions on that, obviously they can only disclose what is in their possession, custody or power.  I have a high opinion of my learned friend's ability to ensure that that their client's discovery obligations are discharged appropriately.  I do think it is important that consideration be given to that.  If the conclusion is the documents are not within the possession, custody or power of the defendant then they will not be disclosed.

My learned friend's formulation sort of pre-judges the issue.  It proceeds on the assumption, which we do not accept, that the internal documents of the financial advisors are not within the PCP of the company.  I have taken your lordship to the references in the prospectus which illustrate that there could well be documents that would fall outside of the provided to or received from.

My Lord, another aspect, and again I know my learned friend quite rightly says that I have changed my position as we have been negotiating this, which I make no apologies for. I am a fallible human being, but obviously my understanding of

this matter has developed, particularly as I have had a much
closer look at the prospectus, or rather proxy, sorry.

My learned friend proposes this sort of two-step process
of disclosure, and while initially that has a sort of
attraction to us, because at least we get some documents
earlier, it is slightly odd.  For example what has been
envisaged is first getting documents made available by the
company to the financial advisors and then 46 days later
getting the rest.

Now presumably a lot of the communication during what
looks like it was a very busy period, would be back and forth.
Emails back and forth.  So the company may provide something
to financial advisors because they have requested it.  Under
this formulation we will see what the company provided but we
might not see why it was requested and understand the context
of it.

We think that the preferred approach, and it is easier
for my learned friends in terms of completing their
production, to do it all together.

**CHIEF JUSTICE HARGUN:**  Yes.

**MR CHUDLEIGH:**  My Lord, paragraph 3 is agreed.  This is what I suppose is the sort of the Cayman and now Bermuda standard for Dissenter Disclosure.  Paragraph 4, I referenced this earlier:

>    "Both sides have liberty to make additional specific
>    discovery requests."

    Paragraph 5, "The parties have agreed a disclosure protocol".  I don't propose to take your Lordship to that.  The next two paragraphs are sort of administrative matters to do with the data rules.

**CHIEF JUSTICE HARGUN:**  Of course.

**MR CHUDLEIGH:**  My lord, then in paragraph 8, again this is something that we went back and forth on, the discovery completion date which I think can be a moving target.  The idea here was that the parties could potentially agree when that has taken place, failing which the court can give directions on that.  Directions for expert reports and the like are all timed by reference to the Discovery Completion date.

    Next, this document perhaps I do not need to take you to.  Then we are on to paragraph 11, which is the experts.  Again there is a variation to our proposal which I think is really

for clarification purposes which would insert the words, and I will tell you when I get to that, that state that,

> "The Plaintiffs and the company have leave to instruct and calls as a witness for trial one expert witness each in the field of valuation to opine upon the fairness to the company's shareholders of … [and then I insert the words] … the fair value of the plaintiff's shares in the company and the exchange ratio into the agreement and plan of merger."

Which is the second piece which obviously we discussed at the outset, which may be a remarkably simply piece, because if indeed the experts were to say agree that it is the market price on the date completion.  Then that would largely take care of that component.

**CHIEF JUSTICE HARGUN:**  Sorry, I understand the fair value of the plaintiff's shares in the company.  What are you hoping to capture by the words, "And the exchange ratio"?  "The fair value of the exchange ratio"?

**MR CHUDLEIGH:**  Well, because that is, my Lord, maybe, this is where I get to use the Authorities bundle.  My lord, perhaps a

very quick look at Section 106 of the Companies Act which is in paragraph 17.

**CHIEF JUSTICE HARGUN:**  Yes, I have it.

**MR CHUDLEIGH:**  And obviously the key section is Section 106(6).

**CHIEF JUSTICE HARGUN:**  Yes.

**MR CHUDLEIGH:**  You will see that is the key issue, but if you look down to 6(b), this is what happens afterwards, is --

**CHIEF JUSTICE HARGUN:**  What the Court is asked to do under Section 6(6) is to give a fair value of his shares, that is the fair value of your client's shares at a relevant date.

