# EXHIBIT 3

154

IN THE COURT OF APPEAL FOR BERMUDA

Civil Appeal No. 23 of 1992


|                     |            |
|---------------------|------------|
| LANCE MURRAY CROCKWELL | Appellant |

and

|                                    |             |
|------------------------------------|-------------|
| THERESA E. HALEY & THOMAS F. HALEY | Respondents |

Before:   da Costa JA., **P.Ag.**
          Henry  JA.
          Georges JA.


Date of hearing:  11th & 12th March 1993
Date of judgment: 29th June, 1993


-------------------------

JUDGMENT

-------------------------


da Costa JA., **P.Ag.**


   In August 1955 the respondent Mrs. Haley while on vacation in
Bermuda was struck on a pedestrian crossing near the Inverurie
Hotel by a motor cycle driven by the appellant.   She suffered
serious injuries which have effected the whole course of her
life.   At the time of the accident she was a school teacher in
Philadelphia.   She was then 49 years of age.   She has been forced
by her injuries to abandon her career as a teacher.


   She claimed damages for pain, suffering and loss of
amenities, loss of earnings past and future and medical expenses
past and prospective.   Ward J. assessed the past loss of earnings
in the sum of **$225,078.78** and the future loss in the sum of
$263,900.   These were gross figures.   The appellant does not
contest these figures, but contends that tax should be deducted
from these gross figures with the result that the award should be
based on the net figures.   In short the appellant submits that
the principle established by the decision of the House of Lords
in British Transport Commission v. Gourley (1956) AC 185 should
be applied in Bermuda.

/55

The learned judge examined the question of whether he ought to take into account the tax position in assessing the part of the damages attributable to loss of earnings actual or prospective and concluded:

> "In Russell v Van **Galen** Civil Appeal No. 21 of 1984 the Court of Appeal for Bermuda considered the question of the possible tax liability in assessing damages for loss of earnings and concluded that the reduction of damages under that head so as to take account of a possible tax liability should not have been made because the matter involved a consideration of foreign law which must be pleaded and proved by expert evidence.   The Court also held that loss of earning capacity was a capital asset and not subject to income tax.   The Court adopted the reasoning advanced in the dissenting speech of Lord Keith in British Transport Commission v Gourley (1955) 3 All E.R. 796.
> Mr. Cooper sought to distinguish Russell's case from the one at bar and suggested that anything which might have been said by the learned Justices of Appeal which was not strictly necessary for the decision in Russell was obiter and should not be followed.   I disagree. Bermuda has long prided itself on having no income tax and Bermudian Courts should not concern themselves with the application of income tax rules and regulations in other jurisdictions particularly when such application would yield no direct benefit to the foreign state."

The first question that arises for consideration is whether the observations made in Gourley's case were part of the ratio decidendi or were obiter.

In Russell v Van **Galen** (1985) 36 WIR 144 at 176 I said:

> "The interesting question of the application of Gourley's rule in the present context almost emerged in this case, but in reality does not and for a very good reason.   The principle that in a court in Bermuda, as in England, foreign law is a matter of fact is well established and it has two important practical consequences.   In the first place, the foreign law must be pleaded: the general rule is that if a party wishes to rely on a foreign law he must plead it in the same way as any other fact (King of Spain v. **Machado** (1827) 4 **Russ** 225).   Secondly, the foreign law must be proved as the court will not take judicial notice of foreign law; and, further, it must be proved in each case."

After some further observations I added:

> "Accordingly, in my judgment, it is the defendant who relies on foreign law and he was therefore obliged to plead and prove it.   This he has **failed** to do.   The consequence is that it is not open to him to contend that United Kingdom tax should be deducted from the plaintiff's loss of earnings under the rule in Gourley's case.

- 2 -

*156*

> While I fully realise that any comment of mine on the rule in Gourley's case must hereafter be held to be strictly obiter I nevertheless would add a few observations."

The learned President, Sir **Alastair** Blair-Kerr too after an examination of the views expressed in Gourley's case concluded at p.166: "But any views expressed by me concerning the decision in Gourley's case should be treated as obiter." He then gave his reasons why the views he expressed should be so regarded.

My brother Henry **JA** did not expressly state that his views on the Gourley case were obiter, but a perusal of his judgment shows that they obviously were (see pp. 180-181).

The vital question therefore which arises for consideration on this appeal is whether the views expressed in Russell v. Van **Galen** (1985) 36 WIR 144 by this Court on the Gourley case are correct. Mr. **Ashworth** for the appellant submits that in the circumstances of this case the Court is bound by, or alternatively ought to follow Gourley; in the further alternative, irrespective of Gourley, the general principles governing the assessment of damages in cases of negligence require that tax be deducted.

I turn therefore to consider the issue as to whether this Court is bound by the decision of the House of Lords in Gourley's case. I have had the privilege of reading in draft the judgment of my brother Georges. I am in entire agreement with the views expressed therein. I particularly endorse his views at pp. 4-7 of his judgment on the authority of the decisions of the House of Lords, expressed as they are with consummate clarity. With some diffidence I venture to add a few observations on this aspect of the case.

The orthodox theory of the **position** of colonial courts is stated by Sir Kenneth Roberts-Wray as follows:

- 3 -

/5⁴

"In the first place, there appears in the past to have
been a tendency, possibly unintended, to view the
judicature overseas as if their authority was in some
way inferior.  In some quarters, it may have been
fostered by their own judges, though the unquestioning
readiness with which they often relied upon English
decisions need be attributed to no more than the
respect with which the English Judiciary have always
been held and the dearth of other precedents.  However
that may be, this tendency probably flowed from the
subordinate states of the Executive and the
Legislature.  If so, the analogy, though understandable
was unsound; for Colonial Courts are not, and never
have been, subordinate to English Courts, or anymore
subordinate to the United Kingdom Parliament or
Government than the English Courts themselves" (Sir
Kenneth Roberts-Wray, Commonwealth & Colonial Law pp.
569-570).

Those words were written in 1966.  Since then there have

been many judicial pronouncements on the subject.  In de Lasala

v. de Lasala (1980) AC 546;  557-558 Lord **Diplock** said:

"It has become generally accepted at the present day
that the common law is not unchanging but develops to
meet the changing circumstances and patterns of society
in which it is applied.  In Australian Consolidated
Press Ltd. v. Uren **[1969]** 1 AC 590 it was accepted by
this Board that the common law as to the right to
punitive damages for tort had of recent years developed
in different ways in England and in New South Wales and
that neither Australian courts themselves nor this
Board sitting on an appeal from an Australian court
were bound by the decision of the House of Lords in
Rookes v. Barnard **[1964]** A.C. 1129 which limited the
categories of cases in which punitive damages could be
awarded in England.  So too in Hong Kong, where the
reception of the common law and the rules of equity is
expressed to be "so far as they are applicable to the
circumstances of Hong Kong or its inhabitants" and
"subject to such modifications as such circumstances
may require" a decision of the House of Lords on a
matter which in Hong Kong is governed by the common law
by virtue of the Application of English Law Ordinance
is not ipso facto binding upon a Hong Kong court
although its persuasive authority must be very great,
since the Judicial Committee of the Privy Council,
whose decisions on appeals from Hong Kong are binding
on all Hong Kong courts, shares with the Appellate
Committee of the House of Lords a common membership.
This Board is unlikely to diverge from a decision which
its members have reached in their alternative capacity,
unless the **decision** is in a field of law in which the
circumstances of the colony or its inhabitants make it
inappropriate that the common law in that field should
have developed on the same lines in Hong Kong as in
England."

