# EXHIBIT 9

# Section 3. - Miscellaneous Procedural Issues

The Law of Reinsurance 5th Ed.

Mainwork

Part IV - Reinsurance Disputes and the Conflicts of Laws

Chapter 13 - Reinsurance Litigation

Section 3. - Miscellaneous Procedural Issues

# Parties

### England: CPR Pt 20

13-080    CPR Pt 20 deals with multiple parties, that is, counterclaims and other additional claims. A "Pt 20 claim" includes, counterclaims against parties other than the claimant, "a claim by a defendant against any person (whether or not already a party) for contribution or indemnity *or some other remedy* …" (emphasis added). [296] The glossary to the CPR describes "contribution" as "a right of someone to recover from a third person all or part of the amount which he himself is liable to pay"; and "indemnity" as "a right of someone to recover from a third party the whole amount which he himself is liable to pay". [297] In our view it is open to argument that an insurer sued by an insured may bring a Pt 20 claim against its reinsurer (even in a case where the insurer has not reinsured 100 per cent of its liability). It is uncertain whether *Nelson v Empress Assurance* [298] will be followed by a court called upon to interpret Pt 20 of the CPR. The court has a discretion to order whether a Pt 20 claim should be separate from the main claim. [299]

*European International Reinsurance Co Ltd v Curzon Insurance Ltd* [300] is an example of the kind of reinsurance case in which third party proceedings were typically brought and which is now within the scope of Pt 20. The claimant sought to avoid a reinsurance contract for non-disclosure and the defendant brought Pt 20 proceedings against various brokers and sub-brokers that it alleged owed it a duty of care. The Court of Appeal held that the defendant had an arguable claim against each of the proposed Pt 20 defendants.

### Bermuda: Third-party proceedings, RSC Ord.16

13-081    Order 16 r.1(1) provides that:

> "Where in any action a defendant who has given notice of intention to defend—(a) claims against a person not already a party to the action any contribution or indemnity …"

the defendant may issue a third party notice, and thereby join the person against whom the indemnity is claimed as party to the action. A (re)insurance contract is a contract of indemnity. However, earlier provisions equivalent to Ord.16 r.1(1)(a) have been construed so as to prevent the joinder of insurers and reinsurers as third parties. [301] In *Clover Clayton & Co Ltd v Hessler & Co* [302] ship repairers brought an action against managers of a steamer for the cost of repairs. The managers served a third-party notice on the owners of the steamer. The owners applied

for leave to serve a fourth-party notice on the underwriters alleging that they were entitled to an indemnity from them for the whole amount of the claim in the action. Scrutton LJ said:

> "The third party procedure is limited to claims for indemnity or contribution, [303] and there is, I believe, no reported case, and I have never heard of a case, in which persons have been joined as third parties merely because they have underwritten a policy insuring the defendant against the loss which gives occasion for the plaintiff's claim. There are two reported cases which go to show that underwriters cannot be so joined [304] … In each case the ground of the decision was that the insurance was against loss which the assured may incur through loss of or damage to the subject matter of the insurance, and that was a different thing from indemnifying him against any claims by other people against him. Upon the same principle the original underwriter cannot be joined." [305]

It appears to follow from Scrutton LJ's reasoning that a liability policy (such as a professional negligence policy, or a motor insurance policy) [306] would be a contract of indemnity within the scope of Ord.16 r.1(1)(a). For example, in *Walker & Knight v Donne Mileham & Haddock* [307] the defendant solicitors were sued for professional negligence, and their insurers denied liability. The defendant solicitors joined Sun Alliance (who insured them up to £100,000) as a third party. Sun Alliance settled and dropped out of the action. The defendant solicitors then sought leave to join their excess insurers (who insured them for £250,000 in excess of £100,000) as second and third parties. Leave was given even though the trial of the action had commenced.

13-082   In *Re Burford* [308] Lord Hanworth MR referred somewhat critically to *Clover Clayton v Hessler*, which he said established that:

> "… the narrow rule regulating third party proceedings did not allow a separate claim under a policy of insurance to be made, even though the same facts would have to be examined over again to establish the liability of the underwriters."

He considered the then newly extended third-party provisions, equivalent to the present Bermuda RSC 1985 Ord.16. r.1(1)(b) and (c), and concluded:

> "… that where the same facts have to be conned over [309] in order to ascertain the liability and to give some relief to one or other of the parties, in such a case the rule now provides that it is unnecessary to have separate actions and separate proceedings, but that a third party notice may be served." [310]

If the learned Master of the Rolls was suggesting that *Clover Clayton v Hessler* would necessarily be decided differently under the present rules, we respectfully beg to differ. The claim by the owners against the underwriters was not for "any relief or remedy relating to the subject matter of the action" [311]; nor did it call for "any question or issue relating to the original subject matter of the action to be determined" [312] as between the owners and the underwriters.

There is relatively little case law on the question whether a reinsured being sued by the original insured may join the reinsurer as a third party. The early cases [313] suggest that reinsurers may not be joined as third parties. In *Nelson v Empress Assurance Corp Ltd*, [314] the Court of Appeal [315] held that the rules relating to third-party procedure did not apply to enable a defendant insurer/reinsured to join its reinsurer as a third party to an action on the original policy of reinsurance. Mathew LJ said that it was exceedingly difficult to treat the reinsurance policy as a mere policy of indemnity, and the original insurance policy and the reinsurance policy were independent contracts. He considered that it would be inconvenient to make the reinsurer a third party. *Nelson v Empress Assurance* was considered by the Court of Appeal in *British Dominions General Insurance Co Ltd v Duder*, [316]

a case concerning the reinsurance of two underlying hull and machinery insurance policies. It was held that the contract of reinsurance was a contract of indemnity, but that it was a contract wholly independent of the original contract of insurance and so not within the third-party rules relating to indemnity as decided in *Nelson v Empress Assurance*.

In *Hayter v Nelson* [317] the defendant Lloyd's underwriters (the Nelson Syndicate) applied for summary judgment against their retrocessionaire, Home Insurance Co, which had been joined as a third party on the basis that they were required to indemnify the Nelson Syndicate under a retrocession treaty in respect of sums which Nelson's Syndicate was required to pay under an arbitration award and subsequent judgment of the court. The third party successfully applied to stay the proceedings under s.1 of the Arbitration Act 1975. The issue of whether, absent an arbitration clause, the third party should have been joined did not arise.

