# EXHIBIT 10



# In The Supreme Court of Bermuda

**CIVIL JURISDICTION**

**(COMMERCIAL COURT)**

2021 Nos. 107, 108, 109, 111, 112, 113, 114, 115, 116, 117, 118, 119, 120, 121, 123, 124, 125 & 126

IN THE MATTER OF JARDINE STRATEGIC HOLDINGS LIMITED

AND IN THE MATTER OF THE AMALGAMATION AGREEMENT BETWEEN JMH INVESTMENTS LIMITED AND JMH BERMUDA LIMITED AND JARDINE STRATEGIC HOLDINGS LIMITED

AND IN THE MATTER OF SECTION 106 OF THE COMPANIES ACT 1981

**Before:**  Hon. Chief Justice Hargun

**Appearances:**  **Robert Levy QC, Simon Salzedo QC, Mark Chudleigh and Lewis Preston Kennedys Chudleigh Limited, Matthew Watson of Cox Hallett Wilkinson Limited, Delroy Duncan QC and Ryan Hawthorne of Trott and Duncan Limited,  Lilla Zuill of Zuill & Co, for the Plaintiffs.**

**Martin Moore QC and John Wasty of Appleby (Bermuda) Limited for Jardine Strategic Holdings Limited and Jardine Strategic Limited**

| | |
|---|---|
| **Dates of Hearing:** | **5–7 of October 2021** |
| **Date of Judgment:** | **12 November 2021** |

## JUDGMENT

*Directions in relation to appraisal of fair value of shares under section 106 of the Companies Act 1981; scope of discovery to be provided by the company to the dissenting shareholders; whether necessary to provide for a meeting between the expert valuers and the management of the company*

**<u>Hargun CJ</u>**

## Introduction

1.  In these 18 separate actions commenced by Originating Summonses the Plaintiffs ("**the Dissenting Shareholders**") seek, pursuant to the terms of section 106(6) of the Companies Act 1981 ("**the Act**"), appraisal of the fair value of their shares in Jardine Strategic Holdings Limited ("**the Company**"). These proceedings arise out of the amalgamation of the Company with JMH Bermuda Limited ("**JMH**") on 14 of April 2021 ("**the Amalgamation**") pursuant to the provisions of the Act, on which date JMH and the Company continued as Jardine Strategic Limited ("**Jardine Strategic**"). The present application principally relates to the scope of discovery sought by the Dissenting Shareholders from the Jardine Matheson group of companies ("**the Group**"). The Dissenting Shareholders contend that the Court should adopt the settled approach of the

Cayman courts in relation to the provision of discovery and the information under section 238 of the Cayman Companies Law (2018 Revision). The Company, on the other hand, argues that such an approach, in the exceptional circumstances of this case, is oppressive and wholly inappropriate.

**The background**

2.   The background to these proceedings and the Amalgamation is set out in the First Affidavit of Jeremy Parr (dated 10 September 2021), the Group General Counsel. Mr. Parr explains that Jardine Matheson Holdings Limited ("**Jardine Matheson**") is a company limited by shares and incorporated in Bermuda. It has as its primary listing a standard listing on the Main Market of the London Stock Exchange. It also has secondary listings in Singapore and Bermuda.

3.   Prior to the Amalgamation, amongst other interests in the Group, Jardine Matheson held, indirectly, approximately 84.9% of the shares in the Company. Prior to the Amalgamation, the Company was also incorporated in Bermuda and had as its primary listing a standard listing on the Main Market of the London Stock Exchange. It also had secondary listings in Singapore and Bermuda.

4.   The Group is comprised of a broad portfolio of businesses operating principally in China and Southeast Asia. Across the Group, over 400,000 employees work in a wide range of businesses in sectors including motor vehicles and related operations, property investment and development, food retailing, health and beauty, home furnishings, engineering and construction, transport services, restaurants, luxury hotels, financial services, heavy equipment, mining and agribusiness.

5.   The Group's structure included a cross-holding structure between the two listed companies. The Company owned, directly and indirectly, 59.3% of the shares in Jardine Matheson. In addition, the Company held most of the Group's major listed interests, including, for example, approximately 50.4% of Hong Kong Land Holdings Ltd, 77.6% of Dairy Farm

International Holdings Ltd, 79.5% of Mandarin Oriental International Ltd and 75% of Jardine Cycle & Carriage Ltd.

6. On 8 March 2021, the Company and Jardine Matheson announced plans to simplify the structure of the Group. In summary, the planned simplification would involve (1) the acquisition by Jardine Matheson, for cash, of the approximately 15% of the issued share capital of the Company that it did not already own directly or indirectly and (2) the subsequent cancellation by Jardine Matheson of the Company's almost 59% shareholding in it. The present claims by the Dissenting Shareholders are concerned with the first of those two steps.

7. The acquisition was implemented by way of an amalgamation under the Act. Under Bermuda law and the Company's bye-laws, the Amalgamation required the approval of at least 75% of the votes cast by shareholders in the Company. Jardine Matheson had undertaken to the Company that it would vote and would procure that its wholly-owned subsidiaries would vote the 940,903,135 shares (representing 84.89% of the existing issued share capital of the Company) in favour of the resolution. The requisite approval was therefore certain to be secured.

8. Under the terms of the Amalgamation, shareholders in the Company (other than Jardine Matheson and its wholly-owned subsidiaries) were entitled to receive US$ 33.00 in cash for each ordinary share which they held in the Company (the Acquisition Price). Mr. Parr states that the Acquisition Price valued the shares at US$ 5.5 billion, representing a premium of approximately: (i) 20.2% to the closing middle market price of US$ 27.45 per share on the Singapore Stock Exchange on 5 March 2021; (ii) 29% to the volume-weighted average closing middle market price of US$ 25.58 per share on the Singapore Stock Exchange over the one-month period ended 5 March 2021; and (iii) 40.3% to the volume-weighted average closing middle market price of US$ 23.53 per share on the Singapore Stock Exchange over the six-month period ended 5 March 2021.

9. As a number of the directors of the Company were also directors of Jardine Matheson, the Company's board delegated responsibility for considering the Amalgamation to a committee of directors who were not also directors of Jardine Matheson (**"the Transaction**

**Committee"**). The members of the Transaction Committee were Lord Powell of Bayswater, KCMG and Mr Lincoln KK Leong.

10. The Transaction Committee, advised by Evercore Partners International LLP ("**Evercore**") as to the financial terms of the Amalgamation, considered the terms of the Amalgamation to be fair and reasonable so far as independent shareholders in the Company were concerned. At the General Meeting of the Company held on 12 April 2021, a resolution approving the Amalgamation Agreement was passed. The Amalgamation became effective on 14 April 2021.

11. On 12 and 15 April 2021, 18 originating summonses were filed in relation to the Amalgamation. By those summonses, the Plaintiffs seek appraisals pursuant to section 106 of the Act to determine the fair value of their shares in the Company.

**Directions leading up to the appraisal hearing**

12. Over a period of 3 days the Court heard submissions from counsel in relation to the appropriate directions which the Court should make leading up to the hearing to appraise the fair value of the shares held by the Dissenting Shareholders. The Dissenting Shareholders submitted a draft "Directions Order" ("**the draft Order**") for consideration of the Court. The draft Order (as appearing at tab B23 of the Core Bundle) deals with directions relating to experts; electronic data room and Company disclosure procedure; lists of documents; translations of documents; experts' information requests of the Company; management meetings; factual witness evidence; expert reports of valuation experts and joint memorandum; and case management, case management conference and trial date.

