# EXHIBIT 11



**IN THE GRAND COURT OF THE CAYMAN ISLANDS**
**FINANCIAL SERVICES DIVISION**

**CAUSE NO. FSD 184 OF 2020 (RPJ)**

**IN THE MATTER OF SECTION 238 OF THE COMPANIES ACT (2020 REVISION)**
**AND IN THE MATTER OF FGL HOLDINGS**

**BETWEEN**

**FGL HOLDINGS**

<u>**Petitioner**</u>

**And**

**1. KINGSTOWN PARTNERS MASTER LTD**
**2. KINGSTOWN PARTNERS II LP**
**3. KTOWN LP**
**4. KINGFISHERS LP**
**5. KINGSTOWN 1740 FUND LP**

<u>**Respondents**</u>

| | |
|---|---|
| **Appearances:** | Mr Mac Imrie, Mr Malachi Sweetman, Mr Lukas Schroeter of Maples for the Petitioner |
| | Mr Simon Salzedo QC of Brick Court Chambers and Mr Simons Dickson, Ms Jessica Vickers and Mr Adam Barrie of Mourant for the Dissenting Shareholders |

| | |
|---|---|
| **Before:** | **The Hon. Justice Parker** |
| **Heard:** | **6  November,  2020** |
| **Draft judgment circulated:** | **10 December,  2020** |
| **Judgment delivered:** | **18 December, 2020** |

<u>**HEADNOTE**</u>

***Section 238 Companies Act-company disclosure-dissenter disclosure-Information requests of dissenters-Management Meeting transcripts.***



**JUDGMENT**

## Introduction

1.  FGL Holdings (the company) applies by way of petition dated 17 August 2020 under section 238 of the Companies Act for a determination by the court of the fair value of shares held in the company. The company provides life insurance and annuities products in the USA.

2.  Prior to 1 June 2020, the company's common stock was listed on the New York Stock Exchange. By a series of mergers on that date, pursuant to a merger agreement dated 7 February 2020, the company was taken private and became a subsidiary of Fidelity National Financial Inc (FNF) (the Merger).

3.  FGL Holdings merged with Cayman Islands companies affiliated with FNF, another US listed company, which carried on business as a real estate title insurance company. As a consequence the petitioner company became a wholly-owned subsidiary of FNF, now known again as FGL Holdings. The merger was approved by special resolution of the shareholders on 29 May 2020 (the Valuation Date) and became effective on 1 June 2020. The total value of the Merger was approximately US$2.7 billion.

4.  The dissenters are the investment funds of a US-based investment manager, Kingstown Capital Management, which each held shares in the company prior to the Merger. The dissenters were long-standing stakeholders in the company and its predecessor.

5.  They have exercised their statutory right to dissent from the Merger and to receive the fair value of their shares as determined in accordance with section 238 of the Companies Act.

6.  This judgment follows a summons for directions hearing. The parties have been proactively negotiating a detailed draft directions order which for the most part follows the directions that have emanated from recent s.238 cases. The court endorses this approach, which should generally be followed, unless there is a good reason to depart in any particular case. The court also notes that most of the relevant matters have been agreed.

7.  Mr Mac Imrie and Mr Lukas Schroeter appeared for the company. Mr Simon Salzedo QC appeared for the dissenters.



8.    The main outstanding issues concern disclosure. They are essentially whether the company's discovery which ,in keeping with other s238 cases is a huge exercise, should be restricted in two disputed areas and whether the dissenters' discovery, which they have agreed to give, should be expanded.

9.    The company also seeks a provision for the experts to ask Information Requests of the dissenters.

10.   There are then some miscellaneous disagreements as to conditions to be applied to the company's liberty to apply for enhanced confidentiality protections for documents it may disclose, some disputes as to timetabling, and the approach to be taken in finalising Management Meeting transcripts.

11.   It is convenient to deal with the issues in turn, whilst at the same time recording my decision and reasons.

### The Company's discovery

12.   It is well settled that extensive discovery of documents within their possession, custody or power of petitioner companies is essential in section 238 proceedings. This is because the company is the object of the valuation exercise and will have a large amount of information and material of critical relevance to that exercise[1]. This 'information gap' has been emphasized in numerous decisions of this court and the Court of Appeal.

