# EXHIBIT 12

Golar LNG Ltd v World Nordic SE                                                       [2011] Bda L.R. 9
                                                                                            page 1

**In The Supreme Court of Bermuda**

**Commercial Jurisdiction 2009 No. 163**

**In the Matter of a Compulsory Acquisition Notice under section 103(1) of the Companies Act 1981 dated 8 May 2009 relating to shares in BW Gas Limited**

**And in the Matter of an Application for appraisal under section 103(2) of the Companies Act 1981**

BETWEEN:

|  |  |
|---|---|
| **GOLAR LNG LIMITED** | Applicant |
| v |  |
| **WORLD NORDIC SE** | Respondent |

Dated the 18th February 2011

Mr A Martin and Mr J Garrood for the Applicant

Mr C Luthi for the Respondent

**Valuation of shares - Acquisition of shares of minority shareholders - Minority discount**

The following cases were referred to in the judgment:

*In re Holt, decd* [1953] 1 WLR 1488
*McKay v McSparran* [1974] NI 137
*Gorne v Scales* [2006] EWCA Civ 311
*Cyprus Anvil Mining Corp v Dickson* (1982) 40 BCLR 180
*Irvine v Irvine (No. 2)* [2007] 1 BCLC 445

**JUDGMENT of GROUND, CJ**

1. In these proceedings Golar LNG Ltd. ('Golar') seeks an appraisal under section 103 of the Companies Act 1981 ('the Act') of its shares in BW Gas Limited ('the Company'). Both are Bermuda exempted companies. The Company is, via the respondent, a subsidiary of BW Group Limited, which is also the holding company of various other BW denominated shipping and tanker entities. The Company itself is the holding company of the BW Gas group of companies, which is a leading global provider of gas marine transportation services and one of the largest owners and operators of carriers of liquefied petroleum gas ('LPG') and liquefied natural gas ('LNG').

2. The relevant provisions of section 103 of the Act are:

"Holders of 95% of shares may acquire remainder

103. (1) The holders of not less than ninety-five per cent of the shares or any class of shares in a company (hereinafter in this section referred to as the "purchasers") may give notice to the remaining shareholders or class of shareholders of the intention to acquire their shares on the terms set out in the notice. When such a notice is given the purchasers shall be entitled and bound to acquire the shares of the remaining shareholders on the terms set out in the notice unless a remaining shareholder applies to the Court for an appraisal under subsection (2):

Provided that the foregoing provisions of this subsection shall not apply unless the purchasers offer the same terms to all holders of the shares whose acquisition is involved.

(2) Any shareholder to whom a notice has been given under subsection (1) may within one month of receiving the notice apply to the Court to appraise the value of the shares to be purchased from him and the purchasers shall be entitled to acquire the shares at the price so fixed by the Court."

Golar LNG Ltd v World Nordic SE [2011] Bda L.R. 9
page 2

3. Golar held 234,400 of the common shares in the Company, representing 0.0575% of its issued share capital. On 8 May 2009 the Respondent, World Nordic SE ('World Nordic'), having acquired in excess of 95% of the shares, issued a notice of its intention to acquire the outstanding shares in the company pursuant to section 103 of the Act, ('the 'Notice'). The Notice set an offer price of NOK 21 (about US $3.23) per share. World Nordic was, at the time of the Notice, the owner of 99.37% of the shares in the Company. Under the terms of section 103 (2), minority shareholders had one month to bring an application to appraise the value of the shares to be purchased. Golar exercised its right to do so on 8 June 2009. Golar contends that the Notice significantly undervalues the shares, which it originally said the Court should appraise at a value of NOK 61.5 (or approx. $9.38 per share) that representing its valuer's initial assertion as to the fair value of the shares, although in his evidence his estimate tumbled to a range of NOK 33 - 37.

4. The issues narrowed somewhat immediately prior to the hearing. A potentially substantial argument concerning an accounting 'impairment' of the value of four LNG vessels was abandoned. Also Golar's original contention that the shares should be valued as at the date of the hearing was, rightly, abandoned, leaving an essentially academic issue as to whether it should be the date of the section 103 notice or the date of the election for a valuation or even the last day of the objection period (those latter being on the facts of this case the same date, 8th June 2009). In my view it should be the date of the section 103 notice, that being the date from which the acquirer becomes bound.

