# EXHIBIT 17

A3/2004/0644,
Neutral Citation Number: [2005] EWCA Civ 265

IN THE SUPREME COURT OF JUDICATURE
IN THE COURT OF APPEAL (CIVIL DIVISION)
ON APPEAL FROM THE CHANCERY DIVISION
MR JUSTICE RIMER

Royal Courts of Justice
Strand, London, WC2A 2LL

Thursday 17th March, 2005

B e f o r e:

LORD JUSTICE MUMMERY
AND
MR JUSTICE MUNBY

– – – – – – –

BEAZER HOMES LIMITED

Appellant

– v –

PETER STROUDE

Respondent

– – – – – – – – –

(Transcript of the Handed Down Judgment of
Smith Bernal Wordwave Limited, 190 Fleet Street
London EC4A 2AG
Tel No: 020 7421 4040,  Fax No:  020 7831 8838
Official Shorthand Writers to the Court)

MR TIMOTHY FANCOURT QC (instructed by Nabarro Nathanson) for the Appellant
MR GREGORY HILL (instructed by Marrons) for the Respondent

J U D G M E N T
As Approved by the Court
Crown Copyright ©

**Lord Justice Mummery :**

There are two points of interest in this appeal, one procedural and the other evidential. They both arise out of a dispute on the meaning of a written agreement made on 16 October 2000 pursuant to s106 of the Town and Country Planning Act 1990 (the s106 Agreement) and the Highways Act 1980 in connection with a proposed development at Longstanton in Cambridgeshire. The development included the construction of the Longstanton Bypass linked to the phasing of the development of the whole site.

1. The parties to the s106 Agreement were (1) the South Cambridgeshire District Council, as the local planning authority, (2) the Cambridgeshire County Council, as the local highway authority and as owner of certain land, (3) Mr Peter Stroude, as owner of certain land, (4) Mr & Mrs Cartwright, as owners of certain land, and (5) Beazer Homes Limited (BHL), who had entered into agreements with the owners to buy land from them subject to the grant of planning permission. Two of the parties to the s106 Agreement, Mr Stroude and BHL, negotiated with one another in September and October 2000 on matters of collaboration and contribution relating to the development, but never reached a concluded agreement. They are now in litigation about the construction of the s106 Agreement.

2. An order made by Rimer J on 15 March 2004 contains a ruling sought by the claimant, Mr Stroude, that

   "× evidence of proposals and negotiations for a proposed contribution agreement and/or a collaboration agreement×is not admissible for the purpose of construing the Section 106 Agreement made on 16 October 2000 and mentioned in the Particulars of Claim."

3. BHL is, along with two associated companies, a defendant to the proceedings. The Beazer companies have been part of the Persimmon Group of companies since 2001. BHL is also a respondent to two interlocutory applications by Mr Stroude. The first in time was dated 28 November 2003 and sought summary judgment on Mr Stroude's claim that he has the right to enter on certain land in order to construct the Longstanton Bypass. The estimated 1 day hearing was floating for 25/28 March 2004. The second application dated 3 March 2004 was for a ruling that evidence of the parties' subjective intentions and of their negotiations for the separate collaboration agreement between Mr Stroude and BHL, in anticipation of the development for which planning permission had been granted, is inadmissible in ascertaining the meaning of the s106 Agreement.

4. BHL appeals, with the permission of Jonathan Parker LJ granted on 15 April 2004, against the ruling of Rimer J. The summary judgment application has not been heard pending the determination of this appeal.

**Procedural point**

5. Mr Stroude's application for a ruling on the inadmissibility of evidence of subjective intentions and negotiations was made under CPR Part 32.1(1) shortly before the summary judgment application was due to be heard. Mr Stroude made the summary judgment application under CPR 24 on the ground that BHL has no real prospect of successfully defending the action.

6. Under Part 32.1 the court has power to "control the evidence by giving directions" as to the issues on which it requires evidence, the nature of the evidence which it requires to decide these issues and the way in which the evidence is to be placed before the court. Obviously the court can use its controlling power to direct that, on the basis of an exclusionary rule, certain evidence may not be given. It is also expressly provided in Part 32.1 that the court can use its power to exclude evidence that would otherwise be admissible, for example in order to save costs and to cut delays.

7. Although the judge's initial instinct was that the ruling on evidence would probably have been better left to the judge hearing the summary judgment application, he proceeded to determine it, as at the hearing both parties preferred him to rule on it at the earlier stage.

