# EXHIBIT 19
# Part 1

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**
**FINANCIAL SERVICES DIVISION**

**CAUSE NO. FSD 235 OF 2017 (IKJ)**

**IN THE MATTER OF SECTION 238 OF THE COMPANIES LAW (2016 REVISION) AND IN THE MATTER OF NORD ANGLIA EDUCATION, INC**

**IN COURT**

| | |
|---|---|
| **Appearances:** | Lord Grabiner QC and Mr Richard Boulton QC of counsel and Mr Mac Imrie, Mr Malachi Sweetman and Mr Lukas Schroeter of Maples and Calder on behalf of Nord Anglia Education, Inc. ("**the Company**") |
| | Mr Richard Millett QC of counsel and Mr Simon Dickson, Ms Jessica Vickers and Mr Harry Rasmussen of Mourant Ozannes on behalf of the Mourant Dissenting Shareholders |
| | Mr Jonathan Adkin QC of counsel and Mr Andrew S Jackson of Appleby on behalf of the Appleby Dissenting Shareholders |
| | Mr George Bompas QC of counsel and Mr Hamid Khanbhai of Campbells on behalf of the Campbells Dissenting Shareholders |
| | (together **"the Dissenters"**) |

| | |
|---|---|
| **Before:** | **The Hon. Justice Kawaley** |
| **Heard:** | **2 December – 20 December 2019** |
| **Draft Judgment Circulated:** | **28 February 2020** |
| **Judgment Delivered:** | **17 March 2020** |



**HEADNOTE**

*Appraisal of fair value of shares-section 238 of the Companies Law Petition-appropriate valuation method-whether market value or discounted cash flow analysis is appropriate valuation methodology-efficiency of market in the Company's shares-relevance of transaction price-rigour of transaction process-whether merger agreement an arms-length transaction-relevance of non-public information-minority discount*

# JUDGMENT

**INTRODUCTORY**

1.    On November 9, 2017, the Company presented a Petition under section 238(9) of the Companies Law (2016 Revision) for the determination of the fair value of the Dissenters' Shares.  The Shares had been acquired by the Company pursuant to a merger agreement dated April 25, 2017 ("Merger Agreement") which was approved by the requisite majority of Shareholders at an extraordinary general meeting held on August 21, 2017 ("EGM").  The path to trial has been strewn with many (often flowery) interlocutory applications, the history of which need not be recited here. In the final event the parties cooperated very effectively to ensure that the scheduled trial was completed on time, despite the multiplicity of witnesses who appeared and the range of issues which were canvassed by counsel.

2.    The Company initially offered the Dissenters the Merger Consideration of US$32.50 for their Shares, before the present proceedings were commenced. At trial the Company contended that a market price of US$30.45 reflected the fair value of the Shares; the Dissenters contended that US$76.51 was, applying a discounted cash flow ("DCF") valuation methodology, the fair value of the Shares.

**THE ISSUES**

3.    There was no material dispute on the general legal principles governing the Court's jurisdiction to determine the fair value of the Shares under section 238 of the Companies Law. How those principles should be applied to the facts of the present case, which were disputed to a material extent, in light of the expert evidence formed the central controversy.

4.    The governing legal approach was summarised in the Company's Written Opening Submissions as follows:

"*11. The meaning of fair value in the Cayman Islands has not been clarified by a precise legal definition. Nevertheless, the main concepts are becoming easier to express with the benefit of recent authority. For introductory purposes, the following points are the key ones:*

> *11.1 It is the Dissenters' shares in the Company that are being valued;*

> *11.2 The valuation is intended to compensate the Dissenters for the fair value of their shares and reflects an economic exchange of the rights and obligations attaching to the shares for cash;*

> *11.3 'Fair' adds the concepts of just and equitable treatment, and flexibility, to 'value';*

> *11.4 Fair value applies to both the Dissenters and the Company; neither side should be preferred, and fair value does not require that the price must be the highest possible;*

> *11.5 Excluded from fair value are the benefits and burdens of the merger transaction itself;*

> *11.6 Minority shareholdings are to be valued as such, subject to the particular rights and liabilities attaching to the shares.*

*12 Consistent with these principles, in this case the experts have proceeded on the basis that fair value is to be expressed on a "per share" basis and have agreed that fair value refers to the value of a share in the Company as a going concern, and does not include advantages which accrue to the Company as a result of the merger, including anticipated synergies, and that minority shareholdings are to be valued as such.*"

5.   The Written Opening Submissions for Trial on behalf of the Dissenters described the governing legal principles concisely as follows:

> "*2. The term "fair value" has a well-established meaning in Cayman law. As will be set out in detail below, it does **not** mean "merger price" or "market value" or even "fair market value". Rather, it means what has been described as the **intrinsic** value of shares in the Company, valued as a going concern and taking into account all value-relevant information, whether or not available to the market, whilst leaving out of account any factors peculiar to a particular buyer or seller but irrelevant to the value of the business, and any enhancement*

*or reduction in value arising from the merger itself. The statutory meaning of "fair value" is the only matter of law in this case, and the law is well established. The rest is the application of the evidence."*

6.   The main headline factual issues in controversy were the following:

   (a)   whether the adjusted Market Price was the most appropriate valuation. The Company's primary position was that US\$30.45 reflected the fair value of the Shares. It was common ground that it would only be appropriate to use this if:

      (i)   the market was semi-strong efficient; and

      (ii)   there was no material non-public information ("MNPI") about the value of the Shares;

   (b)   what, either as a check on the validity of the Market Price or because the Market Price was not an appropriate methodology to use, was the fair value of the Shares using the DCF valuation method. The Dissenters' primary position was that their Expert's DCF valuation should be adopted by the Court. Both Experts carried out what each contended was the correct valuation exercise but generated starkly different results:

      (i)   \$33.23 per share (Professor Fischel's mid-range figure);

      (ii)   \$76.51 per share (Professor Gompers);

   (c)   the critical elements for an appropriate DCF analysis were agreed in principle but the precise values to be applied to each input on the facts of the present case were contentious. The key elements are:

      (i)   central or reasonable estimates of projected cash flows;

      (ii)   a discount rate that reflects the risks attached to those projections, based on the Company's weighted average cost of capital ("WACC");

      (iii)   a perpetuity growth rate based on central or reasonable estimates of long-term growth; and

   (d)   whether the Merger Consideration or Take–Private transaction price of \$32.50 (the "Transaction Price") was a relevant indicator as to the fair

value of the Shares. The Company contended that the Transaction Price included a premium but was a useful indicator of fair value while the Dissenters contended that the process adopted fell short of being an arms' length transaction.

## THE COMPANY'S FACT WITNESSES

### Graeme Halder

#### Overview of witness

7.    Mr Graeme Halder was at all material times Chief Financial Officer of the Company. A Chartered Accountant, he was responsible for the preparation of the Company's financial statements and the financial projections which were central to the contentious DCF valuation analysis. He left the Company in August 2018.

8.    I found Mr Halder to be a credible witness who generally gave his evidence in a careful and (in the face of probing cross-examination) impressively objective manner. His capacity for answering questions with precision is illustrated by the following exchanges during cross-examination by Mr Adkin QC:

> "...So it looks like early part of December the
> Project Darwin process is halted; yes?
> A. I mean, obviously I'm not copied on any of the emails,
> so I can't comment on those, but I was aware that, you
> know, the Project Darwin did come to a halt in either
> late November or early December.
> Q. I see.
> A. So, yes, I'm aware that that happened but not through,
> obviously, this process. I wasn't copied in on any of
> these emails.
> Q. I see. And were you involved in the decision to halt
> it?
> A. No.
> Q. Do you know who was involved in that decision?
> A. No.
> Q. Do you know why that decision was taken?
> A. Well, I can't if I did not know who was involved in
> taking it.
> Q. I think it's probably logically possible, but anyway,



> *your answer is no, you don't?*
> *A. Correct."*[1]

9.    His ability to respond to potentially contentious questions in a balanced, fair yet firm
      manner is provided by the following extract from the Transcript:

> "*A. That is what EY are saying, yes.*
> *Q. That's what they are saying. And if we go to page 4,*
> *{HSD/18/4}, there is a number of quick wins, so we have*
> *got food and catering, books, IT, it seems to be around*
> *there, facilities and management on the edge. Yes, do*
> *you see that?*
> *A. Yes, I can see it.*
> *Q. And this was pretty realistic, wasn't it? There were*
> *some pretty -- there is some low hanging fruit, where*
> *savings could be made?*
> *A. I mean, you know, I think there was an opportunity in*
> *procurement to make savings. I think there weren't*
> *quick wins, as we discovered when we came to actually*
> *implement it, which was later on in this year. You*
> *know, to change the way a school operates -- it's*
> *a fairly individual place, it operates as it wants to*
> *operate per the principal, which is one of the*
> *challenges of managing a global education business and*
> *trying to get them to buy into the idea of, you know,*
> *that procurement is a foreign language that you have to*
> *work hard to try and get them to understand. So, you*
> *know, my view is I think there was an opportunity.*
> *I think there is an opportunity. I'm not sure how much*
> *of it has been got as of today but the idea of quick*
> *wins I thought was always going to be difficult because,*
> *you know, there is absolutely no doubt about the*
> *analysis that says there are opportunities."*[2]

10.   Perhaps the most important contentious aspect of his oral evidence was Mr Halder's
      characterisation of the approach he followed in preparing forecasts of future
      performance:

---

[1] Transcript Day 2 page 34 line 6-page 35 line 1.
[2] Transcript Day 2 page 169 line 17-page 170 line 22.



"Q. ...And what it says is that you had told Houlihan Lokey
that the projections you gave them had been reasonably
prepared -- let's just ignore the word "reasonable", if
you like -- that they had been prepared in good faith on
bases reflecting the best currently available estimates
and judgments of management as to the future financial
results and condition of the company, and that is indeed
the basis upon which they had been prepared, isn't it?
A. Yes, the information at that point in time, yes.
Q. Yes. What you had done was produce projections that
reflected what you believed in good faith, quite
honestly, to be the best currently available estimates
and judgment -- your estimates and your judgment -- as
to the future financial results and condition of the
company; yes?
A. Yes, based on the way I produce forecasts.
Q. Well, what do you mean by that?
A. I mean, when I'm producing -- you know, so what I would
like to say is, you know, when I was producing these
forecasts, the one thing I didn't envisage would be
sitting here two and a half years later discussing the
forecasts. I approached forecasts very similarly
throughout my career for 30 years, that you mentioned,
that I did forecasts and I defined it in the responses
to some of the letters as ambitious but achievable, and
I've also talked about the fact that I did not have risk
weighting within that, and that's the way that I did
forecasts, you know. They were always stretching.
That's what a CFO does in a business, he does stretching
forecasts, stretching targets to push the business to
try and achieve. And I — you know, these forecasts
were no different to the August 16 forecasts I did or
the November 16 forecasts I did or the April -- sorry,
the August 17 projections I did or the ones I did for
the IPO or any other projections I did at Nord Anglia or
anywhere else. They were stretching, they were
ambitious but, in my view, achievable. So I think
that's sits within that wording that I had created
forecasts that were my best view of, you know, what the
company could achieve at that point in time. What
I didn't do was put in a risk weighting. And I've
discussed why I didn't do that in my affidavit; it's
difficult -- it's difficult to know how to risk-weight



> *things that you don't know, that invariably are probably*
> *going to happen in the future but haven't yet happened.*
> *And I can give, you know, a myriad of examples of that,*
> *things that have happened in the past that, when we did*
> *previous five year projections we didn't know about, you*
> *know, some of which are pretty material."*[3]

11. Save as regards the narrow issue of this portion of his evidence relating to the basis on which he prepared his projections, his credibility was not directly challenged. Even the sole challenge was advanced in a very nuanced way. I shall return to this issue in further detail below.

12. Overall Mr Halder appeared to me to give his evidence in a level-headed non-partisan manner. He briefly departed from this approach after lunch on the day of his testimony, causing me to speculate whether during the short adjournment he had been subjected to a passing jibe about giving his evidence in an overly 'passive' manner. Under cross-examination by Mr Adkin QC about future earnings potentials at around 3.00pm, he responded as follows:

> *"...So that's a pretty promising outlook for the*
> *China Bilingual market, is it not, being expressed by*
> *Parthenon in this March 17 report?*
> *A. I mean, it might be that Ian Johnson was involved in*
> *either the agenda or reviewing this. So he might be*
> *a better person to ask because he was --*
> *Q. I will do.*
> *A. -- directly responsible for that. You know, what*
> *I would say about it is I'm sitting here thinking*
> *I wonder why we paid them the money because it's pretty*
> *useless because if you look on the previous page, if we*
> *can just go back, and I read the cities that they*
> *reviewed and I don't know why -- sorry, the one*
> *before -- why they chose the cities they chose, and Ian*
> *will be able to correct me..."*[4]

13. A few minutes later, the witness was forced to admit that the Company itself had requested Parthenon to study the cities they chose to study[5]. This was a very minor error

---

[3] Transcript Day 2 page 49 line 19-page 51 line 17.
[4] Transcript Day 2 page 153 line 13-page 154 line 2.
[5] Transcript Day 2 page 155 line 8- page 156 line 7.

on a matter as to which the witness admitted he had limited information, but it struck me at the time as flowing from the witness atypically providing a loose answer designed to bolster the Company's case. Thereafter, it appeared to me, Mr Halder resumed the predominantly careful and neutral manner in which he gave his oral evidence.

**Overview of evidence-in-chief**

14. Mr Halder's First Affidavit was sworn on January 31, 2018 ("First Halder Affidavit") when he was still resident in Hong Kong and employed as Chief Financial Officer of the Company. For present purposes, this Affidavit pertinently supported the Petition by explaining the mostly non-contentious background to the Merger Agreement and the Company's business. In summary:

    (a)    the Company's main business involved managing international schools from the pre-school to secondary level. At that time, the Company operated 54 schools in 24 countries with a student enrolment of over 49,000 and staff of over 9,000;

    (b)    the Company's business originated (under a different corporate structure) in 1972 from a base in the United Kingdom. The Company's centre of management has been located in Hong Kong since 2012. The Company's initial public offering on the New York Stock Exchange ("NYSE") took place on March 26, 2014 and the Shares were listed until September 1, 2017;

    (c)    since 2008 the Company's majority shareholder has been Premier Education Holdings ("Premier"). Some 96% of Premier's shares were held by The Baring Private Equity Fund III and the Baring Private Equity Fund IV (the "Selling Funds"/"Fund III" and "Fund IV"). The Selling Funds are affiliated with "*one of the largest independent alternative investment management firms in Asia*"[6], Baring Private Equity Group Asia Limited ("BPEA");

    (d)    the Merger Transaction was an arms' length take-private acquisition transaction between the Company and a buyer consortium comprising:

        (i)    The Baring Asia Private Equity Fund VI, L.P. 1, The Baring Asia Private Equity Fund VI, L.P. 2 and The Baring Asia Private Equity Fund VI Co-investment L.P. (the "Buying Funds"/"Fund VI LP 1", "Fund VI LP 2" and "Fund VI Co-investment LP"); and

---

[6] First Halder Affidavit, paragraph 10.