**MR CHUDLEIGH:**  Yes, my Lord, I fully accept that.

**CHIEF JUSTICE HARGUN:**  The only complication here is how do we say it is more or less than the shares which they have received?

**MR CHUDLEIGH:**  Again, that is theoretically an issue.  How much an issue remains to be seen.  6(b) is an inter payment provision, if the fair value of the company is higher than the

value attributed to it by the company, in most cases this is completely uncontroversial, but 6(b) says:

> "If the amount paid to the dissenting shareholder is less than that appraised by the court the (Inaudible) company should pay the difference."

Now here because the amount paid was in the form of stock there is, hopefully a very simple issue but that issue arises, and that needs to be covered.

**CHIEF JUSTICE HARGUN:**  There has to be a number attached to the shares you have received?  A value attached to it? Otherwise you cannot tell whether you could have received more or less, and what the difference is.

**MR CHUDLEIGH:**  Yes, my Lord.  My learned friend says we are not -- and maybe we are getting ahead of ourselves, and I think this is the case anyway, it is understood that there is the ability to -- this is an issue that affects both parties. They will try to agree upon it, in which case the court does not need to be troubled, and we can perhaps simply advise the court that the scope has been mended by agreement of the parties and leave it at that.

On the other hand, once we have the valuation experts fully engaged, if this becomes a burning issue and parties cannot agree on it, then come back.

**CHIEF JUSTICE HARGUN:**  Yes.

**MR CHUDLEIGH:**  Again, we are trying to get ahead ourselves by trying to imagine how a valuation expert would look at it.

**CHIEF JUSTICE HARGUN:**  6(b) is premised, the draftsman has drafted 6(b) on the basis that it was a cash transaction.  The Dissenting Shareholder with all the other shareholders received his $95 per share.  Then there is a valuation, and the court says it is $100 and you are paid $5 within the month.  Here you've got the complication that you did not get the cash.

**MR CHUDLEIGH:**  Yes, my Lord.  I do not think there is an issue between the parties as to whether 106(6) can accommodate the stock transaction.  That is in Section 105 which is in the bundle which includes the matters that are to be included in the offer.  That does specifically reference --

**CHIEF JUSTICE HARGUN:**  You are quite right.  Under Section 106(2) are you not supposed to say what the value was in cash?  The notice to the shareholders:

"A fair value of the shares as determined by each
amalgamating or merging company."

So presumably --

**MR CHUDLEIGH:**   The proxy does address that, and this was right
at the beginning in the letter to the shareholders where the
reference --

**CHIEF JUSTICE HARGUN:**   It would say in the letter to
shareholders what the company thinks is a fair value of the
shares in cash.

**MR CHUDLEIGH:**   My Lord, that is in the proxy, yes.  My Lord,
again on the bundle, because an early 2001 decision of the
Bermuda Court, Clerk v Enejea(?) I think, it is called which
is a Section 106 case.  That was a case where the
consideration payable was paid partly in cash, and then there
was a contingent piece which was dependent on how various
projects turned out.

That illustrates that certainly the Bermuda Courts have
dealt with situations falling outside, other than a pure
single cash payment.

**CHIEF JUSTICE HARGUN:**  Yes.  The reason the Section 106(2) is important; it wasn't in the original enactment, it was subsequently amended so that the shareholder could say what the company is valuing the shares, as at the time of the merger.  Even if the consideration is not in cash but in other consideration like shares.  So presumably you would be looking at that figure and a figure arrived at by your valuer.

**MR CHUDLEIGH:**  Yes, my Lord.

**CHIEF JUSTICE HARGUN:**  Yes.

**MR CHUDLEIGH:**  Knowing my learned friend has allayed my concern that their focus is exclusively on values of shares in the company, does not exclude an analysis of the relevance of Apollo, to that valuation which is helpful.

    My Lord, for my part I think having received that confirmation from my learned friend and on the basis that the parties could come back if necessary to revise the scope of the expert evidence once we have input from our experts.