This passage from the judgment of Lord **Diplock** was cited

with apparent approval by Lord Ackner in Franklin v The Queen

(1987) AC 576, 593-594.  In Tai Hing Cotton Mill Ltd. v. Liu

Chong Hing Bank Ltd. (1986) AC 80, 108 Lord **Scarman** said:

*158*

> "It is, or course, open to the Judicial Committee to
> depart from a House of Lords' decision in a case where,
> by reason of custom, statute, or for other reasons
> peculiar to the jurisdiction where the matter in
> dispute arose, the Judicial Committee is required to
> determine whether English law should or should not
> **apply.**  Only if it be decided or accepted (as in this
> case) that English law is the law to be applied will
> the Judicial Committee consider itself bound to follow
> a House of Lords' decision."

It would seem to follow therefore that the Judicial

Committee of the Privy Council would uphold a decision of a

colonial court differing from a decision of the House of Lords

when the conditions stated by Lord **Scarman** prevailed.   (See for

example, Australian Press Ltd. v Uren (1969) 1 AC 590, 641).


Whatever may be the position in strict theory the reality of

the situation is summed up by Lord **Diplock** in these words:

> "Since the House of Lords as such is not a constituent
> part of the judicial system of Hong Kong it may be that
> in juristic theory it would be more correct to say that
> the authority of its decision on any question of law,
> even the interpretation of recent common legislation,
> can be persuasive only: but looked at realistically its
> decisions on such a question will have the same
> practical effect as if they were strictly binding, and
> courts in Hong Kong would be well advised to treat them
> as being so."   (de Lasala v de Lasala (1980) AC 554,
> 558).

In short, whatever may be the orthodox theory of the

doctrine of precedents, any decision of the House of Lords will

be treated with the greatest respect having regard to the

reputation and distinction of that august body as the highest

legal tribunal of the United Kingdom, and will as a general rule

be followed by a court in Bermuda.   Should the rare occasion

arise where it is thought that local conditions dictate a path

different from that charted by the House of Lords, then the local

court must be at liberty to adopt such a course leaving it to the

Judicial Committee to decide as ultimate arbiter whether such a

course was justified.


In matters of commerce uniformity-is of course highly

desirable and this court in J.E.L. Lightbourne **&** Co. Ltd. v Test

Freres (1980-80) LRC (Comm) 463 readily followed the decision of the House of Lords in the Advocaat case (1980) RPC 31 as being "the most authoritative pronouncement on the law of passing off in England." The President of the Court took the view that there was no reason why the Common Law on this subject as applied in these island should be any different.

I think it is appropriate at this stage of my judgment to face my locus poenitentiae. As stated above I was a party to the decision in Russell v Van **Galen** (1985) 36 WIR 144 and expressed certain views. Faced with an expression of an opinion that was clearly obiter but which is no longer sustainable one must recant with as much grace as possible. One can take some comfort that at least the renunciation of an obiter dictum is not as mortifying as the abandonment of a ratio decidendi previously enunciated. In the very case that is at the heart of this matter we find Lord Tucker saying:

> "**My** Lords, having heard this point argued three times - twice in your Lordships' House and once in the Court of Appeal - I am persuaded that the decision in Billingham v Hughes, to which I was a party in the Court of **Appeal,** was erroneous." (Gourley's case 1955 AC 185,215).

Perhaps, like the trial judge I was overly impressed by the fact that Bermuda had no income tax, Mr. **Ashworth** has however demonstrated that his fact is really irrelevant. It is not the lex **fori,** that is the determinant for the deduction of tax in the assessment of compensation for loss of earnings. English courts always look at the factual basis, and if and only if, the earnings would in fact (because of the law of his domicile or the state where he was working) have been subject to taxation do English courts deduct tax in the assessment of compensation f-or their loss.

I come now to consider the rule in **Gourley's** case and to give my reasons why after hearing the case fully argued I have resiled from the view expressed in the Van **Galen** case.

- 6 -

*160*

Few decisions of the House of Lords have been more controversial and the debate on its merits have been vigorous and sustained.   In fact it rests upon a simple, but fundamental proposition of law that damages for negligence are intended to be purely compensatory.   The case for the Appellant in the House of Lords was put with striking simplicity by their counsel thus:

> "The object of awarding damages for personal injuries is to compensate the injured person for what he has lost in the past and is likely to lose in the future. All that the plaintiff has lost in the past and all that he will lose in the future is the amount of his earnings less tax.   The true way to compensate him is to give him the sum equivalent to what he would have enjoyed from his earnings after paying the liabilities attached to those earnings.   To do otherwise would be to enable him to make a profit out of his injuries."
> (per Sir Andrew Clarke Q.C. (1956) AC 185, 190).

The compensatory principle, if I may so call it, was accepted by the Law Lords in Gourley's case ((1956) AC. 185: see for example per Earl Jowett at **pp.197-198**; per Lord Goddard at 206; per Lord Reid at 212).   Even Lord Keith the lone dissentient did not express a contrary view, but addressed himself to the "serious difficulties and complications" that would arise if tax was to be deducted from the gross earnings.

In Hodgson v Trapp (1989) 807, 819 Lord Bridge reaffirmed the principle in these terms:

> "My Lords, it cannot be emphasised too often when considering the assessment of damages for negligence that they are intended to be purely compensatory. Where the damages claimed are essentially financial in character, being the measure on the one hand of the injured plaintiff's consequential loss of earnings, profits or other gains which he would have made if not injured, or on the other hand, of consequential expenses to which he has been and will be put which, if not injured, he would not have needed to incur, the basic rule is that-it is the net consequential loss and expense which the court must measure. If, in consequence of the injuries sustained, the plaintiff has enjoyed receipts to which he would not otherwise  ·  have been entitled, prima facie, those receipts are to be set against the aggregate of the plaintiff's losses and expenses in arriving at the measure of his damages. All this is elementary and has been said over and over again."

- 7 -

*161*

The principle is also accepted in Australia.   In Skelton v. Collins (1965-66) 115 CLR 94, at 128, Windeyer J. gave eloquent expression to this **axiomatic** principle when he said:

> "The one principle which is absolutely firm, and which controls all else, is that damages for the consequences of mere negligence are compensatory.  They are not punitive.  They are given to compensate the injured person for what he has suffered and will suffer in mind body or estate.  Only so far as they can do so is he entitled to have them."

Even **Barwick** C.J. an avowed opponent of the decision in Gourley's case accepts the proposition that damages are only compensatory as fundamental (see Atlas Tiles Ltd. v. Briers (1976-78) 144 CLR 202 at 208).

There are however two prerequisites for the application of the decision in Gourley's case: in the words of McGregor they are:

> "(1) the sums for the loss of which the damages awarded constitute compensation would have been subject to tax; and (2) the damages awarded -to the plaintiff would not themselves be subject to tax.  For there cannot be any reason for **taking** tax into account in calculating damages given in compensation for a loss which would never itself have been taxed: this would let in a taxation where no taxation would have been, which would be unfair to the plaintiff.  Equally there cannot be any reason for taking tax into account in calculating the damages if the damages themselves will then be taxed:  this would result in a double taxation, equally unfair to the plaintiff."  (McGregor on Damages, 15th edn. **pp.335-6**).