In *International Commercial Bank Plc v Insurance Corporation of Ireland Plc*,[318] the Irish Courts upheld service out of the jurisdiction, under the Irish version of Ord.11, of a third party notice by a reinsured on its reinsurer. The defendant/reinsured had been sued by the plaintiff/insured in the Irish courts. Meanwhile, the third party/reinsurer had commenced proceedings in the English courts, seeking declaratory relief, against both the reinsured and the original insured.[319] Giving the judgment of the Irish Supreme Court, Chief Justice Finlay said:

> "[N]otwithstanding the existence of proceedings in the High Court in England in which the third party claims a negative declaration against the defendant of its right to avoid responsibility on the reinsurance policy and in which the defendant has served a third party notice arising from that claim on the plaintiff, that the third party is classically within the definition of a necessary or proper party to the action in this jurisdiction."[320]

13-083 The issue before the Irish courts was whether they should decline to exercise jurisdiction over the third party/reinsurer because of the proceedings brought by the reinsurer in the English courts. *Nelson v Empress Assurance* does not appear to have been cited.

The question whether reinsurers can be joined as third parties under Ord.16 r.1(1) brings us back to the question of what is the subject matter of a reinsurance contract. If the subject matter of the reinsurance contract is the same as that of the original insurance contract then, notwithstanding *Nelson v Empress Assurance*,[321] there is a good argument to be made that the issue of whether the reinsurer is required to pay the reinsured is one "relating to or connected with the original subject matter of the action"[322] and should be determined in the same proceedings. It will be recalled [323] that if there is no "follow the settlements" and the reinsurer is not a party to the proceedings between the original insured and the insurer/reinsured, the reinsurer is not bound by the result of those proceedings. Where there is a "follow the settlements" clause joining the reinsurer is arguably unnecessary. We suggest the proper course is probably not to approach the question of whether the reinsurer should be joined, philosophically. If the insurer and the reinsurer are both arguing that the facts mean that the loss falls outside the coverage and the reinsurer has told the insurer that he will not be bound by the outcome of the proceedings against the insurer, there are common facts to be explored and it would be against reason for the two claims on the insurer and on the reinsurer—not to be heard together. If the reinsurer argues something arising from the reinsurance, that the insurer does not argue against the insured, joining the reinsurer to the action may benefit the insurer but it inconveniences the insured and the reinsurer.

### Proceedings involving Lloyd's underwriters

13-084 As we have seen,[324] a Lloyd's syndicate may be comprised of a number of members. Except where it is comprised of a single corporate member,[325] the syndicate is not a legal entity or a partnership. It might be inconvenient to name each member of a syndicate as a party in proceedings. The usual practice is to name the active underwriter—if he is a member of the syndicate—and recite that he appears on behalf of all other

members of the syndicate for the year of account in question. A representative defendant can only be appointed where all the defendants have the same interest. [326] Where several syndicates have subscribed to a slip, it may be thought convenient to sue only the leading underwriter as a representative defendant. However, this has the consequence that the court cannot order disclosure of documents in the possession custody or power of those syndicates which are not parties to the action.

## Subrogation and assignment

13-085  The principal procedural difference between subrogation and assignment is that in the case of subrogation the (re)insurer brings the proceedings in the name of the (re)insured. He is asserting the rights of the (re)insured against a third party, and if the (re)insured ceases to exist the action cannot continue. [327]

A (re)insurer subrogated to the rights of the (re)insured, who conducts proceedings in the name of the (re)insured must give discovery if the (re)insured is a nominal plaintiff. However, if the (re)insured remains a substantial party to the action, only the (re)insured is obliged to give discovery. In *James Nelson & Sons Ltd v Nelson Line Ltd*, [328] the plaintiff cargo owners sued the defendant ship owners. The plaintiffs were insured for 75 per cent of the loss. After the plaintiffs had commenced proceedings, their insurers indemnified them as to 75 per cent. The plaintiffs remained interested in 25 per cent, but the insurers' solicitors took over the conduct of the action. The Court of Appeal held that the defendants were not entitled to discovery of a surveyor's report prepared for, and held by, the insurers. It was said that the result would have been different if the plaintiffs had received a 100 per cent indemnity for the loss.

## Declaratory actions and locus standi

13-086  A reinsurer seeking to avoid liability may, in order to found jurisdiction in his preferred forum, commence proceedings against the reinsured. In such proceedings the reinsurer, as claimant, will seek a declaration that he is not liable under the reinsurance contract. The reinsurer may wish to argue one or both of the following: (1) there is no liability under the reinsurance contract because (a) the loss is not covered under reinsurance contract, or (b) the reinsurer is entitled to deny coverage the reinsurance contract; (2) there is no liability under the original insurance contract, and therefore no liability under the reinsurance contract, because (a) the loss is not covered under the reinsurance contract, or (b) the insurer/reinsured is entitled to deny liability under the original insurance contract on non-coverage grounds. In principle, and subject to the existence and wording of any "follow the settlements" clause in the reinsurance contract, [329] it is open to the reinsurer to seek, as against the reinsured, a declaration that there is no liability under the original insurance contract and therefore no liability under their insurance contract. However, it is not possible for the reinsurer to join the original insured as a party to such a declaratory action and to have the court decide in proceedings to which the reinsurer, the reinsured and the original insured are all parties whether there is any liability under the original insurance contract. It was so held by the Court of Appeal in *Meadows Indemnity v The Insurance Corporation of Ireland*. [330]

In *Meadows v ICI*, the plaintiffs ("Meadows") reinsured the first defendant (ICI), who insured the second defendant (ICB) under a credit guarantee policy. ICB sued ICI on the policy in the Irish courts in respect of a claim for CHF11.5 million. ICI brought third party proceedings against Meadows in the Irish courts. [331] Meadows brought an action in the English courts claiming declarations against both ICI and ICB that ICI was entitled to avoid the policy with ICB. Hirst J (as he then was) held [332] that the interests of Meadows were vitally affected by the outcome of the dispute between ICI and ICB under the policy, and that Meadows had locus standi to seek a declaration against ICI and ICB as to the validity of the policy.