**A. Experts**

13. The parties are agreed that the Company shall have leave to call one expert witness and the Dissenting Shareholders shall have leave to call one expert witness collectively between

them in respect of each field of expert evidence for which relief has been granted ("**Experts**").

14. The parties are also agreed that the Company, and the Dissenting Shareholders (collectively), shall have leave to instruct and to call as a witness at trial one expert witness each in the field of valuation to opine upon the fair value of the Dissenting Shareholders' shares in the Company as at 12 April 2021.

15. The parties propose that within 28 days of the date of the order, the Company and the Dissenting Shareholders shall each advise the other in writing of the identities and email addresses of the respective Valuation Experts who are so appointed.

16. The parties also accept that after the completion of discovery there may be a need to have additional experts. The Company proposes that the parties shall have liberty to apply for permission to adduce expert evidence in additional fields. The Dissenting Shareholders propose a mechanism for doing so. On balance, the Court accepts the wording suggested by the Dissenting Shareholders in paragraphs 4 and 5 of the draft Order.

17. Accordingly, in relation to expert evidence, the Court makes the directions as set out in paragraphs 1 to 5 of the draft Order.

**B.   Electronic Data Room and Company Disclosure Procedure**

18. Paragraph 6 of the draft Order provides that within 14 days from this Order, the Company shall open an electronic data room (the "**Data Room**") and provide access to the Experts; each person whom the Expert appoints to assist him or her in any work relating to the proceedings, including the preparation of the Expert Reports and the Joint Memorandum; the Dissenting Shareholders; and the parties' respective agents, advisers (including legal advisers), sub-advisers, direct or indirect affiliates, representatives and consultants.

19. Mr. Moore QC, on behalf of the Company, submits that any access to the Data Room, by or on behalf of the Dissenting Shareholders, shall be conditional upon agreement of appropriate confidentiality club provisions. The Court agrees that this is an appropriate condition and the Court so orders.

20. Mr. Moore QC also argued that the Short-Term Shareholders should not have access to the Data Room until the Company's and Jardine Strategic's application to strike out their claims has been determined by the Court. The expression Short-Term Shareholders refers to those shareholders who acquired shares after the date of the Notice, with knowledge that the Amalgamation was a foregone conclusion, and who acquired those shares as an arbitrage opportunity. It is the position of the Company and Jardine Strategic that the Short-Term Shareholders have no reasonable cause of action under section 106(6) and the commencement of their claims is, further or alternatively, an abuse of process.

21. The application to strike out the claims of the Short-Term Shareholders is unlikely to be heard and determined until February 2022. It appears to the Court that the Short-Term Shareholders should be treated as any other Plaintiff unless and until the Company and Jardine Strategic are successful in their application to strike out the claims. Furthermore, there is unlikely to be any real prejudice to the Company or Jardine Strategic if the Short-Term Shareholders are subject to the same confidentiality club provisions.

22. In the circumstances the Court makes an order in terms of paragraph 6 of the draft Order subject to the condition that access to the Data Room is conditional upon agreeing the appropriate confidentiality club provisions.

23. The real dispute between the parties relates to the terms of paragraph 7 of the draft Order:

(1) Paragraph 7.1 provides that the Company shall upload to the Data Room, within 30 days of this order, all documents (of whatever description, whether electronic, hardcopy or in any other format) and communications (whether by email or otherwise) and other materials which, in accordance with RSC Order 24, are in their possession, custody or power comprising the categories of documents identified at **Appendix 2** of this order and which were prepared or created or communicated in

the five-year period ending on the Valuation Date (except where a different date or date range is expressly provided for in Appendix 2).

(2) Paragraph 7.2 provides that the Company shall upload to the Data Room, within 60 days from this Order, all additional documents (of whatever description, whether electronic, hardcopy or in any other format) and communications (whether by email and otherwise) which, in accordance with RSC Order 24, and which were prepared or created or communicated in the five-year period ending on the Valuation Date and which are relevant to the determination of fair value of the Dissenting Shareholder's shares in the Company as at the Valuation Date and/or the deal process.

24. Appendix 2 is reproduced as an Annex to this Judgment. As Mr. Parr correctly notes in his Third Affidavit (dated 28 September 2021), Jardine Strategic would be required to upload to an electronic Data Room all relevant documents and communications in its possession, custody or power comprising the categories identified in Appendix 2. Appendix 2 is a list running to 9 pages of documents and communications falling into 38 separate defined categories.

25. In the main, Appendix 2 would apply to documents or communications generated over a period of 5 years, although in some instances that this is extended to 10 years.

26. To appreciate the extent of the discovery sought it is relevant to note the definitions of "**Document**", "**Communication**" and "**Company**" in paragraph 1 of Appendix 2 and the definition of the "**Jardine Group**" in paragraph 2 of Appendix 2:

1.1 "**Document**" includes, without limitation (such that the following description is non-exhaustive) original and all non-identical copies of all written or printed items and electronically stored information, including but not limited to letters, correspondence, emails, text messages, agreements, contracts, forms, chat messages (including but not limited to Bloomberg messages, Instant Bloomberg

chats, WeChat messages, WeCom messages, QQ messages, and WhatsApp messages), memoranda, calendars, diaries, legal pleadings, day planners, travel records, lists, outlines, summaries, records of telephone conversations, facsimiles, notes, reports, compilations, notebooks, work papers, graphs, charts, spreadsheets, books, pamphlets, brochures, presentations, analyses, circulars, manuals, instructions, ledgers, compact discs, computer files and disks, photographs, all written or graphic records or representations of any kind and description that are fixed in any medium upon which intelligence or information can be recorded or retrieved, including but not limited to documents electronically or digitally stored on disk or tape in a native format. A draft, non-identical, or marked copy is a separate document within the meaning of this term.

1.2. "**Communication**" in this Appendix includes, without limitation (such that the following description is non-exhaustive) any written, or electronic transmission of information, including but not limited to chat messages such as Bloomberg messages, Instant Bloomberg chats, WeChat messages, WeCom messages, QQ messages, and WhatsApp messages, or other forms of written interchange, however transmitted.

27. The Jardine Group is defined in paragraph 2 of the draft Order as "including, but not limited, to Jardine Matheson Holdings Limited, Jardine Matheson Limited, Matheson & Co Limited, Jardine Matheson International Services Limited, JMH Investments Limited, JMH Bermuda Limited, Mandarin Oriental Hotel Group International Limited, Hongkong Land Limited, Dairy Farm Management Services Limited, Jardine Cycle & Carriage Limited, Jardine Pacific Limited, Jardine Motors Group Limited, Zung Fu Company Ltd., PT Astra International, Jardine Thompson Group plc, United Tractors, Zhongsheng Group and their direct or indirect subsidiaries (together the "**Jardine Group**")."

28. In his Third Affidavit Mr. Parr seeks to explain that to apply the discovery requests set out in Appendix 2 to the structure, the complexity and the scale of the Jardine Group is wholly disproportionate, impractical, and unnecessary for the purposes of appraising fair value of

the shares in the Company. He says that having regard to the nature, size and the structure of the Group, the discovery exercise sought by the Dissenting Shareholders would be colossal.

29. As noted earlier, the Group employs more than 400,000 people or about 12 times the working population of Bermuda. Its consolidated revenues for the year ended 31 December 2020 were US$32 billion. The Group is ranked in the Fortune 500 list of the world's largest 500 companies.

30. Mr. Parr explains that several of the companies at different levels of the Group - including Jardine Matheson itself - are publicly listed on one or more leading stock exchanges and have been for some time. These companies operate very much in the public sphere and are subject to the rules and requirements that come with such status.

31. The Group is made up of approximately 1,150 individual companies. This figure excludes a further approximately 650 companies in respect of which the Group is in the position of minority investor.