13.   It is acknowledged that this is an onerous and expensive burden on the company, but it is essential for the fair determination of the matter. The dissenters as 'outsiders' are entitled to it. Moreover the court relies on relevant material to be produced to the valuation experts upon which they can base their opinions in order to assist the court to arrive at its conclusions.

### The areas of dispute and the company's approach

14.   There are only two items which remain disputed in relation to the company's disclosure. The dissenters have served evidence that the discovery resisted by the company is likely to be relevant to fair value and would assist the valuation experts[2]. The company has not countered this evidence on relevance, but does so essentially in relation to the onerous practicality of complying with such broad requests, through the affidavit evidence of Jodi Hyde (the company's General Counsel) [3]. The company

---

[1] *Re JA Solar Holdings Co Ltd (unreported 18 July 2019 ) per Smellie CJ  at § 76*
[2] *Affidavit of Gwynn David Nevill Hopkins (**Hopkins 1**) §§ 11-29*
[3] *First and Second Affidavits of Jodi Lynn Hyde (**Hyde 1** and **Hyde 2**).*



says it would be unreasonably burdensome to provide what is requested in these two areas and has provided some alternatives.

15.    I accept that the company's approach in this case has been reasonable and proactive in agreeing a regime to provide an efficient and sensible way for discovery to be provided. This is demonstrated by the fact that 39 out of the 42 categories of information were agreed prior to this first case management conference and one was agreed at the hearing.

16.    Of course the point cuts both ways and I also accept that there have been compromises on the dissenters' side, but as I say the burden is on the company and it has approached the matter in an appropriate way. The resourcing requirements for the exercise are significant and if the universe of documents that needs to be reviewed for relevance, privilege, and confidentiality is unnecessarily broad that requires even greater resources, and would be disproportionate.

17.    In relation to the two categories that remain in dispute the company is not refusing disclosure but suggesting a different way of dealing with the disclosure of documents, due it says to the breadth of the drafting of the dissenters' requests.

18.    The company is also seeking to shift the burden of disclosure to the Information Request phase where the experts, if they identify material relevant to their task, can ask further questions about it and call for further documents which will refine further the particular scope. To that extent a question of not only proportionality but also principle arises.

19.    The company's discovery obligations are usually addressed by the established practice for categories to be identified of the documents that the company possesses that are likely to contain relevant material. That is what has happened in this case as well.

20.    This practice should not in principle be put over to the Information Request process, which is designed to elicit specific information and answers based upon the experts' prior and ongoing review of the relevant discovery.

21.    The two categories the dissenters press for are supported by the affidavit evidence of Mr Hopkins in relation to relevance to the expert process and involve significant transactions. Mr Hopkins is the managing director of Perun Consultants based in Hong Kong.



*Category I*

*Contractual agreements with business partners and investors*

22.     This concerns a restricted category of agreements and contractual arrangements with the Merged Company's business partners or investors with an annual value of US$25 million or more. It is to be noted in this regard that there are, according to Ms Hyde, only two specific agreements and one category of agreements which the company has above the value cut-off.

23.     The company objects to being obliged to disclose 'related communications' concerning these agreements because it says that it would be unreasonably burdensome to search for such a broad range of documents[4]. It is said that this would significantly increase the time required to complete disclosure and would require the search for and production of potentially many thousands of irrelevant communications. It would involve broadening the custodians whose mailboxes are collected and adopting broad search terms that would result in a material number of false-positive documents.[5] The company suggests that if the experts wish to ask about the contracts and want to see more detailed information they can do so during the Information Request process.

24.     I appreciate that it would not be proportionate for the company to have to have to search through thousands of emails of an administrative nature (having first produced sensible search terms) and to then review them unnecessarily.

25.     However to mitigate this, in my judgement the dissenters have put forward a sensible form of narrower wording:

>     *"**Agreements or other contractual arrangements** (**or any amendments** thereto), including **investment management agreements**, with the Merged Company's business partners with an annual value of US$25million or more; documents and communications **relating to** the **negotiation or renegotiation** of those agreements, including **drafts**; documents and communications containing or evidencing **requests for payment** pursuant to any such agreements and **records of payments** made; **reports, presentations or analyses** provided to the Company **by the counterparties** to any such agreements, and **minutes of meetings** with those counterparties, in relation to their subject matter".* (my emphasis).