5. There were some preliminary issues, with which I can deal quite quickly at the outset. There was a question as to the proper approach to valuation. I think that the court should appraise the shares at their fair value. In ascertaining that the court is likely to have regard to the market value, when that is available, but it is also going to have regard to all the relevant information that is put before it. No prescriptive rule applicable to all cases is possible, and as courts are fond of saying, valuation is as much an art as a science.

6. There was a question as to where the burden of proof lay. I think that it is neutral – it is up to the court to assess the value and neither side bears a burden to establish the value for which it contends. On the other hand, to the extent that either side asserts a factual situation, it is up to it to prove it.

7. The remaining issues are:

   (a) The weight to be given to the quoted share price.

   (b) The Net Asset Value ('NAV') of the Company, in respect of which the issues were – (i) the incidence of tonnage tax, and whether legal developments after the valuation date could be taken into account; (ii) the value of the Company's LPG carrier fleet; (c) a commission on the acquisition of four LNG vessels from World Nordic.

   (c) The extent, if any, to which a minority discount should be applied to the NAV.

8. The valuation evidence on Golar's behalf came from a Mr. Bjorn Giaever, who at the time of his affidavit was a portfolio manager and financial analyst employed by Frontline Corporate Services in London. That entity provided corporate services to companies within the Frontline group, with which Golar was 'affiliated'. He had been at Frontline since May 2006, where he had been employed to provide analysis and investment advice. Before that he had been employed as an equities analyst to provide advice and analysis in respect of publicly listed shipping companies for institutional investors by a financial services company DnB NOR Markets. By the time of trial he was a director of SEB, a Nordic investment bank, working in the corporate investment department.

9. The valuation evidence for World Nordic came from Mr. Mark Bezant, a chartered accountant and a senior managing director in the London office of FTI Consulting Inc.,

which he describes as a global expert services firm specializing among other things in litigation support and valuation. He sets out his extensive valuation experience in appendix 1 of his report.

10. I frankly preferred Mr. Bezant's approach and conclusions to those of Mr. Giaever. I considered his expertise as a valuer was more pertinent that Mr. Giaever's as a financial analyst, and his overall approach to be more detailed and principled. In assessing Mr. Giaever I took account of the fact that the applicants had resiled from some of the positions originally advanced by him, and that his valuation had almost halved by the time of trial. I also found one fairly minor dispute between the experts very telling as to their expertise, and that related to the omission of the VLGC BW Broker from the LPG fleet as valued by Mr. Bezant, but its inclusion in the valuation by Inge Steensland AS ('Steensland'), the firm of Oslo shipbrokers relied upon by Mr. Giaever. The fleet list included in the 2008 Annual Report contained two VLGCs on bare-boat charter with a purchase option – the BW Broker and the Berge Summit. When Mr. Bezant came to value the LPG fleet he omitted the BW Broker but retained the Berge Summit, although at first glance there was nothing to distinguish them. His explanation was that, while the BW Broker was properly regarded as merely leased, the Berge Summit was held on a charter for the remainder of its economic life and so was treated as held on a finance lease, essentially a form of hire purchase. This was not accepted by Mr. Giaever, who considered both should be included in the fleet list for the purposes of ascertaining the Company's NAV. However, Mr. Bezant's approach was supported by the notes at p. 105 of the 2008 accounts, which record the Berge Summit as on a financial lease, and the BW Broker as being on an operational lease, and it also accords with the length of the charters and the respective ages of the vessels as shown in the fleet list.

11. To a certain extent Mr. Bezant relies upon information and opinion derived from Mr. Andreas Sohmen-Pao, the deputy chairman and CEO of the Company. Mr. Sohmen-Pao swore an affidavit of 3rd June 2010, which addressed much of the background. He also gave evidence before me and was cross-examined on his affidavit. I have to say that I was forcefully impressed both by his expertise and his knowledge of the facts, and I unhesitatingly accept his evidence. Where it conflicts with that tendered on behalf of Golar, I prefer that of Mr. Sohmen-Pao.