8. Although no procedural objection has been raised on the appeal and there is no question of this court rejecting the appeal on the procedural ground, I should express my reservations about the future use of the procedure adopted in this case.

9. In general, disputes about the admissibility of evidence in civil proceedings are best left to be resolved by the judge at the substantive hearing of the application or at the trial of the action, rather than at a separate preliminary hearing. The judge at a preliminary hearing on admissibility will usually be less well informed about the case. Preliminary hearings can also cause unnecessary costs and delays.

10. In the present case no good reason is apparent nor has one been advanced for departing from the usual practice. It has not been suggested that this is one of those cases in which the ruling on admissibility would dispose of or abbreviate the substantive application. The practical effect of a split proceeding seeking a pre−emptive ruling has been to hold up the hearing of the summary judgment application. It may well have increased the costs of proceedings. I cannot see what advantage there was in it for anyone.

**Extrinsic evidence point: the general principle**

11. The basic legal principles are not in dispute: evidence of negotiations leading to the making of a contract or of the subjective intentions of the parties as to the meaning of

the contract is not admissible for the purpose of construing the contract: **Prenn v. Simmonds** [1971] 1 WLR 1381 per Lord Wilberforce at 1384C−1385H; **Reardon Smith Line v. Yngvar Hansen−Tangen** [1976] 1 WLR 989 per Lord Wilberforce at 996E−997D ; and **Investors Compensation Scheme v. WBBS** [1998] 1 WLR 896 per Lord Hoffmann at 912F−913F. Such evidence is not admissible as part of the factual matrix or as relevant objective background of a contract, as it is not helpful in construing a contractual document.

12. There is, however, a dispute between the parties as to (a) the scope of the exclusionary principles laid down in the authorities and (b) the application of the principles to the facts of this case.

**Background Facts**

13. The key question in the summary judgment application is whether it is implicit in the s106 Agreement or there is to be implied into it a term that Mr Stroude is entitled to access over land shown cross−hatched on an agreed plan for the purposes of constructing the Longstanton Bypass. No express right of access was granted to him by the s106 Agreement. At the time of the s106 Agreement the land over which the right of way was claimed was owned by Mr & Mrs Cartwright. They were parties to the s106 Agreement, but they were not involved in the negotiations for the collaboration agreement.

14. Both before and after the conclusion of the s106 Agreement Mr Stroude and BHL were in negotiation for a separate collaboration agreement, but it was never concluded. A draft of the agreement recites the s106 Agreement. BHL claims that the collaboration agreement was intended to provide for the grant of mutual rights in the nature of easements between Mr Stroude and BHL in relation to the proposed development, including entry onto the relevant land for the construction of the Bypass.

15. The issue on the admissibility of evidence arose out of the contents of a witness statement served in opposition to Mr Stroude's application for summary judgment. The maker of the statement was Ms Dempster, an in−house solicitor with the Beazer Group of Companies at the relevant time. In 8 paragraphs of the witness statement she made assertions about the negotiations in the summer and autumn of 2000 for the collaboration agreement between Mr Stroude and BHL. BHL wished to rely on this material for the purpose of showing that neither expressly nor by implication in the s106 Agreement was it ever intended by Mr Stroude or BHL to grant any rights of access over the cross−hatched land.

**The Judgment**

16. The judge correctly pointed out that the negotiations which BHL sought to rely on were for a different and separate agreement from the s106 Agreement which fell to be construed. Further, only two of the parties to the s106 Agreement were involved in the negotiations for the collaboration agreement. He expressed doubts about the relevance of the evidence of what passed between Mr Stroude and BHL to the issue of a grant of implied rights of access over land which belonged at the material time to third parties, Mr & Mrs Cartwright (see paragraph 18), but he did not exclude the evidence specifically on that ground.

17. Rimer J also said that he was

> "14×not persuaded that the negotiations for the collaboration agreement can fairly be regarded as in the nature of negotiations for the section 106 agreement and as being inadmissible on that ground for the purposes of interpreting the 106 agreement. That is because they were not such negotiations. They were negotiations exclusively between Mr Stroude and BHL for the purposes of a separate agreement between them, and none of the other parties to the section 106 agreement were parties to the negotiations for the collaboration agreement."