(ii)     Canada Pension Plan Investment Board ("CPPIB"), which
         represents 20 million contributors/beneficiaries

(together the "Buyer Group);

(e)      BPEA informed the Company's Board of Directors (the "Board") of its
         interest in an acquisition at a Board meeting on January 13, 2017. The
         Board established a special committee comprised of two independent
         directors unaffiliated with either the Buyer Group or the Company's
         management (the "Special Committee"). The Special Committee
         engaged Houlihan Lokey Capital, Inc. ("Houlihan Lokey"), a specialist
         adviser, to prepare a fairness opinion on the proposed transaction;

(f)      the Company created a transaction due diligence data room but was not
         involved in the negotiations between the Special Committee and, *inter
         alia*, the Buyer Group between January and April 2017. Discussions
         took place between the Special Committee's professional advisers,
         BPEA and the professional advisers of the Buyer Group;

(g)      an initial non-binding offer was made by the Buyer Group on April 4,
         2017 of US$30 per Share, which offer was rejected. The Buyer Group
         raised its offer to US$32.00 per Share, but the Special Committee
         insisted on a "go-shop" provision to permit the pursuit of other offers
         within a 30 day period. Following further discussions, the Buyer Group
         increased its offer by 50 cents to US$32.50 per Share;

(h)      Houlihan Lokey verbally advised the Special Committee that the offer
         price was fair in advance of providing its formal written fairness
         opinion;

(i)      on April 25, 2017, the Special Committee determined that it was
         advisable to enter into the Merger Agreement, the Plan of Merger and
         the related transactions contemplated by those agreements. The Board
         decided to enter into the Merger Agreement on the same date subject to
         approval at an extraordinary general meeting ("EGM");

(j)      the main features of the Merger Agreement were as follows. US$32.50
         was the consideration for each Share ("Merger Consideration"). Bach
         Acquisitions (the "Merger Sub") would be merged with the Company.
         The Company would continue to exist as a subsidiary of Bach Finance
         Limited (the "Purchaser"), but the Merger Sub would cease to exist. The

> Company would cease to be a listed company and would be beneficially owned by the Buyer Group;

> (k)   also on April 25, 2017, the Merger Agreement and a Share Sale and Support Agreement ("SSSA") were entered into between Premier and the Parent. The Merger Agreement was announced. The previous day, the closing trading price of the Shares was US$27.62;

> (l)   the offer price represented a premium of 17.7% above the pre-announcement closing price and 24.2%, 31.7% and 33.8 % respectively above the weighted average daily trading price of the Shares over the previous 30-day, 60-day and 90-day period;

> (m)   the go-shop period ended 30 days after April 25, 2017 and no other bids were received although Houlihan Lokey on behalf of the Special Committee contacted one potential strategic bidder and 14 potential financial bidders;

> (n)   the EGM was held on August 21, 2017. 79,369,500 Shares (approximately 85% of the shares represented at the EGM) voted in favour of the Merger and 14,006,383 Shares (approximately 15% of the shares represented at the EGM) voted against. The Merger became effective on September 1, 2017 when the Plan of Merger was executed and filed with the Registrar of Companies.

15.   Mr Halder's Second Affidavit was sworn on April 10, 2019 ("Second Halder Affidavit"). By this time he was no longer Chief Financial Officer of the Company and was residing in England. The Second Halder Affidavit explained the basis on which he had prepared financial projections while in the Company's employ. In summary:

> (a)   annual budgets prepared by a small team he directed were the primary basis on which the Company made its financial plans. Occasionally projections would be prepared for the purposes of raising debt and/or equity;

> (b)   in August 2016, Mr Halder prepared 5 year projections for the first time as part of the annual budget process. These forecasts formed the basis for all subsequent Company forecasts;

> (c)   in November 2016, Mr Halder prepared an updated version of the August 2016 5 year plan in connection with Project Darwin, another potential sale ("November 2016 Projections"). The 'Bank Model' sheet

was not prepared by him but was based on his figures insofar as it included 5 year projections. The additional "Projections to Reach Steady State" covering the period 2022-2026 were neither prepared by Mr Halder nor based on his figures. His own figures for financial years 2017-2022 represented his "*ambitious but achievable view at the time*"[7];

(d)   the next five year projections prepared by Mr Halder's team were in April 2017 ("April 2017 Projections") in the context of the Merger transaction. This update included additional updated material and included additional (presumably electronic) features (the option of turning on and off certain new developments)[8]. These projections were supplied to Houlihan Lokey. Mr Halder "*did not consciously apply any risk-weighting to the April 2017 Projections. They were ambitious*"[9];

(e)   after the Merger Agreement was consummated, the Buyer Group prepared its own projections which were more aggressive than the Company's as part of the Group's debt raising and syndication process. The main difference was that BPEA models assumed a positive impact on future earnings attributable to Operational Excellence. Based on Mr Halder's own experience in the business he regarded the BPEA assumptions as being "*very ambitious... [but] not outside the realms of possibility*"[10];

(f)   between April and August, Mr Halder's focus was on preparing a full budget. Ian Johnson and the China Bilingual team were requested to prepare more detailed projections because the China Bilingual project was a major area targeted for future development. Existing projections were based on the experience of one such school already operating in China. Between July 2 and August 1, 2017 Mr Johnson forwarded to Mr Halder revised projections for the China Bilingual project. The July 26, 2017 Projections for China Bilingual were far more conservative than those included in the April 2017 Projections. Because Mr Halder did not appreciate the significance of the distinction at the time, he did not include the new figures in the August 2017 5 year plan (the "August 2017 Projections"). Apart from this oversight, the August 2017 Projections represented Mr Halder's "*most up-to-date view of the Company's foreseeable performance as of the valuation date*"[11];

---

[7] Second Halder Affidavit, paragraph 12.
[8] In the course of the trial, various figures in Excel spreadsheets were digitally altered to demonstrate the financial impact of different inputs on projected share values.
[9] Second Halder Affidavit, paragraph 15.
[10] *Ibid*, paragraph 19.
[11] *Ibid*, paragraph 23.



(g) Mr Halder deposed that his projections were never risk-weighted in part because risks were difficult to model and in part because the Company operated on the basis that its core business was sufficiently robust that any adverse risks could be absorbed. He also noted that no provision had been made for possible depreciation in foreign currencies, because foreign currency earnings had been converted into US dollars.

## Alan Kelsey

### Overview of witness

16.    Mr Alan Kelsey was at all material times Chairman of the Company and, as an independent director, one of the two members of the Special Committee which recommended to the Board of the Company that the Company could properly enter into the Merger Agreement. He obtained a BA and MA from Oxford University. He joined the Company's Board in 2003 and became Chairman in 2005. He left the Company at the end of August 2017, by which time he had a business career which spanned nearly 50 years.

17.    I found Mr Kelsey to be a credible witness who generally gave his evidence in a careful and (in the face of vigorous cross-examination) impressively objective manner. He acknowledged that he had no experience of merger transactions and deferred to specialist advisers Houlihan Lokey and Kirkland & Ellis as regards the detailed management of the process. He also admitted that a key player in the Buyer Group was a longstanding colleague who might have sought to exploit their personal relationship. For instance:

> "*Q. Didn't you see the inherent risk that, even unconsciously, your personal business relationship with Mr Hennessy might compromise your ability to represent the unaffiliated shareholders fearlessly and effectively?*
>
> *A. No, I had thought about that and I didn't think that and*
>
> *I felt -- I took comfort from the fact I had my own legal and investment banking advisers to give me advice,*
>
> *and I suppose subconsciously, I felt if I'm going to*



*stray off the straight and narrow, they would put me right.*"[12]

18. A mature man with a somewhat Churchillian air, he imperiously swatted away the suggestion that he had in personal terms been improperly motivated in approving the transaction, under cross-examination by Mr Millett QC:

> "*Q. So can we take it from that, Mr Kelsey, that the benefit*
>
> *to you of this   merger was that you would not only get*
> *$32.50 in cash for your Nord shares as at or after*
> *31 August, but you would also get that price in cash for*
> *your restricted units?*
> *A. Yes.*
> *Q. Was that something of an incentive to you personally to*
> *get this deal done?*
> *A. At the highest price, yes. But if -- I believe*
> *Professor Gompers is postulating a value of $76 and if*
> *it had been $76, I would have got 10 million more or*
> *something like that.*
> *Q. Never mind about what Professor Gompers does or doesn't*
> *say, Mr Kelsey, I think the answer is that it was an*
> *incentive to you personally to get the deal done.*
> *A. It was an incentive for me to get the highest price.*"[13]

19. Although it was never positively asserted that Mr Kelsey had deliberately misled the Court, it was contended by way of submission that the Court should infer from his evidence that the transaction process was seriously flawed.

**Overview of evidence-in-chief**

20. Mr Kelsey's First Affidavit was sworn on April 4, 2019 ("First Kelsey Affidavit"). Its main purpose was to explain his involvement in the Special Committee's work in relation to recommending the Company's entry into the Merger. He deposed in summary as follows:

> (a) the work of the Special Committee was primarily carried out by its advisers and he did not personally have a detailed recollection of all that occurred. However, the process is described in detail in the Company's

---

[12] Transcript Day 3, page 141 lines 1-11.
[13] Transcript Day 4 page 98 line 18-page 99 line 8.



proxy statement dated July 11, 2017 (the "Proxy Statement") and the minutes of various meetings and calls;

(b) both he and Mr Nicholas Baird (a former British Ambassador to Turkey and Board member since 2015) were appointed as Special Committee members in January 2017. Neither had in-depth experience of mergers, but they each understood the Company's business well. They considered they were well supported by Houlihan Lokey and attorneys Kirkland & Ellis;

(c) both Messrs Kelsey and Baird understood that their role was to negotiate and recommend a deal which was in the best interests of the shareholders in circumstances where Premier was controlled by BPEA and had the voting power to approve any merger. As far as Mr Kelsey himself was concerned:

> "...To me, this meant that the Special Committee had a particular responsibility to negotiate the best terms possible for the non-BPEA affiliated shareholders (which I refer to as the 'minority shareholders') and only to approve such a deal and recommend it to the Board and to shareholders if were satisfied that we had met this obligation. That is the mind-set that I took into this task and which I was confident we had achieved in the result we attained"[14];

(d) Mr Kelsey summarised his personal reasons for approving the transaction as follows:

(1) Premier's interest in obtaining a high price, which he took for granted, was aligned with the interests of the minority shareholders,

(2) the Special Committee was able to negotiate freely with CPPIB as the lead investor,

(3) his job was to negotiate vigorously for the best possible deal for the Company and all its shareholders which was likely to succeed,

(4) the Special Committee's experienced team of advisors helped it to negotiate a price which valued the Company fairly and was favourable to minority shareholders;

---

[14] First Kelsey Affidavit, paragraph 9.

(5)    the merger price of US$32.50 was higher than the traded share price had ever been and Houlihan Lokey advised that it was a fair price from a financial point of view;

(6)    if another party had been willing to offer better terms, the agreement with the Buyer Group could have been terminated.

21.    A secondary function of the First Kelsey Affidavit was to respond to Experts' questions. These questions related to, *inter alia*, the Company's relationship with BPEA (or Baring), any common interests on the sell and buy sides, why Project Darwin failed, the appointment of Special Committee members and conflicts of interest, the appointment of advisors, the negotiation of the deal price, why the deal was not first offered to a wider pool of investors, the terms of the Merger Agreement (including the dropping of the 'majority of the minority' clause and the 'go-shop' provisions).

22.    Mr Kelsey's Second Affidavit was sworn on July 17, 2019 ("Second Kelsey Affidavit) in response to the First Affidavit of Anil Seetharam filed on behalf of the 18[th], 27[th] and 28[th] Respondents (the "Stockbridge Dissenters"). The essence of Mr Kelsey's more detailed response to criticisms of the 'go-shop' process is captured in the following portion of his written testimony:

> "...*I was and am unaware of there being any process failures with the go-shop process and I do not accept that the go-shop process was just window-dressing as Mr Seetharam tries to suggest. In fact, from my perspective as a member of the Special Committee, I considered the go-shop process to be competently and professionally managed...Had an offer been forthcoming from Stockbridge, the Special Committee would certainly have taken it seriously and considered whether it met the requirements to be taken forward.*"[15]

**Ian Johnson**

**Overview of witness**

23.    Mr Ian Johnson was at all material times Commercial Director of the Company's China Bilingual programme, who prepared the July 2017 projections which painted a less optimistic picture of this programme's prospects than was reflected in the Company's April 2017 and August 2017 financial projections. A Chartered Accountant, he joined the Company in 1995. He left the Company's full-time employ on August 31, 2019 and

---

[15] Second Kelsey Affidavit, paragraphs 9-10.

continued to work from England on a part-time basis, supporting the programme leader Ms Jian Tang.

24.    I found Mr Johnson to be a credible witness who generally gave his evidence in a straightforward and fair manner.

## Overview of evidence-in-chief

25.    The First Affidavit of Ian Johnson was sworn on April 5, 2019 (the "First Johnson Affidavit"). It was intended to supplement explanations given at the Management Meeting about the China Bilingual programme. His written evidence may be summarised as follows:

      (a)    in China, the Company operated (1) schools for mostly foreign nationals and (2) China Bilingual schools for mostly Chinese nationals;

      (b)    although there were four types of competitor for the China Bilingual business, a greater difficulty was securing land on which to operate the schools. Accordingly, it had not been possible to replicate the initial success of the "NACIS" school;

      (c)    additional challenges included obtaining licenses, construction time and the lack of brand familiarity for Nord Anglia in cities where no international schools already existed;

      (d)    in May 2017 Mr Andrew Fitzmaurice and Mr Graeme Halder asked Ms Tang and Mr Johnson to prepare a 5 year forecast for the China Bilingual business. The forecast model was completed on July 26, 2017. Mr Johnson described the basis for this model as follows:

> "...*In preparing this model we had taken into account recent market research from Parthenon which gave details of the potential for the bilingual schools market in various tier 1, tier 2 and tier 3 cities, the competition which existed, the student numbers and growth in existing schools, the fee rates in those schools and other matters as well as input from our newly established business development team in Shanghai. Ms Tang and I looked at these findings, in order to establish the assumptions for the model...Between us we determined the inputs for student numbers and fee levels and this was developed into a model...*"[16];



---

[16] First Johnson Affidavit, paragraphs 19-20.