**CHIEF JUSTICE HARGUN:**  Absolutely.  They would know how best to put forward a case to the Court that if the valuation is say $100 a share, what is the difference.

**MR TAYLOR:**  My lord, to take up my learned friend's sort of proposal or suggestion, we thought the most appropriate way was to stick with the statutory formation of what is to be sought in that spare value.  We did that for no other reason than it is the statutory formulation.

Number two, certainly, for me speaking for myself only, it will be for my Lord and my learned friend to say whether they view it the same way.  It is presumptuous I think for me to say, "Oh well, here is a direction that we need to be pushing these experts in".  I am not sure that that is the correct way to approach the exercise, and it goes no further than that, my Lord, really.

**CHIEF JUSTICE HARGUN:**  I can certainly see that if the experts, having looked at it, say, "In order for us to do a job properly and in order for us to give an opinion as to whether the $100 a share results in fair value already received, or less than fair value, and here is the difference. Let us see what additional exercise we have to do".  I would of course allow them to do that.

It is understood that the Court is being asked at this stage to fix the fair value of the plaintiff's shares. Recognising that that just allows, that fixes the value and that paragraph 6 and 6(b) to be dealt with.  In relation to

that they might well have to be done, further work to be done, by the experts.

     In relation to that I think we should perhaps wait for the experts' views as to what they think is a sensible way to deal with it.  You can take it from me that within reason I would allow the experts to do that of course.

**MR CHUDLEIGH:**  My Lord, yes, that sounds very sensible.  What I would suggest, just for the avoidance of doubt and the freedom and liberty, to apply provision, and paragraph 11 --

**CHIEF JUSTICE HARGUN:**  It is fine, it is on the transcript, I have said that and that will be read.

**MR CHUDLEIGH:**  My Lord, that is very helpful.  I think we are now plain sailing for the rest of this document.

     There is provision in paragraph 14 for private parties apply for any additional experts.  There is again, we have adopted the expert's information request approach, which is modelled on the Jardine approach, paragraphs 16 to 19.

     Then, my lord, in paragraph 20 and 21 we just flag that we make provision for parties to apply in relation to that in due course.

Paragraph 22.1, which would have to be adjusted obviously to make sure it comports with the scope provision in paragraph 11.  Then the usual provision for the filing of experts' reports and independence and meetings and memoranda et cetera.

**CHIEF JUSTICE HARGUN:**  Yes.

**MR CHUDLEIGH:**  Now provision for facts, witness evidence and then case management issues in dispute trial.  I can see there is a rogue comma in paragraph 31, and obviously it is quite difficult at this juncture to have any idea as to how long, how much time, will be required.  The parties thought that perhaps within about three months' time, or four months' time, when we have the experts on board, will be in a position to at least provide a provisional estimate and/or to get listed.

My Lord, that is all I have to request your Lordship on.

**CHIEF JUSTICE HARGUN:**  Good.  Mr Taylor, can we take a morning break at this stage?

**MR TAYLOR:**  Yes, my Lord, of course.

**CHIEF JUSTICE HARGUN:**  Let us take a 15-minute break.  Do not log off, just turn your video and audio off and we will come back in 15 minutes.


(Adjournment)


**CHIEF JUSTICE HARGUN:**  Yes, Mr Taylor.


**MR TAYLOR:**  Yes, my Lord, thank you.  I should not be too long.  If I may just summarise where I think we have got to until now.


I think the sole remaining issue is the scope of the initial tranche of discovery.  I think we are at the point where we are going to use the statutory configuration or formulation.


I think my learned friend, and I am grateful, has removed the sentence in relation to agency, and that will not be for today, though I acknowledge his point that he is not necessarily not going to make arguments about those documents down the line.  I have heard him on that.


Where I think we are left is paragraph 2 of the Order and the two formulations.

**CHIEF JUSTICE HARGUN:**   Yes.

**MR TAYLOR:**   My lord, perhaps if I may just briefly, and I spoke about it a little earlier, but perhaps I just explain the reasoning behind this and why we propose our wording.