Gourley was a decision in Tort, but the principle upon which it rested also applies in other branches of the law where the function of damages is compensatory and not punitive.  Commenting on its application in the realm of contract the authors of a leading text-book on the faw of Contract observe: "The logic of the principle **may** be impeccable, but the difficulties involved-in its application are formidable" (Cheshire, Fifoot **&** Furmiston's, Law of Contract, 12th edn. p. 610).

The alleged difficulties involved in the application of the principle in Gourley's case is one of the main grounds on which

*162*

the opponents of the principle rely.   But can the objection
really be sustained?  Admittedly there are elements of
uncertainty in the assessment of tax payable.   But there is often
a considerable element of uncertainty in an award of damages, but
that does not prevent a court from doing the best it can in the
circumstances.   In assessing pecuniary damages for the loss of
earnings there are many imponderables to be taken into account,
e.g. the likely duration of the plaintiff's incapacity, his
chances for promotion or increase in **earnings,** and the future
rates of inflation and return on invested capital.   Again when a
court comes to deal with non-pecuniary damages the difficulties
are even more formidable.   As Dickson **J.** observed in Andrews et
al v Grand **&** Toy Alberta Ltd. et al (83 D.L.R. (3d) 452 at **475-**
476):

> "There is no medium of exchange for happiness.   There
> is no market for expectation of life.   The monetary
> evaluation of non-pecuniary losses is a philosophical
> and policy exercise more than a legal or logical one.
> The award must be fair and reasonable, fairness being
> gaged by earlier decisions; but the award must also of
> necessity be arbitrary or conventional.   No money can
> provide true restitution. . . . The sheer fact is that
> there is no objective yardstick for translating **non-**
> pecuniary losses, such as pain and suffering and loss
> of amenities, into monetary terms."

Despite the inherent difficulties courts do not shrink from
the task of assessing damages.   One is tempted to observe that
the difficulties of application envisaged by the opponents of the
Gourley principle appear largely in the theoretical cases raised
by learned judges and authors rather than in the practical
application of the principle.   In the Queen (In the Right of
Ontario) v Jennings (57 D.L.R.  92d) 644 at 657) Judson J. a
notable opponent of the Gourley principle enumerated some of the
practical difficulties that would arise from an application of
the principle.   The final sentence in the potential catalogue of
woes asked: "What will be done with the foreign plaintiff and the
foreign system of taxation?"  The case before us is just that
case and one could not justifiably say that the tax aspect has
presented any practical difficulties.   In fact the parties have

*163*

found it possible to agree the tax element, thus dispensing even
with the necessity to call evidence on the matter.

As Kemp & Kemp have observed:

> "Many of the problems it was predicted would arise as a
> result of Gourley's case were premised on plaintiffs
> who were "people of affairs", and who had complex tax
> liabilities.   In truth the overwhelming majority of
> plaintiffs are employed people subject to the **PAYE**
> scheme, most of whom are not even liable to the higher
> rates of tax, and it is usually straight forward in
> such cases to apply Gourley's rule simply by looking at
> the plaintiff's earnings."  (Kemp & Kemp, The Quantum
> of Damages, (1992) edn. Vol. 1 **p.** 9-005-006).

The result is that "in practice, at least in personal injury
litigation, the rule in Gourley's case has been applied for over
a quarter of a century without creating too many difficulties or
an abundance of case law" (Kemp & Kemp ibid **p.9-005)**

The opponents of Gourley further say: "The plaintiff has
been deprived of his capacity to earn income.   It is the value of
that capital asset which is to be assessed."   In Atlas Tiles Ltd.
v Briers (1976-1978) 144 CLR 202 at 210 **Barwick** C.J. a leading
protagonist of this school said:

> "Some have thought the distinction I have drawn between
> loss of earnings and loss of earning capacity is
> illusory or insubstantial.   But, in my opinion, it is
> real and radical. . . . In my opinion, the distinction I
> make is not a matter of semantics but basically
> conceptual."

In my judgment the answer of Salmond & Heuston to their
criticism is complete:

> "Another criticism is that a person whose earning
> capacity is wholly or partially destroyed thereby loses
> a capital asset, and-as it is a fundamental principle
> of English revenue law that a capital asset is not
> taxable, it should follow that the compensation which
> replaces that asset is also tax-free.   But while it is
> true that a man's skill and experience are in the
> nature of capital assets, all that was done in Gourley
> was to value those assets by the income which they are
> likely to produce, and that income was affected by the
> predictable factor of taxation.   In short, the Law
> Lords in Gourley faced the realities of life and
> refused to be misled by maxims such as res inter alios
> **acta.**   There is no reason why someone who has lost a
> net sum should receive a gross sum."   (Salmond &
> Heuston, Law of Torts, 18th edn. p.638).

- 10 -

*164*

There is however, an interesting decision of Denning M.R. in which he seeks to distinguish the two concepts. In Farley v John Thompson Ltd. (1973) 2 Lloyd's Rep. 41, 42 he said:

> "It is important to realize that there is a difference between an award for loss of earnings as distinct from loss of earning capacity. Compensation for loss of future earnings is awarded for real assessable loss proved by evidence. Compensation for diminution in earning capacity is awarded as part of general damages."

**Scarman** L.J. (as he then was) was a member of the Court and he obviously agreed with the distinciton Lord Denning M.R. made. At p. 43 **Scarman** L.J. said:

> "Before the accident he could get his living as a steel or steelwork erector. After the accident he cannot. There is no evidence that actually it is causing or will cause him any loss of future earnings. Yet there is a disability. I think, with my Lord, that it has to be considered as an element in general damages."

It appears therefore from the above case that if a steel erector was earning E40 per week, but as a result of an accident he could only do a job in which he earned f30 per week he would be awarded compensation on the basis of £10 per week for loss of future earnings. If on the other hand he suffered no loss of earnings then all he would have suffered was a loss of earning capacity for which he would be entitled to general damages.

This principle was applied by the Court of Appeal in Moeliker v Reyrolle & Co. (1977) WLR 132, a case where the plaintiff had suffered serious but not incapacitating injury. At p.140 Browne L.J. observed:

> "As I have said. this problem generally arises in cases where a plaintiff is in employment at the date of trial. If he is then earning as much as he was earning' before the accident and injury (as in the present case), or more, he has no claim for los of future earnings. If he is earning less than he was earning before the accident, as in Nicholls v. National Coal Board [1976] l.C.R. 266, he has a claim for loss of future earnings which is assessed on the ordinary multiplier/multiplicand basis. But in either case he may also have a claim, or an additional claim for loss of earning capacity if he should ever lose his present job."

*165*

**One** can of course appreciate the distinction made by Lord Denning M.R. & Browne L.J.. On the other hand the view of the Pearson Commission was that loss of earning capacity should be regarded simply as a factor to be taken into consideration when assessing damages for future loss of earnings (Salmond & Heuston op. at **pp.635-6**).

In the final analysis however the fact of the matter is, as **my** brother Georges has observed, in estimating a lump sum value of the loss of earning capacity, the most sensible starting point is an **estimate** of the annual earnings converted to a lump sum over a number of years.