The Court of Appeal [333] struck out Meadows' claim for a declaration against ICB, applying the principles laid down by the House of Lords in *Gouriet v Union of Post Office Workers*. [334] Neill LJ said that (as stated by Lord Diplock in *Gouriet*) the jurisdiction of the court to grant a declaration is limited to:

> "… declaring contested legal rights, subsisting or future, of the parties represented in the litigation before it and not those of anyone else." [335]

May LJ stated:

> "Once one takes the view that the principles referred to in the speeches in Gouriet's case do not apply only in the public law context, then … it becomes clear … that Meadows had no locus standi to claim the declarations which they seek against ICB. These two parties have no rights or obligations against or to each other; they are not in a contractual relationship. Although there is of course a connection between the contract of insurance on the one hand and of reinsurance on the other, Meadows' rights are in no way involved in the existing dispute between ICI and ICB. Whether ICI has to pay ICB depends upon the terms and circumstances of the insurance contract between them and, if relevant, any non-disclosure or misrepresentation that occurred between them. In so far as Meadows is concerned, any liability on their part will depend upon the contract of reinsurance and the factual situation which existed between [Meadows and ICI] when this was entered into … the position of Meadows is in no way threatened because ICI are vigorously defending ICB's claim in the Irish proceedings … Meadows' interest are not 'vitally affected' within the meaning that one must give to that phrase on the authorities." [336]

May LJ concluded by saying that he accepted:

> "… the general submission … that a person not a party to a contract has no locus, save perhaps in exceptional circumstances, to obtain a declaration in respect of the rights of other parties to the contract." [337]

In *Merrill Lynch v Commune di Verona* [338] the defendant sought to rely on *Gouriet* to resist declarations sought by Merrill Lynch in relation to swaps that the parties had entered into. Verona said that there had been no failure to pay and no breach of the contracts and the bank should not be allowed to proceed. The court took the view that there was sufficient evidence that Verona was planning a pre-emptive strike in Italy, contrary to the agreed jurisdiction requirements, and allowed the declaratory proceedings issued by the bank to continue.

# Summary judgment

## England: CPR Pt 24

13-087  Reinsurance disputes are generally concerned with the (non)payment of money. The purpose of the summary judgment procedure (Pt 24 of the CPR in England RSC Ord.14 in Bermuda) is enable a claimant/plaintiff, who is owed money by a defendant, to get paid quickly in cases where there is no defence. CPR r.24.2 provides that, "the court may give summary judgment against a claimant [339] or defendant" if:

> "(a) it considers that—

> (i)that claimant has no real prospect of succeeding on the claim or issue; or
>
> (ii)that defendant has no real prospect of successfully defending the claim or issue; and
>
> (b)there is no other compelling reason why the case or issue should be disposed of at trial."

An application for summary judgment under r.24.2 may be based on: a point of law (including a question of construction of a document); the evidence which can reasonably be expected to be available at trial or the lack of it; or a combination these. [340]

In *Assicurazioni Generali Spa v CGU International Insurance Plc*, [341] the Deputy Judge (Mr Gavin Kealey QC) summarised the effect of Pt 24 as follows:

> "In the light of the guidance given by *Swain v Hillman [2001] 1 All ER 91 (CA)* [342] and *Three Rivers DC v Bank of England [2001] 2 All ER 513*, [343] an application under Part 24 should be approached as follows:
>
> i.art 24 confers on the court an exceptional power since the ordinary principle, which is established to meet the ends of justice, is that disputes are to be resolved at trial on the evidence and after completion of disclosure.
>
> ii.Part 24 is to be applied in the interests of all concerned to dispose of cases or issues that are not fit for trial at all.
>
> iii.The test whether a case or issue is fit for determination on an application for summary judgment is whether there is a real prospect of the claim or defence, as the case may be, succeeding in circumstances where 'real' is to be equated with 'realistic' and contrasted with 'fanciful'."

13-088    In *English & American Insurance Co Ltd v Axa* [344] the reinsured, because it was insolvent, did not participate in a London market settlement of Dow's breast implant claims and the reinsured was therefore pursued separately after the settlement. The reinsured called upon its reinsurer, Axa. Axa asserted that its offer to settle the reinsured's claim at the amount the reinsured would have paid had it participated in the London market settlement had been without prejudice. Expressly following Mr Kealey QC in *Assicurazioni v CGU*, Gloster J gave the reinsured the summary judgment it sought. There was a follow the settlements *and* follow the fortunes provision in the reinsurance. Gloster J found that the reinsured had taken all proper business-like steps to reach a settlement with Dow and there was no real dispute that at least the sum claimed was owed by Axa. Axa's letters setting out its willingness to pay were not without prejudice but statements on the record of its position. She did not however order payment of the IBNR element of the settlement, accepting that there was an issue to be tried about that. In *Korean National Insurance Corp v Allianz Global* [345] KNIC obtained summary judgment against London reinsurers for liabilities incurred by a North Korean airline that KNIC insured, following a helicopter crashing into a warehouse. This despite reinsurers alleging fraud—the fraud in this instance was alleged to be that the reinsured had concluded a settlement and then ignored it.

## Bermuda: RSC Ord.14

13-089    It has been said that:

> "… Order 14 is for clear cases, that is, cases in which there is no serious material factual dispute and, if a legal issue, then no more than a crisp legal question as well decided summarily or otherwise." [346]

Order 14 r.1(1) provides as follows:

> "Where in an action to which this rule applies a statement of claim has been served on a defendant and that defendant has entered an appearance in the action, the plaintiff may, on the ground that that defendant has no defence to a claim included in the writ, or to a particular part of such a claim, or has no defence to such a claim or part except as to the amount of damages claimed, apply to the Court for judgment against the defendant."

Typically, a plaintiff will issue a summons under Ord.14 before a defence has been served. The defendant will then file affidavit evidence (which may exhibit a draft defence) seeking to raise triable issues of fact or law. [347] The court may grant a defendant unconditional leave to defend or impose a condition (typically the payment of all or part of the plaintiff's claim into court). [348]

## Defences to Summary Judgment applications

In reinsurance disputes two situations frequently arise on the hearing of a summary judgment application. First, the defendant may assert that there is a "dispute or difference" between the parties which should be referred to arbitration pursuant to an arbitration clause in the reinsurance contract. [349] Secondly, the defendant, if he is a reinsurer, may complain that the plaintiff reinsured has refused to allow him to inspect the reinsured's books. The defendant/reinsurer may say:

> "… the reinsured has made a demand on me to pay £X, unless I am allowed to inspect the reinsured's books, I am not in a position to say how much, if anything, is properly due under the contract."

The typical response of the reinsured is that the reinsurer is merely seeking to delay payment. We have referred to the cases concerning inspection of records above, [350] and noted some inconsistency in judicial approaches to the problem.