32. According to Mr. Parr approximately 715 of the 1,150 companies within the Group can properly be viewed as active or operating companies. By this Mr. Parr means that they carry out activities like holding board meetings, taking minutes, preparing management accounts, employing staff and/or operating a trading business. In other words, they are not mere holding companies or dormant entities.

33. Most of the approximately 1,150 companies within the Group are subject to, and comply with, independent audit requirements and requirements to prepare statutory accounts. The international accountancy firm PricewaterhouseCoopers LLP ("**PwC**") and its affiliated firms audit the statutory accounts for many of these companies.

34. In very broad terms, Mr. Parr explains, that the Group's structure might be thought of as a series of pyramids within a larger overall pyramid, with Jardine Matheson at the top. There

are several listed holding companies in the upper levels of the Group, in turn holding (directly or indirectly, and among other things) a number of subsidiary companies. These, in turn, each hold further subsidiary companies, which in turn hold further subsidiary companies, and so on.

35. However, Mr. Parr adds it would be wrong to conceive of the Group as one in which there were one or two active holding companies at the apex with a complicated web of largely dormant shell or holding companies sitting below them. It would also be wrong to think of it as a single corporate group managed from the top-down by a sole parent company in the same way as are most listed companies. Rather, the Group comprises multiple operational sub-groups headed by different listed companies, each with external shareholders. Its principal subsidiaries are:

(a) Hong Kong Land which has a total of 407 subsidiary companies, of which 266 are active or operating. Hong Kong Land is listed in the standard segment in the UK and admitted to trading on the Main Market of the London Stock Exchange with secondary listings in Singapore and Bermuda. It is a stand-alone business entity in its own right. It has its own Board of Directors and financial control procedures to support the preparation of its own consolidated accounts. The approximate market capitalisation of Hong Kong Land is US$ 10 billion.

(b) Dairy Farm which has a total of 64 subsidiary companies, of which 36 are active or operating. Dairy Farm is also listed in the standard segment in the UK and admitted to trading on the Main Market of the London Stock Exchange with secondary listings in Singapore and Bermuda. It is a stand-alone business entity in its own right. It has its own Board of Directors and financial control procedures to support the preparation of its own consolidated accounts. The approximate market capitalisation of Dairy Farm is US$ 5 billion.

(c) Mandarin Oriental which has a total of 115 subsidiary companies, of which 100 are active or operating. Mandarin Oriental is also listed in the standard segment in

the UK and admitted to trading on the Main Market of the London Stock Exchange with secondary listings in Singapore and Bermuda. It is a stand-alone business entity in its own right. It has its own Board of Directors and financial control procedures to support the preparation of its own consolidated accounts. The approximate market capitalization of Mandarin Oriental is US$ 2.6 billion.

(d) JC&C has 19 subsidiary companies, of which 11 are active or operating. JC&C, which is incorporated in Singapore, has its primary listing on the Singapore Stock Exchange and its audited consolidated accounts are prepared in accordance with Singapore Financial Reporting Standards (International) and audited by PWC in accordance with Singapore Standards on Auditing. Like Hong Kong Land, Dairy Farm and Mandarin Oriental, JC&C is a large business entity with its own Board of Directors and financial control procedures to support the preparation of its own consolidated accounts. Its approximate market capitalisation is US$ 5.5 billion.

(e) Astra which has 235 subsidiary companies, of which 227 are active or operating. Four of Astra's subsidiary companies are listed companies, holding their own respective groups of companies and preparing their own audited consolidated financial statements. Astra, which sits below JC&C, is a substantial diversified business conglomerate. It is incorporated in and based primarily in Indonesia. It currently has approximately 187,300 employees and operates across 7 different business segments. It is listed on the Indonesian Stock Exchange and is subject to the listing rules of the Indonesian Stock Exchange. Its audited accounts are prepared by a member of the PwC network of firms in accordance with Indonesian Financial Accounting Standards. Its market capitalisation is approximately US$ 15.5 billion.

(f) The Group's other two principal subsidiary businesses - Jardine Motors and Jardine Pacific - are not publicly listed but are nevertheless each also large, complex, standalone business entities. Jardine Pacific holds a significant number of the Group's non-listed interests in Asia, with a diverse portfolio comprising businesses active in engineering and construction, aviation and transport services,

and restaurants. The Jardine Pacific businesses generated revenues of US$ 6.2 billion in the year ended the 31 December 2020. The Jardine Motors business generated revenues of US$ 5 billion in the year ended the 31 December 2020.

36. Jardine Matheson operates as a fully functioning standalone entity which is the principal holding company for the Group. Key matters that the board of Jardine Matheson is responsible for include: the overall aims and objectives of the Group; approval of the Group's strategy and risk appetite to align with the Group's purpose and values; approval and oversight of the Group policy framework and approval of appropriate Group policies; approval of the annual budget and monitoring of performance against it; oversight of the Group's operations; approval of major changes to the Group's corporate or capital structure; approval of major capital expenditure and significant transactions (in terms of size or reputational impact); approval of interim and final financial statements upon recommendation from the audit committee, and interim management statements; approval of annual report and accounts; and approval of dividend policy and amount and form of interim and final dividend payments for approval by shareholders as required.

37. Operational management of each of the Group's principal subsidiaries is carried out by the relevant operating company and not by Jardine Matheson. Coordination with the Group's listed subsidiaries is undertaken by the board of the Group management company, JML.

38. Jardine Matheson is fully audited. Mr. Parr states that it is subject to numerous requirements that come with its multiple listings, with which it fully complies. These include the UK Market Abuse Regulation, the Listing Rules, and the Disclosure and Transparency Rules (DTRs), in each case as defined in the Handbook of the UK Financial Conduct Authority, as they apply to a company incorporated in Bermuda with a standard listing of equity shares in the UK. Prior to the Amalgamation, the Company was subject to the same regulatory regime and audit requirements as Jardine Matheson.

39. As noted earlier the Company held most of the Group's major listed interests, including approximately 50% of Hong Kong Land, 78% of Dairy Farm, 79% of Mandarin Oriental

and (indirectly) 75% of JC&C. These interests (and others) all continue to be held by Jardine Strategic. Jardine Strategic itself is not listed.

40. The Company's role was to act as an intermediate holding company within the Group. Mr. Parr explains that the memorandum of association of the Company provided for the chairman of Jardine Matheson to be, or to appoint, the permanent and managing director of the Company. In addition, the bye-laws of the Company provided for Jardine Matheson, or such wholly-owned subsidiary as it should nominate, to be the general manager of the Company. JML was so nominated and provided management services to the Company and other members of the Group. The Company had no employees. Operational management was delegated and coordination with the Group's listed subsidiaries was undertaken by the board of JML as general manager.

41. Having regard to the size and the complexity of the Group's business operations, Mr. Parr contends that the discovery sought in Appendix 2 is wholly disproportionate and unnecessary. By way of example only, Mr. Parr refers to the discovery requests made in paragraphs 5.14 to 5.19 Appendix 2. The requests are as follows:

> "5.14. Monthly management accounts for all members of the Jardine Group for the last 5 years.

> 5.15. Consolidated quarterly accounts for all members of the Jardine Group for the last 5 years.

> 5.16. Monthly and/or quarterly financials for all members of the Jardine Group and supporting Documents including, where available, profit and loss statements, balance sheets, cash flow statements and any accompanying notes, commentary, reports or business plans for the last 5 years.