26.     I accept the reasons put forward by Mr Hopkins as to why that material would assist the valuation experts[6]. They may contain information relating to the company's business which will help them understand better it as well as the contracts themselves.

---

[4] Hyde 1 §§ 42-44 and Hyde 2 §§6-13
[5] Hyde 1 § 43
[6] *Hopkins 1 §§ 18-22*



27.     Communications concerning high value contracts may contain an insight into amendments, corrections or assumptions which may otherwise be difficult to ascertain. They may give an insight into the internal processing, amendment, approval and execution of these high revenue generating contracts.

28.     In my judgement this would be a proportionate exercise to conduct, by restricting them to the value threshold, on the basis of the approach and language proposed by the dissenters and should be ordered.

### Category X

### *Fidelity & Guaranty Life acquisition*

29.     The company in its current form commenced with an acquisition in 2017 (the FG Acquisition) which Miss Hyde accepts was a significant transaction for the company[7].

30.     The dissenters seek discovery of "*internal documents relating to*" the FG Acquisition including documents relating to the decision to make the acquisition and "*any internal projections, models, or other valuation analysis*".

31.     Originally the dissenters proposed a wider form of order seeking all internal documents relating to the acquisition, which for the reasons set out in Ms Hyde's affidavit evidence[8] would have been an extremely onerous expensive and time consuming exercise.

32.     Mr Hopkins explains[9] why he believes these materials would be relevant to fair value in that they will assist the valuation experts in assessing the basis for changes to the company's financial forecasts and projections over time. He says that since the acquisition occurred three years ago, events from such a reasonably recent history will assist the experts in assessing the financial forecasts insofar as they are an extension of past performance, as well as providing insight as to how the company assesses the value and potential performance for an executed transaction with regard to an entity that now forms part of the company.

33.     He also says that forecasting performance forms a large part of the valuation process and underlying information or source data with regard to the company's projections is highly relevant to the valuation exercise, particularly in relation to understanding and testing the inputs, assumptions and metrics.

---

[7] *Hyde 1 § 46*
[8] *Hyde 1 §47 and Hyde 2 §§14-20*
[9] *Hopkins 1 §§ 23-26*



34.    The company does not dispute this evidence.

35.    The company has however offered a more limited category of documents, which were made available to the board in relation to the transaction in the form of board packs (which contain detailed and relevant information)[10] and the due diligence data room from the transaction [11](which is said to comprise 3,000 documents) on the basis that to produce material beyond that would be unreasonably burdensome[12].

36.    Ms Hyde may well be right in that the material offered by the company might contain the documents sought by the dissenters, but it is not a satisfactory way to deal with the issue. There is a risk that relevant information covering the company's valuation process would be missing from what was distilled into the board materials. The disclosing party should not be able to make a choice as to the particular sources from which discovery should be made, unless it can give an assurance that there is no other relevant material.

37.    The company says the experts can always ask for more during the Information Request process. To give discovery on this basis and leave the experts to seek further documents by way of Information Requests insofar as they need them is likely to increase costs and reduce efficiencies. It would leave the experts to speculate as to what are the relevant documents that might exist and then to formulate the correct request.

38.    It would also be wrong in principle for the reasons set out above. Discovery by the company of relevant documents is not to be avoided by pushing off the issue to the experts to ask for it by way of Information Request.

39.    In my judgement the company should give the discovery requested by the dissenters which is a proportionate and reasonable request that should be complied with.

*Category MM*

40.    There had been a dispute concerning discovery of "*internal communications or documents in relation to the market price of the Merged Company's shares'.* This was agreed at the hearing and I need say no more about it.

---

[10] *Hyde 2 § 15*
[11] *Hyde 1 § 46*
[12] *Hyde 1 § 47*



### *Dissenter discovery*

### *The dissenter proposal*

41.    The dissenters have proposed to give discovery of documents created in the period from 1 December 2017 to the Valuation Date.

42.    This in summary would include documents which reflect or relate to any valuations or similar analyses of the Merged Company which they prepared, reviewed, or considered, including all written documents and Excel files which summarise or otherwise reflect valuation analyses of the Merged Company or its shares, and any internal valuations and any valuations reviewed or considered by them in connection with the Merger.