**The Issues**

**(a) Weight to be Given to Share Price**

12. I accept that trading in the shares had been a bit thin in the months preceding the Notice. Nonetheless there had been some large and comparatively recent transactions, as identified in Mr. Bezant's Table 5.1. The NOK 21 figure seems to have been established by Third Avenue International, the then second largest shareholder, selling its stake of 15.45M shares to World Nordic on 19 January 2009 at that price, which represented a 51% premium over the closing price on the previous day. There was also the up-take on the rights issue, of 10,627,041 shares, 10M of which were purchased by Geveran Trading at NOK 18.50, who then sold all its shares to World Nordic for NOK 21. I accept Mr. Sohmen-Pao's evidence that Geveran Trading is controlled by Mr. John Frederiksen, who also controls World Shipholding, the largest shareholder in Golar (with 47%). Mr. Frederiksen is also Chairman of the Board of Golar. World Nordic makes the point that Geveran did not take up its full entitlement to 23M shares on the rights issue, at NOK 18.50, which they argue is inconsistent with Golar's position that the shares were worth more than that. While I do not find that particularly persuasive, more tellingly on 27 March 2009 Geveran sold its entire stake in the Company to World Nordic voluntarily at NOK 21 per share, implying that it, and by extension Mr. Frederiksen, considered that a proper price at that time. Against that background, I accept Mr. Bezant's conclusion that the Company's quoted share price should be considered as the principal method to assess the market value of the Minority Interest, and that, based on the Company's quoted share price, NOK 21 "falls within a reasonable range of values".

**(b) NAV**

**(i) The Tonnage Tax**

13. The facts in summary are these. For many years, shipping companies incorporated in Norway benefited from a favorable tax regime stipulating that no tax was payable on operating profit unless a) dividends were paid to shareholders or b) assets were moved out of Norway. As a result, Norwegian shipping companies kept profits in the companies free of tax. The Norwegian Government amended the tax system in the fourth quarter of 2007 and put forward a new tonnage tax system with retroactive effect from 1 January 2007. Under the amendment the operating profit of companies that elected to enter into the new tonnage tax regime would be fully exempt from taxation on a permanent basis. However, entry into the new tonnage tax regime carried a "transition tax". The transition tax entailed a payment over a ten year period of a tax on all profits which had been kept in the Norwegian shipping companies that had not been subject to taxation under the previous tonnage tax regime. The result was that the Norwegian Government would tax previous profits of those companies which were formerly exempt from tax.

14. The impact on the Company was that it would have to pay NOK 3,900,000,000 (approx. US $604,000,000), of which 67% was repayable in 10 equal installments over 10 years. 33% of that sum would be waived, provided that an equal amount was spent on environmental investments over 15 years. The tax liability booked in the Company's accounts for the year ending 2007 was US $379,700,000 (the then present value of the 67% portion) and the 33% environmental portion of liability was accrued at a present value of US $108,000,000. The total tax liability was therefore booked in 2007 at US $487,700,000. In the 2008 accounts the environmental tranche of spending was reclassified as equity because the Norwegian Government expanded the 15 year deadline to an indefinite period. As a result, the 2008 Annual Report reclassified the liability at US $271,700,000 as the present value portion payable in 10 years taking into account exchange rate fluctuations.

15. That was how things stood as at the date of the Notice. Shortly thereafter, however, things began to move in the Company's favour. On 26 June 2009, following a hearing which took place between 3 June and 12 June, the Oslo District Court held that the transition tax was unconstitutional. The government appealed that decision, but on 12 February 2010 the Supreme Court of Norway ultimately held by a narrow majority (6-5) that the tax was indeed unconstitutional. Prior to and at the date of the Notice it was well known that the Company was challenging the assessment of the transition tax in the Norwegian Courts. However, the outcome of that challenge was not and could not be known with any certainty on 8 May 2009, the date of the Notice. The uncertainty was compounded by the fact that another first instance court in a parallel case on the same issue ruled against the tax-payer at about the same time as the decision of the Oslo court, so until the matter was resolved on appeal there were competing decisions.

16. Golar contend that the tax liability should be re-credited to the Company for the purpose of valuation – in his affidavit Mr. Giaever, deposes that "in the premises the value of the Company should be revised by reversing this payable tax provision in the sum of 3,900,000,000 NOK or US $604,651,160". However, in his evidence he appeared to recognize that, even if it was right in principle to credit back the tax, the figure was more nuanced than that. World Nordic takes the position that the Company should be valued as things stood at the date of the Notice, and without the benefit of hindsight.