18. He went on to hold that the evidence was inadmissible on the construction of the s106 Agreement, as

> " 16×evidence as to what the parties to the agreement subjectively intended with regard to such rights of access is inadmissible. That is clear from **Prenn v. Simmonds** and from Lord Hoffmann's speech in the **Investors' Compensation Scheme** case.
>
> 17. In my judgment the problem in BHL's path in seeking to place reliance in the present action on the negotiations to the proposed collaboration agreement is that the substance of what it is seeking to do is to rely on that material by way of evidence that neither it nor Mr Stroude intended the section 106 agreement to grant by implication any rights of access over the cross−hatched land. In my judgment once the essence of Ms Dempster's evidence is so analysed, it is clear that it is inadmissible for the purposes of interpreting the section 106 agreement."

**Submissions of BHL**

19. Mr Fancourt QC appearing for BHL argued that the exclusionary principle laid down in the authorities did not prevent the evidence of the negotiations for the collaboration agreement from being used in order to construe the s106 Agreement. BHL was not seeking to introduce any evidence of the negotiations for or of the subjective intentions of the parties to the s106 Agreement for the purpose of ascertaining its meaning. This feature of the instant case distinguished it from the cases cited in paragraph 12 above.

20. The letters and drafts which BHL wishes to rely on for the construction of the s106 Agreement relate only to the negotiations for the abortive collaboration agreement. These negotiations were admissible in evidence to show that Mr Stroude and BHL were seeking to conclude a separate agreement in anticipation of the development of the land for which planning permission was granted contemporaneously with the s106 Agreement. The negotiations were part of the essential factual background and of the shared knowledge of the parties. They were relevant to the construction of the s106 Agreement, as they showed that it was not the commercial aim or purpose of the s106 Agreement to address certain matters, such as contribution to planning gains, reciprocal rights of entry and access and co-operation in carrying out the development, none of which were within its scope. The negotiations and drafts were relevant to and were admissible in respect of the issue as to whether rights of entry were to be implied in the s106 Agreement.

21. Mr Fancourt emphasised that the negotiations for the collaboration agreement were not caught by the exclusion of evidence of the subjective intention of the parties to the s106 Agreement as to what the s106 agreement meant. The evidence of the existence of the negotiations was part of the objective factual background known to the parties to the s106 Agreement, which could be relied on to establish the genesis, aim and purpose of the s106 Agreement and, in particular, whether it was intended to contain rights going beyond what would ordinarily be expected in a planning agreement under s106.

22. Two authorities were cited in support of the submissions. **Smith v. Chadwick** (1882) 20 ChD 20 at 62 was cited for the proposition that where a number of agreements are concluded more or less contemporaneously, all are admissible in evidence on a question as to the meaning of one of them. The case does not help, as there was only ever one concluded agreement, the s106 Agreement. The rest never got past the negotiations stage.

23. Although **Little v. Courage Ltd** (1994) 70 P&CR 469 was produced for the proposition that negotiations for one contract are admissible in evidence on the question whether a term is to be implied in another contract, I was unable to derive any guidance from it. There was an issue as to whether a term could be implied, but the judgment of Millett LJ did not deal with any point on the admissibility of evidence of negotiations and of subjective intentions or cite any of the authorities relating to that question.

**Conclusion**

24. I have reached the same conclusion as Rimer J. The issue between the parties is on the construction of the s106 Agreement and as to the existence of an implied term relating to a right of access to construct the Longstanton Bypass. It is common ground that the effect of the authorities is that, if the evidence sought to be adduced by BHL related to the negotiations and subjective intentions of the parties as to the meaning of the s106 Agreement, it would be inadmissible. It would not help the court to resolve the meaning of the s106 Agreement. The same would have been the case with evidence of the negotiations for the collaboration agreement and the subjective intentions of the parties to it as an aid to the construction of the collaboration agreement had the parties actually arrived at a consensus on it. The fact that a contemporaneously concluded collaboration agreement would have been admissible on the construction of the s106 Agreement is beside the point. We are concerned in this case with evidence of negotiations, drafts and other manifestations of subjective intention, not with contemporaneous agreements.