(e)     the result of this analysis was projections far lower than the previous China Bilingual projections which had been based solely on the performance of the NACIS school in Shanghai. Account had to be taken of the fact that fee increases required regulatory approval. The lower forecast projections were also because, *inter alia*, the proposed schools were to be set up in smaller, less wealthy and more remote cities, resulting in likely far lower full time enrolment ("FTE") targets being achieved;

(f)     a significant commercial problem unique to China was the problem of extracting cash from both international and bilingual schools, described as the "*non-fungible cash generated in China*" problem. Regulatory changes in 2016 were the source of this impediment to extracting distributable profits.

**Patrick Cordes**

**Overview of witness**

26.     Mr. Patrick Cordes was at all material times Chief Financial Officer of Baring Private Equity Asia ("BPEA"). By the date of the trial he was an employee of more than 13 years' standing who had also been a Managing Director since 2015. After graduating from Lehigh University in Pennsylvania in 1997, he had worked for some nine years with Deloitte in New York and Hong Kong. In 2006 he became Financial Controller for BPEA; and he was promoted to Chief Financial Officer in 2008. Mr Cordes was primarily cross-examined about the dual role played by Baring on the "Sell Side" and the "Buy Side".

27.     Mr Cordes was by far the youngest of the Company's fact witnesses. He had seemingly not previously given evidence in a court and at one juncture became somewhat discombobulated by the barrage of questions he was required to answer. He appeared to be a "bright young spark" comfortably embedded in the environment he worked in and with a firm grasp of the relevant facts. I found him to be a credible witness who gave his evidence in a straightforward and fair manner overall. On the contentious issue of the efficacy of the transaction process, for instance, he gave what appeared at first blush to be a very frank response to robust cross-examination by Mr Millett QC:

> "*Q. Who was representing the sellers -- other than the
>         special committee for the unaffiliated shareholders, who
>         was representing the BPEA affiliated funds on the
>         seller's side?
>     A. Technically, we had taken the team and separated it,
>         meaning Kosmo Kalliarekos was serving the sell side,*



> *Jack Hennessy was doing buy. But at the same time, it's*
> *not -- you know, there is no Chinese wall. You know,*
> *investment committee meetings, people are all present.*
> *So it's just something to have some consideration on*
> *sides.*
> *Q. Yes. So is it right to say that actually there was no*
> *negotiation between the seller side -- the affiliated*
> *BPEA funds on the seller side and those on the buyer*
> *side?*
> *A. Because, like I said, if anything, it was -- you had*
> *CPPIB, who was reticent about price, believing it's too*
> *high. So, in fact, we had to work to get them up. So*
> *it wasn't that Jack Hennessy was only trying to work*
> *down, we actually were working the buyer group up to the*
> *level that we believed was the full fair price.*"[17]

28.   The Dissenters did not suggest that he was not an honest witness but submitted that
      Mr Cordes "*was not a very impressive witness and the Court should be very cautious
      before relying on anything he said*"[18].

**Overview of evidence-in-chief**

29.   The First Affidavit of Patrick Cordes was sworn on July 11, 2019 (the "First Cordes
      Affidavit"). He was part of the team that structured the Merger transaction and sat in
      on various meetings where the transaction was discussed. The main function of his
      First Affidavit was to reply to the First Seetharam Affidavit. His evidence may be
      summarised as follows:

      (a)   the BPEA Funds which were relevant to the First Seetharam Affidavit
            were Funds III and IV, which had beneficial interests in the Company
            pre-Merger, and Fund VI which acquired a beneficial interest through
            the Merger. Each Fund had separate General Partners;

      (b)   BPEA was a subsidiary of Baring Private Equity Asia Group Limited
            ("BPEAG"), which was either the parent of or investment advisor to
            seven Funds established by BPEA from 1997. The deponent referred to
            BPEA, BPEAG, the Funds and their General Partners collectively as
            "BPEA Group" :

---

[17] Transcript Day 4 page 143 lines 4-24.
[18] Dissenters' Written Closing Submissions, paragraph 43.



> *"12. BPEA is a subsidiary of Baring Private Equity Asia Group Limited ("**BPEAG**"), the investment advisor or parent to the investment advisor of all Baring Private Equity Asia funds (collectively '**BPEA Group**')"*;

(c)     he further deposed that:

> *"17...the BPEA Group, Fund III and Fund IV were strongly incentivised to achieve the highest possible price for the Company shares beneficially owned by Funds III and IV"*;

(d)     Fund VI only acquired an interest post-Merger via the Merger process along with CPPIB. Fund III beneficially owned a 6.8% stake in the Company and Fund IV 63.7%;

(e)     although the Proxy Statement showed the Company's ownership post-Merger would be CPPIB 61.9% and Baring Filing Persons 38.1%, it was always intended to reduce that stake by selling on to co-investors. After the process of syndication which actually occurred, CPPIB only beneficially owned 36.9% and Fund VI beneficially owned 21.1% with co-investors beneficially owning 39.8% and the BPEA Group itself only owning 2.2%;

(f)     prior to the Merger, the BPEA Group had owned 1.8% so there was not any significant increase in its stake resulting from the transaction. Moreover, BPEA was very mindful of its fiduciary duties to the investors in Funds III and IV, whose interests lay in achieving the maximum possible price. In any event, the Advisory Boards of those Funds approved the Merger Consideration;

(g)     the threshold for the Baring General Partners to receive 20% of any sale proceeds received by Funds III and IV had been reached, so BPEA itself was incentivised on the Sell Side. There were no hidden benefits accruing to BPEA on the Buy Side.



**THE DISSENTERS' FACT WITNESS**

**Anil Seetharam**

<u>Overview of witness</u>

30.     Mr Anil Seetharam was at all material times Managing Director of the Stockbridge
        Dissenters. The main function of his evidence was to explain why the Stockbridge
        Dissenters were, as long-term minority investors in the Company, dissatisfied with the
        value assigned to their Shares.

31.     Mr Seetharam appeared to me, somewhat like Mr Cordes, also to be a "bright young
        spark", with a firm grasp of the private equity world he works in and the facts relevant
        to his testimony. Despite his obvious enthusiasm about advancing his company's cause
        I found him overall to be a credible witness who generally gave his evidence in a
        straightforward manner. Under cross-examination by Lord Grabiner QC, for instance,
        he fairly made the following concession:

> "*Q. Anyway, I think you are saying that you can't recall --*
> *well, correct me if I am wrong, you can't recall an*
> *occasion where you were asking for information which you*
> *reasonably thought you were entitled to but they*
> *wouldn't give it to you?*
> *A. We asked for lots of things and I would say the majority*
> *of times in most public companies, the answer you get*
> *is, 'No, we can't give that to you'.*
> *Q. What about Nord though? I'm not interested --*
> *A. Nord was no different.*"[19]

32.     His credibility was challenged as regards one aspect of his testimony in particular,
        namely his evidence that the Stockbridge Dissenters only prepared written valuations
        of the Shares after the Merger Agreement had been consummated. I shall return to this
        issue in more detail below.

<u>Overview of evidence–in-chief</u>

33.     The First Affidavit of Anil Seetharam was sworn on February 15, 2019 (the "First
        Seetharam Affidavit"). It explained Stockbridge's role as an investor in the Company,
        why it dissented and expressed concerns about the fairness of the go-shop process. Mr
        Seetharam's evidence may be summarised as follows:

---

[19] Transcript Day 5 page 29 lines 12-21.

(a)   Stockbridge first invested in the Company's Shares in July 2014 and increased its stake until the Merger. It was a long-term investor, not an appraisal arbitrageur, and one of the largest outside investors, holding 6,049,035 Shares at the Merger Date;

(b)   over that three year period, Stockbridge maintained a constructive dialogue with BPEA's lead Board representative (Kosmas Kalliarekos), spoke to Company Management and visited school campuses in Hong Kong, Shanghai, Beijing and Houston;

(c)   Stockbridge strongly believed the Transaction Price seriously undervalued the Company, and made this position known to the Company as soon as the Merger was announced on April 25, 2017;

(d)   Stockbridge expressed an interest in making a joint bid to representatives of CPPIB on April 28, 2017 and expressed an interest in participating in the go-shop process to Houlihan Lokey on May 3, 2017. It did not pursue this option because it was told any bid would have to be based on publicly available information. Although after the Go-Shop period expired and before the Proxy had been belatedly filed Houlihan Lokey said an unsolicited bid could still be made, this was not viewed as a serious proposition in light of the informational advantages enjoyed by the Buyer Group and the 2/3rds majority interest of BPEA;

(e)   this left Stockbridge (and presumably other Dissenters) with the sole option of dissenting as they believed there was a significant gap between the Merger Consideration and fair value.

34.   The Second Affidavit of Anil Seetharam was sworn on May 28, 2019 (the "Second Seetharam Affidavit"). It dealt with Dissenter discovery issues.

## THE COMPANY'S EXPERT EVIDENCE

### Professor Daniel Fischel

#### Overview of Witness

35.   Professor Daniel Fischel is President and Chairman of Compass Lexecon, a consultancy, with specialities including Valuation and Financial Analysis. He qualified

as a lawyer in or about 1979 and in 1982 became a professor of law at Northwestern University School of Law. He was the Lee and Breena Freeman Professor of Law and Business at the University of Chicago Law School between 1984 and 2005 (with his chair being awarded in 1984). Professor Fischel has given expert evidence in numerous cases in the United States for over 40 years. Unsurprisingly, he has published extensively. He has in recent years been accepted as an expert in several appraisal cases in courts including the Court of Chancery of Delaware, which court has a broadly similar appraisal regime to section 238 of the Companies Law.

36.     Although obviously an eminent expert and an impressive witness in general terms, Professor Fischel from time to time gave what appeared to me to be obtuse answers to questions on potentially contentious issues and to be unwilling to countenance any modification of the opinions recorded in his Expert Reports. For instance, when questioned about academic literature suggesting that "go-shops" were transaction devices which might push the merger price down unless they were properly structured, he seemed reluctant to admit even as a matter of general principle that the form a "go shop" took might be even potentially relevant to the resultant merger price:

> "Q...Let's see if we can cut this short.  There
> is an article you cite yourself by Subramanian and Zhou.
> It's {F/86/46}.
> I'm sorry to dive in in the middle of a complex
> piece of academia, which is on this subject, but do you
> recognise this?
> A.  Yes, I'm very familiar with this article and I actually
> discuss it at some length in my report.
> Q.  You do, which is why I'm assuming you are familiar with
> it.  It says in the last paragraph:
> "We agree with Vice Chancellor Laster's formulation
> of existing Delaware doctrine."
> He's got four bands about the sale process:
> 'As a matter of policy, we further believe that this
> is a sound formulation, because it encourages good deal
> processes.  The key question, of course, is what deals
> should go in each band.
> 'On that key question, we are not suggesting that
> go-shops are categorically bad, ie automatically pushing
> the deal into Band 3 or Band 4.  There may be good
> reasons for sellers to want to limit pre-signing
> competition (eg, to avoid leaks, grab the 'bird in
> hand', et cetera).  However, the key doctrinal takeaway
> from this Article is that the use of a go-shop in lieu



*of a traditional pre-signing market canvass
(particularly a 'pure' go-shop) should generally push
the deal down on this spectrum, but this presumption of
a downward nudge can be overcome by a properly
structured go-shop."
Do you agree with that?
A. I don't know what's meant by "a properly structured
go-shop". What I discuss in my report is, even with
respect to this article, which probably in the spectrum
of academic literature on go-shops is more critical of
go-shops than many other articles that I also discuss --
but even with respect to this article, it discusses the
number of topping bids that have resulted in
transactions with go-shops, so I would say that, even
based on the commentary in this article, there is not
a basis to conclude that go-shops are useless or
shams --
Q. No --
A. -- and don't encourage the existence of topping bids.
Q. I haven't suggested that and nor do the learned authors
of this article..."[20]*

37.   However, the following day, dealing with the same broad topic of transaction process,
he gave a more straightforward and fair answer to a question of general principle:

"Q... *As a general question, though, it's right, isn't
it, that whether negotiated sales are better than
auctions at producing value for sellers will vary from
case to case depending on the facts and circumstances?*
A. *Yes, that's correct.*"[21]

38.   And under further cross-examination by Mr Millett QC on the "*go-shop*" question,
Professor Fischel was ultimately willing to make a concession about the limited
parameters of his Report:

"Q. *All right. Let's turn to a different topic. Do you
accept that the robustness of a go-shop doesn't depend*

---

[20] Transcript Day 6 page 198 line 18-page 200 line 16.
[21] Transcript Day 7 page 1 lines 20-24.



*solely on the legal terms of the go-shop but also the*
*way in which it was conducted?*
*A.  Yes, of course, I would agree.*
*Q.  And it's right, isn't it, in the way you deal with this,*
*apart from the proxy statement and the contractual*
*documentation, you don't refer to a single*
*contemporaneous document on the record as part of your*
*report, which tends to show how, in fact, the go-shop*
*exercise was conducted?*
*A.  That may very well be true, I don't know.*
*Q.  So, in fact, you were considering this go-shop entirely*
*in the abstract?*
*A.  Well, I not only discussed the articles that you*
*referred to about go-shops, I also looked at the*
*empirical evidence about go-shops, including in the*
*exhibit that you just showed me, but I did not conduct*
*a detailed factual investigation of how this particular*
*go-shop was conducted, other than what's already stated*
*in my reports.*"[22]

39.  He was in general terms a credible and objective expert witness.  The Dissenters sought to paint the Company's Expert as "*an evangelist for the market price as the primary, and in this case only, data point for fair value*"[23].  That argument deserves careful consideration.  It was further submitted that Professor Fischel gave his evidence in a "*combative*" manner, as an "*advocate for the Company…inconsistent with the duties of an expert witness before this court*"[24].  This argument is summarily rejected as an unjustified characterisation of the manner in which the Company's Expert testified overall.

40.  Nonetheless Professor Fischel did not appear to me to make a single concession on the merits of any issue which was significant to his main opinions in the present case.  In these circumstances I consider that the most critical aspects of his testimony should be approached with some care.

---

[22] Day 7 page 17 line 6-page 18 line 1.
[23] '*Written Closing Submissions of the Dissenting Shareholders*', paragraph 11.
[24] *Ibid*, paragraph 20.