So from almost a thematic or logistical stance.   Our approach was to this was knowing that it was going to be (Inaudible).   What can we do in terms of a first tranche that we can put together relatively quickly so that the experts can begin moving?

Number two, in terms of crafting an initial search.   In the weeds on how the discovery will actually take place, a sort of noble set of documents where search terms will be relatively easy.   The to and the from, the to the advisors and the from is relatively easy, my Lord, because as a practical matter we can identify all of those members of the special committee and anybody assisting them on the Athene side, with all of those members of the advisors and anybody working with them, and we can do searches.   We can pull that as a subset fairly quickly.

It will not only include what I suspect, though I'm not an expert, will be very, very important, perhaps most

important, the numbers, financial projections, spreadsheets, all of these things that we would expect.

Also requests for and provision of information from Athene to the advisors in relation to some of the questions that I expect they undoubtedly asked, and we responded to assist them in giving their fairness opinion.

That was the jumping off point, with the thinking being -- my Lord, as I say, I do not know the exact number but that number of documents, as we understand it in our preliminary work with our client, is going to be significant. We are talking about between 4,000 and 6,000 and that is before deduplication.  To give the Court a sense of what we are talking, we are not going to produce sort of 48 documents. That is not what we are talking about, it is a meaningful tranche.

My Lord, if I may, as a lay person I would agree with my Lord's comments early on, that it seems that that would provide most of the material, the relevant material, in the first instance.

That is the approach that we took.  My learned friend suggested, and I certainly do not fault him for it, but I will take issue with it.  My learned friend's suggestion that

broadening this somehow would effectively make our lives easier.  I don't agree with that from a sort of an in the weeds' discovery perspective, because what that would introduce, in this first phase, is significantly more documents.  That would need some more detailed review in terms of relevance and privilege because it would not be appropriate just to do a document dump.

We will certainly do a review of privilege and what we have exchanged with the financial advisors, but I think I can say, on the face of it, it would be difficult to imagine that there would be much, if any, privilege because of course we are sharing with them with the advisors and that is sort of the point.

We could put together this first tranche much more quickly and along the lines of the timeframes that are suggested.  My learned friend and I, we differ in sort of the length of time, the plaintiff say 45 days, the company says 60.  I think if we expand it that timeframe would have to be revisited.  That is really the basis upon which we embarked upon this.

Now my learned friend took you through the proxy statements and took you through the advisors' letters that

come at the end of those documents, and he has raised the
issue of notes of internal calls.

My Lord, if it does assist the court and you see the
utility and the provision of those, then we can do a specific
search for those, and we can do that.  My concern is that if
at this stage we go more -- we increase the search to a more
broad search along the lines of the plaintiff's proposal, we
are not talking about 60 days.  It could be significantly
longer.

This is what, at least in the way that the parties engage
upon the process, the sort of get it moving, get experts
engaged so that they can begin to make further requests,
understanding and acknowledging that they are the ones who
will be properly positioned to say, "We need further
information to give these fair value appraisals", then --

**CHIEF JUSTICE HARGUN:**  Is it possible to do it in stages where
you provide this initial information within 45 days?  In
general they should be entitled to documents, minutes or file
notes of conversations which have not been exchanged which are
simply in your possession.  In principle that would be
relevant and that should be produced if it can be done without
too much trouble.  If it takes longer, it may well be that it
can follow this initial stage.

**MR TAYLOR:**  No, as I say, my Lord, I don't disagree with the minutes.  I must say this is something that my learned friend and I had not discussed until this morning, which is again, it is no criticism.  He was looking through the proxies and found these references.

     How quickly or not that will take, I am not entirely sure, but as I say, if my Lord is considering language along the company's proposal, and the first is the 60 days, and then we follow thereafter as soon as reasonably practicable.  That would be fine with the company, and it may well be that those notes would be easily identifiable in the existing data set that we would be searching.  I cannot say --

**CHIEF JUSTICE HARGUN:**  When you say, "The company's" before, are you looking at paragraph 2, the second paragraph?

**MR TAYLOR:**  My Lord, actually what I am looking at, it is for my ease, it is what I have been working from, is page 4 of our Skeleton; is where I have been working from.