In calculating the damages for future **loss of** earnings the learned judge used the **same** method that is employed in England. It is agreed that this is the usual practice in Bermuda.

In **Cookson** v Knowles (1979) A.C. 556 the House of Lords approved practical guidelines which have been confirmed and applied in subsequent decisions, notably in **Pickett** v British Rail Engineering Ltd. (1980) A.C. 136 and in Lim Poh Choo v Camden and Islington Area Health Authority (1980) A.C. 174 in which Lord **Scarman** delivered the leading speech.

In Hodgson v. Trapp (1989) A.C. 807, 826 Lord Oliver after emphasising "the unpredictable consequences" inherent in making an assessment of future income loss said:

> "Such an assessment cannot, therefore, by its nature be a precise science. The presence of so many imponderable factors necessarily renders the process a complex and imprecise one and one which is incapable of producing anything better than an approximate result. Essentially what the court has to do is to calculate as best it can the sum of money which will on the one hand be adequate, by its capital and income, to provide annually for the injured person a sum equal to his estimated annual loss over the whole of the period during which that loss is likely to continue, but which, on the other hand, will not, at the end of that period, leave him in a better financial position than he would have been apart from the accident. Hence the conventional approach is to assess the amount

*166*

notionally required to be laid out in the purchase of
an annuity which will provide the annual amount needed
for the whole period of loss."

His Lordship then went on to observe that the process cannot
be better described than it was by Lord **Diplock** in **Cookson** v
Knowles (1979) A.C. 556 and although that case was concerned with
a claim under the Fatal Accidents Act 1846-1959 "his description
of the approach to and the method of assessment of damages, is
equally applicable to claims for future loss of earnings and
future expenses by the injured party himself."   His Lordship then
went on to cite two well known passages from the speech of Lord
**Diplock** in **Cookson** v Knowles at **pp.567-568** & 571-572.

At p.571 of his speech in **Cookson** & Knowles Lord **Diplock**
said:

> "Quite apart from the prospects of future inflation,
> the assessment of damages in fatal accidents can at
> best be only rough and ready because of the conjectural
> nature of so many of the other assumptions upon which
> it has to be based.  The conventional method of
> calculating it has been to apply to what is found upon
> the evidence to be a sum representing "the dependency,"
> a multiplier representing what the judge considers in
> the circumstances particular to the deceased to be the
> appropriate number of years' purchase.   In times of
> stable currency the multipliers that were used by
> judges were appropriate to interest rates of 4 per
> cent. to 5 per cent. whether the judges using them were
> conscious of this or not.  For the reasons I have given
> I adhere to the opinion Lord Pearson and I had
> previously expressed which was applied by the Court of
> Appeal in Young v. Percival **[1975]** 1 W.L.R. 17, 27-29,
> that the likelihood of continuing inflation after the
> date of trial should not affect either the figure for
> the dependency or the multiplier used.   Inflation is
> taken care of in a rough and ready way by the higher
> rates of interest obtainable as one of the consequences
> of it and no other practical basis of calculation has
> been suggested that is capable of dealing with so
> conjectural a factor with greater precision."

Indeed as Lord Oliver said in Hodgson v. Trapp (1988) 807,
828:

> "In an area in which, as Lord **Diplock** observed, the
> conjectural nature of the exercise necessarily renders
> the computation at best rough & ready, it is not to be
> expected that the process will or can be precise or
> entirely logical."

*167*

Be that as it may, the courts have evolved a particular method for assessing the amount of damages for future loss of earnings. This amount as appears from the cases is calculated by ascertaining the annual sum that represents the plaintiff's loss of earnings at the date of trial, and multiplying this by a figure which, while based upon the number of years during which the loss of earning power will last, is discounted so as to allow for the fact that a lump sum is being awarded now instead of periodical payments over the years. This latter figure is referred to as the multiplier; the former figure has come to be called the multiplicand.

As Lord Fraser of Tullybelton observed in **Cookson** v. Knowles (1979) AC 556, 576:

> "The multipliers which are generally adopted in practice are based on the assumption (rarely mentioned and perhaps rarely appreciated) that the principal sum of damages will earn interest at about 4 or 5 per cent. which are rates that would be appropriate in **times** of stable currency, as **my** noble & learned friend Lord **Diplock** pointed out in Mallett v **McMonagle** (1970) AC **166,1761** D.

This method of assessment is not without its critics. (See for example Kemp & Kemp, The Quantum of Damages (1979) 6-005 & 7-010); but this is perhaps not the place to pursue such criticism. It is however the practice almost invariably adopted by the court.

Again to quote Lord Oliver:

> "The **system** of multipliers & multiplicands conventionally employed in the assessment takes account of a variety of factors, none of which is or, indeed, is capable of being-worked out scientifically, but which are catered for by allowing a reasonably generous margin in the assumed rate of interest on which the **multiplier** is based" (Hodgson v Trapp (1989) AC 807, **834**).

Their Lordships in Hodgson v Trapp were also of the view that "the incidence of taxation in the future should ordinarily be assumed to be satisfactorily taken care of in the conventional

- 14 -

assumption of an interest rate applicable to a stable currency and the selection of a multiple appropriate to that rate" (p.835).   This reasoning would normally apply to inflation **though:-**

> "Both in **Cookson** v. Knowles (1979) AC 556 and in Lim's case (1980) AC 174 this House was prepared to envisage that there might be very exceptional cases, where it could be positively shown by evidence that justice required it, in which special allowance might have to be made for inflation and, inferentially for tax" (per Lord Oliver at p.835).

The **"Diplock** approach" has been consistently followed in assessing damages in Bermuda.  As I have observed it has its critics.  It is not a perfect system but then it operates in a realm in which perfection must remain beyond the wit of man.  On the whole however it produces results that are substantially just.  There does not appear to be any valid reason why Bermuda should seek to depart from it a system of assessment that has become well established here.

On the whole despite criticisms the decision in Gourley's case has gained favourable reception in many Common Law jurisdictions.   In Atlas Tiles Ltd. v. Briers **(1976/78)** 144 CLR 202 the High Court of Australia by a majority rejected the doctrine; however, eighteen months later, in **Cullen** v Trappell **1979/80)** 146 CLR the full court by a majority overruled its previous decision thus establishing the principle in Australia.

The legendary acceptance of things British by Barbados found another illustration in the reception of the Gourley principle. In Johnson v. Browne 1972) 19 WLR 382 Douglas CJ followed the Gourley case without comment.

The situation in Canada presents a strange picture.  In the Queen v. Jennings (1966) 57 DLR (3d) 64 the Supreme Court rejected the principle stated in Gourley, expressing agreement with the dissenting opinion of Lord Keith and the minority views

- 15 -

of the 7th Report of the Law Reform Committee.   The rejection was largely on the basis that the plaintiff has been deprived of his capacity to earn income and that was a capital asset.   (See per Judson J. at page 656).   It would appear however that the decision applies only to damages for future loss of earnings.  In Keiser v. Hanna (1978) 82 DLR 3(d) 449 the Supreme Court held that in assessing damages in Fatal Accident cases income tax must be deducted.   In Andrews v. Grand & Toy Alberta Ltd. (1978) 83 DLR 3(d) 452 the Supreme court affirmed both Jennings and Hanna v. Keiser distinguishing them on the ground that in the case of prospective income of a living plaintiff it is "earning capacity and not lost earnings which is the subject of compensation", whereas in a fatal accident case the "support payments could only come out of take home pay"   (p. 774)   It appears that in Canada tax is deducted from pre-trial loss of earnings but not from future loss of earnings.