13-090  In *SAIL v Farex*, where the reinsurance contracts contained no express provision giving the reinsurers the right to inspect, Hoffmann LJ (as he then was) had little sympathy for the reinsurers, and denying leave to defend, said that he was:

> "… not deterred from reaching this conclusion by the thought that it means that whether or not a reinsurer can find the material to raise a prima facie case of non-disclosure in respect of a particular risk may depend on the accident of his access to information …" [351]

He continued:

> "If the need to find better evidence causes difficulties for reinsurers, they are at liberty to stipulate for greater access to information. But I think that the requirements of certainty and the expeditious enforcement of payments in the insurance market requires that courts should not too readily grant leave to defend on the basis of speculative allegations." [352]

However, in *Baker v Black Sea and Baltic General Insurance Co Ltd*, Potter J (as he then was) said that the question of inspection:

> "… was plainly an issue of importance at the Order 14 stage in relation to whether or not leave to defend should be given. If it were not so, an insured could, in a case of this kind, simply hide behind a policy of non-disclosure and non-cooperation while seeking summary judgment in a matter on which … the court requires to be positively satisfied that summary judgment is appropriate." [353]

In *Pacific & General Insurance Co Ltd (In Liquidation) v Baltica Insurance Co (UK) Ltd*, [354] Rix J adjourned an application for summary judgment to permit a limited inspection to take place. That was a case where the complaint of non-notification and the demand for inspection went back some 18 months before the hearing and for over a year before the commencement of the action. Rix J said that "the circumstances in which the claim to inspect comes forward" was a "relevant consideration", in the exercise of judicial discretion with regard to an application for summary judgment under Ord.14. He concluded:

> "If a reinsurer passes by his rights of inspection until the very last moment when he is under the lash of a claim for summary judgment pursuant to a follow the settlements clause, the Court will be reluctant to refuse summary judgment simply upon the basis that if inspection belatedly takes place something may turn up in a Micawber-like way. Where, however, there have been timely requests for inspection, the matter may well be different … it seems to me that a court should be cautious about giving summary judgment before an inspection which has been long claimed has been allowed to take place." [355]

13-091   In *Aetna Reinsurance Co (UK) Ltd v Central Reinsurance Corp Ltd*, Longmore J [356] (as he then was) made similar observations to Rix J—again in a case where complaints had been made by the reinsurer before the action commenced—and also refused summary judgment. The position may be different where there is an arbitration clause: the reinsurer may be able to argue that a "dispute" or "difference" exists arising out of the reinsured's refusal to permit inspection, which should be referred to arbitration. [357] In *Trinity Insurance Co Ltd v Overseas Union Insurance Ltd*, [358] summary judgment was granted, despite an arbitration clause, the reinsurer having had the opportunity to inspect records.

The reinsurer who believes, or who has reasonable grounds for suspecting, that the inspection may disclose grounds upon which the contract can be avoided, should take care to reserve his rights prior to requesting inspection, for by insisting upon the right to inspect, the reinsurer may be taken to have affirmed the contract. [359] The reinsurer should also assert his rights to inspect records at an early stage, as was done in the *Pacific & General* case, to avoid any inference that the reinsurer is seeking to delay payment of a legitimate claim.

## Disclosure/discovery

### England: Disclosure, CPR Pt 31

13-092   Pt 31 of the CPR provides for disclosure and inspection of documents. Unless the court directs otherwise, "standard disclosure" will be ordered. Rule 31.6 requires a party to disclose only:

> "(a) the documents on which he relies; and
>
> (b) the documents which—
>
>> (i) adversely affect his own case;
>>
>> (ii) adversely affect another party's case; or
>>
>> (iii) support another party's case; and
>
> (c) the documents which he is required to disclose by a relevant practice direction."

The scope of "standard disclosure" is therefore narrower than the *Peruvian Guano* test of discoverability under RSC Ord.24.[360] In the first edition we recalled that in *Marc Rich v Portman* Longmore J said that it:

> "… would … be an unfortunate consequence of the House of Lords' decision in *Pan Atlantic v Pine Top* if cases of this kind were to be saturated with inquiries about a plethora of risks written by the actual underwriter on occasions other than the time when the relevant risk was itself written."

Yet, if it is alleged that a particular underwriter's decision would not have been influenced a fact alleged to be material, it may be essential to examine how that particular underwriter dealt with similar submissions in the past. We therefore believe that a party faced with a defence of non-disclosure of a material fact, or an unfair presentation is, as a matter of principle, entitled to disclosure of documents relating to how the particular underwriter treated similar submissions. The failure to make a fair presentation is a "qualifying breach" (s.8 of the Insurance Act 2015). For what remedy is available, one turns to Sch.1 and disclosure will have to be given of documents relevant to what the insurer would have done if he had known what he did not know.

The court may dispense with or limit standard disclosure.[361] The 2017 edition of the Admiralty and Commercial Courts Guide states:

> "The Court will seek to ensure so that disclosure is no wider than appropriate……."[362]

Where standard disclosure has been ordered a party is required to make a reasonable search for documents.[363] This appears to be less onerous than the obligations imposed upon parties and their legal advisers under RSC Ord.24.[364]

### Bermuda: Discovery, RSC Ord.24

13-093  Discovery, as that term is used in Bermudian civil litigation,[365] strictly speaking means the process whereby one party to litigation is required to disclose to another party the existence of documents which relate to matters in issue between them. In practice "discovery" is often used loosely to include both discovery and inspection. The procedure is governed by RSC Ord.24.[366] Order 24 r.2(1) provides for automatic discovery within 14 days after close of pleadings[367] by the parties exchanging lists of documents in their "possession, custody or power relating to any matter in question between them in the action". The expression "relating to" is frequently, and inaccurately, paraphrased as "relevant". The test is wider than direct relevance to issues in the pleadings, and covers the following categories of documents:

(1) which are direct evidence of facts in issue, or which are to be used at trial;

(2) which contain information which may enable one's opponent to advance his own case, or damage one's own case; or

(3) which "may fairly lead him to a train of inquiry which may have either of those consequences".[368]

*South British Insurance Co Ltd v Mediterranean Insurance & Reinsurance Co Ltd*[369] provides an example of the potentially wide scope of discovery in reinsurance disputes. The dispute arose out of a marine reinsurance contract evidenced by a slip. The defendant reinsurers contended that the parties intended to reinsure the risk of total loss only on full conditions of business, and that this intention was to be inferred from the premium that was charged.[370] The judge[371] had refused to order the reinsurers to give discovery of similar slips which they had written, saying:

> "What the [reinsurers] have really been asked to give is material which would be useful in the cross-examination of their witnesses, particularly their expert, and that is not the object of discovery."

The Court of Appeal,[372] however, ordered that the reinsurers give discovery of the following documents:

> "(a) any Bordereaux or other documents whereby vessels insured on original terms other than 'full conditions' have been declared to the First Defendants under any Total Loss Only marine insurance cover written by the First Defendants between 1st January 1981 and 31st December 1982, together with the underwriting slips or other documents containing or evidencing the contracts under which such declarations were made; (b) any correspondence, internal memoranda or other documents evidencing or relating to the negotiation of any such open covers."