*5.17. Monthly and/or quarterly management information packs / presentations / reports / dashboards and supporting Documents that were used to monitor financial performance for all or part of the Jardine Group for the last 5 years.*

*5.18. Audited annual financial statements for all members of the Jardine Group for the last 5 years.*

*5.19. Annual financial budgets for all members of the Jardine Group (including but not limited to supporting Documents and any subsequent revisions during each year) for the last 5 years."*

42. Mr. Parr states that he has consulted with the Finance Directors of the various divisions of the Group as to the numbers of monthly management accounts, annual financial budgets and other internal financial reporting documents produced and reviewed within their divisions.

43. It is Mr. Parr's evidence that if all the corporate entities within the Group are included, the requests made in paragraphs 5.14 to 5.19 of Appendix 2 would likely result in 5,290 Monthly Reports (including management accounts and all other monthly reports/packs produced to monitor financial performance), 214 Quarterly Reports, 3,868 Annual Financial Budgets (including preliminary budgets) and 2,229 other Financial Reporting (including annual financial statements and other annual reports for monitoring financial performance). Mr. Parr says that this results in over 70,000 reports annually and more than 350,000 during the 5-year period preceding the transaction. As Mr. Moore QC observed, assuming each of the reports/packages is 100 pages long, the requests made in paragraphs 5.14 to 5.19 would result in discovery of 35 million pages of documentation.

44. A court would only require a party to incur the expense of giving discovery of 35 million pages of documentation if it was satisfied that the discovery was necessary. In relation to the utility of this documentation Mr. Parr notes that a large number of management accounts are prepared on a bottom-up basis for companies that have their own subsidiaries

and that this continues for companies that are higher and higher up the chain. For that reason, Mr. Parr states that referring to management accounts for companies lower in the chain is in many respects unnecessary because the consolidated accounts higher up the chain already account for them. Further, accounts for individual entities lower down the corporate chain are usually less meaningful because they do not take account of the broader group/sub-group context.

45. Mr. Parr says that a similar picture emerges in respect of the annual budgets for all the members of the Group (including supporting documentation and subsequent revisions during the year) as well as the monthly and/or quarterly management information packs, presentations, reports, dashboards and supporting documents that are used to monitor financial performance for all or part of the Group.

46. So far as the financial statements are concerned, Mr. Parr is informed that the audited financial statements that the auditors audit for the key holding companies in the Group that are higher up the chain relative to others are prepared on a consolidated basis and will typically make appropriate adjustments to eliminate intra-group transactions and present information on a consistent basis in order to provide a true and fair view of the relevant group of companies.

47. Based on advice, Mr. Parr concludes, that the individual legal entity accounts often do not present a meaningful position for the relevant groups of companies, for example due to the need for the intra-group transactions between those companies to be adjusted to avoid duplication.

48. In relation to the scope of discovery, the Company has filed the affidavit of Kevin F. Dages. Mr. Dages is a Certified Public Accountant and regularly serves as a consulting or testifying expert in valuation and damages matters. Commenting on the scope of Appendix 2, Mr. Dages states that he does not recall seeing such a broad request for communications and documents (including requests of drafts, text and chat messages) over such a long time period (in most cases covering the most recent five or ten years). Mr. Dages notes that the Dissenting Shareholders make these requests not only of information in the possession of

Company, but also seek to apply them to each of the 9 listed companies that directly report to the Company, as well as the more than 1,000 individual holding or operating companies that consolidate up to these holding companies (many of which are also listed companies). Based on his experience in complex valuation matters, Mr. Dages expresses the opinion that the review of information at such a disaggregated level would be cost prohibitive, inefficient, counter-productive, and unlikely to assist the valuer in appraising the Company in these circumstances.

49. Mr. Dages further states that complex hierarchies such as the structure of the Company consolidate financial performance and projections as groups of companies report up the corporate structure. This process is important since it eliminates transactions between related entities within the structure. Therefore, when the goal is to estimate the value of the overall corporate entity, examining the unconsolidated historical financial performance or projections of an individual company at levels below the entities directly reporting to the ultimate corporate parent is potentially misleading and counterproductive. Mr. Dages understands that intra-group consolidation of this kind takes place within the Group.

50. It is not practical to set out in this Judgment the detailed criticisms of Appendix 2 made by Mr. Moore QC. His general thrust was that the requests made in Appendix 2 were overly broad, unreasonably diffuse, largely irrelevant to the issue of valuation of shares in the Company and clearly intended to exert the maximum pain/pressure on the Company to resolve the Plaintiffs' claims at the earliest opportunity. By way of example, Mr. Moore QC made the following submissions in relation to the discovery requests made in Appendix 2.

51. Paragraph 4 of Appendix 2 requests Documents evidencing all completed or proposed transactions (both on-market and off-market) in the shares of the Company and/or any member of the Jardine Group (other than those which relate to publicly traded shares and thus the information is publicly available). Mr. Moore QC complains that the request is far too wide in scope as it requires the Company to search for documents which evidence transactions in shares in 1,100 companies. He also questions how this documentation would assist the valuation experts to arrive at fair value of the shares in the Company. Mr.

Moore QC proposes that the issue should be left to the experts to request any additional information in relation to a particular company if it would assist them in the valuation of the Company's shares.

52. Paragraph 5.8 of Appendix 2 requests communications with or between and Documents produced by, provided to or received by any member of the Jardine Group in the ten years preceding the Valuation Date relating to the Jardine Group's pursuit of "*a long term approach to the creation of shareholder value and further enhancing [of] the Group's ownership positions through a series of share purchases and buybacks*" as advised in the Notice of Special General Meeting of the Company dated 17 March 2021. Mr. Moore QC complains that the request is so open ended and nebulous that it is impossible to conduct a meaningful search for the requested communications.

53. Paragraph 5.13 of Appendix 2 requests minutes and agendas of Board meetings of all members of the Jardine Group including but not limited to any supporting Documents and any other reports prepared for such Board Meetings (in the case of the Company and Jardine Matheson Holdings Limited covering the ten years preceding the Valuation Date). Mr. Moore QC again complains that the request is so wide that it requires the Company to review many thousands of minutes and agendas and supporting documents in relation to over 1,150 companies for a period of 5 years. Mr. Levy QC, for the Dissenting Shareholders, confirmed that the request is effectively for the minutes of all the Board meetings of all the companies for the last 5 years because "*they have to get inside the Company, they have to understand the Company*". The only minutes that would be excluded would be where the business of the Group was not being discussed and considered – "*if the board meeting is about whether to paint a particular room in the office green.*" Mr. Moore QC questions how this information would assist the expert valuers in determining fair value of the shares in the Company.

54. Paragraph 5.26 of Appendix 2 requires the Company to discover any internal Communications or Documents relating to the market price of the Company's and/or any member of Jardine Group's shares by its/their directors, management and/or managers,

agents, employees, counsel, or advisors during the five-year period immediately preceding the Valuation Date. Mr. Moore QC objects that this request again is enormously expansive and will require review of all documents relating to the long-term share plans of every member of the Group. Again, he questions whether this information will have any bearing on the determination of fair value of the Company's shares.

55. Paragraph 5.28 of Appendix 2 requires the Company to discover any agreements between the Company and/or any member of the Jardine Group and its/their major suppliers with an annual value of US$ 1 million or more. Mr. Moore QC complains this will capture huge amounts of irrelevant information which will have to be reviewed by the Company's professional advisers before it can be produced. He points out that this will, for example, capture a contract between a person who supplies axles for tractors in the Philippines to one of the companies in the Group. In this regard Mr. Moore QC points out that for the purposes of producing audited accounts for the Jardine Group, the materiality threshold is not the *de minimis* amount of US$ 1 million referred to in paragraph 5.28 but the commercially realistic amount of US$ 314 million. Again, he questions how this will have any relevance to the determination of the fair value of the shares in the Company.