43.    They have also agreed to provide all documents, information and material created, issued received or shared between them and their investment managers and/or investment advisers and their Investment Committee in relation to the Merger, including file notes of meetings, meeting agendas and all forms of written communications.

44.    They also have agreed to provide a 'schedule of trades' detailing the history of their trading in the shares between 1 December 2017 and the Valuation Date (including the number of shares purchased, the dates on which they were purchased, and the prices for which they were purchased).

45.    This is they say is consistent with the discovery identified by the Court of Appeal in *Qunar.*

### *The approach*

46.    The principles to be applied in respect of dissenter discovery were set out by the Court of Appeal in *Re Qunar Cayman Islands Ltd[13]*. The dissenters are not the main focus of the discovery exercise in s238 cases as they will not hold the lion's share of relevant material, although of course the Court of Appeal, overturning the decision of this court, made clear that the dissenters should give discovery of documents that are relevant to the exercise of determining fair value.

47.    However, it carefully delineated what those categories of documents should be which has been applied by this court since then[14]. There is no general discovery obligation on the dissenters.[15] That would be inconsistent with the careful analysis of the Court

---

[13] *2018 (1) CILR 199 (Qunar).*

[14] *JA Solar § 16*

[15] *The argument that dissenters should give general discovery was rejected by Smellie CJ in JA Solar at § 62*



of Appeal in settling the specific categories of documents that are discoverable by the dissenters.

48.     In particular, they are not obliged to disclose documents relating to their characteristics and  their motivations, or the timing and amount of their investments.[16] This is because these matters are irrelevant to the determination of fair value[17], which is the sole issue before the court.

49.     The Court of Appeal in *Qunar* accepted the relevance of valuation analyses of those looking to invest in the market[18]. The dissenters are like any other investor in the market who are 'outsiders' to the company and if they possess relevant material in this regard they should disclose it.

50.     Of relevance too are reports which contain research and opinions on value produced by securities analysts engaged by investors to gather and interpret data on companies, industries and financial markets and who advise particularly in advance of a merger.

51.     The Court of Appeal took the view that the dissenters' reports were likely to be '..*all the more pertinent in that they were likely to be highly contemporaneous and professional reports of sophisticated members of the market who are not only observers ,but ready to act on their own research and scholarship.*'[19]

52.     The dissenters have agreed, as is set out at paragraphs 41- 44 above, to disclose these categories of documents. Such documents are to be disclosed and are relevant because they comprise, as they did in *Qunar*, all documents which reflect or relate to '*valuations or similar analyses of the company and documents issued or shared for internal consideration of the petitioner company's take private action and a history of the dissenters' trades in the shares of the company (*which in fact the Court of Appeal ordered to be scheduled).[20]

53.     This court has since *Qunar CICA* limited dissenter discovery to documents that are themselves reflective of or related to "valuations or similar analyses" and has rejected company requests going beyond that category[21] .

---

[16] *Although the schedule of trades will go some way to providing this*
[17] *Re Integra Group [2016] 1 CILR 192 per Jones J; Re Qunar Cayman Islands Ltd 2019 (1) CILR 611 at § 63 per Parker J and Re Ehi Car Services Ltd (unreported 24 February  2020) at § 64  per Parker J.*
[18] *Qunar CICA supra at § 75 per Rix JA*
[19] *§§68,and see 74 and 75*
[20] *Qunar CICA §§21 ,79 and 78,followed in JA Solar § 58 and Ehi §§67-74 and see Re Nord Anglia Education, Inc* (unreported, 1 June 2018) *at §§13 and 18*
[21] *JA Solar ,Ehi and Nord  supra*



*The company's arguments for expanded disclosure*

54.   The company argues that the limited discovery ordered in the cases since the decision of the Court of Appeal in *Qunar* is explained by reference to what was sought in the particular case and that *Qunar (CICA)* is authority for ordering more expansive discovery by dissenters and that the categories of documents are open ended, not closed.

55.   The company says that this case warrants the additional categories of documents it seeks from the dissenters in circumstances where there is a group of dissenters, with an investment manager, which was a significant and sophisticated stakeholder in the company over a long period of time and whose views therefore are particularly well informed and important.

56.   The company argues that disclosure is a mutual obligation and the dissenters should be ordered to provide documents in the additional categories because they will be of assistance to the parties and counsel and could feature in cross examination of both factual and expert witnesses.