17. In my judgment the approach of World Nordic, and of their valuer, Mr. Bezant, is the correct one, and the matter should be assessed as things stood at the time and without the benefit of hindsight. That is the general rule: see e.g. *In re Holt decd.* [1953] 1 WLR 1488, at 1492; *McKay v McSparran* [1974] NI 137; and *Gorne v Scales* [2006] EWCA Civ 311. I do not think that this is one of those cases that slip outside the ambit of the general rule because the tax liability was a constant, unchanging

component of the company's value and all that has changed is one's understanding of that unchanged component: see *Cyprus Anvil Mining Corp v Dickson* (1982) 40 BCLR 180 at [80]. In that case the exception was applied to the tonnage and grade of ore in the ground. I do not think that that is in any way analogous to the Company's tax liability. On the other hand, to the extent that any valuation is guided by the quoted share price, the market would have factored into the price the possibility of the legal challenge to the tax succeeding, and to that extent that possibility will be represented in a valuation which has regard to the quoted share price.

**(ii) The Value of the LPG Fleet**

18. In fact, on fleet value, there is not a great deal between the experts. Mr. Giaever grudgingly accepts the Company's valuation of its LNG vessels, on the basis that valuation is difficult due to a paucity of market transactions. That reservation may be slightly disingenuous as the valuer used by the Company, Drewry Maritime Services (Asia) Pte. Ltd. ('Drewry') values the LNG fleet on a discounted cash flow basis in any event, due to the 'illiquidity of the market'. In any event the difference of opinion concerns the LPG fleet, in respect of which Mr. Giaever contends for a valuation of US $1,325,700,000 as opposed to US $1,152,400,000[1], the difference being $173,300,000. In coming to his conclusion Mr. Giaever prefers the higher Steensland valuation for the LPG fleet. Mr. Bezant prefers valuations produced by Drewry for the purpose of certifying compliance with the Company's covenants with its lender (Drewry's in fact being the higher of the two valuations provided to him by the Company). Mr. Bezant prefers Drewry over Steensland's valuation because (i) Steensland are brokers and best-practice is to prefer non-brokers; (ii) Steensland are controlled by an owner of LPG carriers, and so may have an incentive towards higher valuations; (iii) their valuation was ex post facto, being dated 29th January 2010, and thus ran the risk of contamination by after-acquired information, while that of Drewry was contemporary; and (iv) Steensland did not have access to the Company's management, and the information they could provide, while Drewry did. I accept Mr. Bezant's reasoning and approach on all of this.

**(iii) The Commission on the LNG Carriers**

19. In January 2009 the Company considered that it needed to strengthen its balance sheet so as to preserve its position in respect of its covenants with its lenders. In order to do this the Company agreed to acquire four LNG vessels from World Nordic at a price of US $720,000,000[2]. The consideration for the transaction was to be paid in shares, and consisted of 273,577,019 shares in the Company which were issued to World Nordic at NOK18.50. At the same time the Company embarked on a rights issue to raise funds and, it is also said, to enable its minority shareholders to maintain their proportionate shareholdings in the Company if they so wished. It is World Nordic's case that the acquisition was in line with the Company's stated strategy of strengthening its balance sheet with regard to its financial covenants and that the price paid in shares was in line with the appraised value of the vessels. The transaction was approved by the independent directors of the Company. The value of the vessels was verified by an independent appraiser, Drewry, and the overall transaction was assessed by an independent financial advisor, Fondsfinan ASA, who provided an opinion of 25 January 2009 that the transaction was fair, from a financial point of view, to the Company.

20. Subsequently the price at which the consideration paid was booked was subject to an accounting 'impairment'. It is World Nordic's case, which I now understand to be accepted by Golar, that the accounts were prepared in accordance with standard accounting practice IAS No 16 which required that the acquisition price for the vessels be recorded at US $883,700,000 (the value of the number of shares issued multiplied

---

[1] In fact Mr. Bezant's valuation based on the Drewry figures adjusted for the ownership interest held by the Company and for unpaid instalments on two newbuilds, is $1,145,300,000.
[2] The transactions was more complicated than that, involving the transfer of shares in the ships' owners, Bergesen LNG Limited, but I do not think it necessary to go into the details.

at NOK 21, which was the price for the shares at the date of the closing of the transaction). On their case, the assessed market value of the vessels did not change, and was expressed to be broadly the same throughout, namely US $720,000,000. The impairment adjusted the fixed asset value in the Company's accounts to reflect the actual value price of the vessels when bought. Golar initially sought to argue that this impairment evidenced an intention to dilute the minority shareholders' interest in contemplation of an acquisition, and argued it should be reversed for valuation purposes, but abandoned that position by the time of the hearing, ostensibly on the basis of the Fondsfinan opinion.