25. The policy underlying the exclusion of that evidence applies also to evidence of the negotiations and subjective intention of the parties relating to a separate agreement, such as the negotiations for a collaboration agreement between Mr Stroude and BHL which failed to produce a concluded agreement. As evidence of the purpose, meaning and scope of the s106 Agreement, the draft collaboration agreement, the abortive negotiations for it and the subjective intentions of Mr Stroude and BHL in relation to it are quite simply worthless. In some very loose sense they could be described as "background" to the s106 Agreement, but they are far from being the factual matrix or objective setting of the s106 Agreement which Lord Wilberforce and Lord Hoffmann described. Indeed, I would go further than saying that the evidence sought to be adduced is not helpful on the construction issue. Like much material that is irrelevant or only marginally relevant, this evidence is distracting and detrimental to the legal process: it is time wasting, cost consuming and diverts attention away from what matters most when construing a formal written contract, namely, the language which the parties have agreed upon to express their contractual intentions.

**Result**

26. I have read in draft the judgment of Munby J. I agree with it and would dismiss the appeal.

**Mr Justice Munby:**

27. I agree. For the reasons my Lord has given this appeal must be dismissed. I add some words of my own because the point at issue is both important and interesting.

28. Mummery LJ has identified the key passages from the relevant authorities. I need not repeat the exercise. The authoritative statement is to be found in the speech of Lord Hoffmann in **Investors Compensation Scheme Ltd v West Bromwich Building Society** [1998] 1 WLR 896 at 913A:

> "The law excludes from the admissible background the previous negotiations of the parties and their declarations of subjective intent. They are admissible only in an action for rectification. The law makes this distinction for reasons of practical policy".

We are concerned here with the proper ambit of this rule in a situation which the House of Lords did not have to address in any of the three cases to which my Lord has referred. The resolution of the present case is not, however, to be found in a mere attempt to construe the language of Lord Wilberforce and Lord Hoffmann. Utterances even of the demi−gods are not to be approached as if they were speaking the language of statute. Our task, rather, is to identify, with their assistance, the underlying principles of the common law.

29. The common law is here driven not by technicality but by pragmatism. As Lord Wilberforce said in **Prenn v Simmonds** [1971] 1 WLR 1381 at 1384E:

> "The reason for not admitting evidence of these exchanges is not a technical one or even mainly one of convenience, (though the attempt to admit it did greatly prolong the case and add to its expense). It is simply that such evidence is unhelpful."

He made the same point at 1385E when commenting on the fact that in the Court of Appeal Lord Denning MR had seemingly taken into account Dr Simmonds' anxiety to protect himself against unilateral decisions by Mr Prenn:

> "I cannot see how any of this can be admissible, because, I repeat, I cannot see how it is helpful."

As Lord Hoffmann said in the passage I have already quoted, the law takes this course for "reasons of practical policy".

30. What seems to me to have been the key insight was articulated by Lord Wilberforce when, in the course of the passage from his speech in **Prenn v Simmonds** [1971] 1 WLR 1381 to which my Lord has referred, he said at 1384H−1385A:

> "By the nature of things, where negotiations are difficult, the parties' positions, with each passing letter, are changing and until the final agreement, though converging, still divergent. It is only the final document which records a consensus $\times$ at this stage there is no consensus of the parties to appeal to."

It is for this reason, as Lord Wilberforce went on to point out at 1385C, that:

> "Far more, and indeed totally, dangerous is it to admit evidence of one party's objective - even if this is known to the other party. However strongly pursued this may be, the other party may only be

> willing to give it partial recognition, and in a world of give and take, men often have to be satisfied with less than they want. So, again, it would be a matter of speculation how far the common intention was that the particular objective should be realised."

31. Mr Fancourt says that none of this stands in his way because he is not, he says, seeking to rely upon the negotiations between the parties for the s106 Agreement, the meaning of which is in issue, but only the negotiations for the collaboration agreement, the meaning of which is not in issue. Negotiations for contract B are, he says, admissible if one is construing contract A. I do not agree.

32. Mr Hill correctly points out that the only 'facts' which are immediately apparent are that there had been negotiations for the collaboration agreement and that those negotiations had not been finalised at the time when the s106 Agreement was executed. As Rimer J said, "It is common ground that the negotiations for a collaboration agreement never reached finality and no such agreement was ever entered into." Without delving into the detail of the negotiations for the collaboration agreement we cannot know why they had not reached finality nor, indeed, can we know how close - if at all - the parties were even to reaching agreement on the drafting of its terms. Indeed, these matters themselves seem to be the subject of potential controversy for, as Rimer J pointed out, the parties cannot even agree as to whether the negotiations for the collaboration agreement had collapsed before the signing of the s106 Agreement or whether they continued for some time afterwards.