**Overview of evidence-in-chief**

41.    Professor Fischel's Expert Report was dated July 18, 2019. In paragraph 22 of his
       Report, he summarised his principal conclusions as follows:

           "

           • *Market evidence generally provides the best estimate of the fair market
             value of a company's common stock because market transactions reflect
             what willing buyers paid willing sellers for that stock. The closing price
             of Nord Anglia Education's ordinary shares on the day before the
             Announcement Date of $27.42 (the 'Unaffected Price') provides a
             reliable estimate of the fair market value of a Share if market
             participants believed that there was a possibility that the Company
             would have been acquired at a premium. When adjusted to account for
             interim changes in market and industry conditions, the Unaffected Price
             implies that the fair value of a Share as of the Valuation Date was
             $30.45.*

           • *The Merger Consideration of $32.50 per Share that the Buyer
             Consortium agreed to pay, and Nord Anglia Education agreed to accept,
             is another form of market evidence that is relevant to an assessment of
             the value of a Share. However, the value of the Merger Consideration
             likely exceeds the fair value of a Share because the Merger
             Consideration presumably reflects a sharing of the gains the parties
             anticipated would be created by the Transactions. This conclusion is
             supported by the process that led to the Transactions, the actions of
             insiders, the results of the go-shop process, analysts' target prices, and
             analysts' reaction to the announcement of the Transactions.*

           • *Based on a DCF analysis of the Company's contemporaneous
             projections, the fair value of a Share ranged from $28.64 to $41.19 on
             the Valuation Date, before adjusting for any discount that may be
             applicable to minority holdings. For various reasons detailed herein,
             however, I have concluded that a DCF analysis should be given little or
             no weight in the determination of the fair value of a Share.*

           • *The comparable company multiples analyses performed by analysts,
             and the financial advisor to CPPIB are consistent with my opinion that
             the Unaffected Price provides a reliable estimate of the fair value of a
             Share as of the Announcement Date. However, for reasons detailed
             herein, I have concluded that a comparable company multiples analysis*

> *should be given little or no weight in the determination of the value of a Share.*"

42.   Further to the Experts' Joint Memorandum dated August 29, 2019, Professor Fischel prepared a Supplemental Report dated September 24, 2019. A summary of the main conclusions reached in the Supplemental Report is as follows:

> "*5. Professor Gompers' conclusion that the fair value of the Dissenters' Shares is $77.45 per Share is implausible on its face because that amount bears no relation either to prices that willing buyers paid willing sellers for the Shares or to the value of the Merger Consideration that the parties to the Transactions reached in arm's-length negotiations. Moreover, none of Professor Gompers' reasons for disregarding market evidence withstand scrutiny. Furthermore, Professor Gompers' DCF analysis is fundamentally flawed, unreliable and fails the reasonableness check that he himself proposed but did not perform. Finally, Professor Gompers' analysis of the value of control is flawed...*
>
> *7. Section VI of this supplemental report describes three revisions to my DCF analysis, which, as revised, results in an estimated equity value per Share of $28.34 to $41.32 on the Valuation date, depending on the discount rate. This range contains my estimate of the fair value of Dissenters' Shares on the Valuation Date of $30.45 per Share. However, for the reasons discussed in my initial report and §IV.A infra, it is my opinion that DCF analysis should have little or no weight in the determination of the fair value of Dissenters' Shares.*"

43.   In Professor Fischel's oral examination-in-chief, he formally produced updated versions of Exhibit S-5 and S-8 to his Supplemental Report and produced four further Exhibits. The revisions reduced the lower point DCF valuation range by 30 cents per Share and increased the upper point in the range by 13 cents. This was a reduction of roughly 1.05% of the initial bottom figure in his range and an increase of roughly 0.31%. As trifling as these changes seem to be, it is noteworthy that they are minor changes to the upper and lower figures in a more generous range of potential values with a gap of just under $13 between top and bottom.



**THE DISSENTERS' EXPERT EVIDENCE**

**Professor Paul Gompers**

<u>Overview of witness</u>

44.     Professor Paul Gompers has since 2000 been the Eugene Holman Professor of Business
        Administration at Harvard Business School. After graduating from Harvard College in
        in 1987 and obtaining a Masters from Oxford University in 1989, he obtained a PhD in
        Business Economics from Harvard University in 1993. His pre-2000 academic career
        includes University of Chicago (1993-1995) and Harvard Business School (1995-
        2000). Unsurprisingly, he has an impressive list of publications. Professor Gompers
        has provided expert evidence to various United States courts over, *inter alia*, the last 5
        years, including appearing as an expert in appraisal litigation before the Delaware Court
        of Chancery.

45.     Applying the standards of <u>British</u> common law courts, it was surprising that Professor
        Gompers as an experienced expert witness often appeared to me to give his testimony
        on hotly contested issues in what for me seemed an overly partisan manner. This may
        partly be attributable to legal cultural differences and partly personality. Professor
        Gompers' resume reveals that that he is a marathon runner who in his youth was an
        alternate member of the US Olympic team. The Dissenters' Expert's engagement with
        Mr Boulton QC, who displayed admirable mastery of the expert materials in the course
        of his cross-examination spanning three days, often resembled an Olympian intellectual
        contest. A man with stellar academic credentials, Professor Gompers was an expert with
        strong views which were typically forcefully expressed. He was always clear (if not
        always convincing), but his initial reluctance to accept hypothetical scenarios which
        were inconsistent with his clients' cause diluted any semblance of objectivity on his
        part. Inevitably, this increased the need for his evidence to be approached with
        considerable care. Viewing his evidence fairly overall, I would reject the submission
        advanced in closing arguments that Professor Gompers fundamentally failed to
        discharge his duties as an independent expert witness altogether.

46.     The following exchange reflected the adversarial and somewhat bombastic stance that
        Professor Gompers often exhibited under cross-examination. The topic under
        discussion was four different ways of making adjustments to financial projections to
        take into account potentially negative outcomes:

                    "*Q. And if you didn't like any of those, you might add
                    a premium to the discount rate to reflect the fact that
                    your projections didn't build in the possibility of bad
                    outcomes.
                    A. I would fail you in finance if you did that. There is*



*no basis to do that. That's absolutely wrong.*
*Q. It's sometimes criticised, isn't it, as being a fudge*
*factor, I think is the Brealey and Myers term for it.*
*A. Sir, if I might, I think the best way to do it is, when*
*you are projecting out capacity on schools you would buy*
*or schools that you would build, you would build in what*
*you think historically has been your average across all*
*the schools. So let's just say hypothetically -- and at*
*Nord it's roughly 80 per cent, but some are above and*
*some are below, so projecting those new schools or*
*projecting those schools at that capacity would take*
*into account that some are going to be above and some*
*would be below. So that is, I would think, how you*
*would do it. But at the end, the way you would really*
*want to assess, sir, is to assess how Nord had done*
*historically relative to, in aggregate, they projected.*
*Q. Can I be absolutely clear here, that you say that adding*
*a premium to the discount rate would lead to a fail in*
*finance?*
*A. Correct."*[25]

47.    Mr Boulton QC returned to the same topic later the same day by reference to the
       Expert's own writings:

*"Q. If we go to page 3, {F/82/3}, what you are doing here is*
*helping your readers understand how you might account*
*for specific types of risk, diversifiable, firm and*
*country-specific risks.*
*A. Correct.*
*Q. And if we pick it up in the largest paragraph on the*
*page, you talk about the possibility that management of*
*a company steals the assets of the firm away and you*
*say, how can you deal with that. You say you've got to*
*factor it into the cashflows. One method:*
*'... would be to create two scenarios that are*
*probability weighted ...'*
*That would be, on my example, 80 per cent and*
*20 per cent. And you go on to say:*
*'It is always possible, however, to adjust the*
*discount rate in such a way to achieve exactly the same*

---

[25] Transcript Day 9 page 37 line 25-page 39 line 2.



*valuation as the one reached by adjusting the cashflows
with this weighted scenario.'
Do you see that?*

*A. I do.*

*Q. Do you stand by that as being the two ways that you can
do it?*

*A. That is correct. So mathematically, if you have
a constant per period probability that
a country-specific risk factor materialises, that you
can derive the maths to show that that would be the
case. And so one way, for example, to interpret these
country risk premia, which come from Damodoran, is that
it's equivalent to assessing whether it's stealing the
company, whether it's regulatory imposition, whether
it's restrictions on cash, as we were talking about
earlier. These are country-specific things. That sort
of says that this accounts for that as these constant
per period probabilities. Mathematically, it's
identically the same thing.*

*Q. I think on the next page, please, operator, {F/82/4}, we
can see that you work through an example, a specific
example in the penultimate paragraph, and you are
considering a risk that a firm will go out of business
and you say you can deal with it through the cashflows
but you can also deal with it through the discount rate,
which is the final paragraph on the page.*

*A. That's correct. This is just deriving the math*

*Q. Yes. So if we could look at page 37 of today's
transcript, {Day9/37:7}. I was going through four ways
you could deal with a bad outcome, and one of them was
you could specifically model a bad outcome or you could
do a general provision or you could model different
scenarios. That's at {Day9/37:21}. That's one of the
two approaches that you take in your article. And the
final question I put to you is: {Day9/37:25}
'And if you didn't like any of those, you might add
a premium to the discount rate to reflect the fact that
your projections didn't build in the possibility of bad
outcomes.'
Do you see that?*

*A. I do.*

*Q. And you said:
'I would fail you in finance if you did that.'*



*A. And I still would.*

*Q. But, in essence, that's dealing with exactly the same situation that you're writing about in your article, isn't it?*

*A. No, actually I would ask you to -- and if you want to pull a copy from Harvard Business School publishing, if you pull my note on valuation in private equity, you will see a discussion exactly of this. So one of the things, sir, that private equity professionals and venture capital investors often do is they increase their discount rates to 25, 30 or 50 per cent. In that note, sir, you will see that I discuss why that's wrong and why you shouldn't do it. They do it because they think they are adjusting for the risk. And the real question is, if you do that, you are missing all of the important underlying assumptions that go into a DCF, as well as a whole other set of issues. So generally speaking, sir, if I had a student who was looking at a project and they goosed up the discount rate by 20 or 30 per cent, that student would fail.*

*Q. Indeed, Professor Gompers, but nothing about adding 20 or 30 per cent to the discount rate was in my question to you earlier. It was the principle that you have two ways of dealing with this. One is through the cashflows and the other, in certain circumstances, is through the discount rate ....*"[26]

48.     The Dissenters' Expert had an elaborate explanation as to why he believed it was in all circumstances, save for dealing with country risks, inappropriate to provide for risks in financial projections by adjusting the discount rate. However, it seemed obvious that he had responded to the initial very general question in an unjustifiably broad and combative manner. This was not a fair representation of Professor Gompers' approach overall. He also gave very straightforward answers to some questions about the key (and contentious) elements of his DCF model. For instance:

> "*Just simply want to demonstrate how much money on your valuation turns on this, Professor. Your long-term growth rate here is, I think you say, 1.5 times the weighted average inflation rate. That's correct; yes?*



---

[26] Transcript Day 9 page 166 line 12–page 169 line 21.

*A. Yes.*

*Q. So if we remove the 1.5 times multiplier and simply use the weighted average inflation rate, your 4.23 per cent would go down to 2.82 per cent. Is that right?*

*A. Correct.*

*Q. Let's insert that at B45, simply to see the sensitivity that arises from that assumption. 2.82 per cent, please, operator. $54.10. So something like $21 of value arises simply from an assumption that the company for ever more will be able to increase its tuition fees at 1.5 times the rate. I think that may be an underestimate. If we could go to exhibit 3B, and we have a separate long-term growth rate here for China Bilingual. So on the same assumption, we will change B93 to 3 per cent, please, operator. That's changing long-term growth rate from 4.5 per cent to 3 per cent. Thank you.*

*Let's go back to exhibit 3A. Diluted price per share is now down to $49.71. So a third of the value in your DCF model arises solely from your assumption that from ten years' time forever the company will be able to increase its tuition fees in dollars by 1.5 times the rate of inflation.*

*A. That is correct under the conservative assumptions of no expansion of capacity or acquisitions after the terminal period, but the math is what it is.*"[27]

49.   Professor Gompers also admitted that the most value-relevant criticism he made in his Report of the Houlihan Lokey valuation related to the fact that their projections were limited to a five year period. He further admitted that the documentation evidencing the work that they did (obtained by the Dissenters pursuant to section 1782 applications in the United States) "*would be helpful in assessing the work*"[28]. Without expressly admitting that the Houlihan Lokey work product was not subject to any criticism, the Court was left with the distinct impression that had it been subject to serious criticism the work carried out would have been put to the sword by Professor Gompers in a detailed and reasoned manner. Instead the position appeared to be that either the Expert's support team had not seen fit to draw the supporting documentation to his attention or (improbably) he had failed to review documents which were obviously relevant to advancing a reasoned critique of Houlihan Lokey's DCF analysis:

---

[27] Transcript Day 10 page 123 line 20-page 124 line 124.
[28] Transcript Day 10 page 225 lines 20-21.



"Q. So it appears that, despite the time and cost of the
1782 application, that you, in the end, chose not to
rely on any of the 2,900 documents?
A. I would have to go back and see which documents were
produced to me, but they are certainly not relied upon
in my first report.
Q. And I don't have an equivalent appendix to your
supplemental report. But if one searches that document
for Houlihan Lokey references, take it from me,
Professor, that all we have are a document relating to
the go-shop process and the financial model, which we
will find at footnote 379 to your second report, that's
{HSD/6/112}.
A. There is appendix 3 in the supplemental report at
{E/85/1} and going forward.
Q. It's not up on the court bundle.
A. I'm sorry, sir.
Q. That's not your fault. Are you aware, Professor, that
Houlihan Lokey did, in fact, perform internal analyses
that extended the April 2017 projections to reach
a steady state?
A. They did not utilise them in their valuation in the
fairness opinion.
Q. That wasn't my question. Are you aware, Professor, that
Houlihan Lokey did, in fact, perform internal analyses
that extended the April 2017 projections to reach
a steady state?
A. I don't recall seeing such projections...