**CHIEF JUSTICE HARGUN:**  Hold on a second.  Yes, that is the second paragraph of paragraph 2 in the --

**MR TAYLOR:**  That is correct, my Lord.  That is just what I have been working from, so they are the same.

**CHIEF JUSTICE HARGUN:**  So you are saying that you are looking for 60 days as opposed to 45.

**MR TAYLOR:**  This is right, my Lord.  This is simply based upon our preliminary discussions and previous iterations.  Forgive my friend, I don't believe these were WP discussions, but I think previously we had said 90 and we have come down to 60.

Yes, my lord, so that is the difference.  You will notice, so my Lord, if we were to include any file notes and the like, and I say that broadly, I do not mean to narrow it. Recordings, reports of calls by way of note, then we would be willing to do so, and we could.

Thus far I think the parties have been relatively cooperative and speaking to each other.  If it became difficult for us to do that in a short timeframe, we would let my learned friend and I am sure we could work on something. We can certainly, from my perspective, add those sort of meeting minutes, if I can put it that way.

The other reason that we have suggested the provided to or received from is just the relative ease, we say, with which

we can identify that subset and produce it in a relatively short timeframe to get the experts working.

My Lord, unless you have any further questions for me, I think this is the lone remaining point that the parties will need my Lord's assistance in relation to.

**CHIEF JUSTICE HARGUN:**  Yes, so in principle you are prepared to produce those documents, and the question is not within 60 days but say 14 days thereafter?

**MR TAYLOR:**  My Lord, it is difficult for me to say but I am quite comfortable to take my Lord's suggestion.  If we begin the search and that proves for whatever reason difficult, we will certainly my learned friend know right away.  You are always hesitant to commit.  I would be surprised whether it is difficult to locate those in good time.  I will say it, it just seems to me to be something we will be able to locate.

**CHIEF JUSTICE HARGUN:**  So that I understand it, when will you upload these documents?  These are documents which have been exchanged with the financial advisors.

**MR TAYLOR:**  Yes, so my Lord, if you look at our formulation, my learned friend indicated to you that our phased approach -- I don't want to say he does not favour, but maybe

he does not favour.  The idea was within 14 days to upload
the --

**CHIEF JUSTICE HARGUN:**  So is it 60 days plus 14 days or 45
days plus 14 days?

**MR TAYLOR:**  In our formulation they were running concurrently.
The 14 is for the first tranche and then within 60 it would be
the balance.  Looking at 60, I think we could try and do our
best to get the additional minutes within those 60 days.  I am
looking across the computer at Mr Howard, who is in the weeds
in the discovery process.

**CHIEF JUSTICE HARGUN:**  I see.

**MR TAYLOR:**  Based on that formulation --

**CHIEF JUSTICE HARGUN:**  So you are saying that these documents
would be uploaded within 14 days, the obtained documents.

**MR TAYLOR:**  That is correct.

**CHIEF JUSTICE HARGUN:**  I see.  Yes.

**MR TAYLOR:**  Correct.  My lord, what I would say is that we
could include within the 60 days, the company shall upload to

the data room any other documents described in paragraph 2.
We could say, for the avoidance of doubt, to include minutes
of the meetings that we have discussed.  My learned friend and
I should be able to find some formulation that would satisfy
my Lord.

**CHIEF JUSTICE HARGUN:**  Yes, I think I would like you to agree
a formulation of that.  What I have in mind is in effect
documents which record communications with the financial
advisors, but which do not fall within the category of
received or sent, but which reflect communications and
transmission of information with the financial advisors.

    That would include for example the agenda, documents
provided at a meeting but not exchanged, the minutes of
telephone calls, minutes of meetings, prepared, made by your
clients, the company; but not exchanged.

    The idea is that any and all information which has been
shared with the financial advisors but is not caught by the
subset sent and received, should be produced, assuming it has
been reduced to writing either in hard copy or electronically.