In Smiths v. Wellington Wool Mfg. Co. Ltd. (1956) NZLR 491 the Court of Appeal of New Zealand followed Gourley.   However, in North Island Groceries Ltd. v. **Hewin** (1982) 2 NZLR 176 the Court of Appeal by a majority declined to follow Gourley in a wrongful dismissal case.   The majority expressly declined to reconsider the application of Gourley in a personal injury case because by then the question had become an academic one in New Zealand.

The position in South Africa is interesting as it appears that even before the decision in Gourley income tax was taken into consideration in the awarding of damages for the loss of earning:  Thus in Pitt v. Economic Insurance Co. Ltd. **[1957 (3)]** SALR 284 Holmes J. said: "I would add as a matter of interest, that this is now the accepted view in England", as a result òf the Gourley case.

In the United States the practice varies from state to state.   However, in Norfolk and Western Railway Co. v. **Liepelt**

- 16 -

*170*

(1980) 100 S.C.R. 755 Stevens J. in delivering the judgement of the Supreme Court said at p.757:

> "The amount of money that a wage earner is able to contribute to the support of his family is unquestionably affected by the amount of the tax he must pay to the Federal Government. It is his **after-**tax income, rather than his gross income before taxes, that provides the only realistic measure of his ability to support his family. It follows inexorably that the wage earner's income tax is a relevant factor in calculating the monetary loss suffered by his dependents when he dies".

It is not possible to ascertain the precise method of their calculation of damages in as much as in the United States damages are awarded by juries. Again practice in various States appear confused. Apparently in matters governed by state law rather than federal law the state courts pursue their own policy without regard to pronouncements of the Supreme Court.

It would thus appear that so far as the common law jurisdictions are concerned although the decision in Gourley is not supreme over palm and pine it has nevertheless gained considerable acceptance.

As I said near the beginning of this judgment like the learned trial judge, I was overly impressed by the argument that Bermuda has no income tax. But clearly this factor is irrelevant. The Bermudian plaintiff will continue to be untouched by the Gourley principle for Bermuda has no income tax. Indeed, if a Bermudian goes to England and has the misfortune to be involved in an accident and sues there he will still enjoy his freedom from the demand of income tax. The Gourley principle will only apply here in the few exceptional cases, where foreign plaintiffs who sue for injuries suffered here come from countries in which income tax is payable. In such cases questions of foreign tax law will arise. They must be proved unless agreed, as indeed happened in this case.

In the result, I would hold like my brother Georges, that while this Court is not bound to follow the Gourley case, there does not appear to be any valid reason in the context of the Bermuda situation why we should refuse to follow that decision, based as it is on a proposition that is universally accepted in common law jurisdictions.  The learned judge should accordingly have taken the Gourley principle into consideration in assessing the actual and future loss of earnings.

Before the trial the parties had actually agreed that the plaintiffs past and future earnings (had she not been injured) would have been subject to federal and state income taxes at the rate of 25 per cent., and that her damages will not be taxable. The agreement was confirmed on appeal.

The parties have submitted the following agreed figures:

SUPREME COURT JUDGMENT

```
(a) Medical Expenses           $30,456.51  Total (a) & (b)
(b) Part loss of earnings     $225,078.78  $255,535.29
                                              Total (b) & (c)
(c) Future loss of earnings   $263,900.00  $488,978.78
(d) General damages            $65,000.00
(e) Interest on (a) & (b)                    $62,973.69
(f) Interest on (d)                           $4,581.16

          TOTAL  JUDGMENT      $651,990.14
```

IF APPEAL SUCCEEDS:

FIRSTLY:        Reduce (b) and (c) by 25%

$$25/100 \times \$488,978.79 = \$122,244.70$$

SECONDLY:       Reduce (e) as follows

$$\$62,973.69 \times \frac{\$225,078.78}{\$255,535.29} \times \frac{25}{100}$$

$$= \$13,867.00$$

```
DEDUCTIONS  (1)       $122,244.70
            (2)     +  $13,867.00
       TOTAL          $136,111.70

TOTAL  JUDGMENT       $651,990.14
LESS: DEDUCTIONS    -  $136,111.70  .
       TOTAL          $515,878.44
```

- 18 -

*172*

Accordingly, I would allow the appeal and applying the Gourley principle I would substitute the amounts of **$515,878.44** agreed by the parties as correct for the award of damages made by the trial judge under the heads of loss of earnings and loss of future earnings.  Accordingly there will be judgment for the plaintiff - respondent in the sum of **$515,878.44.**

H.L.  da  Costa


Piers **Ashworth** Q.C.  and  John  Cooper  for  the  Appellant
Kieron  Unwin  for  the  Respondent

*173*

1

IN THE COURT OF APPEAL FOR BERMUDA

CIVIL APPEAL NO 23 of 1992

Lance Murray Crockwell                    Appellant

v

Theresa E. Haley & Thomas F. Haley     Respondent

Date of hearing: 11th March, 1993

Date of judgment: 29th June, 1993

Before       da Costa JA (Ag. P)
             Henry JA
             Georges JA

─────────────────────────

JUDGMENT

GEORGES JA

    The question arising for decision in this appeal is whether in
assessing damages for loss of earning capacity claimed in an action
for personal injuries, the judge should take into account and
deduct the tax the plaintiff would have had to pay on the lost
earnings.

    The respondent, Mrs. Haley, was struck on a pedestrian
crossing near a local hotel by a motor cycle driven by the

*174*

2

appellant.  She was at the time of the accident 49 years old and

employed as a school teacher in Philadelphia.  The injuries she

sustained effectively disabled her from resuming her employment.

The trial judge discussed the issue as to whether or not income tax

should be deducted before arriving at the figure on which Mrs.

Haley's loss of earnings would be **capitalised.**  He concluded -

> "In Russell v Van_Galen_ Civ. App.
> No.21 of 1984, the Court of Appeal
> for Bermuda considered the question
> of the possible tax liability
> assessing damages for loss of
> earnings and concluded that the
> reduction of damages under that head
> so as to take account of a possible
> tax liability should not have been
> made because the matter involved a
> consideration of foreign law which
> must be pleaded and proved by expert
> evidence.  The Court also held that
> loss of earning capacity was a
> capital asset and not subject to
> income tax.  The Court adopted the
> reasoning advanced in the dissenting
> **speech** of Lord Keith in British
> Transport Commission v Gourley
> **[1955]** 3 All E.R. 796
>
> Mr. Cooper sought to distinguish
> Russell's case from the one at the
> bar and suggested that anything
> which might have been said by the
> learned Justices of Appeal which was
> not strictly necessary for the
> decision in Russell was obiter and
> should not be followed.  I disagree.
> Bermuda has long prided itself on
> having no income tax and Bermudian
> courts should not concern themselves
> with the application of income tax
> rules and regulations in other
> jurisdictions particularly when such
> application would yield no direct
> benefit to the foreign state."