## Specific Disclosure/Discovery

13-094   Although wide-ranging discovery or disclosure may be appropriate in some cases, as a general rule discovery may not be used as a "fishing expedition". The court has the power to limit the automatic discovery where "… it is of opinion that discovery is not necessary either for disposing fairly of the action or for saving costs".[373] Where an application is made for an order for the production of specific documents, the court will only make an order where it "… is of opinion that the order is necessary either for disposing fairly of the matter or saving costs".[374] In *Ventouris v Mountain* Parker LJ said:

> "[D]iscovery and inspection or production of documents are two quite separate matters, discovery being dealt with in rr. 1 to 8 of Ord. 24 and inspection in rr. 9 to 14. This is of importance because orders for discovery are made subject to r. 13. In the former case, the burden is upon the objecting party to satisfy the Court that discovery is not necessary for the purposes specified, whereas in the latter the burden is on the applying party to satisfy the Court that production is necessary for the purposes specified. This of course applies to non-privileged documents, since privileged documents cannot be ordered to be inspected or produced."[375] [Original emphasis]

In *Dolling-Baker v Merrett*[376] the plaintiff Lloyd's underwriter (suing on behalf of Syndicate 544) was claiming under an excess of loss reinsurance contract written by the Merrett Syndicates (417 and 421). Merrett sought to avoid on the grounds of material non-disclosure. The placing brokers were also being sued. The plaintiff sought an order for specific discovery under RSC Ord.24 r.7, of documents relating to an arbitration involving the Merrett Syndicates. The arbitration concerned a similar reinsurance contract written by Merrett and placed by the same brokers, and the Merrett Syndicates had unsuccessfully argued that the contract should be avoided. The Court of Appeal[377] held that production of the documents relating to the arbitration was not necessary for the fair disposal of the action.

## Privilege and common interest

**13-095**   Documents which are privileged are immune from inspection, although their existence must be disclosed in the list of documents, and privilege claimed for them. There are two broad categories of privilege:

> **(1) Legal Advice Privilege:**
> all communications between legal adviser and his client, whether directly or through an agent, made for the purpose of giving or receiving legal advice, irrespective of whether litigation exists or is contemplated, are privileged. [378] Legal advisers include both foreign [379] and "in house" lawyers. [380] As a general proposition, "the mere fact that a person speaking is a solicitor and the person to whom he speaks is a client affords no protection"; the test is whether "within a very wide and general ambit of interpretation" [381] the communication was for the purpose of giving legal advice. [382]
>
> **(2) Litigation Privilege:**
> a document which is brought into existence either before or after litigation commences will be privileged, provided that the dominant purpose of either the author of the document or of the person under whose direction, whether particularly or generally, it was brought into existence was that the document should be used (a) to conduct, or (b) aid in the conduct, or (c) obtain legal advice in relation to the conduct of litigation which was pending or which was contemplated by the person who produced or caused to be produced the document. [383]

Once a privileged document of either category (1) or (2) comes into existence it will remain privileged in the hands of the party originally entitled to the privilege, or his successor in title. The rule is "once privileged always privileged". [384] Such a document will also be privileged in the hands of a party, or his legal adviser, who has a common interest in the litigation with the party who was originally entitled to claim privilege.

The scope of common interest privilege was considered in *Bank of Nova Scotia v Hellenic Mutual War Risks Association (Bermuda) Ltd (No.2) (The "Good Luck")* [385] Saville J (as he then was) said:

> 'Common interest' legal professional privilege was discussed by the Court of Appeal in *Buttes Gas Oil Co v Hammer (No.3) [1981] Q.B. 223*. In that case disclosure was sought from Buttes of certain documents or copy documents in the possession of Buttes that had come into existence or been obtained for the purposes of the Ruler of Sharjah; and not for the purpose of Buttes themselves seeking or obtaining legal advice or prosecuting the litigation in which they (but not the Ruler) were involved. Brightman L.J. stated as a proposition of law that if two parties with a common interest and a common solicitor exchange information for the dominant purpose of informing each other of the facts or the issues, or the advice received, or obtaining legal advice in respect of contemplated or pending litigation, the documents or copies containing that information are privileged from production in the hands of each. Donaldson L.J. (as he then was) preferred to express no general proposition, though it would appear that he did not regard the existence of a common solicitor as a necessary pre-condition to the existence of common interest privilege. Lord Denning M.R. expressed the principle as one applying to parties who have the self-same interest and exchange information and advice relating to that interest.
>
> In the present case, the parties concerned (the plaintiff bank and the owners of 'The Good Luck') did not share a common solicitor. In my view, however, that in itself is not a bar to a claim of common interest privilege: indeed, the examples given by Lord Denning M.R. and Donaldson L.J. are of cases where no common solicitor or lawyer was employed. *What to my mind is required, however, is an identity of interest so close that the parties concerned could (had they chosen to do so) have used the same solicitor or other lawyer*. It seems to me that such a limitation provides

not only a relatively simple rule which lawyers can apply when seeking to discharge their duty regarding discovery, but also reflects what seems to me to be implicit in the judgments of the Court of Appeal, particularly that of Lord Denning.' [Emphasis added]

13-096   Two situations commonly arise where reinsurers may seek to assert common interest privilege. First, where reinsurers participating on the same slip share information in the course of investigating or defending a claim. As we have noted above,[386] there may or may not be a leading underwriter clause, but even if there is not such a clause and the reinsurers do not all agree to appoint the same lawyers, there is plainly a common interest among the reinsurers. Secondly, where a reinsurer exercises his rights under a claims co-operation or control clause,[387] if he takes over the handling the claim, there exists an obvious common interest between the reinsurer and the reinsured. The position is perhaps less clear in a case where the reinsurer does not appoint lawyers to handle the claim but merely asks for information, and in particular asks to see the legal advice given to the reinsured. But in *Svenska Handelsbanken v Sun Alliance and London Insurance Plc*, Rix J took a broad view of the scope of common interest privilege as between reinsurer and reinsured. He said:

> "It seems to me that insurers and reinsurers may well be regarded as parties having a common interest. It is true that in this case, so far as I am aware, policies were never brought into existence and the reinsurance contracts appear to rest upon slips. There is no evidence that there are any particular contractual provisions, as often arise in reinsurance, such as follow the settlement clauses, or any particular terms as to the way in which litigation is to be conducted, or as to the provision of documentation … Nevertheless, it does seem to me that there is a very close community of interest between an insurer and a reinsurer in general. No particular contractual provision is relied upon by [Sun Alliance's solicitor], rather she says that Sun Alliance felt obliged to communicate the relevant advice to their reinsurers."[388]

Rix J concluded:

> *"Where, there is, either under legal compulsion or in practical terms, a need for legal advice to be shared confidentially with parties with a community of interest*, then the law should not be astute to find distinctions between, for instance in this case, a reinsurer and his reinsured on the one hand and an assured and his legal liability insurer on the other."[389] [Emphasis added]

This formulation is somewhat broader than Saville J's common solicitor test. It meets the practical needs of the reinsurance market. However, reinsurers who reinsure risks in the United States should be aware that American courts may take a different view of confidential communications between reinsured and reinsurer, and appropriate American legal advice should be taken to ensure that legal advice given to a reinsured who is in litigation in the United States remains privileged in the hands of his reinsurer.