56. Paragraph 5.30 of Appendix 2 requires the Company to produce any Documents supporting (or otherwise relevant to) the values of long-term investments, property, real-estate (including but not limited to valuations and lease agreements with tenants, investment plans and proposals), loans and other receivables and liabilities of the Company and/or any member of the Jardine Group including, but not limited to any Communications with or Documents produced by or for their bankers, bondholders or shareholders. Mr. Moore QC complains that the request is so widely drawn that it is impossible to make any sensible delineation of what is really going to be required. He suggests that any request for this type of information should be focused so as to assist the expert valuers in the determination of fair value. For that reason, Mr. Moore contends that the request should be made by the valuation experts to the Company.

57. Paragraph 5.36 of Appendix 2 requires the Company to discover any incorporating Document(s), Memorandum(/a) of Association, bye-laws, shareholders' agreement(s),

subscription agreement(s), or any other contract(s) governing the terms on which shares are held in the Company or any member of the Jardine Group. Mr. Moore QC questions how the production of Memoranda of Association, bye-laws, shareholders' agreements, and subscription agreements relating to over 1,100 companies in the Group is going to assist in assessing the fair value of the shares in the Company. Again, Mr. Moore suggests that if this information is required it should be focused and the request should be made by the experts.

58. Having reviewed the extent of the discovery sought in Appendix 2 Mr. Dages expresses the view, with which the Court agrees, that the extent of the discovery and the implied level of document and data review is more similar to the scope of document review and analysis which he would expect for a forensic accounting investigation in which there were credible allegations of fraud or accounting misstatements at multiple subsidiary levels within the corporate hierarchy.

59. In addition to the discovery sought by the express terms of Appendix 2, the Dissenting Shareholders also seek, as noted above, general discovery pursuant to RSC Order 24 rule 3 of all additional documents which were prepared or created or communicated in the five-year period ending on the Valuation Date and which are relevant to the determination of the fair value of the Dissenting Shareholders' shares in the Company.

60. Mr. Moore QC submits that the Dissenting Shareholders' approach to discovery is premature, unnecessary and disproportionate. It is premature in that the experts have not been appointed and have not yet identified the appropriate valuation methodologies or the documents required to carry out the valuations. He states that the issues have not crystallised. The disclosure sought is not necessary (at least at this stage) for disposing fairly of the causes. Mr. Moore QC argues that the Court cannot be satisfied at this stage that the documents will be of utility to the experts. He submits that having regard to the size and structure of the Group, the discovery order sought would be manifestly disproportionate. Subject to the questions of power, custody and possession, which are likely to surface in due course, the task would be colossal.

61. In support of the relief sought in the draft Order, Mr. Levy QC relies heavily upon the directions given in appraisal actions in the Cayman Islands courts. He points out that there have been numerous appraisal actions before the Cayman courts and, as a result, the Cayman courts and attorneys have gained considerable insight and experience of what is needed for a fair, efficient and proportional trial process. He says that there have been numerous contested directions hearings which have resulted in the development of the relatively standard procedure designed to bring such cases to trial.

62. Mr. Levy QC submits that the tried and tested directions orders (approved by Smellie CJ in *JA Solar* [FSD 153 of 2018]) in Cayman consistently provide for the following:

   (a) the opening by the company of an electronic data room;

   (b) an initial (and swift) upload to the data room by the company of specific classes of documents that are immediately available to the company (being documents etc. generated for, or used in, the merger process, which, by definition, had only recently closed). These categories of documents are often tailored to the facts of the case, bearing in mind that a transaction has only recently concluded. It is that, submits Mr. Levy QC, which has informed Appendix 2 to the Dissenting Shareholders' draft Order;

   (c) a further upload (within a reasonably short period of time) of all other documents in the company's possession, custody or power that are relevant to fair value (i.e. a general discovery obligation);

   (d) the dissenting shareholders upload documents that fall into the categories ordered by the Court of Appeal in *Qunar* [2018 (1) CILR 199] that are relevant to fair value;

   (e) the parties be at liberty to file evidence of fact (before expert reports are exchanged) and leave is given for cross-examination;

(f) each of the company and the dissenting shareholder(s) instruct a valuation expert (with the potential that the Court may also grant leave to the parties to instruct another type of expert, such as an industry expert or interest rate expert, if the Court believes this would be of assistance);

(g) up until close to the exchange of expert reports, the company uploads to the data room any further documents or information that either of the valuation experts (and if applicable, other experts) request of the company within a specified period of time from the date of the request, typically within 14 days of the request;

(h) the company makes appropriate members of management available to meet with the valuation experts (whether in person or by telephone) upon request to discuss information provided by the company and issues relevant to the valuation experts' reports; and

(i) the experts file reports and then meet to ascertain agreement/disagreement amongst the experts and file supplemental reports.

63. In support of the discovery order sought Mr. Levy QC also relies upon the expert opinion of Mark E. Zmijewski, Professor Emeritus at the University of Chicago Booth School of Business. Professor Zmijewski has worked as a consultant or expert in litigation matters in United States state and federal courts, including the Delaware Court of Chancery, in the Supreme Court of Victoria in Australia, in the Grand Court of the Cayman Islands, and in arbitrations in the United States and internationally. In summary it is the evidence of Professor Zmijewski that:

(1) An independent valuation of a company's fair value requires that the independent valuation expert examine all available value-relevant information that is known or knowable as of the valuation date. All available value-relevant information includes both publicly disclosed and non-public (private) information. Not having access to all value-relevant information results in an incomplete (and therefore likely inaccurate) valuation, which is inconsistent with my understanding of what is required of the independent valuation expert in an appraisal matter.

(2) It is therefore Professor Zmijewski's view that a company should be required to provide all value-relevant documents and information, including (and especially) non-public documents and information that the independent valuation expert could not otherwise obtain.

(3) Based on his experience, both in the Grand Court of the Cayman Islands and in the United States, a five-year look back period is common and would allow the valuer to gain an understanding of the dynamics and trajectory of the company's financial performance, investments (capital expenditures), and capital structure in a reasonable period ending with the transaction.

(4) A valuation expert (and/or deal process expert) considering the transaction price as a potential indicator of fair value requires access to documents held by the Company including documents concerning the deal process and any value-relevant non-public information. Similar considerations apply in relation to other valuation techniques: as explained above, in order to determine whether the unaffected stock price can be relied upon, it is essential (among other things) to determine whether there is value-relevant non-public information; and in order to perform a reliable DCF valuation it is necessary to critically evaluate and (if necessary) adjust the company's forecasts. The documents are required to be in sufficient granular detail to support sum-of-the-parts analysis and also to permit assessment of the comparability of component businesses with potential comparators.

(5) Having reviewed the Appendix 2 categories requested by Dissenting Shareholders in this matter ("**Appendix 2 Categories**" and "**Appendix 2 Documents**"), Professor Zmijewski confirms his view that documents in the Appendix 2 Categories all fall within the types (categories) of documents that he has used in numerous appraisal matters as an independent valuation expert.