57.   It relies on the evidence of Mr McAnally who is a principal and an experienced valuer at the Brattle Group, an economic consulting firm, based in the US.

58.   He explains the particular utility of dissenter derived documents in paragraphs 19 to 22 of his first affidavit (McAnally 1).

59.   Mr McAnally explains why in his opinion further categories of documents from dissenters are relevant and says..".. *it would be uncommon for a highly sophisticated investor, like the Dissenters, to make such a sizeable investment without some valuation model or other information informing the investment thesis and their investment decision'.*[22]

60.   In my view this kind of material would be already caught by the scope of the disclosure agreed by the dissenters.

61.   However documents that are relevant only to the dissenters "rationale' or their expectations are, as I have said, not useful to the assessment of fair value. They do not assist the court in arriving at the fair value determination.The particular motives or commercial positions taken by the dissenters or other persons is not relevant. Neither are their subjective views and decisions they may have made as to valuation, as the exercise of the court and the valuation experts assisting it, is not one of 'weighting'

---

[22] *Second Affidavit of Timothy P. McAnally (**McAnally 2**) § 4.2.*



valuations produced by the parties -see *Ehi*[23].The exercise the court is engaged in is independent of the subjective views and the commercial decisions of the parties as to value.

62.    A line of enquiry that pursues how the dissenters dealt with their shareholdings in the company and their decisions to trade company shares, which is said to reveal the dissenters' views of the value of the company's shares and potential inconsistencies between their actions and their position on fair value at trial, is therefore in principle impermissible[24]. Documents which go to reasons why the dissenters may have believed the merger price was undervalued are not relevant. If any such views were based upon valuations or similar analyses those documents will be produced in any event.

63.    Mr McAnally says that they may assist a valuation expert in evaluating how much weight to give to the dissenter's valuation[25]. However, as I have said the court is not engaged in a weighting exercise between valuations produced by the dissenters or indeed anyone else.

64.    Furthermore discovery for the purposes of undermining the credit of a party or its witnesses is generally not appropriate in such cases. In s.238 cases the court is engaged in a process of arriving at the fair value of the dissenters shares, assisted by the experts who play a vital role and who owe duties to the court. The characteristics and motivations of dissenting shareholders are irrelevant as the court has now ruled on a number of occasions. Obtaining discovery simply to cross examine a factual witness who may give evidence on behalf of the dissenters is likewise not of assistance to the court in determining the fair value of the company's shares.

65.    I accept Mr Hopkins detailed evidence[26] which deals with  each of the categories the dissenters wish to expand.

66.    Any value relevant information regarding the dissenters' trading in the company's shares will be captured by the schedule of trades the dissenters have agreed to provide. The dissenters have agreed to verify the schedule of trades on affidavit if requested to do so in case its reliability is challenged by the company.

67.    Anything beyond that seems to me to go to the motives of the dissenters and the subjective views of brokers and counterparties, which are irrelevant[27], unless they constitute in themselves *valuations or similar analyses* which the dissenters have agreed to disclose.

---

[23] *EHi Car Services Ltd (unreported, 24 February 2020),* §70
[24] McAnally 1 §33
[25] McAnally 2 §11
[26] Hopkins 1 §§52-71
[27] Ehi § 70



68.    Similarly the company's request for material relating to the dissenters' particular investment strategies and decision-making processes are specific to each dissenter and has no relevance to a s.238 process. This would include documents and communications concerning decisions to purchase, hold or sell shares in the company, investment policies or guidelines in relation to those investments, and other discussions of the dissenters' investment objectives concerning those shares.

69.    If those strategies relied upon *valuations or similar analyses*, that material has been agreed by the dissenters to be produced.

70.    The company's request for all documents and communications concerning '*the company, its business and competitors, and the merger*' from the dissenters is a very broad request and is tantamount to a request for the dissenters to give general discovery. If there is material which is relevant to valuation of the company the dissenters have agreed to disclose it and it would not be necessary or appropriate to expand the obligation on the dissenters to search for large quantities of irrelevant material.

71.    In this regard I note that if there are formally commissioned comparable company analyses held by the dissenters which could be relevant, Mr Hopkins is of the view that .."*without the benefit of company insider information those reports are little different from any other reports readily obtained from public sources*[28].