21. However, Golar did persist with a further criticism related to the transaction. As part of the acquisition of the four LNG vessels, World Nordic was paid a commission of 2% of the value of the transaction, being US $14,400,000. Golar maintains its objection to that, and says that it should be disallowed (i.e. credited back) when valuing the company on the basis that it served little or no genuine commercial purpose. World Nordic's position is that it is customary in the capital markets to pay an underwriting commission in consideration for the commitment of investors to subscribe up front to private placements. They make a number of points. They say that as part of the sale and purchase of the vessels, World Nordic agreed to give up cash flows of Bergesen LNG from 30 November 2008 in favour of the Company – a dollar value greater than the underwriting commission. They point out that World Nordic was bound to the transaction for the first quarter of 2009, and that it agreed to vote in favour of the transaction and inject the vessels at a fixed value. They argue that the transaction was subject to fluctuations in the value of the Company between signing and closing – 29 January 2009 and 30 March 2009, and that World Nordic accepted the risk during that period of fluctuations in underlying asset values and the risk of changes in the share price of the Company as well as the exchange rate risk. I accept those arguments and find that the underwriting fee indeed had a genuine commercial purpose, supported by real consideration, and should not be disallowed for valuation purposes.

**(iv) Summary on NAV**

22. Mr. Bezant arrived at a NAV in a range of NOK 22 – 26 as at 8th May 2009 on a pro rata basis. That compares with Mr. Giaever assessment in his original report of NOK 61.05 per share, which by the time of trial had come down to a range of NOK 23.6 – 27.2 per share. The difference between them on the basic NAV is not, at the end of the day, very great. However, Mr. Giaever then adds back to that an element in respect of the reversal of the provision for tonnage tax in a range of NOK 6 – 9.5. For the reasons given above, I do not think that that is permissible, and to the extent that Mr. Bezant's assessment of the NAV is otherwise slightly lower than Mr. Giaever's, I prefer it.

**(c) MINORITY DISCOUNT**

23. This was a relatively small shareholding in a quoted public company. In such a case I consider that it is appropriate to apply a minority discount to any share value derived from the pro-rated NAV. It may be that in this respect the law of Canada has diverged from that of England, but if I had to choose I would choose to follow the latter. In that regard I have been helped by the review of the law conducted by Blackburne J in *Irvine v Irvine (No. 2)* [2007] 1 BCLC 445, and by his conclusion at 449 [11]:

> "A minority shareholding, even one where the extent of the minority is as slight as in this case [*there the split was 50% plus and minus one share on each side*], is to be valued for what it is, a minority shareholding, unless there is some good reason to attribute to it a pro rata share of the overall value of the company. Short of quasi-partnership or some other exceptional circumstance, there is no reason to accord to it a quality that it lacks."

Applying that to this case, this was not a quasi-partnership and there are no exceptional circumstances, and so a minority discount should be applied.

24. It is also necessary to keep a sense of perspective, and bear in mind that the NAV is an entirely hypothetical figure which cannot easily be realised, particularly in a case such as this where the sudden sale of the entire tanker fleet at valuation is likely to be unachievable. The reality is that in a case such as this there is no possible way for the NAV to translate into money in a shareholder's pocket without incurring substantial break-up costs and associated losses. It is therefore appropriate to discount the NAV, and I am reinforced in that view by the substantial discounts from NAV applied by the various market pundits collated in Mr. Bezant's Table 8.2.

**Summary**

25. In my judgment the proper approach is to arrive at a fair value having regard to all the information available to the court. In this case the two primary factors which in my judgment bear upon value are the share price and the company's NAV. I accept Mr. Bezant's conclusion that the Company's quoted share price should be considered as the principal method to assess the market value of the Minority Interest, and that, based on the Company's quoted share price, NOK 21 "falls within a reasonable range of values". For the reasons given above, I also accept Mr. Bezant's evidence on the Company's NAV, and his conclusion that "the adjusted equity per share, based on the Company's NAV, is in the range of about NOK 22 and NOK 26 as at 8th May 2009 on a pro rata basis". Like him, however, I also consider that that does not translate directly into fair value, but that a minority discount should be applied to that. When that is done, I fully accept Mr. Bezant's further conclusion that when tested against the NAV World Nordic's offer of NOK 21 per share again falls within a reasonable range.

26. In the circumstances I appraise the shares in the Company for the purposes of section 103(2) of the Companies Act 1981 at NOK 21 per share, which is the price offered in the Notice. I will hear the parties on costs when I deliver this judgment.