33. What is clear, to put Mr Hill's point slightly differently, is that although finality had not yet been achieved in relation to the collaboration agreement - and indeed, as turned out in fact to be the case, might never be achieved - the parties were nonetheless content to enter into and bind themselves irrevocably to the s106 Agreement. In these circumstances, as it seems to me, Mr Fancourt finds himself in a dilemma from which there is no escape. If he confines himself to reliance only upon the 'facts' to which I have just referred, then it gets him nowhere. Such evidence is simply "unhelpful", to use Lord Wilberforce's word, because it takes us nowhere. What, after all, does it establish? Of itself, nothing. On this approach, as Mr Hill puts it, the key 'fact' is that there was never any consensus in relation to the collaboration agreement, and on that ground alone, in my judgment, the evidence is inadmissible, essentially for the reasons given by Lord Wilberforce. The absence of consensus means that the evidence is "unhelpful".

34. If, on the other hand, Mr Fancourt seeks to delve further into what happened during the negotiations for the collaboration agreement - and of course he does - then, as it seems to me, he is caught on the other prong of Lord Chancellor Morton's well–known fork. I agree with what Rimer J said:

> "In my judgment the problem in BHL's path in seeking to place reliance in the present action on the negotiations to the proposed collaboration agreement is that the substance of what it is seeking to do is to rely on that material by way of evidence that neither it nor Mr Stroude intended the section 106

>agreement to grant by implication any rights of access over the cross–hatched land. In my judgment once the essence of Ms Dempster's evidence is so analysed, it is clear that it is inadmissible for the purposes of interpreting the section 106 agreement."

>Just so. For present purposes, evidence in relation to the collaboration agreement has no intrinsic utility at all, for the collaboration agreement is not before the court for construction. The only utility of the evidence is in relation to the construction of the s106 Agreement - and hence the difficulty for Mr Fancourt. Either the evidence that he seeks to rely on tells us nothing useful - in which case it is inadmissible as plainly unhelpful - or it amounts to evidence of the parties' subjective intentions, not so much in relation to the collaboration agreement but also, and crucially, in relation to the s106 Agreement - in which case it is, as Rimer J correctly said, quite plainly inadmissible.

35. Mr Fancourt cannot escape by seeking to assert, as he does, that the relevant evidence is not evidence of intention but merely evidence helping to establish, objectively, the aim and purpose of the s106 Agreement. Quite apart from all the other difficulties in the way of this argument, how can ultimately inconclusive negotiations for one agreement establish, objectively, the aim and purpose of another in circumstances such as we are here concerned with? The answer is clear and fatal: only by demonstrating that it was intended that, because a particular subject–matter was to be dealt with in the one agreement, it was not intended to be dealt with in the other.

36. There is a further problem which arises on the facts of the present case. There were five parties to the s106 Agreement, only two of whom were also parties to the abortive collaboration agreement. When identifying those matters which *are* admissible in evidence the authorities consistently refer, for example, to "the factual background known to the parties", "the situation of the parties", "the factual matrix × in which the parties were" and "the background knowledge which would reasonably have been available to the parties in the situation in which they were at the time of the contract": see **Prenn v Simmonds** [1971] 1 WLR 1381 at 1385H, **Reardon Smith Line Ltd v Yngvar Hansen–Tangen** [1976] 1 WLR 989 at 996E, 997C, and **Investors Compensation Scheme Ltd v West Bromwich Building Society** [1998] 1 WLR 896 at 912H. This must mean all the parties, for as Lord Wilberforce pointed out in a passage in his speech in **Prenn v Simmonds** [1971] 1 WLR 1381 at 1385C which I have already quoted, it would be "totally dangerous" to admit evidence of one party's objective.

37. Mr Fancourt seeks to escape from this particular difficulty by pointing out that the exercise upon which the court is embarked in the present case is not so much the construction of the s106 Agreement simpliciter, nor even consideration as to whether or not the term for which Mr Hill contends should be implied, but rather whether the evidence he wishes to adduce is admissible in answer to Mr Hill's case. He relies upon the statement of principle in **Chitty on Contract** (ed 29) para 13–007:

> "A term will not, however, be thus implied unless the court is satisfied that *both* parties would, as reasonable men, have agreed to it had it been suggested to them. The knowledge or ignorance of each party of the matter to be implied, or of the facts on which the implication is based, is therefore a relevant factor."

In my judgment this does not help him, for at root he is relying upon matters known only to two of the parties to the s106 Agreement in support of his case as to its true construction.