Q. You can see that these projections -- if we blow up the
middle of the page, please, operator -- have been
extended out to 2026, can't we?
A. Again, I don't know whether or not -- again, not having
the underlying spreadsheets for how they calculated
this, I don't know if they did the proper thing, which
was to take the schools that weren't in capacity and
put -- get them up to capacity. So again, I have no way
to evaluate how they did the five years of extension in
this model."[29]

---

[29] Transcript Day 10 page 226 line 23-page 227 line 25; Transcript Day 10 page 228 line 9-18



50.     This exchange took place at the end of Day 10 and the second day of the Dissenters'
        Expert's testimony. Thereafter, on Days 11 and 12, it appeared to me that Professor
        Gompers generally responded to questions put to him in cross-examination in a
        somewhat more balanced and less combative manner. It remains to consider the
        following arguments set out in the Company's Closing Submissions:

> "*127 A particularly telling exchange about how Professor Gompers approaches
> his expert assignments is recorded at {Day11/178:18} - {Day11/179:23}. In
> response to the question:*
>
> '*Well, yes, you've relied on other class certification reports, but you yourself
> have never filed a report that concluded that a market was semi-strong efficient.*'
>
> *Professor Gompers answered:*
>
> '*Because I've only been asked to work for the defendants in matters in class
> certification. It's not in their interests to pay me to write that report, so even once
> I find it, I either won't write a report or I would write about other issues that I
> find might be relevant to class certification. I've clearly worked with plaintiffs
> on other types of matters but, for whatever reason, plaintiffs in securities class
> action have never approached me to work for them.*'
>
> *128 That response is a blatant contradiction of the duties imposed on experts by
> the FSD Users Guide, particularly B5.2(b)(i), (ii), (iii), (iv), (vii). In ordinary
> circumstances one might be able to excuse Professor Gompers' statement as a
> Freudian slip partway through a long cross-examination. Sadly, on the present
> facts such an excuse is not credible. Professor Gompers made the statement on
> his second attempt at Mr Boulton QC's question. The statement is consistent with
> pointed criticism of Professor Gompers in the United States courts. Most
> damningly it aligns with Professor Gompers' performance in this case where he
> took a clearly partisan approach, refused to make sensible and obvious
> concessions and misrepresented key evidence and academic authorities.*
>
> *129 In light of the above, the Company respectfully submits to the Court that
> the evidence of Professor Gompers cannot be relied upon when determining the
> fair value of the Dissenters' shares.*"

51.     In my judgment the answer relied upon does not, properly understood, support a finding
        that Professor Gompers has breached his fundamental duties as an expert in the present
        case. As Mr Bompas QC pointed out in his oral closing submissions, the role of an
        expert in a class certification case is fundamentally different to that of an expert at the
        trial of an appraisal action:

> *"My Lord, Monroe. That case is at authorities*
> *bundle 31.1, {AB/31.1/1}, and we covered it in our*
> *closing at paragraphs 157 and 158. My Lord, the Monroe*
> *case was used mainly as a vehicle for an attack on*
> *Professor Gompers' credibility. In our submission, that*
> *was unjustified, and there is, you will note from my*
> *learned friend's closing submissions, the fact they have*
> *chosen at paragraph 128 to say, somehow, that, because*
> *of what Professor Gompers said to you about the way in*
> *which he was routinely instructed in those kinds of*
> *cases, somehow he has not complied with his obligations*
> *under the FSD experts' declaration. That is an odd*
> *point, to put it at its most polite.*
> *But what he says in the passage that's seized upon*
> *by my learned friends and quoted -- it needs to be*
> *understood in the context of certification procedures in*
> *fraud on the market actions in the United States. What*
> *happens, as I'm instructed -- and you can see this from*
> *all these cases, if you are so minded to take the time*
> *to burrow through them -- is that the claimants serve an*
> *experts report, the defendants choose whether or not to*
> *answer it. It's sequential. There is no burden on the*
> *defendant to show efficiency. So if the defendants'*
> *expert thinks he can't undermine the claimants' case on*
> *efficiency, he won't write a report or he'll write on*
> *something else, a different Cammer factor, liquidity,*
> *the number of analysts covering the stock. There are*
> *four others to choose from. That's all he was saying.*
> *And although it's correct that the court in that case in*
> *Atlanta rejected Professor Gompers' opinion on market*
> *efficiency, it did so in the context -- the very limited*
> *context, of a challenge to the rebuttable presumption of*
> *market efficiency for the limited purpose of*
> *a preliminary application to determine the constitution*
> *of a plaintiff class."*[30]

52.     More fundamentally still, the suggestion that Professor Gompers would in any legal
        context indicate to a client seeking a desired opinion that he was unable on the facts of

---

[30] Transcript Day 14 page 83 line 11-page 84 line 20.



that case to provide it is on its face entirely consistent with the proposition that Professor Gompers understands his duties of independence to this Court.

**Overview of evidence –in-chief**

53.    The Expert Report of Paul A. Gompers was dated July 18, 2019. The Dissenters' Expert's key conclusions may be gleaned from the following portions of that Report:

> "*12. As an economic matter, the price paid for an asset in an arm's length negotiation between informed parties may be viewed as a reliable indicator of fair value, particularly if that price results from an open, competitive sales process designed to attract multiple potential buyers who are given equal opportunity to bid on that asset. Where an open and competitive process does not exist, it cannot be assumed that the transaction price reflects fair value.*
>
> *13…I understand that the question of the extent to which Stockbridge was able to participate in the go-shop process is an issue between the parties but that this is not an issue for the expert to resolve. However, I consider that it is relevant in this regard to note that my analysis described in Section VII does not support the contention that the Take-Private Transaction resulted from an arm's length process nor one that was competitive with multiple bidders…*
>
> *15. The price at which a company's stock trades may provide evidence of the company's value as a going concern…*
>
> *16….the evidence here shows that Company insiders, including Baring, had access to relevant private information of the Company that was not available to other market participants. Thus the market price cannot be taken to be reflective of the Company's fair value.*
>
> *17. In addition, my analyses show low liquidity of the Company's shares (which I establish empirically, and which was acknowledged by the Company itself in public filings), and a lack of response of the trading price to the disclosure of earnings-related information. Under these circumstances, I conclude that Nord Anglia's market price prior to and at the time of the Take-Private Transaction cannot be taken to reflect the Company's fair value…*
>
> *19. Given that the so-called market indicators of value …cannot be taken as reliable evidence of fair value, I calculate the fair value of the Dissenters shares using DCF methodology. One of the central tenets of modern finance is that the*



*intrinsic value of a firm is equal to the discounted value of its expected after-tax cash flows...*

*20. The calculation of fair value in this case is well-suited for the DCF approach, among other reasons, because there were a number of reliable cash flow projections available for the Company, including projections prepared and approved by the Company's management...*

*26. Based on my DCF analysis, using the midpoint of the valuation implied by the August 2017 Projections (projections prepared  by Company management and closest in date to the Valuation Date) and the valuation implied by the Bank Model, I find that the fair value of the Company's  shares equalled $77.35 per share as of the Valuation Date.*

*27. While my valuation represents a significant premium over the pre-announcement market and Take-Private Transaction prices, in my opinion this difference can be reconciled based on differences in the information available to the market and to Company insiders, (e.g., Baring) as well as based on the particular features of the deal process, such as absence of competitive bidding and inability of potential bidders to access internal information about the Company."*

54. Further to the Experts' Joint Memorandum dated August 29, 2019, Professor Gompers prepared a Supplemental Report dated September 24, 2019. A summary of the main conclusions reached in the Supplemental Report is as follows:

"5...*My calculation in the Gompers Report yielded a fair value of the Dissenters shares [of] $77.35 per share as of the Valuation Date. I have further revised my calculation in light of discussions with Professor Fischel in drafting of the Joint Report, whereby Professor Fischel and I agreed to use common values for certain inputs in our cost of capital calculations in order to narrow the scope of differences between the experts, as well as to make an adjustment for stock-based compensation. This yields a value of $76.51 per share as of the Valuation Date...*

*8. My conclusions regarding Nord Anglia's fair value expressed in the Gompers Report remain unchanged with the exception of the adjustment described above. It is also my opinion that Professor Fischel's analysis of fair value significantly understates the fair value of Dissenters' Nord Anglia shares, as described in the Gompers Supplemental Report, and that correcting for even some of the problems in his analysis would lead one to conclude that fair value*

*of the Dissenters' shares was substantially higher than the Take-Private Transaction Price and closer to my valuation of $76.51 per share. "*

55. As a result of agreed input changes, Professor Gompers reduced his initial valuation by 84 cents (or approximately 1.08%). Like Professor Fischel, he was only willing to agree that minimal adjustments were required to his initial DCF analysis. Unlike Professor Fischel, he was not willing to explicitly acknowledge that an appropriate DCF valuation might fall within a range of potential valuations rather than being definitively reflected in a specific sum.

## JOINT MEMORANDUM BETWEEN FISCHEL AND GOMPERS

### Agreed Matters

### Preliminary Matters

56. It was common ground that the valuation opinions should be expressed as at the Valuation Date on a per share basis. Each Expert also understood that "fair value" meant the value of a Share of the Company operated as a going concern and excluding any advantages which might accrue as a result of the Merger.

### Valuation Approaches Considered

57. Each Expert considered the same four valuation methodologies, although they disagreed as to whether the Market Price or DCF approach was more appropriate in the circumstances of the present case.

### Market Efficiency

58. It was agreed that the stock market is not generally considered to be "*strong-form efficient*" i.e. with market prices reflecting both public and private information. A market is "*semi-strong form efficient*" if the market fully reflects all public information. It was agreed that in a semi-strong efficient market:

    (a)    stock prices respond to and rapidly incorporate new value-relevant publicly available information (market, industry and/or company-specific); and

    (b)    no significant changes in stock price would be expected on days when there was no new value-relevant information.



**Event Studies**

59.     It was agreed that the event study methodology is an accepted means of testing semi-strong market efficiency and that a properly designed event study tests whether a company's stock price has reacted to company-specific news to a statistically significant extent. The effect of market or industry factors on stock returns is calculated by regression analyses using either a market index (a 'one-factor model') or both market and industry indices (a 'two-factor model').

**Relevance of trading volume**

60.     It was agreed that a relatively high trading volume can be an indicator that newly available information is being incorporated into a company's stock price and low trading volumes can raise concerns that such incorporation is not occurring and that the stock is not semi-strong efficient.

**Comparable Companies and Precedent Transaction Analyses**

61.     Neither Expert relied on these analyses.

**DCF Analysis**

62.     The Experts were agreed on the following matters:

(a)     the general mechanics required;

(b)     the appropriateness in general terms of using the Company's August 2017 Projections;

(c)     the need to modify those Projections (by extension) to reflect a transition to a steady state and to correct minor errors; and

(d)     the discount rate can be calculated using the Company's weighted average cost of capital ("WACC").

63.     As regards the elements of WACC, the Experts agreed that:

(a)     the country risk premium (if any) should be 1.17%;

(b)     recent academic literature cast doubt on the validity of using a size premium;



(c)     the equity risk premium should be 5.985%;

(d)     the risk-free rate should be 2.52% (based on the 20 year U.S. Treasury bond;

(e)     although they used different market indices and capital structure assumptions to calculate the Company's equity beta, they agreed that these choices did not account for any material differences that their respective beta calculations yielded; and

(f)     the depreciation and amortisation assumptions should be consistent with the August 2017 Projections.

**Main areas of disagreement between the Experts**

64.     The Joint Memorandum lists almost 30 "major" areas of disagreement between the Experts. Based on the way the parties conducted the case at trial[31], I would distil those areas of disagreement into the following headline issues:

(a)     whether fair value was adequately reflected in the Market Price or whether a DCF analysis was required; and (assuming a DCF analysis was required);

(b)     what adjustments should be made to the August 2017 Projections as regards the China Bilingual Project;

(c)     what adjustments should be made to the August 2017 Projections as regards exchange rates in relation to foreign currency earnings; and

(d)     how the appropriate discount rate or "beta" should be determined and, having regard to materiality, the following sub-issues:

(1) the length of the estimation period,
(2) the use of weekly data,
(3) the cost of debt, and
(4) the terminal growth rate.

---

[31] See e.g. *'Company's Closing Written Submissions'*, paragraph 110 *et seq*, and paragraph 130 *et seq* '*Written Closing Submissions of the Dissenting Shareholders'*, paragraph 282 *et seq*, paragraphs 336 *et seq*, paragraph 392 *et seq* and paragraph 406 *et seq*.

**LEGAL FINDINGS: PRINCIPLES GOVERNING THE SELECTION OF THE APPROPRIATE VALUATION METHODOLOGY**

**Cayman Islands authorities**

65.   The pivotal statutory provision to the present case is section 238 (1) of the Companies Law which provides as follows:

> "*(1) A member of a constituent company incorporated under this Law shall be entitled to payment of the fair value of his shares upon dissenting from a merger or consolidation.*"

66.   The Dissenters centrally argued:

> "*70. To summarise the legal position, in assessing 'fair value' what the Court is aiming at is not merely the market price of its shares but rather their value, taking into account all value-relevant information whether or not it was available to the market at the time, leaving out of account any advantages or disadvantages accruing to the Company arising from the Merger Transaction itself. The usual way of arriving at such a value, and one which forms a part of the Court's assessment of "fair value" in all prior s.238 cases, is through a DCF analysis.*"[32] [Emphasis added]

67.   Rather than considering which valuation approach should be adopted based on the contending views of the Experts viewed in light of the isolated facts of this case, it seems logical to me to first consider how this question has been resolved by this Court in previous cases. Is there a governing legal principle or does the choice of valuation methodology turn on purely factual considerations? The previous section 238 cases that have gone to trial appear to number only three: *Re Integra Group* [2016 (1) CILR 192] (Jones J); *Re Shanda Games Limited*, FSD 14 of 2016 (NSJ), Judgment dated April 25, 2017 (unreported) (Segal J); and *Re Qunar Cayman Islands Limited*, FSD No 76 of 2017, Judgment dated May 13, 2019  (Parker J) (unreported).

68.   In *Re Integra Group*, Jones J described the transaction as being "*a management buyout…structured as a statutory merger*" (paragraph 5). The petitioner contended that the market price of the listed shares reflected fair value and the respondents contended for a DCF analysis combined with (applying a 25% weighting) a market-based comparables approach. These positions were advanced through expert witnesses. Jones J concluded, having considered the expert evidence:

> "*38. The mere fact that a company's shares are listed on a major stock exchange, in this case the LSE, does not lead to the conclusion that a valuation*

---

[32] '*Written Opening Submissions for Trial on Behalf of the Dissenter Groups*'.



*methodology based upon its publicly traded prices is necessarily the most reliable approach towards determining its fair value for the purposes of a section 238 court appraisal.*"

69.   The presumed free float was 67.5% of the issued capital and the trading volume of that free float was 16% and 9% in the last two years before the merger. The trading volume was dramatically lower and the median bid-ask spread marginally higher than the corresponding figures for comparable companies. Based on his view of the expert evidence, Jones J rejected the full-blown market price approach contended for by the petitioner. The shares were valued at $11.70 per share rather than the offer price of $10.