**MR TAYLOR:**  Yes, my Lord, I understand.  We are comfortable
with that formulation.

**CHIEF JUSTICE HARGUN:**  Yes.

**MR CHUDLEIGH:**  My Lord, if I may just make one suggestion in relation to that.  If for example there were minutes of a call with the financial advisors and say the purpose of the call was to discuss a particular set of financial projections which are noted in the minutes themselves.  Obviously in order to have that context we would need to see those documents.

**CHIEF JUSTICE HARGUN:**  Yes, of course.

**MR CHUDLEIGH:**  We can include language including any documents referred to therein.

**CHIEF JUSTICE HARGUN:**  Yes, but that would apply in any event. If a document is disclosed and it refers to another document, you would be entitled to see it.

**MR CHUDLEIGH:**  Thank you, my lord.

**CHIEF JUSTICE HARGUN:**  Yes.  Let me then, in that case, give you a Direction which should be included in the Order.  There are only two areas where there is a degree of disagreement. That is in relation to the initial disclosure, which is paragraph 2 of the Draft Order, and the scope of the expert reports, which is paragraph 11 of the Order.

In relation to paragraph 2, which is the initial disclosure, Mr Chudleigh expressed concern in two ways.  One was the reference to the valuation of Athene should not limit the documents to just Athene so as to exclude the documents which have been sent and are received in relation to Apollo.

Mr Taylor has confirmed that that is not the intention and so that is simply that all documents will be produced by the company, whether they relate to Apollo or Athene, which have been shared with the financial advisors.

The second issue was in relation to the documents which, categories of documents, which have not been sent or received but which may record information which has been shared with the financial advisors, including in relation for example, minutes, telephone calls, meetings and the like.  Mr Taylor has agreed, and I direct, that they should also be produced but they should be produced within 60 days of this Order. Both counsel should try to agree sensible language which reflects that.

Otherwise I would accept the language which is proposed by the company and not by the plaintiff.  Specifically at this stage I am not dealing with documents to include documents held by Lazard and Houlihan Lokey as agents for the company.

I am not making a ruling in relation to it on the substance of the matter, simply that at this stage that is not the case and that does not preclude Mr Chudleigh for the plaintiffs to subsequently pursue the application if it is considered appropriate to do so.  For the time being the language should be the language which has been proposed by the company.

In relation to the experts, I direct that the language which, for the time being should be used, is the language which appears in the statute, namely that the plaintiffs and the company shall have leave to instruct and to call as a witness at trial one expert witness each in the field of valuation, to opine upon the fair value of the plaintiff's shares in the company.  That is the statutory language which has been proposed by the company which I accept.

In giving that Direction I should make it quite clear that because we are not dealing with simply a share price, a monetary price offered by the company in terms of the merger price, and it includes exchange of shares, it will be of course open to the experts to suggest to the Court and make an application to the Court that their opinion should also cover and expand to other areas.  To the extent that it is necessary, to come up with the difference in value, which is

envisaged in Section 106, 6(a), 6(b).  That is to say obviously at the end of the day in the ordinary course the company would pay the difference between the amount assessed as fair value by the court, assuming it is higher and the value and the sum which has already been paid by the company.

Here an exercise of some description will have to be done to affix a value to the initial share, the initial consideration already received by the dissenting shareholders. It may well be, I do not preclude the argument, it may well be that that is a figure which was inserted in the notice which was sent to these shareholders.  In case there is an argument that is not the value accepted, that some other mechanism has to be arrived at.  I simply do not preclude the experts to say that further work has to be done.

As long as it is understood that the parties are at liberty to come back to the Court if further expert assistance is required in relation to that issue.  I am not suggesting that it would be necessary, all I am saying is that I am not precluding it simply because I do see that as an issue at some stage.

Otherwise the Order which has been prepared by the parties is acceptable to me and I will sign it.  If you can

agree the language in relation to paragraph 2 as we discussed and let me have a Draft Order, I will sign it.