*175*

3

A perusal of  Russell v Van **Galen** (1985) 36 W.I.R. 144 shows
that the comments by the learned Justices of Appeal were clearly
obiter.   The  President,  Sir  **Alastair**  Blair-Kerr,  critically
reviewed Gourlev's case between pages 164 and 166 of the report and
concluded  -

> "But  **any**  views  expressed  by  me
> concerning the decision in Gourley's
> should  be  treated  as  obiter.   The
> defendant  argues  that  the  award  of
> damages should be reduced by 30%.
> That  involves  a  consideration  of
> foreign  law.   He relies on that law.
> The onus was on him to prove it as a
> matter of fact.   He has not pleaded
> it;    and  even  if  he  had,   such
> evidence as emerged in one way or
> another was wholly inadequate.   The
> relevant  foreign  law  was  neither
> pleaded nor proved; and it is for
> those  reasons  that,  in  my  view,
> grounds of appeal 7 must fail and
> grounds 3 and 4 of the cross-appeal
> must  succeed."

Ground 7 of the notice of appeal  and grounds 3 and 4 of the
respondent's notice dealt with the manner in which the trial judge
had ruled on the issue of income tax **deductibility** from loss
earnings.

**DaCosta** JA reviewed Gourlev's case at pp 174-175 concluding -

> "While ⁻I fully realise that any
> comments  of  mine  on  the  rule  in
> Gourley's  case  must  hereafter  be

*176*

4

> held to be strictly <u>obiter</u> I
> nevertheless would add a few
> observations . . . . . .."

He went on to state that he found the views of the minority as

stated in the 7th report of the Law Reform Committee on the effect

of tax liability on damages convincing.


Henry JA did not specifically state as did his brethren that

the views he expressed on <u>Gourley</u> were <u>obiter</u> but in the context it

was patently obvious that they were.   He stated at p. 180 -

> "It is the submission of counsel for
> the defendant that the trial judge
> (who held that the rule in <u>Gourley's</u>
> case applied) ought to have reduced
> the amount he awarded by 30% and not
> 15% in order to make allowance for
> the plaintiff's tax liability where
> she now resides.   In my view, the
> short answer to this issue is that
> the incidence  of taxation arises
> under the English Finance Act, a
> foreign  law which has  not been
> pleaded by the defendant and it was
> not therefore open to him to lead
> any evidence as to the law or to
> rely on it by way of **defence** for the
> purpose of reducing the amount of
> damages payable by him. However, it
> may be of assistance for the future
> to express some views as to the
> applicability of  the  rule  in
> **Gourley's** case."

He went on at p.181 to state that he was

> "inclined to agree with the views
> expressed by Lord Keith and Judson
> J.   In my opinion,  the rule in
> <u>Gourley's</u> case should not be applied
> in Bermuda."


These statements even though strictly <u>obiter</u> could properly

*171*

5

have been regarded by a trial judge as strongly indicative of the course that should be followed in decisions in that area in the future.   The approach to be taken by this Court must clearly be different.   The statements, being _obiter,_ are not binding.   The issue is open for re-examination though clearly much deference will need to be given to the considered opinions  forcefully expressed.

Against that background the  first issue which  arises is whether this Court is free to depart from the views of the law expressed by 6 of the 7 members of the House of Lords who decided **Gourley's** case.

It should be emphasised that although Bermuda is technically not an independent country and retains colonial linkages the hierarchy of its courts is no more subordinate to courts in England than are the courts of independent countries which maintain the Judicial Committee of the Privy Council as the final appellate tribunal.   As Sir Kenneth Roberts-Wray states in Commonwealth and Colonial Law at pp. 563-4 -

> "English decisions are treated as authoritative   much   more  in   the Courts  of  Colonies   than   in independent countries: but (though this  is   understandable)    there appears to be no sound reason for saying they ought to be.   It seems sometimes to be overlooked that the general  jurisdiction of Superior Courts,   even  in  the  smallest territories,  is the same as that of the Courts of Westminster:   local statutes  commonly so  provide in express terms. If, therefore, there

*178*

6

> is an obligation upon such courts to
> regard English decisions as binding,
> it cannot rest upon any theory of
> inferior status."

Statements of the principles which should be applied in
determining the binding effect of English authority on Commonwealth
Courts reflect the inherently irreconcilable goals which are being
pursued. There is the desire for almost seamless uniformity in the
development of the common law as a dynamic mechanism assisting in
the regulation of human affairs but this survival is only possible
where there is creative adaptation to local conditions.

It must be conceded that the common law of Bermuda now being
applied in the courts of Bermuda derives from the common law of
England.  The ultimate authority for the declaration of that law is
the House of Lords.    In that sense even though the courts of
Bermuda are not hierarchically subordinate to the House of Lords as
they are to the Judicial Committee of **the** Privy Council, there
exists compelling reason to accept declarations of the common law
by the House of Lords as binding.   Further, in practical terms as
Lord **Diplock** has pointed out in de Lasala v de Lasala **[1980]**
A.C.546 at p.538 since the Judicial Committee of the Privy Council
shares a common membership with the Appellate Committee of the
House of Lords it is to be expected that the Judicial Committee
sitting as  the final appellate  tribunal  for  any  particular
Commonwealth Country is hardly likely to disagree with views which
its members have expressed as the Appellate Committee **of ·the** House

*119*

7

of Lords.

Finally there is the fact that the practical experience and legal scholarship of the Appellate Committee of the House of Lords are such as to sustain a generally admirable reputation for soundness. The consequence is that views which they propound are usually reasoned and persuasive and easy to adopt quite apart from any dictate of the doctrine of precedents.

When all these factors are given full weight, there nonetheless remain areas in which there can be room for reasoned disagreement - often arising from conflicting views as to the purpose to be served by a rule - though necessarily formulated in the language of conceptual analysis and of an examination of the practical consequences flowing from the choice of a particular alternative. Not many disputes will fall within this range. Generally then it can be said that the Courts of Bermuda will accept as binding decisions of the House of Lords in common law matters. Where, however, a problem does fall within this range and the Courts are satisfied that the social conditions of Bermuda make inappropriate the particular path of development chosen by the House of Lords against the background of British conditions, then the Courts of Bermuda must be at liberty to map their own particular path making clear their reasons for so doing. Should the issue eventually reach their Lordships in their role as members of the Judicial Committee and as such the final **appellate tribunal**

*180*

8

for Bermuda, it will be possible for them to weigh and assess the reasons underlying the divergence and thereupon decide whether it should be nonetheless affirmed.

In my view, the method of determining the damages to which a plaintiff is entitled in an action for damages for negligence does permit of differences of approach springing from societal values. In this regard it clearly differs from the law relating to passing Off in relation to which Sir **Alastair** Blair-Kerr **P.** speaking for the Court in <u>J.T. Lightbourne & Co.</u> Ltd and another v <u>Testut</u> [1980-84] **LR(Comm)463** at 473 stated that there was no reason why the Common law on that subject in the <s>Advocaat</s> case **[1980]** R.P.C.31 should be any different in Bermuda.

It was stressed on behalf of the appellants that **once** the law being applied in the assessment of damages for personal injuries was English law, then there was an obligation to apply the entire bundle of rules. I find the proposition unacceptable. **<u>Gourley's</u>** case was not itself decided until 1956. Until then damages would have been assessed without regard to the plaintiff's tax liability.

One comes then to decide the issue whether the rule in **<u>Gourley's</u>** case should be adopted in Bermuda. Controversy over the adoption of the rule has been intense and proponents on one side and the other have seldom changed their views so deeply do convictions run.