# Evidence

## England: The Civil Evidence Act 1995

13-097   The Civil Evidence Act 1995 ("the 1995 Act") and Rules of Court made under the 1995 Act govern the giving of evidence in civil cases tried before the English courts.[390] The "hearsay rule" has been abolished in civil proceedings. A written witness statement is generally admissible as evidence, provided notice is given to the

other side, and it is not necessary to call the witness. The court is required to estimate the weight to be given to hearsay evidence. The rules on admissibility of documentary evidence have been considerably simplified. Analysis of the 1995 Act is outside the scope of this work. [391]

In *Ventouris v Mountain (No.2)*. [392] The defendant Lloyd's underwriters alleged that the plaintiff shipowner had conspired to blow up the vessel. The Court of Appeal [393] upheld the ruling of the trial judge [394] that tape recorded statements which had been recorded without the speaker's knowledge were not admissible under the provisions of the Civil Evidence Act 1968, unless proved in accordance with s.2(3) by direct oral evidence of the person who made the statement or by someone who heard them being made. As a result of this ruling, the defendants were obliged to withdraw their allegations of conspiracy. Under the 1995 Act the tape recorded statements would be admissible.

### Bermuda: The Evidence Act 1905

13-098   The Bermudian Evidence Act 1905 has been amended to include the provisions of the English Civil Evidence Act 1968. However, Bermuda has yet to adopt the English Evidence Act 1995, and the hearsay rule continues to apply in civil proceedings in Bermuda. [395]

## Interest

### England

13-099   The basic rule of common law is that damages are not awarded for late payment of money. [396] The Insurance Act 2015 s.13A implies into all contracts of insurance (and thus also reinsurance) an obligation on the (re)insurer to pay a claim within a reasonable time. If this term is breached the insured may claim damages for that breach as well as interest for late payment. Since the payment is made within the terms of the insurance contract, any sum thus paid might well be covered by the terms of the reinsurance contract, such that the liability for such a payment may fall on the reinsurer.

A reinsurance contract may expressly provide that interest shall be charged, at a specified rate, in the event that the sum due is not paid within, say, 30 days of rendering an account. Although reinsurance treaties frequently provided for quarterly accounting, such express provisions for the charging of interest have not been common. As we have noted above [397] in our discussion of reinsurance brokers' accounts, it may take a considerable time for money to flow down a chain of intermediaries.

In the absence of an express contractual provision, under English law the reinsured is, at present, only entitled to claim interest under s.35A of the Senior Courts Act 1981 [398] if he issues a claim form. The court has a general discretion, but will normally award interest on any contractual debt. The practice of the Commercial Court is to award interest at base rate plus 1 per cent. However, this is not an inflexible rule of practice, it "amounts to a presumption which can be displaced if its application would be substantially unfair to either party". [399] The Law Commission's proposals to give the insured a remedy for late payments of insurance claims were not incorporated into the Insurance Act 2015 when it was originally passed, but were added by amending legislation. [400]

In *Baker v Black Sea*, [401] a reinsurance case, the Court of Appeal [402] upheld the award of interest by the trial judge [403] of base rate plus 2 per cent. Otton LJ said:

"I am satisfied that the general approach of the Judge was correct. He started with the overriding principle that interest should be awarded to compensate the plaintiff for having been kept out of his money. He acknowledged that the plaintiff had not in fact borrowed in the amount or over the period at the rate to which the witness had deposed. He was correct, in my view, in holding that it was not essential to do so. The plaintiff adduced evidence of the rate at which a person with his general attributes (but ignoring his particular position) could have borrowed money over the period … In my view, the basic principle or practice in the Commercial Court should be to award interest at base rate plus 1 per cent. The Judge's decision in this case did not abrogate or undermine the basic principle. There was evidence upon which the Judge could properly award interest at 2 per cent. The uplift to 2 per cent was not in any sense contrary to principle, immoderate or unreasonable in the circumstances. He neither erred in principle nor in the exercise of his discretion." [404]

## Bermuda

13-100   In Bermuda, s.4 of the Interest and Credit Charges (Regulation) Act 1975 ("the 1975 Act") provides that where no provision is made in a contract with regard to interest a party may charge interest at the statutory rate [405] on any account that has been unpaid for more than six months. The Bermuda Court has a discretion, under s.10 of the 1975 Act to award pre-judgment interest. It is the usual practice in Bermuda to award pre-judgment interests in personal injury cases. However, in the case of a contractual claim, the Bermuda Court will not normally award pre-judgment interest where the contract makes no provision for the payment of interest. [406] Interest will run, at the statutory rate, from the date of the judgment pursuant to s.9 of the 1975 Act.

### Footnotes

296   CPR r.20.2(1)(b).
297   The glossary is intended to be, "a guide to the meaning of certain legal expressions as used in [the] Rules, but it does not give the expressions any meaning in the Rules which they do not otherwise have in the law".
298   *Nelson v Empress Assurance Corp (1905) 10 Com. Cas. 237*, deciding that a reinsurer should not be joined by an insurer to a claim by the policyholder on the insurer. See below.
299   CPR r.20.9(2): "The matters to which the court may have regard include—(a) the connection between the Pt 20 claim and the claim made by the claimant against the defendant; (b) whether the Pt 20 claimant is seeking substantially the same remedy which some other party is claiming from him; and (c) whether the Pt 20 claimant wants the court to decide any question connected with the subject matter of the proceedings —(i) not only between existing parties but also between existing parties and a person not already a party; or (ii) against an existing party not only in a capacity in which he is already a party but also in some further capacity."
300   *European International Reinsurance Co Ltd v Curzon Insurance Ltd [2003] EWCA Civ 1074*.
301   Before 1929 third-party procedure was only available where there was a claim for a contribution or indemnity paras (1)(b) and (c) of Ord.16 r.1 (see below) provide for joinder of third parties in other cases. The commentary to The Supreme Court Practice 1997, Vol.1, para.16/1/12 observes that, "Most of the cases decided before 1929 would *now fall within the ambit of the present rules*" and refers to *Re Burford [1932] 2 Ch. 122* discussed below.
302   *Clover Clayton & Co Ltd v Hessler & Co [1925] 1 K.B. 1*.
303   As noted above, this was the position until 1929.
304   *Johnston v Salvage Assn (1888) 19 Q.B.D. 458*; *Nelson v Empress Assurance Corp [1905] 2 K.B. 281*, and see below.