64. The Cayman authorities relied upon by Mr. Levy QC provide valuable insight in relation to the effective management of appraisal actions. These authorities emphasise that in

assisting the expert valuers to give their opinion on fair value it is necessary for the Court to ensure that the expert valuers are provided with all the necessary relevant documentation and information. The Cayman authorities recognise the crucial importance of providing all necessary relevant information to the expert valuers and the fact that this information inevitably will be in the possession of the company.[1]

65. As noted in the judgment of Martin JA in *In the Matter of Qihoo Technology Company Limited* [2017] (2) CILR 585 the Cayman courts give substantial degree of autonomy to the experts in determining what information is needed for their valuations as the court must have confidence that the valuations are based upon sufficient information.[2]

---

[1] In *FGL Holdings* (FSD 184 of 2020) Parker J stated at [12] and [13]:

"*12. It is well settled that extensive discovery of documents within the possession, custody or power of petitioner companies is essential in section 238 proceedings. This is because the company is the object of the valuation exercise and will have a large amount of information and material of critical relevance to that exercise. This 'information gap' has been emphasized in numerous decisions of this court and the Court of Appeal.*
*13. It is acknowledged that this is an onerous and expensive burden on the company, but it is essential for the fair determination of the matter. The dissenters as 'outsiders' are entitled to it. Moreover the court relies on relevant material to be produced to the valuation experts upon which they can base their opinions in order to assist the court to arrive at its conclusions.*"
To the same effect is the judgment of Smellie CJ in *JA Solar Holdings Co. Ltd* [FSD 153 of 2018] at [27](g) citing the judgment of Martin JA in the Court of Appeal *In Qihoo 360 Technology Co. Ltd* .at [3] ""*proceedings under section 238 present two particular difficulties to the courts. First, all or nearly all of the financial information necessary to enable the Court to determine the value of a company's business, and hence of its shares, will inevitably be held by the company itself. The proper conduct of the valuation exercise will accordingly require that the company make adequate disclosure of that information. Secondly, although the task of determining the value is one for the Court alone, the Court will not usually be equipped to derive a value from the financial information without expert assistance. The consequent importance of the expert evidence means that the Court must have confidence that the valuations proposed are based on sufficient information; and that in turn means that the experts will often have to be given a substantial degree of autonomy in determining what information is needed for their valuations.*"

[2] The autonomy granted to the experts was also emphasized by Parker J *In the matter of EHI Car Services Limited* [FSD 115 of 2019] at [25]:
"*Notwithstanding the difficulties which have arisen in this case, this Court in section 238 cases has confirmed that the role of experts in the valuation process is central to a fair determination of the sole issue at stake, namely the fair value of dissenters' shares. As such, the experts who are engaged to assist the Court enjoy a degree of autonomy, subject to reasonable safeguards. As professional practitioners, the Court relies upon them to assess what information is or is not relevant for their purposes and what procedure might assist them in obtaining and interrogating information in the most economic and efficient way. They can of course be controlled by the Court should it be necessary to correct any abuse of this responsibility and with regard to their overriding duty to the Court.*"

66. The Cayman authorities emphasise that the court must look at each case and decide whether the directions as a whole and as to their individual nature and effect are fair, necessary to do justice between the parties, and economically sensible. Thus, Chief Justice Smellie in *JA Solar* said at [17] that the Cayman practice "*is not meant to suggest that there is a rigid "standard form" of directions for section 238 cases. The directions may have to be somewhat tailored to the facts of any particular case.*"

67. In *Homeinns Hotel Group* [FSD 75 of 2016] Mangatal J noted at [4] that "*directions given in any other case are not to be regarded as "precedents".*

68. In *EHI Car Services* Parker J addressed the same issue at [18] and held:

> "*I accept that directions made in other section 238 cases do not generally carry the value of precedent, especially if the points in question were previously agreed, rather than judicially determined. I also accept that the court must look at each case and decide whether the directions as a whole and as to their individual nature and effect are fair, necessary to do justice between the parties, and are economically sensible.*"

69. The requirements that the directions must be fair, necessary to do justice between the parties and economically sensible, referred to by Parker J *in EHI Car Services,* have been emphasised in other Cayman cases. Cayman authorities require the Court to consider in each individual case that the directions given, including the provision of discovery, must be proportionate in all the circumstances of the case.

70. In *JA Solar* Chief Justice Smellie expressly held at [44] that the requirement to provide discovery must be subjected to the test of proportionality:

> "*As a matter of basic principle, I accept however, that the purpose of the discovery regime in section 238 cases must be circumscribed in addition to the test of relevance, also by a test of appropriate proportionality. Thus, the question that ultimately arises on this aspect of the proposed directions is whether it is proportionate to require the Company to go back five years in producing that material.*"

71. In *FGL Holdings* Parker J held at [16] that *"The resourcing requirements for the exercise are significant and if the universe of documents that needs to be reviewed for relevance, privilege, and confidentiality is unnecessarily broad that requires even greater resources and would be disproportionate."*

72. The Cayman Court of Appeal has recognised that the discovery process in aid of section 238 claims is capable of abuse by the dissenting shareholders. The Court of Appeal has warned of the possibility of abuse by dissenting shareholders conducting a "*drains up*" inspection of the entire business, regardless of the relevance to fair value. The Court of Appeal has also recognised that the latitude given to the experts to define what is relevant to value could be abused and even used to put pressure on a company to agree an inflated value for the dissenting shareholders' shares rather than accept an external inspection of its physical and electronic records. The expression of these views is first to be found in the judgment of Martin JA in *In The Matter of Qihoo Technology Company Limited* [2017] (2) CILR 585 at [27]:

> "*...we come back to the possibility of abuse of the autonomy that is of necessity to be given to experts in s.238 proceedings. In para. 63 of her judgment, the judge recorded a submission by leading counsel for the company "that s.238 fair value claims must not be allowed to become a carte blanche for dissenters to conduct a 'drains up' inspection of the entire business, regardless of relevance to fair value." We think there is a danger that the liberty given to the experts to define what is relevant to value could be abused, and even used to put pressure on a company to agree an inflated value for dissenters' shares rather than accept the wholesale disruption of an external inspection of its physical and electronic records. At para. 114 of her judgment, the judge said that she wished to make it clear that she was not at all holding that an order for appointment of a forensic expert would be appropriate in every s.238 proceeding; and again she was right to do so. It is, however, observable that such orders have been made in at least two cases—this one, and In re Shanda Games Ltd. (although in the latter case the order was made by consent)—and we are concerned that they may become accepted practice. We*

> *stress that they are to be regarded as exceptional remedies, not common currency in s.238 petitions.*"[3]

73. These views were reiterated by the Court of Appeal in *In The Matter of Quanar Cayman Islands Limited* [2018] (1) CILR 199. At [77] Rix JA held:

> "*Finally, I refer briefly to two judgments of this Court of Appeal on the subject of disclosure in s.238 proceedings, albeit judgments only at the permission to appeal stage. The first is* <u>In re Qihoo 360 Technology Co. Ltd.</u>*, where permission to appeal against disclosure by the company concerned was refused, but this court (Martin, Newman and Morrison, JJ.A.) ended by warning of the possibility of abuse by dissenters conducting "a 'drains up' inspection of the entire business, regardless of the relevance to fair value" (2017 (2) CILR 585, at para. 27). The second is to the permission to appeal judgment of Martin, J.A. in this very case, where he repeated his concern about possible abuse by dissenters in their disclosure demands of companies, and was also clearly concerned in general that, in the light of a series of s.238 petitions coming before the Grand Court, the Court of Appeal should have an opportunity to consider the proper parameters of the interlocutory stages of a s.238 petition. It seems to me that in the present case there is as yet no sign of danger of abuse in respect of potential further requests of the experts from the company, provided that they are properly held, subject to the control of the court which will wish to prevent anything abusive or disproportionate.*"[4]

74. In considering the discovery issue the Court is bound to keep firmly in mind that this is a wholly exceptional business enterprise in terms of its size and the complexity of the structure. As noted earlier, the Group comprises 7 principal subsidiaries (5 of which are publicly listed companies) with over 400,000 employees. The consolidated revenues for

---

[3] Mr. Levy QC correctly pointed out that in this case the Court of Appeal did not interfere with the general discovery order made by the judge.
[4] Again, Mr. Levy QC correctly pointed out in that in this case the Court of Appeal did not interfere with the general discovery order made by the judge.

the Group for the year ended 31 December 2020 were US\$ 32 billion and its market capitalization is approximately US\$ 38 billion.