72.    I accept that there will be inputs and assumptions that require the exercise of judgement and that reasonable experts can differ about what those inputs and assumptions should be, based upon their experience and approach. To that extent it may be relevant to know what inputs and assumptions were made by others in any comparable analyses.

73.    What weight is to be given to such comparable studies is a matter for trial. They are however relevant and the dissenters have agreed to disclose them.

74.    Indeed the court is typically provided at s.238 trials with a large volume of independent market analyses from independent financial institutions as well as technical academic papers and studies.

*Brokerage records*

75.    The company, relying on the evidence of McAnally[29], argues that the schedule of trades agreed to be provided by the dissenters is not sufficient and the brokerage

---

[28] *Hopkins 1 §67*
[29] *McAnally 1§§23-26 ,McAnally 2 §§5-6*



records themselves  should be produced. Mr Hopkins is of the view that any material that goes beyond the trading records of the share transactions is not relevant to the fair value appraisal of the company[30].

76.    I again accept Mr Hopkins views on this issue[31].

77.    A review of brokerage records to ascertain trading activity by the dissenters is plainly designed to go to the dissenters' motivations and commercial strategies . To try to discover whether the dissenters subjective views at the time were different to those they may put forward at trial does not assist the court.

78.    The fact that the dissenters in this case may be significant and important market participants does not change the position. The expert process is concerned with the correct approach to and judgements concerning the valuation of the shares in the company, not the commercial motivation and subjective views of the dissenters.

79.    Since the subjective views of investors are irrelevant, so '*a fortiori*' are those that financed them, (who may well be interested in matters relating to their loans, rather than the fair value of the company).

80.    The company makes the point that the dissenters' trading records might inform how its expert should approach the formal valuations produced by the dissenters[32]. This again is not a relevant line of enquiry. The court is not conducting a weighting exercise in valuations produced by the dissenters. The court is not undertaking an exercise to test any dissenting shareholders' assessment of fair value[33]. There is no case made out for disclosure beyond the agreed schedule of trades, verified if necessary upon affidavit.

81.    The court has previously rejected the argument for discovery in relation to intermediaries.[34] An investigation of the individual investors' commercial motivation for decisions and instructions given to intermediaries is also irrelevant. There is no good reason to depart from that position in this case.

***Conclusion on dissenter discovery***

82.    I do not accept any of the arguments for expanded dissenter discovery at this stage. None of the requests sought are on analysis clearly defined as relevant, necessary for

---

[30] *Hopkins 1 §35*
[31] *Hopkins 1 § 38*
[32] *McAnally 1 §25*
[33] *JA Solar §72*
[34] *Ehi § 74*



disposing fairly of the fair value question, proportionate, or likely to be sufficiently probative so as to make the exercise worthwhile[35].

## *Miscellaneous issues on dissenter discovery*

83.   The company also objects to the inclusion of a stipulation in the order that the dissenters' discovery obligations should be subject to the overarching limits of relevance to make it clear that documents that are irrelevant are not disclosed. It seems to me this is a sensible stipulation in the circumstances and has been endorsed by this court on a number of occasions[36]. It is sensible to clarify the dissenters' obligation to disclose relevant materials according to the way this court has interpreted and applied *Qunar (CICA)*.

84.   The company also seeks an earlier start date for the discovery the dissenters have agreed to give. It asks for three months before the dissenters first bought shares in the Merged Company, rather than 1 December 2017. However ,this is the date on which the shares began to be traded on the New York Stock Exchange, (and the date from which  the company will give discovery for category MM.) This is not in my view is appropriate or necessary.

85.   The date on which the shares began to trade publicly is the date on which the object of the valuation exercise centres and is the logical starting point.

86.   The company finally asks for documents and communications that the dissenters intend to introduce or rely upon at trial. A large number of documents are typically produced for the court in s.238 cases in the form of agreed trial material which has not been produced on disclosure by either party, but which are documents which the experts in their researches and analyses have uncovered, or which are in the public domain and which the parties wish to refer to. That material should not fall within any party's obligation to give discovery but should in the normal course be notified to and if necessary provided to the other party as a matter of trial preparation and fairness in advance of trial, if they are to be referred to. If there is a dispute as to admissibility that can be dealt with at trial.