38. In common with Mummery LJ I derive no assistance from the case on which Mr Fancourt placed considerable reliance. He submitted that the decision of this court in **Little v Courage Limited** (1994) 70 P&CR 469 is authority for the proposition that negotiations for contract B are admissible on the question of whether a term is to be implied into contract A. I do not agree. No such statement of principle is to be found anywhere in the judgment of Millett LJ, who seems not to have treated the case as raising any question of principle and indeed makes no reference at all to either **Prenn v Simmonds** [1971] 1 WLR 1381 or **Reardon Smith Line Ltd v Yngvar Hansen–Tangen** [1976] 1 WLR 989. Nor does the actual decision on the facts provide Mr Fancourt with any assistance. The matters which Millett LJ took into account at 478–479 when finding that the relevant term should be implied in contract A were: first, the form and terms of contract B as it had been executed by the parties, Courage Limited and Mr Little; secondly, the fact that contract B had not been negotiable - it was a contract of adhesion which had been presented for signature by Courage Limited to Mr Little on a 'take it or leave it' basis; and, thirdly, the "irresistible inference" that the parties contemplated that contract A was likewise not going to be negotiable by Mr Little. That is a long way removed from the type of evidence that Mr Fancourt seeks to adduce in the present case. There is nothing in what Millett LJ was saying to suggest that he would have treated as admissible either the substance or the content of the negotiations for the earlier contract. As Mr Hill put it, the fact that *agreement* X may be relevant as to the meaning of agreement Y does not mean that *negotiations* for X are relevant to Y if the parties enter into Y only.

39. There are two further points which also need to be borne in mind, each of which, in my judgment, provides a further reason for rejecting Mr Fancourt's approach. Fundamentally, his submission is that although the negotiations for the s106 Agreement are inadmissible some at least of the negotiations for the abortive collaboration agreement are admissible. In the present case that submission receives some ostensible plausibility from the fact that, as it happens, the two agreements were in large measure being separately negotiated by different lawyers. It is therefore possible, I imagine, in significant measure to confine the evidence to the negotiations for the collaboration agreement whilst excluding evidence of the negotiations for the s106 Agreement. Often, however, that will not be so, and both agreements - the main agreement and a side agreement perhaps - will be the subject of negotiations being carried on by the same solicitors and in the self same correspondence. Mr Fancourt's suggestion that redaction will provide an appropriate solution is, with respect to him, more glib than convincing. There may be many such cases where it will simply not be

    possible to redact the correspondence so as to omit what Mr Fancourt accepts has to be omitted whilst leaving what remains intelligible. What is to be done in such a case? Is the court to be invited de bene esse to look at inadmissible material so as the better to understand admissible material? Or is the court to do its best with whatever is left after all the inadmissible material has been redacted - running the risk that it may jump to erroneous conclusions having had what may be only a very partial and inaccurate view of the material? Or is the principle for which Mr Fancourt contends to apply only where it is possible to disentangle the inadmissible from the admissible? The principle for which he contends will in too many cases turn out to be quite unworkable.

40.    It will not have escaped notice that in this particular case the effect of the s106 Agreement was to create, albeit only in equity, transmissible property interests in land. Such a case raises in stark form the difficulties in relation to third party interests referred to by Saville LJ in **National Bank of Sharjah v Delborg** (1997 - unreported). We heard little argument on this point but I have to say that it provides yet another reason why the court should be very cautious about going down the road Mr Fancourt would have us travel.

41.    Rimer J's initial instinct was that the issue of admissibility was best left to be decided by the judge hearing the substantive application. I share my Lord's regret that Rimer J allowed himself to be deflected by the entreaties of the parties from what I am sure was a wise and prudent instinct. Too often, as we all know, and as turned out to be the consequence here, what appears initially to be a neat way of saving costs by taking a seemingly attractive preliminary point ends up saving the parties neither time nor money. Here the endeavour has cost the parties much delay and very substantial costs. The statements of costs lodged by the parties for the purpose of summary assessment show that the appellant's costs of the appeal amount to no less than £19,575 and the respondent's to no less than £12,244. Even allowing for the fact that these figures are inclusive of VAT these are substantial sums to hazard on an exercise whose only purpose was to save what I cannot help feeling was in all probability no more than a modest sum in costs.

ORDER:

1. Appeal dismissed.

2. The respondent to pay the appellant the costs of the appeal assessed at £10,457

3. Leave to appeal to the House of Lords refused.

(Order does not form part of approved judgment)