70.   The transaction in *Re Shanda Games* was described by Segal J as a "*take private transaction led by the principal shareholders and management of Shanda*" (paragraph 6). That shareholder indirectly controlled approximately 69% of the company's voting shares; the Second Buyer Group controlled just over 90% of the voting power (paragraphs 34, 50). Both experts agreed on the DCF approach. The offer price was $7 per ADS; the petitioner's expert valued the shares at $7.10 per ADS and the respondents' expert valued the shares at $27.03 per ADS, reflecting what Segal J described as a "*fundamentally different view*" (paragraph 66). Segal J recorded helpful findings on the general approach to expert evidence in the section 238 appraisal context. Although Segal J's views were expressed in the context of a dispute as to how a DCF analysis should be applied rather than whether it is appropriate to use the methodology at all, they provide valuable general guidance on the section 238 judicial function:

"*85. I note, and find persuasive, the comments of Vice Chancellor Strine in Andaloro v PFPC Worldwide Inc, (Andaloro) Court of Chancery, Delaware, New Castle 2005 Del. Ch. Lexis 125 at [34].*

*In making the fair value determination, the court may look to the opinions advanced by the parties' experts, select one party's expert opinion as a framework, fashion its own framework, or adopt piecemeal, some portion of an expert's model methodology or mathematical calculations. But, the court may not adopt an 'either-or' approach and must use its judgment and an independent valuation exercise to reach its conclusion.'*

*More recently in his opinion in Re Appraisal of Dell Inc 2016 WL 3186538 (Dell) Vice Chancellor Laster quoted with approval dicta in this issue from a number of other cases as follows...[33] :*

---

[33] At pages 42-43.

> *'"In discharging its statutory mandate, the Court of Chancery has discretion to select one of the parties' valuation models as its general framework or to fashion its own". M.G. Bancorporation, 737 A.2d at 525-26. "The Court may evaluate the valuation opinions submitted by the parties, select the most representative analysis, and then make appropriate adjustments to the resulting valuation". The court also may "make its own independent valuation calculation by . . . adapting or blending the factual assumptions of the parties' experts." M.G. Bancorporation, 737 A.2d at 524. It is also "entirely proper for the Court of Chancery to adopt any one expert's model, methodology, and mathematical calculations, in toto, if that valuation is supported by credible evidence and withstands a critical judicial analysis on the record." Id. at 526. "When . . . none of the parties establishes a valuation that is persuasive, the Court must make a determination based on its own analysis."'*

71.   Instructive approaches adopted by Segal J to the expert evidence included averaging the beta figures proposed by the experts and averaging the experts' proposed terminal growth rates (over a terminal period following a 5 year transitional period). These were approaches which subsequently received the *imprimatur* of the Court of Appeal: *In re Shanda Games* [2018 (1) CILR 352] at paragraphs 75 and 92 (Martin JA).

72.   *Re Qunar*, FSD No 76 of 2017 (RJP), Judgment dated May 2, 2019 (Parker J) (unreported), is the third trial judgment in a section 238 case. The company in that case had its shares listed on NASDAQ and the merger was a take-private transaction supported by the majority shareholders. As here, a special committee recommended the transaction to the board of directors and engaged Duff & Phelps who opined that the negotiated price of $30.39 per ADS was a fair one. This was midway in their DCF range which implied values of between $26.59 and $34.52 per ADS. The company's expert's valuation was based 50% on a DCF valuation and 50% on a market price analysis and contended for $28.09 per ADS applying a 4.7% minority discount. The dissenters' expert contended for $125.96 per ADS, using a DCF analysis alone and applying no minority discount. *Re Qunar's* factual matrix has important similarities with that in the present case and accordingly Parker J's judgment provides valuable guidance as to how issues such as, *inter alia*, the following should be approached:

      (a)   when a DCF valuation approach alone should be preferred to a market price approach;

      (b)   the inferences to be drawn from a huge gap between a DCF valuation and the market price;

(c)     the determination of when a market is sufficiently efficient to enable the market price to provide reliable evidence as to fair value; and

(d)     the correct approach to a DCF computation as regards matters such as assessing the reliability of management projections, the calculation of the appropriate beta, whether a 'Blume adjustment is required' and the appropriate terminal growth rate.

73.     Parker J unsurprisingly described the gap between the valuations as "*very considerable*" (paragraph 16). He concluded that a 100% DCF approach was not warranted because the market was not shown to be inefficient and the transaction was conducted fairly. However, the merger process and merger price did not apparently play a central role in the case. The majority shareholder held 95% of the shares, but this did not mean in and of itself that the market in the shares was inefficient. He found that the market price "*can reasonably be relied upon as good evidence of value. It therefore also provides a good cross check against the DCF outcome of fair value*" (paragraph 141). The blended approach contended for by the company's expert was approved but the minority discount was valued at nil. Parker J also approved the dissenters' expert's China-based terminal growth rate of 4.75%. He left the experts to revise their valuations in light of his findings on various disputed issues, which included the various elements of the appropriate discount rate. It seems self-evident that the ultimate result must have been far closer to the petitioning company's expert's valuation than to the dissenters' valuation. The most significant general findings made by Parker J which have potential persuasive weight for the purposes of the present case were the following:

> "*408. The huge difference to the financial outcome of fair value in this case as contended for by the parties, is attributable primarily to the reliance by the Dissenters and Mr Osborne solely on a DCF method of calculation. This method has given rise to a number of issues where, in addition to the arguments concerning the Management Projections, the reliability of models, comparators, assumptions and the validity inputs have been tested. It has also given rise to the consideration of much academic and practitioner literature and financial analysis.*
>
> *409. It has produced, on the Dissenters' case, a valuation which is way off the market price. It is, as Mr Osborne accepted, not credible once the systemic undervaluation theory of shares in companies with their operations in the PRC, but which are listed on US exchanges, has been rejected. Such a result would mean that investors and others who work in the US markets had significantly underestimated the Company's value prior to the Merger and has wider implications for other businesses with similar operations…*"

74.     Just over a month after I reserved judgment in the present case, the Judicial Committee of the Privy Council delivered its judgment in *Re Shanda Games* [2020] UKPC 2.  As regards the approach to interest, not an issue in controversy at the present stage, Lady Arden summarised the Judicial Committee's views as follows:

> *"57. The judge exercised his discretion on the rate of interest that should be paid by Shanda in a manner which on its face was unassailable on appeal. He followed the practice in Delaware. He took the midway point between a rate of interest representing the return on the unpaid appraisal monies that a prudent investor could have made and the rate of interest that the company would have had to pay to borrow the equivalent sum."*

75.     As regards the minority discount issue, of potential relevance to the present case but not addressed by either Expert, the Privy Council held that in principle a minority discount was applicable to a valuation under section 238 of the Companies Law. Lady Arden summarised the Judicial Committee's conclusions on this issue as follows:

> *"55. It follows that the judge should not have held that fair value always means no minority discount (see, for example, judgment of the judge, para 93, second sentence). That could not be a bright-line rule to be applied in every case. Similarly, it was not open to CICA to hold that a minority discount should invariably be applied as a matter of law. The legislature's direction is to find the "fair value" of the dissenter's shareholding. Because of the narrow scope of this appeal, the Board is not in a position to rule out the possibility that there might be a case where a minority discount was inappropriate due to the particular valuation exercise under consideration."*

76.     It is noteworthy that the question before the Court was not what value should be assigned to the relevant shares, but whether section 238 mandated a *pro rata* valuation or not:

> *"56. As explained, the only issue which the parties have argued is whether the shares of the dissenters should be valued on a pro rata basis or not. The parties have not sought to argue that the value should be something other than CICA found it to be if section 238 does not require a pro rata valuation of the dissenters' shares…"*

77.     It is helpful to compare some general features of the present case with those of the
        previous section 238 cases. Compared with *Integra*, where there was seemingly no
        controlling shareholder at all and a 'free float' of 67%, here Baring and affiliates
        beneficially owned 67% of the Company's Shares pre-Merger reflecting a free float of
        roughly 33%. Professor Gompers opined without apparent contradiction that the
        weekly trading volume of the Company's Shares was just over 0.5% of all stock (over
        the 5 years up to and including 2017), far lower than for comparable companies[34].
        Measured in relation to the one third of all Shares reflected by the free float that means
        roughly 1.5% of that float traded weekly.    In *Integra*, trading volumes were also
        comparatively low. In *Shanda Games*, the size of the free float was apparently
        comparable to the present case, roughly 31%. It appears that the market in the shares in
        the latter case was far less liquid than in the present case. In contrast, the free float in
        *Qunar* where the controlling stake was 95% was much smaller and the trading volumes
        presumably even lower.

78.     There is no precedent for placing primary or sole reliance on the market price in any of
        the three previous section 238 cases which went to trial.

**Delaware authorities**

79.     The potential relevance of Delaware and/or Canadian appraisal jurisprudence to the
        application of section 238 of the Companies Law is now well settled. The fact that
        section 238 "*was heavily influenced by the Delaware and Canadian law*" was
        seemingly first judicially acknowledged by Jones J in *In re Integra Group* [2016 (1)
        CILR 192] at paragraph 20. As noted above, Segal J found Delaware jurisprudence in
        appraisal litigation to be of persuasive value in  *Re Shanda Games Limited*, FSD 14 of
        2016 (NSJ), Judgment dated April 25, 2017 (unreported) (at paragraph 156 et seq). In
        *Re Qunar* FSD No 76 of 2017 (RJP), Judgment dated May 2, 2019, Parker J observed:

                "*34. The jurisprudence in Cayman is relatively young in comparison to
                Delaware and Canada and guidance from those jurisdictions has been found to
                be helpful by the Cayman courts in terms of the approach to the similar issues
                the courts of those jurisdictions have adopted. However, the approach is not
                always to be followed in Cayman as there are differences in the language of the
                relevant legislation, the policy behind it, insofar as one can identify that, and
                procedure.*

                *35. I have considered in this case the principles from, in particular, the
                Delaware jurisprudence in the same way as Segal J and the Court of Appeal*

---

[34] Expert Report, paragraph 201; Appendix VIII-5.

> *did in Shanda, but I have also had regard to, for example, English cases*
> *concerned with solving problems relating to the concept of fair value, albeit in*
> *different statutory contexts, as did the CICA in Shanda.*"

80.     The most authoritative judicial support for the relevance of, in particular, Delaware
        appraisal case law at the date of the trial was to be found in recent Cayman Islands
        Court of Appeal decisions. *Re Shanda Games* [2018 (1) CILR 352] was a case where
        the Court of Appeal directly held that the Delaware approach to computing interest
        should be followed but the Delaware approach to minority discounts should not be
        followed. The more general reliance placed by Segal J on Delaware jurisprudence was
        not doubted. In the present case, the general relevance of Delaware case law was not in
        dispute, as regards the general approach to appraisal cases. *In re Qunar* [2018 (1) CILR
        199] was a case where the Court of Appeal was guided by the Delaware approach to
        dissenter discovery. Rix JA (Field JA and Goldring P concurring) opined as follows:

> "*63. Next I go to the jurisprudence of Delaware, which has had long familiarity*
> *with the concept of fair value in the context of dissenting shareholders and a*
> *statute with similar wording to s.238...I do not however take any account of*
> *Dole[35] as constituting any authority or precedent. In any event it comes from a*
> *separate jurisdiction. However, I cannot ignore considerations which are*
> *addressed in Dole as though such matters did not exist in the world. That would*
> *be to shut my eyes to the realities of life.*
>
> *64. What I find in Dole is a sophisticated, well-informed, modern judgment*
> *(delivered in 2014) with extensive citation of jurisprudence...I cite passages in*
> *Laster V.C.'s opinion to exemplify the power of its reasoning...*"

81.     In my judgment there is (or ought to be) a distinction between the relevance of Delaware
        authorities on matters of law and procedure and the relevance of such authorities to the
        more commercially-focussed mechanics of the appraisal process. For the section 238
        trial judge at least, seeking to appraise shares which have been listed on a US stock
        exchange based on expert evidence from witnesses who predominantly give expert
        testimony in Delaware and other US courts, the commercial and 'cultural' elements of
        US appraisal jurisprudence will likely more often than not be very helpful indeed. The
        same applies to commentary on the distinctive judicial characteristics of the Court's
        appraisal function. After I reserved judgment in the present case, the Privy Council
        confirmed that the Delaware approach to valuing the shares of a minority (on a *pro rata*
        basis as opposed by reference to the value of the actual minority shares) does not apply

---

[35] *In re Dole Food Co. Inc. (Appraisal)*, (2014), 114A.3d 541 (Laster V.C.).



to section 238 appraisals: *Shanda Games Ltd.-v-Maso Capital Partners Ltd et al* [2020] UKPC 2. Lady Arden nevertheless opined as follows:

> "*49. The Cayman Islands courts would still be able to use the jurisprudence of the Delaware and other courts if placed before them as a source of guidance on some particular issue. It goes without saying that the jurisprudence of Delaware is of great value in this field. However, it should also be borne in mind that there may be different rules in related contexts, such as a different regulatory scheme for corporations issuing securities to the public and the duty of fairness owed by a controlling stockholder to other stockholders, which are not found in English and Welsh law. In addition, there may be different economic and social policy considerations affecting legislation in Delaware.*"

82.    Lord Grabiner QC in his opening oral submissions primarily sought to demonstrate that the Delaware courts now favour a market-based evaluation approach to a DCF analysis. However, a passage counsel cited indirectly helped to illumine (a) the Court's distinctive commercially-focussed role under section 238, and (b) the fact that US appraisal experts are possibly generally more partisan than a British Commonwealth judge might expect them to be. In *Dell, Inc.-v-Magnetar Global Event Driven Master Fund Limited* 177A.3d 1 (2017) (Supreme Court of Delaware). Valihura J opined as follows (at paragraph 35):

> "*We pause to note that this appraisal case does not present the classic scenario in which there is reason to suspect that market forces cannot be relied upon to ensure fair treatment of the minority. Under those circumstances, a DCF analysis can provide the court with a helpful data point about the price a sale process would have produced had there been a robust sale process involving willing buyers with thorough information and the time to make a bid. When, by contrast, an appraisal is brought in cases like this where a robust sale process of that kind in fact occurred, the Court of Chancery should be chary about imposing the hazards that always come when a law-trained judge is forced to make a point estimate of fair value based on widely divergent partisan expert testimony.*" [Emphasis added]

83.    *Dell, Inc.* helpfully warns trial judges that their legal training does not really equip them to resolve valuation disputes between valuation experts whose estimates are based on the DCF approach and are far apart. Where market indicators such as share or transaction price are reliable indicators of the intrinsic value of the shares, these

ultimately straightforward indicators should not be ignored in favour of far more esoteric financial estimates. It is noteworthy, however, that the gap between the merger price and the dissenters' DCF valuation was a stunning $23 billion in *Dell*. The company had a "*deep public float*" with more than 5% of its shares trading each week[36]. There was no controlling shareholder; Mr Dell owned only 13.9% of the company's shares[37]. The merger process was found to be "*robust*". Yet the Delaware Supreme Court did not direct the Court of Chancery to simply apply the transaction price; the matter was remitted for reconsideration in light of the following critical findings (at paragraph 37):

> "*Given that we have concluded that the trial court's key reasons for disregarding the market data were erroneous, and given the obvious lack of credibility of the petitioners' DCF model—as well as legitimate questions about the reliability of the projections upon which all of the various DCF analyses are based—these factors suggest strong reliance upon the deal price and far less weight, if any, on the DCF analyses.*"

84. The position under Delaware law post-*Dell* appears to me to be that even when the market price (either based on an efficient market or a robust sales process) is a good indicator of the intrinsic value of a company's shares, a DCF valuation will at least be taken into account if the relevant management projections about future cash flows are themselves reliable[38]. This appears to have been the case prior to *Dell* based upon cases referred to by the Dissenters' counsel in their opening oral submissions, including *In re Petsmart*, Inc 2017 WL 2303599, upon which Mr Adkin QC relied. Vice-Chancellor Slights crucially opined as follows (at paragraph 32):

> "*The first key to a reliable DCF analysis is the availability of reliable projections of future expected cash flows, preferably derived from contemporaneous management projections prepared in the ordinary course of business. As this court has determined time and again, if the 'data inputs used in the model are not reliable,' then the results of the analysis likewise will lack reliability. And, as the experts in this case both agree, to be reliable, management's projections should reflect the 'expected cash flows' of the company, not merely results that are 'hoped for'.*"

---

[36] Paragraph 7.