**MR TAYLOR:**  My lord, I am obliged.  There is one additional matter I will raise, and I am obligated to do so at this Direction stage.

   My Lord, we are aware of a ruling of yours in the <u>Jardine</u> matter that is presently under appeal, and I believe it is in this session.  My understanding without being a party to that is at least part of that appeal revolves around whether shareholders who purchased their shares in a merging company after the announcement, in other words they were made aware, and again, no pejorative, but effectively have used the 106 provision as an investment strategy, whether they are precluded from taking advantage of it.

**CHIEF JUSTICE HARGUN:**  Yes.

**MR TAYLOR:**    My lord, I raise it because the plaintiff in this action, to my knowledge, are in that position.  They were aware of the merger and bought-in post having knowledge of it.  If indeed --

**CHIEF JUSTICE HARGUN:**  No, I understand.  If the Court of
Appeal says that they are not entitled to it, you want to
reserve your position.  That is perfectly understandable.

**MR TAYLOR:**  Yes, my lord.  I raise it only because I am
obligated to do so.  I have previously advised my learned
friend that he has graciously heard the position, so I wanted
to let the Court know.

**CHIEF JUSTICE HARGUN:**  I have a feeling that it will end up in
the Privy Council, that point.

**MR TAYLOR:**  Well, if that is the case, then I will also say,
my lord, it may not be today, but we may be instructed to seek
a stay pending that outcome, because that will be some time.
I could see Athene saying to me, "Well, Mr Taylor, how long
will it take?"  And I will say, "Well, it might be 18 months",
in which case they may say to me, "Well, won't be done by
then?"

**CHIEF JUSTICE HARGUN:**  The other way would be if you are
prepared to spend the money, is you can have an agreement that
that this is subject to the final resolution of that point,
which is an arguable point, but you are still prepared to
carry on with this litigation.

**MR TAYLOR:**  I suspect it won't necessarily be an inexpensive proceeding, my Lord.  I think the odds of it being overturned once or twice are probably very remote but --

**CHIEF JUSTICE HARGUN:**  No, no.  It is --

**MR TAYLOR:**  Sometimes the Appellant Courts get it wrong.

**CHIEF JUSTICE HARGUN:**  It is an interesting point; it is an arguable point.

**MR TAYLOR:**  It is.

**CHIEF JUSTICE HARGUN:**  It is being argued next week, I think.

**MR TAYLOR:**  Yes, my lord.  So I raise it just so that everybody is aware of the position and what I may be instructed to do from now on.

**CHIEF JUSTICE HARGUN:**  Yes, I mean it has been argued in different places.  In Cayman it has been argued.  It has been argued actually quite a lot in the US.  There are different decisions.

**MR TAYLOR:**  I think it has been argued in Delaware on a few occasions, but I think their statute is --

**CHIEF JUSTICE HARGUN:**  Different.

**MR TAYLOR:**  Materially different, yes.

**CHIEF JUSTICE HARGUN:**  Yes.  Good, that is noted.

**MR CHUDLEIGH:**  My Lord, just one final matter, if I may, and I do indeed note my learned friend's comments in relation to the Jardine Appeal.

The Draft Directions Order here does not make provision for costs and in light of your Lordship's cost ruling in Jardine and the spirit in which this hearing and the events leading up to it have been conducted, we propose the appropriate Order is simply costs in the courts.  I do not know whether my learned friend has any issue with that.

**CHIEF JUSTICE HARGUN:**  I would agree with that.

**MR TAYLOR:**  No comment.

**CHIEF JUSTICE HARGUN:**  I would agree with that.  Generally these Directions Hearings are a progression of the litigation that benefit both parties.  Yes, I will make an order that the costs of this hearing be costs in the Courts.

**MR CHUDLEIGH:**   My Lord.

**MR TAYLOR:**   Thank you, my Lord.

**CHIEF JUSTICE HARGUN:**   Good, well unless there is anything further this Hearing is now concluded, thank you.

(Hearing concluded)