*181*

9

On all sides, however, it is agreed that damages in a personal injury action are intended to compensate the plaintiff for losses incurred. **Barwick** CJ, an early opponent of the rule accepted this. He stated in Atlas Tiles Ltd v Briers **[1978]** 144 CLR 202 at **p.208**

> "**Gourley's** case and cases such as .........; which have followed and applied **Gourley's** case are said to be founded upon the proposition that damages are only compensatory, a principle which may at once be accepted as fundamental.....-..It is for that of which the plaintiff has been deprived by the defendant's act that the award of damages must compensate."

**Barwick** CJ then went on to state that the important issue was "the identification of that for which compensation is to be assessed." Jurists who reject the Gourley approach emphasize that the process of assessment requires an assessment of the lump sum value of loss of earning capacity - a capital asset which is quite different from actual loss of earnings. Though earnings are usually liable to tax, the capital sum representing the assessed value of earning capacity, like most capital sums, should be reached without reference to income tax considerations.

In his dissent in Gourley Lord Keith of Avonholme did not stress the conceptual issue of the identification of that for which compensation was being assessed. Rather, he elaborated the inequities which could result if damages were to be assessed in circumstances in which two plaintiffs had near identical gross

*182*

10

incomes but one plaintiff had so arranged his affairs that his tax liability had been minimized while the other had not so arranged his affairs.  He made no explicit reference to the compensatory principle underlying the assessment of a plaintiff's damages.

I find difficulty in accepting as compelling the contention that what is being assessed is not loss of earnings but loss of earning capacity and that this distinction makes it juristically improper to take income tax into account.  The distinction appears to me semantic.  I can conceive of no sensible method of estimating a lump sum value of loss of earning capacity which could start from a point other than an estimate of annual earnings converted to a lump sum over a number of years.   Even if the individual with respect to whom the assessment is being made is unemployed and earning nothing,  a potential earning capacity will have to be estimated from past earnings, or if there are none, from the earnings of persons comparably placed.   A building or a plot of land does have an objective value apart from the income which may be derived therefrom, though where this exists it will be a factor to be taken into account in assessing its value.   Earning capacity can have no meaning except in terms of income earned.

**Gourley's** case was decided in 1956. In the argument before us no instance was cited to illustrate an anomalous situation which arose from the application of the rule.   This must mean that the difficulties foreshadowed by Lord Keith of Avonholme have not yet

*183*

11

materialised.

The essential nature of the process of assessment of damages in personal injuries claims should be borne in mind. It is inherently speculative. Judgments must be made in relation to the future about which there can be no evidence - only informed projections. The legal rules provide guidelines for the assessor in the exercise of judgment, but the use of somewhat differing approaches in the method of calculation **may** well lead to surprisingly similar final figures.

The approach of the majority in _Gourley_ does not appear, in my view, to be flawed in logic and appeals to practical common sense. Generally the incidence of income tax is a fact of life. Anyone in evaluating the financial terms of an offer of employment must inevitably take into account the impact of income taxation on the earnings received. Efforts will be made so to arrange benefits as to minimise the incidence of tax. To the person earning income his net receipts after tax are his realistic emoluments and those should be the basis of assessing loss of earning capacity, if the purpose of the damages is to compensate for loss and no more.

The method of calculation used in Bermuda (and the method used by the trial judge in this case) has been described by Lord **Diplock** in **Cookson** v Knowles **[1979]** AC.556 at p.571 -

*184*

12

"Quite apart from the prospects of
future inflation, the assessment of
damages in fatal accidents can at
best be only rough and ready because
of the conjectural nature of so many
of the other assumptions upon which
it has to be based.        The
conventional method of calculating
it has been to apply what is found
upon the evidence to be a sum
representing "the dependency", a
multiplier representing what the
judge declared to be the appropriate
number of years purchase.  In **times**
of stable currency the multipliers
that were used by judges were
appropriate to interest rates of 4
percent to 5 per-cent whether the
judges using them were conscious of
this or not.  For the reasons I have
given I adhere to the opinion Lord
Pearson  and  I  had  previously
expressed which was applied by the
Court of Appeal in **Young** v Percival
**[1975]  1WLR.27-** 29,   that   the
likelihood of continuing inflation
after the date of trial should not
affect either the figure for the
dependency or the multiplier used.
Inflation is taken care of in a
rough and ready way by the higher
rates of interest obtainable as one
of the consequences of it and no
other practical basis of calculation
has been suggested that is capable
of dealing with so conjectural a
factor with greater precision."

This passage was cited by Lord Oliver in Hodgson v **Trapp [1989]**

A.C. 807 to emphasise the "conjectural nature of the exercise"

which necessarily rendered **"the** computation at best rough and

ready."  It was not to be expected that the process would be or

could be "precise or entirely logical" - p.828.


    This lack of precision and dearth of logic were used to base

*185*

13

the rejection of the argument that where a large award was made and
interest on the invested amount could be expected to attract income
tax at a significant rate then, applying the ~~Gourley~~ principle in
reverse, the multiplier should be increased to offset the effect of
tax.   Lord Oliver agreed at p.828 -

> "that it may fairly be said that the
> tax paying plaintiff  suffers tax
> twice, first by having the notional
> tax deducted from his earnings for
> the purpose of computing the award
> and then again by suffering the
> actual tax which is deducted from
> the income earned by the award."

To pursue this course would in his Lordship's view be

> "a  further  illustration of  the
> complications and difficulties which
> arise if one seeks to take account,
> as if the computation were an exact
> science, of individual factors which
> are  themselves  imponderable."

Their Lordships held that there was no need to apply ~~Gourley~~
in reverse.  The use of the **"Diplock** approach" which required the
multiplier to be based on low interest rates generally obtaining in
periods of stable money and low inflation would compensate for the
reduction of the income earned on the lump sum by reason of tax.
It served to take into account both inflation and tax.

While the approach may be **criticised** for lack of logic, it is
by no means devoid of practical sense.   In arriving at an estimate
of reduction of income by reason of tax,  there will be evidence

14

available once the parties wish to present it, on which to reach a
sensible estimate of the existing net income.    Any attempt,
however, to calculate the tax burden over a period of 11-12 years -
a not infrequent multiplier - could only be conjectural.


Whatever its imperfections, the **"Diplock** approach" has been
consistently applied in Bermuda in assessing damages.    It was the
view of Lord Oliver that that approach had "been found over the
years to produce a substantially just result."    By this I
understand a result which over a broad range has been accepted as
satisfactory compensation by litigants.    I would not, therefore,
seek to tinker with it on the basis of lack of elegance or logic.


In rejecting Gourley the trial judge placed much emphasis on
the fact that Bermuda had no income tax and was proud that this was
so.    The Courts of Bermuda should not, therefore,    enmesh
themselves in the income tax laws of foreign countries when Bermuda
itself had no tax.


The argument is attractive but, in my view, not persuasive.
As far as Bermudian plaintiffs are concerned the application of the
Gourley principle would have no effect.    There is no income tax
here.    It will have effect on plaintiffs who sue for injuries
suffered here and who come from jurisdictions in which income tax
is payable.    Evidence of what the tax payable would be would have
to be proved in each case.    Where no evidence is led, no tax will

*181*

15

be deducted as in <u>Russell</u> v <u>Van Galen</u>.  In some cases no doubt there will be agreement - as was the case on the hearing of this appeal.  I would not think that the possible lengthening of the hearing process in some cases could be a proper basis for rejecting the rule in <u>Gourley</u> based as it is on the overriding principle that damages are purely compensatory.