305   *Clover Clayton & Co Ltd v Hessler & Co [1925] 1 K.B. 1* at 8, concurring with Bankes LJ.
306   Third-party proceedings against insurers are not generally used in road accident cases because the plaintiff/victim has a better right to claim against the insurers than the defendant/insured by virtue of ss.151 and 152 of the Road Traffic Act 1988 as amended. There was a practice of not allowing insurers to be joined in a case where the trial was before a jury: *Gowar v Hales [1928] 1 K.B. 191*; *Jones v Birch Bros Ltd [1933] 2 K.B. 597*. This practice does not apply where the trial is by judge alone: *Harman v Crilly [1943] K.B. 168*.
307   *Walker & Knight v Donne Mileham & Haddock, The Times, 9 November 1976.*
308   *Re Burford [1932] 2 Ch. 122* at 138.
309   Studied carefully; not the present day meaning of "conned".
310   *Re Burford [1932] 2 Ch. 122* at 138.
311   RSC Ord.16 r.1(1)(b).
312   RSC Ord.16 r.1(1)(c).
313   Predating the 1929 extension of the rules governing third-party procedure.
314   *Nelson v Empress Assurance Corp (1905) 10 Com. Cas. 237*, which appears to be a fuller version than *[1905] 2 K.B. 281*—see Ch.5 above.
315   Mathew and Cozens-Hardy LJJ.
316   *British Dominions General Insurance Co Ltd v Duder [1915] 2 K.B. 394*.
317   *Hayter v Nelson [1990] 2 Lloyd's Rep. 265*; and see Ch.5 above.
318   *International Commercial Bank Plc v Insurance Corporation of Ireland Plc [1989] I.L.R.M. 788.*
319   *Meadows Indemnity Co Ltd v Insurance Corporation of Ireland and International Commercial Bank [1989] 2 Lloyd's Rep. 298*, and discussed below.
320   *International Commercial Bank Plc v Insurance Corporation of Ireland Plc [1989] I.L.R.M. 788 at 800.*
321   *Nelson v Empress Assurance [1905] 2 K.B. 281*, see above.
322   RSC Ord.16 r.1(1)(c).
323   See Ch.5 above.
324   See Ch.2, 2-011 to 2-016 above.
325   Within Lloyd's it seems that even where a syndicate has only a single corporate member, still the syndicate is a different "entity" from the corporate member, but since the syndicate is not a legal person, that distinction would not appear relevant to legal proceedings.
326   In the Lloyd's Names litigation, the plaintiff Names were all parties to the proceedings.
327   *Smith (Plant Hire) Ltd v Mainwaring (T/A Inshore) [1986] 2 Lloyd's Rep. 244*.
328   *James Nelson & Sons Ltd v Nelson Line Ltd [1906] 2 K.B. 217*.
329   See Ch.5 above.
330   *Meadows v ICI [1989] 2 Lloyd's Rep. 298*. See also *DG Finance Ltd v Eagle Star Insurance Co Ltd [1999] Lloyd's Rep. I.R. 387*.
331   The Irish proceedings, reported at *[1989] I.L.R.M. 788*, are discussed above.
332   *Meadows v ICI [1989] 1 Lloyd's Rep. 181*.
333   May, Neill and Nourse LJJ.
334   *Gouriet v Union of Post Office Workers [1978] A.C. 435*.
335   *Gouriet v Union of Post Office Workers [1978] A.C. 435* at 501 per Lord Diplock.
336   *Meadows v ICI [1989] 2 Lloyd's Rep. 298* at 309.
337   *Meadows v ICI [1989] 2 Lloyd's Rep. 298* at 309.
338   *Merrill Lynch v Commune di Verona [2012] EWHC 1407*.
339   The CPR have abolished the term "plaintiff".
340   Practice Direction (PD24)—The Summary Disposal of Claims.
341   *Assicurazione Generali SpA v CGU International Insurance Plc [2003] Lloyd's Rep. I.R. 725*.
342   The Court of Appeal gave judgment in 1999; see *The Times, 4 November 1999*.
343   *Three Rivers DC v Bank of England (No 3) [2001] 2 All ER 513; [2001] UKHL 16.*
344   *English & American Insurance Co Ltd (in a Scheme of Arrangement) v Axa Re SA [2006] EWHC 3323 (Comm).*
345   *Korean National Insurance Corp v Allianz Global [2007] EWCA Civ 1066.*