75. The Company itself is merely an intermediate holding Company, holding shares in publicly listed companies. The Company does not itself operate any business and has no employees.

76. The valuation exercise in this case does not relate to a single silo operating company. As noted earlier, the Group's structure is a series of pyramids within a larger overall pyramid, with Jardine Matheson at the top. There are approximately 1,150 companies within the Group.

77. The Company is not engaged in a single business. As noted earlier, the Group operates businesses in a wide range of sectors including motor vehicles and related operations; property investment; food retailing; health and beauty; home furnishings; engineering and construction; transport services; restaurants; luxury hotels; financial services; heavy equipment; mining; and agribusiness.

78. The discovery approach envisaged by paragraph 7 of the draft Order may well be appropriate in the case of a single silo company and where there are grounds for suspecting wrongdoing. In the view of the Court, that approach is not appropriate in the exceptional circumstances of this Company and this Group.

79. The Court is persuaded by the submissions of Mr. Moore QC that large parts of Appendix 2, some of which are referred to at paragraphs 41-57 above, are overly broad, unfocused and will produce a massive amount of documentation (possibly as much as 35 million pages in response to the requests made in paragraphs 5.14 to 5.19 of Appendix 2) with little or no relevance to the valuation exercise required to be carried out for the purposes of section 106(6) of the Act. The Court also accepts Mr. Moore QC's submission that a large number of the requests in Appendix 2 are also disproportionate to the reasonable requirements of arriving at fair valuation of the shares in the Company.

80. The Court accepts Mr. Dages' analysis that the proposed draft Order is overly broad, and the information sought by the Dissenting Shareholders is highly unlikely to assist a valuer

in appraising the value of the Company of this nature in the circumstances. Mr. Dages notes that the Dissenting Shareholders not only make the requests of information in the possession of the Company, but also seek to apply them to each of the numerous subsidiary listed companies as well as approximately 1,000 individual companies that consolidate up to these listed holdings. The Court accepts Mr. Dages' opinion that a review of information at such a disaggregated level would be cost prohibitive, inefficient, and counterproductive.

81. The appropriate approach, in the exceptional circumstances of this case, is that as suggested by the Company. Within 14 days of the Order (as provided for by paragraph 8 of the Company's proposed order), the Company shall upload to the Data Room the documents supplied to Evercore for its valuation opinion dated 7 March 2021 together with the Valuation Opinion. Mr. Dages has reviewed the Evercore Data Room Production which he states is organised into four categories: Structuring, Legal, Financial Information, and Valuation Information.

82. The Structuring section consists of documents that provide detail on the organisational structure of Jardine Matheson, the Company, and their key subsidiaries. These documents also explain the structure of the Amalgamation and discuss the steps taken by the parties in negotiating and approving the Amalgamation. Mr. Dages suggests that these documents are responsive to the Dissenting Shareholders' request for details on the organisational structure and ownership percentages for the Company's direct and indirect holdings. This information is important for understanding the Company's business for purposes of identifying potential peer companies and evaluating precedent transactions.

83. Mr. Dages suggests that the documents in the Legal section are responsive to the requests in the paragraph 5.36 of Appendix 2 of the draft Order.

84. The Financial Information section consists of documents and data regarding the Company's historical financial statements, capital structure, and shareholdings, as well as 2021 Budget and forward projections. Mr. Dages suggests that these documents are responsive to certain requests in paragraph 5 of Appendix 2 of the draft Order.

85. The Valuation Information section consists of documents and data regarding the Company's most recent internal sum of the parts ("**SOTP**") valuation and broker reports (i.e. research reports issued by equity analysts) for Jardine Matheson, the Company, and their publicly traded subsidiaries. Mr Dages suggests that these documents are responsive to certain requests in paragraph 5 of Appendix 2 of the draft Order.

86. The Court accepts Mr. Dages' opinion that the Evercore Data Room Production and the Evercore Valuation Report, along with other publicly available documents and data concerning the historical performance of the Company provide a reasonable and appropriate <u>first step</u> for Dissenting Shareholders and their expert valuer to perform a preliminary assessment of the fair value of the Company as of the appraisal date.

87. The Court of course accepts that the expert valuers may require and request further categories of documents and information from the Company after they have reviewed the Evercore material and the publicly available documents concerning the Company and the Group. In relation to these further requests the Court orders that:

> "The valuation experts shall be entitled to make written requests of the Company and/or the Plaintiffs (in each case through their respective legal representatives) for (a) the provision of relevant documents and/or (b) the provision of relevant information, provided always that such documents or information are requested for the purpose of the preparation of their reports. The parties shall, so far as practicable, respond promptly to any such requests and in any event no later than 28 days from the date of the request. There shall be liberty to apply if documents and/or information sought are not provided or the Company is unable to comply with the request within the 28-day period."[5]

---

[5] The Court notes, as pointed out by Mr. Levy QC, that this procedure is at variance with the standard directions given in section 238 appraisal actions in the Cayman courts.

88. With respect to the request for general discovery from the Company in relation to the issue of fair valuation of the shares (paragraph 7.2 of the draft Order) the Court accepts that it has the jurisdiction to do so in an appropriate case.

89. RSC Order 24 rule 3(1) provides the relevant part for the Court to order discovery: "*Subject to the provisions of this rule and of rules 4 and 8, the Court may order any party to a cause or matter (whether begun by writ, originating summons or otherwise) to make and serve on any other party a list of the documents which are or have been in his possession, custody or power relating to any matter in question in the cause or matter, and may at the same time or subsequently also order him to make and file an affidavit verifying such a list and to serve a copy thereof on the other party.*"

90. The power to order discovery under Order 24 rule 3(1) is subject to rule 8 which provides that if the Court is satisfied that discovery is not necessary or not necessary at that stage the court may dismiss the application for discovery. As Kawaley AJ held in *Wong v Grand View Private Trust and others* [2020] Bda LR 45, rule 8 (as to discovery) and rule 13 (as to inspection), "*superimpose a "necessity" filter*".

91. Given the process of discovery outlined at paragraphs 81 to 87 above the Court is satisfied that general discovery under Order 24 rule 3(1) is not necessary in the exceptional circumstances of this case and in any event general discovery is not necessary at this stage. The issue can be revisited if there is a material change in circumstances.

92. The Court accepts that general discovery may be justified where there is a credible suggestion of wrongdoing, and a forensic audit is warranted to uncover that wrongdoing. There is no suggestion in this case of any wrongdoing. The Court is unable to accept Professor Zmijewski's view that for the purposes of determining the fair value of the Company's shares the valuation expert must examine "***all available value relevant information that is known or knowable as of the valuation date***" relating to the Jardine Group including its 1,150 companies. The Court must subject any such statements to the constraints of proportionality and the Court's obligation to make orders which seek to achieve the Overriding Objective.

93. The Court also notes that the general discovery sought in this case appears to be overly broad and open-ended. Paragraph 7(2) of the draft Order seeks discovery from the Company of "all additional documents (of whatsoever description, whether electronic, hard copy or in any other format) and communications (whether by email or otherwise) which, in accordance with RSC Order 24, are in their possession, custody or power and which were prepared or created or communicated in the five year period ending on the Valuation Date and which are relevant to the determination of the fair value of the Dissenters' shares in the First Defendant as at the Valuation Date."