## *Information Requests of dissenters*

87.   Given that the dissenters are outside all the processes and information of the company and their subjective opinions on fair value are irrelevant it is hard to see how Information Requests of them by an expert would be useful or appropriate.

---

[35] *See Ehi § 66*
[36] *JA Solar § 55*



88. This same request was made by the petitioner company in *JA Solar* and was rejected.[37] A summary of the Chief Justice's reasoning is: It is unclear what other material the dissenters might possess, besides the valuations and analyses identified in *Qunar (CICA)*, which could possibly assist the valuation experts[38]; the court is not engaged in testing any assessment of fair value put forward by the dissenters (as opposed to their expert) which would in any event be irrelevant[39]; the position of the company is different as it is in possession of the essential material to determine fair value 'from the inside' and has put forward a fair value determination in its proxy statement[40]; there is no apparent good reason, nor is any explained, to require the dissenters to answer questions; such a requirement is not proportionate nor in keeping with the Overriding Objective.

89. Applying the same clear principles here there is no reason to order that dissenters should respond to Information Requests at all, let alone at the first directions hearing, before any evidence has been served.

90. In *Nord Anglia,* upon which the company (through Mr McAnally who was involved in that case, although not as a testifying expert), relies[41], there was limited and specific provision made by agreement for one group of dissenters to answer Information Requests.

91. The point arose in the following way. One group of dissenters served an affidavit of fact which asserted that they had considered making a 'topping bid' for the company but were dissuaded from doing so. Following a disagreement as to the adequacy of disclosure in relation to that evidence the group of dissenters and the company agreed that they would provide further disclosure and would answer Information Requests about it. This was later reflected in a consent order.

92. That is very different from the position here. No factual evidence has been served in this case as yet. There was no reasoned judgment supporting any such requirement on dissenters as a whole in *Nord*, which arose in particular circumstances relating to one group of dissenters' factual evidence and was agreed.

*Confidentiality*

93. The company (and the dissenters) should have liberty to seek confidentiality protection in respect of any highly confidential or commercially sensitive documents. In order to ensure the smooth progress of disclosure the company, as it has agreed, will in the process of collecting and reviewing the documents captured by the disclosure order, identify any documents which might require further confidentiality

---

[37] *Re JA Solar Holdings Co Ltd (unreported, 18 July 2019) §§70-76*
[38] §71
[39] §72
[40] §§73-75
[41] McAnally 1 §§ 28-30



protection. The company holds for example a lot of policy holder data. The company proposed the time for such an application to be 14 days prior to the expiry of the time limited for disclosure.

94.    The company should be able to identify those documents and to make an application a little bit before then. In my view 21 days in advance of the deadline for disclosure as suggested by the dissenters is reasonable for the parties to have the opportunity of deciding the matter before the deadline.

95.    For this reason I accede to the dissenters' proposal that any such application for confidentiality restrictions should be determined on the papers ,with any objections by the dissenters to be filed  within seven days, and any reply within a further three days. The court should then be in a position to rule on the matter without any slippage to the timetable for disclosure.

### Timetabling

96.    The company argues that the proposed timetable of the dissenters is intended to put the company under unnecessary pressure. I have in mind the Overriding Objective in terms of economy and expedition as well as fairness between the parties and the goal of producing a procedural timetable which allows ultimately for a fair resolution of the issues.

### Appointment of experts

97.    In relation to the appointment of an expert the company asks for 60 days and the dissenters 28 days from the date of the Order. The dissenters served their notices of dissent on 30 June 2020.The petition was issued on 7 August 2020 and from at least that date the parties would have been actively considering the identity of a suitable expert. It seems to me that 60 days is too long and I am prepared to order 40 days from the date of the Order.

### General disclosure by company and disclosure by dissenters

98.    For general disclosure the dissenters submit 42 days from the date of the Order should be sufficient. The company has asked for 125 days given that just the due diligence documents (comprising of over 3000 items) will have been produced within 28 days.

99.    The court has regard to: what is practicable and reasonable to achieve and in what timescale; the knock-on effect on other directions (and any later slippage of the expert evidence process) of delay to disclosure; and when the case could be ready for trial. I bear in mind again the Overriding Objective with its emphasis on expedition and economy[42]. I have carefully considered the evidence of Ms Hyde in this regard and

---

[42] *Ehi § 18*



the considerable resource the company needs to engage.[43] In my judgement 70 days would be a fair and achievable outcome for the company.