[37] Paragraph 9.

[38] The Company's counsel forwarded two more recent Delaware decisions to the Court after I had reserved judgment and had almost completed the present Judgment. The Dissenters' counsel objected. I have not taken these decisions into account.

85.     At the beginning of the Vice-Chancellor's judgment, however, the following insightful
        observations were made about the peculiar nature of the judicial appraisal function (at
        paragraph 1):

> "*I would not be the first to observe that the trial of an appraisal case under the
> Delaware General Corporation Law presents unique challenges to the judicial
> factfinder. The petitioner bears a burden of proving the "fair value" of his
> shares; the respondent bears a burden of proving the 'fair value' of the
> petitioner's shares; and then the judge, as factfinder, assumes, in effect, a third
> burden to assign a particular value 'as the most reasonable in light of all of the
> relevant evidence and based on considerations of fairness.' The role assigned
> to the trial judge in this process independently to review 'all relevant factors'
> that may inform the determination of fair value, if not unique, is certainly
> unusual. It is unusual in the sense that the judge is not bound by the positions
> on fair value espoused by either of the parties. Indeed, the trial court commits
> error if it simply chooses one party's position over the other without first
> assessing the relevant factors on its own.*
>
> *Yet it cannot be overlooked that the judge's decision in an appraisal case
> follows a trial—an honest-to-goodness, adversarial trial—where the parties
> are incented to present their best case, grounded in competent evidence, and to
> subject their adversary's evidence to the discerning filter of cross-examination.
> The trial court then reviews the evidence the parties have placed in the trial
> record and does its best to 'distill the truth'. In this regard, at least, the
> appraisal trial is no different from any other trial. The court's determination of
> 'fair value', while based on 'all relevant factors', must still be tethered to the
> evidence presented at trial. The appraisal statute is not a license for judicial
> freestyling beyond the trial record.*"

86.     *In re Appraisal of Petsmart, Inc.* is also instructive as regards illustrating what type of
        auction process has been judicially viewed as robust. The merger process was initiated
        by an "*activist hedge fund*" which had acquired a 9.9% stake in the company, not by a
        controlling shareholder. 27 potential bidders were identified between August 2014 and
        October 2014, and 15 potential bidders signed non-disclosure agreements. A data room
        including non-public information was made available to the potential bidders and
        management made presentations to them. Five bids were received by October 31, 2014;
        on November 3, 2014, four were allowed to continue further with their bids. The Board
        in early December was still considering alternatives to a sale. Final bids were
        considered on December 10, 2014. There were three separate competing bidding
        groups, and one group expanded its membership near the end of the auction process

increase its bidding capacity. The highest bid was ultimately accepted. The merger was approved by over 77% of all shareholders and over 99% over those who voted. The dissenters did not challenge the efficacy of the process as such. The valuation process deployed by the Ad Hoc Committee's advisers was subjected to apparently strong criticism, as was their impartiality; it was also argued, *inter alia*, that market conditions limited the range of participants in the auction process, such that the Board did not make a properly informed decision. The Vice-Chancellor crucially concluded:

> "*Importantly, the evidence reveals that the private equity bidders did not know who they were bidding against and whether or not they were competing with strategic bidders. They had every incentive to put their best offer on the table…*
>
> *…Respondent has carried its burden of demonstrating that the Merger Price of $83 per share was the result of a 'proper transactional process' comprised of a robust pre-signing auction in which adequately informed bidders were given every incentive to make their best offer in the midst of a 'well-functioning market.'*"

## FINDINGS: THE RELEVANCE OF THE MARKET PRICE TO THE FAIR VALUE ASSESSMENT

### Overview

87.    In my judgment the only real dispute between the Experts as regards the relevance of the Market Price of the Shares is one of degree or emphasis. Professor Fischel opined that the Market Price was the best indicator of fair value, but acknowledged that a DCF analysis was a useful cross-check of the market value. Professor Gompers agreed that the NYSE as a whole constituted a semi-strong efficient market and opined, in effect, that because of MNPI a DCF analysis was in the circumstances more reliable as a guide to the intrinsic value of the Shares. As the Company submitted in its Closing Submissions:

> "*216. At the outset it is important to note that Professor Gompers does not conclude that the market is not semi-strong efficient. He simply says that he has not seen evidence that it is semi-strong efficient.*"

88.    Having regard to the way in which this Court and the Delaware courts have previously approached the question of fair value in the cases referred to above, the Court's appraisal function does not permit me to simply make a choice between the Market Price contended for by Professor Fischel and the DCF valuation contended for by Professor Gompers. Nonetheless in assessing the expert evidence, I cannot ignore the fact that Professor Fischel adopted a more balanced and less absolutist position by

explicitly acknowledging that a DCF analysis could properly be taken into account and carrying out his own detailed DCF analysis (which essentially provided a range of potential values). He did this despite contending that the Market Price was the only appropriate valuation method and he further implied in his oral evidence that his DCF analysis could be used by the Court to confirm the appropriateness in general terms of his Market Price figure, if the Court had doubts about the reliability of the Market Price[39].

89.     Professor Gompers did not appear to me to even tacitly concede the possibility that his assigned DCF valuation might benefit from downward adjustment in light of the far lower Market Price and Transaction Price figures. In the final substantive paragraph of his Supplemental Report, Professor Gompers opined as follows:

> *"429. My conclusions regarding Nord Anglia's fair value expressed in the Gompers Report remain unchanged. It is further my opinion that Professor Fischel's analysis of fair value significantly understates the fair value of Nord Anglia, as described in this Gompers Supplemental Report."*

90.     Professor Fischel concluded his Supplemental Report by opining that:

> *"106....the estimated equity value of a Share based on the Adjusted August 2017 Projections ranges from $28.34 to $41.32 on the Valuation Date, depending on the discount rate. This range of estimated equity values per share contains my estimate of fair value of Dissenters' Shares on the Valuation Date of $30.45 per Share. However, for the reasons discussed in Fischel Report...it is my opinion that DCF analysis should have little or no weight in the determination of the fair value of Dissenters' Shares."*

91.     While all critical opinions must be weighed on their respective merits, I feel bound to approach the most controversial aspects of Professor Gompers' opinions with considerable caution. Professor Fischel generally appeared to me to approach his valuation task with more objectivity than Professor Gompers. That said, the clear picture painted by the evidence overall points to the following broad conclusion. A DCF analysis should be given considerable weight in the Court's valuation process, but not to an extent which generates a value which is significantly at variance with the Market Price, viewed together with the Transaction Price.

**Efficiency of the market in the Company's Shares**

92.     Professor Fischel conducted an Event Study to assess the extent to which the market in the Company's Shares responded to the publication of value-relevant information. The

---

[39] *Transcript, Day 8, page 174 line 20-175 line 25*

results showed far greater volatility on News Days than on other days which he opined was consistent with the market being "*efficient*"[40]. Appendix C-2 recorded a 4.5% deviation on "News Days" compared with a 1.81% deviation on "Other Days". He also opined that the "*Cammer*" requirements for establishing efficiency in the context of securities fraud litigation were met in relation to the market for the Company's Shares. It was not suggested that any recognised test for establishing "semi-strong form efficiency" had been met.

93.     Professor Gompers conducted an Event Study with the specific aim of discovering whether evidence existed for "semi-strong form efficiency"[41], although nothing seems to turn on this terminological difference. In general terms, he set out to measure the same cause and effect relationship to value-relevant information as did Professor Fischel. However, he considered that a 5% variation on News Days (two out of 10 days) was statistically significant. His analysis was based on 10 days when earnings announcements were made; Professor Fischel took into account not just days when earnings reports were published, but other information (Form 6K filings and annual reports) as well . In addition, Professor Gompers opined that it was necessary to analyse whether the price deviation was consistent with what one would expect having regard to the nature of the information published. In his Expert Report, he opined:

> "*182. In an efficient market, the stock price should not only respond to new and value-relevant information, but the direction of response (in terms of the sign of the residual return, i.e. whether it was positive or negative) on each event day should be in line with the expected impact of the news being disclosed to the market.*"

94.     Professor. Gompers recorded the results of his analysis of this additional criterion in Appendix VIII-3 to his Expert Report. He concluded that "*the price movements of Nord Anglia's stock on earnings announcement days were rarely consistent with the various measures of expected impact of news (or lack thereof)*"[42].

95.     Professor Fischel criticised the conclusion that a statistically significant variation on two of 10 days did not meet the 5% threshold; but this was a case of apples and oranges. Professor Gompers only treated as significant a variation or "residual" on any day of at least 5%; Professor Fischel in his Supplemental Report applied the 5% standard to both the amount of the variation on any relevant day and to the number of days on which a statistically relevant variation occurred as a percentage of the total number of "News Days"[43]. When Professor Fischel was cross-examined on Day 6 by Mr Millett QC on his Event Study, attention focussed on the amount of the variation (5% for a one-tail test and 10% for a two-tail test) but not on the import of the number of days on which statistically significant variations occurred. Brief mention was made of the percentage of days on which he found statistically significant variations (roughly one-third) shortly before a short adjournment, but Professor Fischel did not initially suggest that this percentage of days on which statistically significant variations occurred was

---

[40] Expert Report of Daniel Fischel, Appendix C, paragraph 7.
[41] Expert Report of Paul Gompers, paragraph 174.
[42] Expert Report, paragraph 191.
[43] Supplemental Report of Daniel Fischel, paragraph 15.



particularly meaningful[44]. The matter was pursued after the break, and Professor Fischel clearly stated that 8 out of 23 days was statistically significant without meeting counsel's challenge to explain the precise basis for that opinion[45].

96.     In essence, Professor Fischel opined that if there was a statistically significant variation on only one occasion out of 23, this might be attributable to mere chance, but 8 such occurrences were inconsistent with the hypothesis that no value-relevant information was reflected in market activity in relation to the Shares. He also opined one would not expect to see a 100% alignment of statistically relevant price fluctuations on News Days. While I accept this conclusion, I also find by way of partial acceptance of Professor Gompers' opinions on this issue that neither Event Study provided compelling evidence of market efficiency. I accept that some efficiency was demonstrated by each Expert's findings, objectively viewed.

97.     Was it relevant to assess whether the market reacted in a way that you would expect the market to react? I find that Professor Gompers was right to suggest that this is a potentially relevant consideration. However, as Professor Fischel convincingly asserted under cross-examination and in his Supplemental Report[46], it is not entirely straightforward in all instances to identify what would qualify as a logical reaction to a particular announcement and Professor Gompers' analysis of this issue is arguably flawed. I do not consider it necessary or possible to resolve this specific difference between the Experts as to whether the statistically relevant price fluctuations also reflected logical responses to the relevant announcements. This controversy ultimately depends on underlying facts which were not adequately explored in evidence.

98.     In my judgment the pivotal consideration is that the statistical evidence generated by both Experts' Event Studies does demonstrate that there is some evidence of semi-strong form market efficiency, albeit not as compelling as it might be in other cases. As Professor Fischel opined in his oral evidence[47]:

> "*First of all, I didn't say it's binary. I said I can imagine circumstances where some cases are clearer than others but, generally speaking, there aren't degrees of semi-strong efficiency. That's really what I meant to say.*"

## Liquidity of the market in the Company's Shares

99.     I find that it is ultimately obvious that while the Shares were to some extent actively traded, the free float was not a large one (some 33% of the total Shares) and so the market was not so liquid that the need to look beyond the Market Price does not seriously arise. Professor Fischel appeared to me to exaggerate the weight to be attached to the liquidity factor while Professor Gompers understated it. I consider it to be self-

---

[44] Transcript Day 6 page 52 line 16-page 53 line 21.
[45] Transcript Day 6 page 61 line 10-page 63 line 6.
[46] At paragraphs 17-21.
[47] Transcript Day 6 page 13 lines 13-17.



evident that the more heavily shares are traded the more weight that can be attached to the cumulative weight of commercial judgments being made by the buyers and sellers of a particular company's shares. In *Dell, Inc.-v-Magnetar Global Event Driven Master Fund Limited* 177A.3d 1 (2017) (Supreme Court of Delaware), the fact that there was a "*deep public float*" was one of the reasons for criticising the trial judge's decision to give no consideration at all to the relevance of the market price.

100.    Professor Fischel points out that in the year before the Merger was announced, 1.53% of the public float was traded every week which suggests that the Shares not held by insiders were actively traded by some 98 institutional investors over the year[48]. Clearly the Shares were not illiquid. But this does not undermine Professor Gompers' point that the percentage of Shares which were traded was comparatively low[49]. In my judgment this factor does serve to diminish the weight which might otherwise be attached to the Market Price of the Shares.

101.    As regards the comparatively wide "*bid-ask spread*" which Professor Gompers suggested could constitute evidence of an impediment to market efficiency, I find no sufficient evidential foundation for concluding that this factor had any material impact on the efficiency of the market in the Company's Shares.

102.    My critical finding on liquidity is that the proportionate size of the public float in the Company's Shares was sufficiently small to limit the weight that might otherwise be attached to the Market Price alone as reflective of the fair value of the Shares. However, I also find that the volume of Shares traded was not sufficiently small to raise real doubts about whether or not the relevant market was semi-strong form efficient.