I am grateful for the thorough comparative analysis undertaken by Mr. Ashworth.  It was useful and instructive.  I do not think I should increase the length of the judgment by reviewing what has been done elsewhere.  The fundamental arguments remain unchanged and it is necessary only to consider them and to reach a conclusion.

In the result I would hold that while this Court would not be bound to follow the decision in <u>British Transport Commission</u> v <u>Gourley</u> I see no compelling reason in the Bermuda situation why it should not do so.  The principle should have been applied by the trial judge in this case leading to a reduction in the actual loss of earnings by 25% and in the future loss of earnings by a like percentage - the agreed tax deduction.

The parties have submitted agreed figures setting out the consequence of these changes.

I would allow the appeal and substitute for the award of

*188*

16

damages made by the trial judge under the heads of loss of earnings' and loss of future earnings the amounts submitted by the parties as the correct amounts if the rule in <u>Gourley</u> **is applied.**

189

IN  THE  COURT  OF  APPEAL  FOR  BERMUDA

CIVIL  APPEAL  NO.  23  of  1992

LANCE  MURRAY  CROCKWELL              Appellant

and

THERESA  E.  HALEY
THOMAS  F.  HALEY                      Respondents

JUDGMENT

Henry  J.A.

On  August  20,  1985  while  on  a  visit  to  Bermuda  the  First
Respondent  was  injured  by  a  motor  cycle  ridden  by  the  Appellant.
Judgment  was  entered  for  her  on  December  3,  1990  with  damages
to  be  assessed,  and  on  October  2,  1992  the  learned  trial  judge
entered  judgment  for  the  Second  Respondent  also  and  proceeded
to  assess  damages  for  both.    He  assessed  those  damages  in
respect  of  the  First  Respondent  at  $651,990.14  and  in  respect
of  the  Second  Respondent  at  $500.    This  is  an  appeal  against
the  assessment  in  respect  of  the  First  Respondent

Two  grounds  of  appeal  were  argued.    The  substance  of
those  grounds  is  that  the  learned  trial  judge  in  assessing
damages  for  the  loss  of  past  and  prospective  earnings  erred
by  failing  to  take  into  account  the  liability  of  the  First
Respondent  to  pay  income  tax  on  those  earnings.    This,  it
was  submitted,  ought  to  have  been  done  in  the  light  of  the
decision  of  the  House  of  Lords  in  British  Transport  Commission
V.  Gourley  (1956)  A.C.  185.

One  of  the  blessings  of  Bermuda  is  that  the  legislature
has  not  so  far  found  it  necessary  to  introduce  legislation
providing  for  the  imposition  of  income  tax.    The  courts  in
Bermuda  have  not  therefore  been  called  upon  to  deal  with  the
esoteric  principles  of  that  branch  of  the  law.    Those  princi-
ples  would  not  arise  for  consideration  in  the  assessment  of
damages  for  a  Bermudian  plaintiff  even  if  what  is  referred  to
as  the  rule  in  Gourley's  case  is  applied  in  Bermuda.    It
seems  to  me  therefore  that  this  appeal  turns  on  whether  the
courts  in  Bermuda  are  bound  by  the  decision  in  that  case.
The  decisions  on  the  matter  are  by  no  means  clear.

In <u>Robins v. National Trust Co. Ltd.</u> (1927) A.C. 515 at

519 Viscount Dunedin in giving the advice of the Privy Council

stated:

> "...when an appellate Court in a colony which
> is regulated by English Law differs from an
> appellate Court in England, it is not right
> to assume that the Colonial Court is wrong.
> It is otherwise if the authority in England
> is that of the House of Lords.    That is the
> supreme tribunal to settle English law, and
> that being settled, the Colonial Court, which
> is bound by English law, is bound to follow it."

A somewhat less positive statement was made by Lord

Diplock in <u>DeLasala v. DeLasala</u> (1980) A.C. 546 when at p.558A

he said:

> "...a decision of the House of Lords on a matter
> which in Hong Kong is governed by the common law
> by virtue of the Application of English Law Ordinance
> is not upso facto binding upon a Hnog Kong court
> although its persuasive authority must be very great,
> since the Judicial Committee of the Privy Council,
> whose decisions on appeals from Hong Kong <u>are</u>
> binding on all Hong Kong courts, shares with the
> Appellate Committee of the House of Lords a common
> membership."

Lord Diplock then went on to say:

> "The Board is unlikely to diverge from a decision
> which its members have reached in their alternative
> capacity, unless the decision is in a field of law
> in which the circumstances of the colony or its
> inhabitants make it inappropriate that the common
> law in that field should have developed on the
> same lines in Hong Kong as in England."

This latter concept would appear to have influenced the

decision of the Privy Council in <u>Hart v. O'Connor</u> (1985) A.C.

1000 when in overruling a decision of the New Zealand Court of

Appeal Their Lordships observed that they would have taken a

different view if that court's decision had been based on

"considerations peculiar to New Zealand".

In the light of the several authorities I have concluded

that decisions of the House of Lords while highly persuasive

are not absolutely binding on this court, particularly where

circumstances or considerations peculiar to Bermuda make it

inappropriate for the courts in Bermuda to follow those

decisions.    Accordingly in the present case in circumstances

where no income tax is payable in Bermuda it is my respectful

view that the decision in Gourley's case which requires income

*191*

-3-

tax to be taken into account in assessing damages for loss of earnings is not binding in Bermuda.

Counsel for the Appellant also submitted that the courts in Bermuda have adopted English law in following the multiplier and multiplicand method of assessment developed by Lord **Diplock** in **Cookson** v. Knowles (1979) A.C. 556; that method took into account the liability to income tax and the courts in Bermuda ought not to adopt a part only of English law in this regard. It seems to me that the answer to this submission is that the English courts use this method of assessment irrespective of whether the plaintiff is subject to English income tax laws or to some other income tax law or indeed, as would be the case of a Bermudian plaintiff injured in England, to no income tax law at all.

In Russell v. van **Galen** (1985) 36 W.I.R. 144 at 180 I observed:

> "[Gourley's] case has been followed in New Zealand but not in Canada where in R v. Jennings (1966) 57 D.L.R (2nd) 644, the Supreme Court of Canada agreed with the **dissenting** opinion of Lord Keith in Gourley's case. In his dissenting opinion Lord Keith pointed to the anomalies, difficulties and complications arising from the application of the principle approved by the majority. He also pointed out that in Britain income tax was an annual tax imposed by Parliament and that 'to assess damages de futuro on the basis of existing taxation savours of legislation by the judiciary'. In his judgment in the Jennings case Judson J. also pointed to the difficulties arising from the application of the principle. He also expressed the view that income tax is not an element of cost in earning income but a disposition of a portion of earned income required by law. In his view, if the State did not elect to demand payment of tax on damages awarded, the courts should not transfer this benefit to the defendant. I am inclined to agree with the views expressed by Lord Keith-and by Judson J. In my opinion the rule in Gourley's case ought not to be applied in Bermuda."

I remain of the same view.    I would dismiss the appeal.

Dated the 29th June, 1993