346 *Crown House Engineering v Amec Products Ltd (1990) 6 Const. LJ 141* at 154 per Bingham LJ.
347 The plaintiff is entitled to judgment unless the defendant can satisfy the court "… that there is an issue or question in dispute which ought to be tried or that there ought for some other reason to be a trial of that claim …": Ord.14 r.3(1).
348 See Ord.14 r.4 and the notes at para.14/3–4/8 of The Supreme Court Practice 1997, Vol. 1.
349 See Ch.14 below and the cases there discussed.
350 See Ch.5, 5-136 to 5-139 above.
351 *SAIL v Farex [1995] L.R.L.R. 116* at 152.
352 *SAIL v Farex [1995] L.R.L.R. 116* compare the same judge's earlier views in *Re A Company [1992] 1 Re. L.R. 288*, and Ch.17 below.
353 *Baker v Black Sea and Baltic General Insurance Co Ltd [1995] L.R.L.R. 261* at 284.
354 *Pacific & General Insurance Co Ltd (In Liquidation) v Baltica Insurance Co (UK) Ltd [1996] L.R.L.R. 8*.
355 *Pacific & General Insurance Co Ltd (In Liquidation) v Baltica Insurance Co (UK) Ltd [1996] L.R.L.R. 8* at 11.
356 *Aetna Reinsurance Co (UK) Ltd v Central Reinsurance Corp Ltd [1996] L.R.L.R. 165* at 166.
357 Compare *Walton Insurance Ltd v Agrichem Ltd, Bermuda Civ. App. No.6 of 1987, 25 July 1988*; *Hayter v Nelson [1990] 2 Lloyd's Rep. 265*, discussed in Ch.14 below.
358 *Trinity Insurance Co Ltd v Overseas Union Insurance Ltd [1996] L.R.L.R. 156*.
359 *Iron Trades Mutual Insurance Co Ltd v Compania De Seguros Imperio [1991] 1 Re. L.R. 213*, and see Ch.6, 6-142 above.
360 See below.
361 CPR r.31.5(2).
362 Admiralty and Commercial Courts Guide, 2017 edn. para.E1.2.
363 CPR r.31.7(1).
364 CPR r.31.7(2): "The factors relevant in deciding the reasonableness of a search include the following— (a) the number of documents involved; (b) the nature and complexity of the proceedings; (c) the ease and expense of retrieval of any particular document; and (d) the significance of any document which is likely to be located during the search."
365 In the United States discovery means both the production of documents and the taking of depositions.
366 See generally P. Matthews and H.M. Malek, Disclosure, 5th edn (Sweet & Maxwell, 2016); C. Hollander, Documentary Evidence, 13th edn (Sweet & Maxwell, 2018).
367 In practice almost invariably extended by agreement of the parties.
368 *Compagnie Financière et Commerciale du Pacifique v The Peruvian Guano Co (1882–83) L.R. 11 Q.B.D. 55* at 62–63 per Brett LJ. But see *Wallace Smith Trust Co Ltd (in liquidation) v Deloitte Haskins & Sells (a firm) [1996] 4 All E.R. 403* at 412e–h per Neil LJ: "I anticipate … that these principles and the present practice may have to be re-examined in the near future. The scope of discovery in a complex action imposes obligations with regard to the examination and identification of documents which are often extremely expensive properly to fulfil."
369 *South British Insurance Co Ltd v Mediterranean Insurance & Reinsurance Co Ltd [1986] 2 Lloyd's Rep. 247*.
370 Originally 32.5% of ONP, subsequently raised to 35%.
371 Bingham J (as he then was).
372 Neil and Balcombe LJJ.
373 RSC Ord.24 r.2(5).
374 RSC Ord.24 r.2(5).
375 *Ventouris v Mountain [1991] 3 All E.R. 472* at 486d–e. See also *Taylor v Anderton [1995] 2 All E.R. 420* at 443e; *O Company v M. Company [1996] 2 Lloyd's Rep. 347* at 351; *Wallace Smith Trust v Deloitte Haskins & Sells [1996] 4 All E.R. 403* at 412e–h.
376 *Dolling-Baker v Merrett [1991] 2 All E.R. 890*.
377 Fox, Parker and Ralph Gibson LJJ.
378 *Anderson v Bank of British Columbia (1876) L.R. 2 Ch. D. 644*; *Wheeler v Le Marchant (1881) L.R. 17 Ch. D. 675*.
379 *Re Duncan, Garfield v Fay [1968] 2 All E.R. 395*.

380  *Alfred Crompton Amusement Machines Ltd v Comrs. of Customs & Excise [1974] A.C. 405*.

381  *Minter v Priest [1930] A.C. 558* at 568 per Lord Buckmaster.

382  See generally *Balabel v Air India [1988] Ch. 317*; *Three Rivers District Council v Bank of England (No.6) [2005] 1 A.C. 610*.

383  *Grant v Downs (1976) 135 C.L.R. 674*; *Waugh v British Railways Board [1980] A.C. 521*.

384  *Calcraft v Guest [1898] 1 Q.B. 759*; *The "Aegis Blaze" [1986] 1 Lloyd's Rep. 203*.

385  *Bank of Nova Scotia v Hellenic Mutual War Risk Association (Bermuda) Ltd (No.2) (The "Good Luck") [1992] 2 Lloyd's Rep. 540*.

386  See Ch.3, 3-059 above.

387  See Ch.5, 5-43 to 5-048 above.

388  *Svenska Handelsbanken v Sun Alliance and London Insurance Plc [1995] 2 Lloyd's Rep. 84* at 87.

389  *Svenska Handelsbanken v Sun Alliance and London Insurance Plc [1995] 2 Lloyd's Rep. 84* at 87.

390  In Bermuda, the Evidence Act 1905, as amended, adopts the English Civil Evidence Act 1968, which preceded the Civil Evidence Act 1995.

391  See, generally C. Hollander, Documentary Evidence, 13th edn (Sweet & Maxwell, 2018).

392  *Ventouris v Mountain (No.2) [1992] 3 All E.R. 414*.

393  Lord Donaldson MR, Balcombe and Staughton LJJ.

394  Hirst J (as he then was).

395  See: *In the matter of Kingboard Copper Foil Holdings Ltd [2015] SC Comm (Bda) 76* at [45]–[50] (10 November 2015).

396  See *London Chatham and Dover Railway Co v South Eastern Railway Co [1893] A.C. 429*; *President of India v La Pintada Compania Navigacion SA [1985] A.C. 104*. The rule was criticised in *Sempra Metals Ltd v HM Commissioners of Inland Revenue [2007] UKHL 34*. In Sempra Metals the House of Lords allowed a taxpayer to recover compound interest on a restitutionary claim in respect of sums paid to the Revenue in Advance Corporation Tax which, the European Court of Justice subsequently held, had been levied contrary to European law. Sempra Metals was followed in the reinsurance context in *Equitas v Walsham Bros [2013] EWHC 3264*. See Ch.9, 9-010 above.

397  See Ch.11 above.

398  Formerly the Supreme Court Act 1981, renamed by the Constitutional Reform Act 2005 s.59.

399  *Baker v Black Sea [1996] L.R.L.R. 353* at 365 per Otton LJ Quaere whether a more commercially realistic approach will be adopted, in appropriate cases, following *Sempra Metals [2007] UKHL 34*.

400  See Ch.5, 5-131 to 133 above.

401  *Baker v Black Sea [1996] L.R.L.R. 353*.

402  Staughton, Millett and Otton LJJ.

403  Cresswell J.

404  *Baker v Black Sea [1996] L.R.L.R. 353* at 365.

405  Presently 7%.

406  See *Jupiter Asset Management v The Asset Management Group [2005] Bda L.R. 1*; followed, *Tensor Endowment Ltd v New Stream Capital Fund Ltd [2010] SC (Bda) 31 Com (17 June 2010)*.

End of Document                                          © 2022 Sweet & Maxwell