94. The Court desires to reiterate that the intent of the mode of discovery adopted by the Court, at paragraphs 81 to 87 above, is to ensure that the experts will have all the relevant documents and information which they reasonably require to express an opinion as to the fair value of the Dissenting Shareholders' shares in the Company. In case there is any difficulty in obtaining that information or other issue in relation to the process ordered by the Court, the parties are entitled to come back to the Court to seek further directions.

95. The Court also accepts the terms of paragraph 8 of the draft Order, save that the time limit for compliance is 28 days as opposed to 7 days provided in the existing draft.

96. In relation to paragraph 9 of the draft Order, the parties' technical consultants shall attempt to agree the disclosure protocol (the Dissenting Shareholders have proposed the terms of Appendix 3) and, failing agreement, the parties are at liberty to apply to the Court. The Court orders that all costs associated with the establishment and maintenance of the Data Room, including the Data Room provider's costs, shall be borne initially by the Company on an ongoing basis but they shall ultimately be costs in the proceedings. The Court also makes an order in terms of paragraphs 10 and 11 of the draft Order.

## C. Lists of Documents

97. In relation to the Lists of Documents, the Court makes an order in terms of paragraphs 12 and 13 of the draft Order, accepting the position that paragraph 12 is in reality directed at the Data Room provider.

### D.  Translations

98. In relation to translation of a document that is not in the English language (paragraph 14 and 15 of the draft Order) the normal rule should apply, and it would be up to the party relying on the document not in the English language to have it translated at their cost. Further, the time limit for any such translation should be "*as soon as practicable*".

### E.  Experts' Information Requests of the Company

99. In relation to the Experts' Information Requests of the Company, the Court accepts the terms of paragraphs 16, 17, 18 and 19 of the draft Order save that: (i) the time limit for uploading documents in paragraph 16 is 28 days (as opposed to 14); and (ii) the reference to paragraph 7.2 in paragraph 17 should be reference to paragraph 7.1. For the avoidance of doubt, Information Requests may be made from the date that the upload of documents pursuant to paragraph 81 above has been completed.

### F.  Management Meetings

100. In relation to management meetings (paragraphs 20 to 29 of the draft Order), the Court accepts that it has the jurisdiction to order such meetings be held between the experts and the management of the company. The Court accepts the proposition upheld by the Cayman courts that the source of the power is the inherent jurisdiction as a court of justice to make procedural orders to achieve justice (see Parker J in *EHI Car Services* at [33]).

101.    It appears that management meetings have become a common feature of the exchange of information required in section 238 appraisal actions in the Cayman courts. In *JA Solar Holdings* Chief Justice Smellie highlighted their utility in the appraisal process at [97]:

> *"All are agreed that management meetings are a crucial element in the valuation process for ensuring the experts are able to determine the fair value of the Company. Key inputs into the valuation analysis will be derived from management projections and therefore it is crucial that the experts be given an opportunity fully to discuss matters with management in order that they properly understand the documents and inputs that they have to consider. Such meetings "enable the valuation experts to obtain information about the merger company's business for the purposes of the experts' reports to this Court" (see <u>Nord Anglia</u> at [38])."*

102.    At the same time, the use of meetings between the experts and the management, particularly where those meetings are open meetings and transcribed, is unknown in this jurisdiction. In justifying the use of management meetings as a tool for obtaining information, Professor Zmijewski states at paragraph [82]:

> *"In Delaware appraisal proceedings, it is usual for the management team to be deposed prior to trial by attorneys for dissenters, who have the assistance of valuation experts. This process is often invaluable in obtaining detailed information about the subject company, and also in highlighting or resolving value related issues. On the other hand, in my experience in the Cayman Islands, where depositions are not available, typically directions orders make provision for a management meeting. I considered the management meeting I attended to be useful and value-relevant. The management meeting provides a method to "level the playing field" so that the valuation expert can have access to all value-relevant non-public information."*

103.    It appears that in Cayman the transcript of the management meetings may be used to impugn the credibility of the company's witnesses. Thus, in *In re Qunar* [2019] (1) CILR 611 Parker J recorded at [113]:

> *"I have reviewed the transcript of the management meeting which took place on November 7th, 2017 and I am satisfied that the evidence he gave in court is consistent with the answers he gave to questions put to him at that meeting, as well as the responses to the various information and data requests from the experts. At trial he strongly and credibly refuted any suggestion that the management projections were prepared from the point of view of financial self-interest or a desire to assist the majority shareholder to keep the share price low to effect the merger."*

104.   In *EHI Car Services* Parker J addressed the purpose of the procedure requiring management to meet with the dissenting shareholders' experts and the potential use of the transcript of the meetings at the trial at [39]-[40]:

> *"39. With regard to concerns expressed that the procedure may be used oppressively and unfairly against the company's management, I should stress that it is not a procedure to obtain oral evidence without the necessary safeguards with the result that the company is at risk. It is an expert driven process to obtain information, not to 'trap' or undermine company management. Oral evidence on oath or affirmation is to be provided only at trial through fact witnesses giving evidence in person and being cross-examined on that evidence.*
>
> *40. There was argument concerning the production of a transcript of the meeting. The alternative to this would be that people at the meeting would be relying on their own notes. That is likely to be the source of disputes as to what was said. The transcript of any such meeting has no special status. It is not a deposition of oral evidence. Strictly speaking the record or transcript is hearsay evidence. It has a value because it is a practical, efficient and fair way of avoiding disputes as to what was in fact said. Any argument as to what was meant or whether the answer recorded was full or complete, if this is to be tested through witness evidence at trial, is assisted by having a transcript. The trial judge will ensure that no unfair advantage is taken because of the existence of a transcript and its admissibility will also be decided at trial."*

105. The issue whether the Court should order the management of the Company to attend meetings with the experts is essentially a discretionary case management decision. In the Court's judgment, the final decision as to whether management meetings in the circumstances of this case would promote the Overriding Objective should be taken once the issues to be discussed at such meetings have been defined and the relevant management persons have been identified either by name or function. The identification of the relevant management persons is important given that it is the Company's evidence that it does not have any employees of its own. The Court will also address at that stage whether a transcript of any meeting should be prepared or whether the appropriate approach, as suggested by Mr. Moore QC, is for the Dissenting Shareholders' experts to seek confirmation of any points arising out of the meeting in follow-up correspondence with the Company.

**G.  Factual Witness Evidence**

106. In principle, the Court is prepared to accept the terms of paragraphs 30 to 32 of the draft Order subject to the proviso that the calculation of 56 days referred to in paragraph 30 must start from the completion of all discovery requests by the Dissenting Shareholders' experts as envisaged in paragraph 87 above. The parties should attempt to agree the date when discovery has been completed, failing which any party may apply to the Court for further directions.

**H.  Expert Reports of Valuation Experts and Joint Memorandum**

107. The Court accepts the terms of paragraphs 33 to 38 of the draft Order save that the period of 6 months referred to in paragraph 33.2 shall run from the completion of the discovery envisaged in paragraph 87 above. The Supplemental Valuation Expert Reports referred to in paragraph 36 shall be confined to the points of difference between the Experts.

**I.   Case Management, Case Management Conference and Trial Date**

108.   The Court accepts the terms of paragraphs 39 to 45 of the draft Order subject to the adjustment that the time limit by reference to the completion of general discovery under paragraph 7.2 of the draft Order is replaced by the completion of the discovery envisaged in paragraph 87 above. For the avoidance of doubt, the Experts may start issuing Information Requests to the Company once the Company has uploaded the Evercore documents and the Evercore Valuation Opinion as set out in paragraph 81 above.

109.   The Court will hear the parties in relation to the issue of costs relating to this application, if required.

Dated this 12 day of November 2021

_____

NARINDER K HARGUN

CHIEF JUSTICE