100.    The dissenters should exchange their discovery on that date as well.

### Information Requests

101.    The usual time for the experts to respond is 14 days. The order is usually "…. *within 14 days unless otherwise agreed or directed by the court*"[44].

102.    The company seeks 35 days for the first set of requests and then up to 28 days for subsequent requests. I appreciate that this can be a time and resource consuming process for a company but these time periods are too long. The usual order will be made.

### Management Meetings

103.    The company argues that Management Meetings are intended to operate as an open discussion between the experts and the company's management, the purpose of which is to allow the experts a better understanding of the company and its business. They are not intended to be a form of quasi-deposition from which oral answers to questions are elevated without warning into significant evidence on which great weight is placed.

104.    I accept this and insofar as is reasonably possible, within the constraints of a litigation process, am sympathetic to making them relatively informal, productive and of course fair. As has been said in previous cases Management Meetings are not intended to be pre-trial depositions processes. The weight to be given to what is said in the Management Meeting on any particular point will be a matter for the trial judge depending on what the point is, what the nature of the discussion was, and how it relates to other evidence.

105.    The company argues that if the experts wish to rely in their reports on any aspect of the transcript, they should first identify the passage and the company should then have an opportunity to clarify or confirm anything in the passage within a further seven days. The experts are not required to indicate what their intended reliance is.

106.    It is said that this will facilitate the company's management speaking freely and avoids the experts reaching erroneous conclusions about what was said or meant. It would avoid a "gotcha" moment where a loose comment or a comment is made that is

---

[43] *Hyde 2 § 26*
[44] *See JA Solar schedule of orders*



not accurate, because the person making it is not aware of a particular document, or there is a difficulty in the meaning intended to be conveyed. Although in this case the native language of all parties is assumed to be English, it is said it would avoid misunderstandings between the questioner and the company representative.

107.     Such a provision would be designed to prevent too much being made of a particular point in an expert report from the transcript, when the point has not been properly explained or understood and gives the employee involved and/or the company an opportunity before trial to deal with the issue.

108.     The dissenters whilst agreeing with the broad purpose of the meeting say this is unnecessary and is likely to be counterproductive. The company will in any case review the transcript of the meeting, identify any corrections to the transcript that it considers necessary, and provide the transcript to the dissenters and experts within 14 days of the meeting.

109.     On this issue, in order to make the process as fair as possible for the company, I am prepared to accept Mr Imrie's submissions and flex the procedure a little by requiring the valuation experts to identify any parts of the transcript which they wish to specifically rely upon in their reports so that the company has a further opportunity to make sure it is accurate, as requested by the company.

110.     The company will arrange for the meeting to be recorded and produce a transcript .It will then correct any errors within it and circulate it to the experts and the dissenters within 21 days of the meeting ( a week longer than proposed).

111.     After this the experts, if they wish to refer to or rely on any passage or information contained within the transcript  in their reports, should identify it within a reasonable period of time, say 14 days, and give the company an opportunity to comment upon it within a further seven days.

112.     The experts are not required to indicate the basis or purpose of their reliance. This change to the standard directions is designed to avoid the unfairness suggested by the company of the risk of being taken by surprise.

113.     To be clear it is not to be used to change or argue about what was said and recorded. It is intended to give the company an opportunity to make sure what is recorded is complete and accurate, having seen it is something the experts are intending to refer to in their reports. The experts will then have that before they draft their reports.



*Third party information*

114.   There was a minor dispute as to the information obtained from any third parties. The dissenters want to include the word 'relevant' in an order which required any party receiving documents from any third party to disclose it to the other party in the case.

115.   I do not believe there is any need for that restriction because anything obtained by way of third party disclosure will already have been determined to be relevant to the valuation or it would not have been sought and ordered. The party who receives the documents pursuant to the third party disclosure order should not have to reassess relevance again at that stage and should make available all the documents received from the third party to the other party in the case.

116.   The parties should draw up a draft order reflective of this judgment for my review.

_____
THE HONOURABLE MR JUSTICE RAJ PARKER
JUDGE OF THE GRAND COURT