### MNPI

103.    In the Company's Closing Submissions, the contending positions on MNPI are summarised as follows:

> "*215...Professor Gompers claims that 'there is evidence that the market did not have access to all relevant information about Nord's fair value' because 'it did not have access to internal management projections'. 'As a result', Professor Gompers claims, 'Nord Anglia's stock price would have deviated from the Company's fair value if those projections were value-relevant.' Professor Fischel demonstrates that Professor Gompers' analysis is flawed for two reasons. First, there is a difference between raw information about a company (such as information about its business, business strategy, and its quarterly operating results, which the Company was obligated to and did disclose) and management projections, because management projections reflect management's opinions about the company's prospects, which are not necessarily material. Therefore, even if management projections were not publicly disclosed, that would not establish that 'the market did not have access to all relevant information about*

[48] Supplemental Report, paragraph 23.
[49] Expert Report of Paul Gompers, paragraphs 201-203.



> Nord's fair value' as Professor Gompers claims. Second, Nord's management projections were publicly disclosed when the Company filed a preliminary proxy statement on 9 June 2017 {H/414}, and when the Company filed the Proxy Statement on 11 July 2017 {H/444}. However, the Company's stock price did not increase significantly following either of these disclosures and closed at $32.54 on 21 August 2017. Moreover, the release of management's projections did not cause analysts to substantially change their assessments of the value of the Company. Both these findings imply that the management projections did not contain material information."

104.    This summary is helpful because it captures the high point of Professor Gompers' evidence on MNPI, which relies primarily on the non-publication of Management Projections. What individual actors (be they insiders or outside market analysts) subjectively thought of the market value from time to time I regard as being of minimal relevance for the reasons advanced by Professor Fischel. However I am bound to reject the submission that the Management Projections should be disregarded "*because management projections reflect management's opinions about the company's prospects, which are not necessarily material*". It is well recognised that reliable future cash flows prepared by management provide a sound basis for a DCF valuation. And in this case the Company's Mr Halder was personally involved in assisting Baring to raise financing for the Merger in reliance on the relevant Management Projections. It surely does not lie in the Company's mouth to contend post-Merger that its Projections are not at all material, and the equivocal assertion that they are "*not necessarily material*" is, perhaps, tacit acknowledgment of this. The Company's non-materiality case is ultimately, with respect, a somewhat unimpressive one. The Management Projections were indeed published with the Proxy Statement on June 9, 2017. The publication did not result in any discernible market reaction; accordingly, it is submitted, the previously non-public information was not material.

105.    In fairness, both the "*not necessarily material*" and "*not material points*" are supported by Professor Fischel's written evidence[50]. But based on the Company's own factual evidence, I find the November 2016 Projections, the April 2017 Projections and the August 2017 Projections were clearly material to an assessment of the intrinsic value of the Shares in a general sense. These Management Projections, I find contained (to use Professor Fischel's words) both "*raw information about*" the Company and "*management's opinions about the company's prospects*", being opinions based on that raw information. Mr Halder agreed that the Company when retaining Houlihan & Lokey to advise the Special Committee gave the following representation:

> "*The Company further represents and warrants that any financial projections delivered to Houlihan Lokey have been or will be reasonably prepared in good faith on bases reflecting the best currently available estimates and judgments of the future financial results and condition of the Company. The Company will promptly*

---

[50] Supplemental Report paragraphs 12-13.



> *notify Houlihan Lokey in writing of any material*
> *inaccuracy or misstatement in, or material omission*
> *from, any information previously delivered to, or*
> *discussed with, Houlihan Lokey.*"[51]

106.   Mr Halder testified that his primary task was preparing budgets and making forecasts for future budgeting purposes. The forecasts were clearly based on hard data, not speculative guesswork, although future risks were difficult to predict and short-term forecasts were more reliable than longer term ones. He explained under re-examination by Lord Grabiner as follows:

> "*Q. Which parts of the business specifically, if there are*
> *such parts of the business -- which parts of the*
> *business would be less predictable?*
>
> *A. So I think the 43 schools, as I say individually, are*
> *fairly certain because you know what they are.   You then*
> *move on to acquisitions and green fields and they are*
> *more difficult because there is a degree of uncertainty*
> *then in terms of timing and where and how much.*"[52]

107.   It appears to be factually undisputed that after the Projections were published on June 9, 2017 (preliminary proxy statement) and July 11, 2017 (Proxy Statement) the Company's Share price did not increase significantly. However, I do not accept Professor Fischel's invitation to infer from this fact that the Management Projections did not contain material information which had not previously been published. After all, as Professor Fischel himself opined in a parallel context, it is not always logical to expect a specific market reaction from particular information. If that proposition holds good in the ordinary course of business, it must have even greater force in the uniquely complicated context of the Company with its controlling shareholder on the eve of an EGM to consider and likely approve the Merger Agreement. I do infer that the Projections and related proprietary information did not contain an easily identifiable 'smoking gun' which made it <u>obvious</u> that the Merger Price was grossly undervalued. This is entirely consistent with the nature of the Projections as estimates not containing easily digestible "good news" or "bad news". Rather, the Projections contained material which might be fed into complex modelling designed to generate a clearer prediction of how Management's judgment as to the Company's future performance would potentially translate into share value. The April Projections were used by Houlihan Lokey to develop a DCF analysis and by Baring to develop its own models for raising financing for the Merger.

108.   In another context, Professor Fischel convincingly opined that it is not always straightforward to determine what an expected and rational response is to particular

---

[51] Transcript Day 2 pages 58-59.
[52] Transcript Day 2 page 214 lines 11-18.



items of market information about a listed company. In the present case, the Proxy Statement was filed in circumstances where the market had reasons to expect that the Merger would be approved so that many (if not all) purchasers at this juncture would (by the Company's own account) be arbitrage investors "*betting that by dissenting they will be able either to negotiate a settlement above their share purchase price or to persuade the Court to adopt a DCF analysis reflective of a high valuation, all with the safety net that the likely minimum fair value figure even if the dissent litigation is unsuccessful would not be much lower than the merger price*"[53]. If arbitrage investors were indeed purchasing after the announcement of the Merger Agreement with a view to exploiting dissenter rights, it is not easy to draw any clear inferences as to the impact of the publication of the April 2017 Projections embedded in the Proxy Statement on the Share price in the weeks immediately preceding the EGM. If bets were being placed on the vagaries of appraisal litigation, the commercial context is far removed from the traditional context in which market reactions to public information are assessed. The Experts after all essentially agreed that in the merger context the relevant market price measure (assuming it is appropriate to use the market price to determine share value) is the market price <u>unaffected</u> by knowledge of the Merger Agreement.

109.    The Company also argued that there was no MNPI because it gave regular briefings as required by the NYSE. I summarily reject that argument as the relevant question is not whether there was some disclosure of material information but the converse: was there <u>some</u> material information which was not publicly disclosed. Obviously there was <u>some</u> material information which was not publicly disclosed; the elaborate Highly Sensitive Documents ("HSD") regime which the Company championed for the present proceedings, not to mention the non-disclosure agreement aspects of the Go-Shop process, are the proof of the pudding in this respect. It matters not that the Dissenters were unable to identify a non-disclosed "smoking gun" which clearly pointed to a value far higher than market value.

110.    In my judgment the relevant threshold question pertinent to deciding whether a DCF valuation should be pursued is whether the existence of MNPI, and the <u>possibility</u> that the Shares were undervalued by the market, justifies looking beyond the Market Price with a view to arriving at a more reliable conclusion as to fair value. As Professor Gompers stated under cross-examination by Mr Boulton QC in explaining why he had not considered the Market Price:

> "*A. It would only be necessary to perform if you could conclude that the market for Nord's shares were both semi-strong efficient and that there was no material non-public information because, in order for this to be a relevant benchmark or metric, you have to be able to assume that the pre-offer share price reasonably reflected the underlying value of Nord. Absent that, if the market isn't semi-strong efficient and/or if there is material non-public information, this analysis is*

---

[53] Company's Written Opening Submissions for Trial, paragraph 23



*totally irrelevant.*[54]

111.    A secondary question is to what extent (if any) an analysis of any potentially material non-public information (such as the Projections and the Parthenon Reports) suggests that a higher value should be placed on the Shares than the value reflected in the Market Price or the Transaction Price. I find that the Market Price did not incorporate MNPI which was potentially relevant to fair value. I am unable to go so far as to find, without the cross-check of a proper DCF valuation, MNPI which was actually relevant to fair value was not incorporated. The extent to which this MNPI actually indicates a fair value which is significantly different to the Market Price can only be determined by reference to the DCF analysis which both Experts carried out. Professor Fischel agreed that even if the Market Price was a valid measure of fair value, a DCF analysis was a useful cross-check. If there was quite obviously no potentially relevant MNPI in this case, it makes no sense that Houlihan Lokey should have asked Management to provide information which was not at that point public and conducted its own DCF analysis for the purposes of its fairness opinion. Potential lenders should not have been interested in Mr Halder's presentations on, *inter alia*, future cash flows, presentations which apparently revealed internal information about the Company's past and projected future performance. Baring in preparing its own models for the Buy Side ought to have been content to rely on public market information; instead they were (according to Mr Halder) very interested in the Company's internal projections. Market analysts ought to have been content to reference the market value of the stock without considering it useful to consider a DCF analysis.

112.    However in my judgment the most compelling evidence of the existence of MNPI which was not disclosed to the market by the Company during the relevant Adjusted Market Price period is the HSD "hullabaloo" at the hearing of the Summons for Directions. I was persuaded by the Company to approve (in part in relation to "*valuable proprietary research*") what Mr Steinfeld QC referred to as "*a quite draconian protective regime*"[55].

**Summary: relevance of the Market Price**

113.    For these reasons I find that although there is some evidence that the market in the Company's Shares was semi-strong form efficient, the Market Price does not provide reliable *prima facie* evidence of the fair value of the Shares because:

        (a)    the evidence of the efficiency of the market in the Company's Shares is not sufficiently strong to justify appraising the fair value based on the Market Price alone; and

        (b)    further and in any event, there was private information (most significantly Management Projections) which was material to the

---

[54] Transcript Day 10 page 15 line 20-page 16 line 5.
[55] *In re Nord Anglia* [2018 (1) CILR 164] at paragraphs 19, 22.



intrinsic value of the Shares and which key market actors involved in
the Merger felt it desirable to take into account.

## FINDINGS: RELEVANCE OF THE TRANSACTION PRICE

### Overview

114.    There was a dispute between the Experts and between the factual witnesses as regards
the efficacy of the Transaction Process and how reliable the Transaction Price is as a
guide to the fair value of the Shares. The Company's broad position was that the
Transaction Price was the product of a genuinely arms' length and fair process which
generated the highest possible price which could be achieved through a sale to an
available buyer. The Dissenters' broad position was that the Transaction Process was
seriously flawed and was effectively designed to achieve a sale between related parties
which was likely to generate an artificially depressed price. By the end of the trial it
was clear that:

    (a)    the Transaction Process had been carried out in good faith in
circumstances where the beneficial interests on the Sell Side and the Buy
Side had no or no material overlaps and to the extent that Baring was
involved on both sides of the transaction, it was incentivised to achieve
the best possible price;

    (b)    the Transaction Process was not as robust as it might have been,
primarily because Baring was motivated in part by the desire to effect a
quick sale and in part by the desire to sell to one of its existing clients
(CPPIB) and held (through Premier's 66.8% shareholding in the
Company) what amounted to a blocking vote in relation to approving
the Merger Agreement at the EGM and potentially blocking any
competing bid; and

    (c)    accordingly, while the Transaction Price could obviously be relied upon
to some extent as an indicator of fair value, it was not, standing by itself,
a sufficiently reliable cross-check for the Market Price-based valuation.

115.    Mr Kelsey's straightforward evidence satisfied me that the Transaction Process was
carried out by the Company through the agency of an independent Special Committee
who relied heavily on reputable financial and legal advice. The Dissenters' primary
case that the entire process was in effect a complete sham tainted by unmitigated
conflicts of interest, formulated prior to discovery, was revealed to be little more than
a conspiracy theory which was not supported by an objective analysis of the actual
facts. Mr Cordes' evidence satisfied me that there was no significant overlap of
beneficial interests on both sides of the Transaction, despite the fact that Baring Funds

were indeed involved on both sides of the negotiating table. I find that the Transaction Process was an arms' length one despite the fact that it was entered into between related parties, was negotiated by human actors who generally worked as part of the same team and also involved a controlling shareholder. Those factors do not discredit the evidential value of the process altogether; they merely diminish the extent to which reliance can be placed on the Transaction Price as indicative of the fair value of the Shares. Mr Cordes in my view described the underlying commercial position honestly when he stated (under cross-examination by Mr Millett QC):

> "*I look at it slightly differently, actually. The way I look at it is there was an intention to sell the interest from Funds III and IV and there was a fiduciary duty to get the highest price and the question then was what do we believe is full fair value and at that level is there a transaction to be done that we would participate in, you know, or -- if someone else, that's fine.*"[56]

116.    The Dissenters' initial suspicions about conflict of interest were justified by the fact that Premier and Management pre-Merger held nearly 70% of the Company's Shares and the purchaser (Bach Finance Ltd, also controlled by Baring) was acquiring 100% of the Shares. However, Mr Cordes explained that Fund III and Fund IV (the main investors in Premier) were not beneficially involved (either before or after the process of post-Merger syndication) on the Buy Side. Fund VI (with different investors) held a 21.1% interest on the Buy Side and the largest single investor on the Buy Side was CPPIB (admittedly a client of Baring). The BPEA Group itself only beneficially held 2.8%. The true position was not easy to ascertain because of confidentiality obligations owed to the underlying investors, and was hardly obvious as the Proxy Statement affirmed that no change of control would be triggered by the Merger Agreement. The proposed deal was touted in partial reliance on the fact that the change of control rules would not be triggered, which implied the same parties were involved on both sides of the Transaction.

117.    Having accepted the critical assertion that Baring had a fiduciary duty to the beneficial owners of Funds III and IV to maximise the sale price, the suggestion that the negotiated price was an entirely uncommercial one must be rejected. Mr Cordes attended one Advisory Council meeting for Funds III and IV on the Sell Side and one meeting for Fund VI on the Buy Side and prepared minutes of those meetings (which were not produced). He testified that the largest investors in each Fund attended the joint meeting for Funds III and IV and that no one voted against the Merger[57]. I see no basis for doubting his testimony that the main underlying investors on the Sell Side on April 24, 2017 approved the Merger Agreement and the main Buy Side investor, CPPIB, had not invested on the Sell Side. There was therefore no factual support for the opinion expressed by Professor Gompers in Part VII of his Expert Report that there was no

---

[56] Transcript Day 4 page 142 lines 16-23.
[57] Transcript Day 4 page 162 line 15 –page 164 line 19.

